IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**WEST VIRGINIA MEDICAL INSTITUTE, INC.,**

     **Plaintiff,**

v.                                 Civil Action No.: 15-C-1680
                                                   Judge Stucky

**INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
a West Virginia Agency, ANGELA HOBBS, an
individual, and KRISTYN TAYLOR, an
individual,**

     **Defendants.**

## COMPLAINT

### *Parties*

1.  Plaintiff West Virginia Medical Institute, Inc. ("WVMI") is a private, not-for-profit

corporation incorporated pursuant to W. Va. Code § 31E-1-1, *et seq*, that does business in

Kanawha County, West Virginia.

2.  Defendant Innovative Resource Group, LLC d/b/a APS Healthcare Midwest ("APS") is a

private, for-profit foreign limited liability company organized under the laws of Wisconsin that

does business in Kanawha County, West Virginia.

1

3.  Defendant KEPRO Acquisitions, Inc. ("KEPRO") is a private, for-profit foreign corporation organized under the laws of Pennsylvania that does business in Kanawha County, West Virginia. However, KEPRO is not authorized to do business in West Virginia.

4.  Defendant West Virginia Department of Administration, Purchasing Division ("DOA") is the state government body charged by law to provide procurement and purchasing services to various state agencies. *See* W. Va. Code § 5A-3-1, *et seq.*

5.  Defendant West Virginia Department of Health and Human Resources ("DHHR") is a state government body charged by law to provide various medical services.[1]

6.  Defendant Angela Hobbs ("Hobbs") is a resident of Kanawha County, West Virginia.

7.  Defendant Kristyn Taylor ("Taylor") is a resident of Kanawha County, West Virginia.

8.  This case involves tortious and anti-competitive actions in the bidding of public contracts. Currently, WVMI and APS are parties to a contract whereby both parties have provided services to West Virginia's Medicaid program for almost six years. The parties' contract with the State has been extended twice and is scheduled to once again expire and be rebid later this year.

9.  The amicable and cooperative relationship between APS and WVMI abruptly ended when a competitor, KEPRO, purchased APS. Six years ago, KEPRO competed unsuccessfully against the WVMI and APS team when WVMI and APS won the Medicaid contract. Rather than compete against them once again, KEPRO simply *bought* APS, and it is now using its subsidiary to cripple WVMI, KEPRO's strongest competitor in West Virginia. Immediately after the acquisition, KEPRO and APS began efforts to squeeze WVMI out of the final months of the six-year contract; to poach WVMI's crucial employees; and to engage in aggressive, tortious, and bad-faith actions

---

[1]      Pursuant to W. Va. Code § 55-17-3(a)(1), pre-suit notice is not required for DOA and DHHR because WVMI seeks only injunctive relief from those agencies and irreparable harm would occur to WVMI if the institution of this action were delayed any further, as explained further in this Complaint and WVMI's contemporaneously filed Motion for Preliminary Injunction and Temporary Restraining Order.

to undercut WVMI's ability both to perform in the contract's remaining months and to compete in the upcoming rebid process. If left unchecked, APS's and KEPRO's unlawful actions will cause irreparable harm to WVMI, stifle competition in the upcoming bidding process, and disrupt the provision of necessary medical care to West Virginia Medicaid recipients.

10. Hobbs and Taylor were formerly employees of WVMI that left to work for KEPRO and APS. Prior to leaving WVMI for APS, however, Hobbs and Taylor, both now employees of KEPRO and/or APS, took with them significant amounts of confidential, proprietary, and trade secret information and data.

### *The RFP*

11. On or about January 25, 2009, DHHR and DOA released Request for Proposals BMS90007 ("RFP") seeking bids for the provision of utilization management and prior authorization services to three DHHR bureaus: the Bureau for Medical Services, the Bureau for Children and Families, and the Bureau for Health and Health Care Facilities.

12. Prior to and at the time the RFP was released, WVMI had been an incumbent provider of utilization review and prior authorization services to West Virginia's Medicaid program for over 32 years.

13. The 2009 RFP was intended to combine the utilization review and prior authorization services provided by WVMI pursuant to its previous contracts with other behavioral health and child welfare services provided pursuant to separate contracts, effectively combining all utilization review and prior authorization services under a single agreement. APS was the incumbent provider of these other behavioral health and child welfare services.

3

*The Teaming Agreement: WVMI and APS join forces for the RFP*

14. On or about March 11, 2009, APS and WVMI agreed to combine their respective talents and jointly respond to the RFP with a bid ("Bid").

15. Pursuant to this agreement ("Teaming Agreement"), WVMI agreed to offer its utilization review and prior authorization services to DHHR. APS acted nominally as the prime bidder, with WVMI listed as the "proposed subcontractor" for utilization review and prior authorization services. WVMI was the *only* subcontractor named in the Bid.

16. The Bid touted the significant advantages of this arrangement, stating:

> We [APS] propose to subcontract with West Virginia Medical Institute (WVMI) for review resources, an approach that benefits [DHHR] with decades of utilization management review experience in all aspects of review required by the scope of work, enabling us to streamline authorization and other services, and assuring a smooth and timely provider and member transition to the integrated service model within timeframes required by the RFP and minimizing disruption to [DHHR], the provider community, and West Virginia consumers.

17. In several other portions throughout the Bid, APS described and detailed the extensive services that WVMI would provide to DHHR as the "proposed subcontractor."

18. Pursuant to the Bid, WVMI was proposed to perform — and has in fact performed — services equal to roughly 50% of the value of the total Contract.

*The winning bid and the contract*

19. Following a review of the bid submissions, DOA awarded contract BMS90007 ("Contract") to APS and WVMI. KEPRO was the only other bidder.

20. A substantial and critical factor in the award of the Contract was the inclusion of WVMI as the critical "proposed subcontractor" for utilization review services that were touted in the Bid and described in paragraphs 13 and 14, *supra*.

4

21. As expressed in the Contract, it was the intent of APS, WVMI, DHHR, and DOA that WVMI would serve as the critical subcontractor and provide utilization review and prior authorization services for the entirety of the Contract's five-year term.

22. Effective December 1, 2009, APS and WVMI formally became the providers of utilization management and prior authorization services to DHHR, pursuant to the five-year Contract, set to expire on November 30, 2014.

### The Letter of Agreement cements APS's and WVMI's relationship

23. Following the Contract award, WVMI and APS entered into a Letter of Agreement ("LOA") to outline the obligations and rights of the parties regarding the Contract.

24. The LOA states that "[t]he parties intend that WVMI shall provide services as a subcontractor to APS under the Prime Contract."

25. Absent certain occurrences such as breach or sufficient notice, the LOA's term was for the full five-years of the Contract, expiring on November 30, 2014, "unless extended by mutual agreement of the parties in writing."

26. As expressed in the LOA, it was the intent of APS and WVMI that WVMI would serve as the critical subcontractor and provide utilization review and prior authorization services for the entirety of the Contract.

27. WVMI has performed its duties consistent with the LOA and the Contract and has provided a substantial portion of the value of the Contract.

### The First Extension

5

28. With the Contract's original expiration date of November 30, 2014 looming, DHHR extended the Contract for six months until May 31, 2015. Upon information and belief, this six-month extension ("First Extension") was due to delays in preparing the request for proposals for a new contract covering the same services ("Upcoming RFP").

29. Because APS, WVMI, DHHR, and DOA intended that WVMI serve as the critical subcontractor for the entirety of the contract and because the parties intended that WVMI's service be co-terminous with the Contract, WVMI and APS sought to amend the LOA to reflect DHHR's First Extension.

30. Thereafter, on or about December 16, 2014, APS and WVMI amended their LOA ("Extension Amendment") to extend its provisions until May 31, 2015, commensurate with the First Extension of the Contract.

31. The Extension Amendment states that "**the term of the Prime Contract has been extended to May 31, 2015, and the parties desire to extend the [Letter of] Agreement and its current terms and conditions to be co-terminous with the Prime Contract**" (emphasis added).

32. As expressed in the Extension Amendment, it was the intent of APS, WVMI, DHHR, and DOA that WVMI would serve as the critical subcontractor and provide utilization review and prior authorization services (comprising a substantial portion of the total value) for the entirety of the Contract including extensions.

### *The Second Extension and APS/KEPRO's bad-faith tactics*

33. As the extended May 31, 2015, expiration date approached, the State had yet to issue the Upcoming RFP. Thus, on or about May 4, 2015, DHHR once again extended the Contract for another six months until November 30, 2015 ("Second Extension").

34. Upon information and belief, it is DOA's and/or DHHR's intent to release the Upcoming RFP and award the new contract by December 1, 2015.

35. APS and WVMI once again were intending to submit a joint bid in response to the Upcoming RFP, and had begun negotiating an updated teaming agreement.

36. On or about May 6, 2015, KEPRO notified WVMI that it acquired APS effective May 1, 2015. APS became a wholly owned subsidiary of KEPRO.

37. Shortly after purchasing APS, KEPRO contended that federal conflict-of-interest rules precluded KEPRO and APS from continuing the contractual relationship with WVMI. These rules stem from unrelated contracts that KEPRO and WVMI had with the United States Centers for Medicare and Medicaid Services.

38. On account of this purported conflict of interest, KEPRO informed WVMI that it would not extend the LOA commensurate with the Second Extension. KEPRO asserted that, because of the conflict of interest, it could only allow three additional months, in exchange for WVMI agreeing to not compete "in perpetuity" and to transition all of its Medicaid employees to KEPRO.

39. Contrary to KEPRO's specious claims, on or about May 29, 2015, the Centers for Medicare and Medicaid Services informed WVMI that a six-month extension of the LOA would be "fair and reasonable" and would "not pose a conflict of interest" under the applicable federal regulations. In turn, WVMI provided this information to KEPRO and APS.

40. Faced with this guidance from the governing federal authority, KEPRO abandoned its "conflict" argument that it could continue the relationship for no more than three months and indicated a willingness to extend for six additional months, but only if WVMI agreed to anti-competitive provisions and to transition its employees.

41. As this abrupt about-face suggests, APS's and KEPRO's allegation of a conflict of interest was a manufactured justification concocted in bad faith after KEPRO had decided it wanted to force out WVMI and impermissively take its business in West Virginia.

42. Upon information and belief, KEPRO directed APS to squeeze WVMI out of its critical subcontractor role and to impermissively take WVMI's business. The concocted conflict of interest issue was a ruse to accomplish these true intentions.

43. Yet, after being forced to abandon the pretextual conflict of interest objection, KEPRO and APS concocted new bad-faith maneuvers to harm WVMI's business and ability to compete in the Upcoming RFP.

44. In June 2015, in furtherance of their tortious, unlawful, unconscionable, and bad-faith intentions, KEPRO and APS provided to WVMI the following trilemma of unlawful and unacceptable options:

  a. that KEPRO and APS agree to a six-month extension to the LOA in exchange for WVMI agreeing to forgo submitting a bid for the Upcoming RFP, in violation of applicable antitrust and purchasing laws; or

  b. that KEPRO and APS agree to a three-month extension to the LOA and WVMI forfeits half of the remaining value of the Contract (approximately $2.2 million) under the Second Extension; or

  c. that the parties simply let the LOA and Extension Amendment expire, causing WVMI to lose all of its remaining business under the Contract entirely (approximately $4.3 million).

45. The first option was untenable because, in addition to depriving WVMI of its lawful right to compete in the Upcoming RFP, it also would run afoul of the following statutory provisions:

8

a. <u>W. Va. Code § 5A-3-31</u> (emphasis added)

    (a) It shall be unlawful for any person to corruptly **act alone** or combine, collude or conspire with one or more other persons with respect to the purchasing or supplying of services, commodities or printing to the state under the provisions of this article if the purpose or effect of such action, combination, collusion or conspiracy is either to:

        (1) **Lessen competition among prospective vendors**; or

        (2) **Cause the state to pay a higher price for such services**, commodities or printing than would be or would have been paid in the absence of such action, combination, collusion or conspiracy; or

        **(3) Cause one prospective vendor or vendors to be preferred over one or more other prospective vendor or vendors.**

    (b) Any person who violates any provision of this section is guilty of a felony and, upon conviction thereof, shall be imprisoned in a state correctional facility not less than one nor more than five years, and be fined not exceeding $10,000.

b. <u>W. Va. Code § 47-18-3</u>

    (a) **Every contract**, combination in the form of trust or otherwise, or conspiracy **in restraint of trade or commerce in this State shall be unlawful.**

    (b) Without limiting the effect of subsection (a) of this section, the following shall be deemed to restrain trade or commerce unreasonably and are unlawful:

                  * * *

    (2) A contract, combination or conspiracy between two or more persons whereby, in the letting of any public or private contract:

        (A) The price quotation of any bid is fixed or controlled; or

        **(B) One or more persons . . . refrains from the submission of a bid.**

46. The second option was unattractive insofar as it would conflict with the parties' original intent and nearly six-year understanding of the Bid, Contract, LOA, and Extension Amendment ("[T]he parties desire to extend the Agreement and its current terms and conditions *to be co-terminous with the Prime Contract*."). Additionally, accepting this option would result in irreparable harm to WVMI, leaving its roughly seventy (70) West Virginia employees out of work and, more importantly, causing substantial service disruptions to West Virginia's Medicaid program and recipients.

47. The third option, of course, was untenable as it would not only run counter to the parties' contractual agreements, but would also irreparably harm WVMI, leaving its roughly seventy (70) West Virginia employees out of work and, more importantly, causing substantial service disruptions to West Virginia's Medicaid program and recipients.

48. These unlawful and heavy-handed negotiation tactics were intended to unlawfully eliminate any competition in the Upcoming RFP and thereby deprive the State of its ability to maximize the purchasing value of public funds.

49. KEPRO was clear and brazen regarding the anti-competitive intent of these tactics, even conceding that allowing WVMI to compete "with us directly during the upcoming rebid is untenable to KEPRO."

50. After WVMI refused KEPRO's and APS's unlawful and anti-competitive offers, the parties engaged in contentious negotiations and *finally* agreed to a four-month extension of the LOA, until October 1, 2015 ("Four-Month Extension").

51. The Four-Month Extension was agreed to and executed on June 10, 2015, ten days *after* the First Extension had expired. For the intervening time, WVMI continued to perform its obligations to the State under the Contract, without any guarantee that it would be compensated for its services. If WVMI had not continued to perform these utilization review and prior authorization obligations, West Virginia's Medicaid program and patients would have experienced significant service delays.

52. APS and KEPRO unlawfully, tortiously, and in bad faith exploited this precarious position that they themselves created by making unlawful demands for contractual provisions that would violate purchasing law.

53. Rather than jeopardize future business *and* payment for services that it had *already rendered*, WVMI had no other commercially reasonable alternative but to accept the Four-Month Extension in an effort to maintain the status quo, continue working towards an amicable resolution regarding the final two months of the Contract, and preserve its ability to compete in the Upcoming RFP.

54. Within days of executing the Four-Month Extension, KEPRO's and APS's true intentions were laid bare as they began aggressively poaching WVMI's utilization review and prior authorization employees, including directors, managers, and reviewers, all done in an effort to undercut WVMI's ability to perform its current obligations and impair WVMI's ability to compete in the Upcoming RFP.

55. To date, 23 employees have resigned or provided resignation notice, as many as 15 of which have gone or will go to KEPRO and APS.

56. KEPRO and APS are deliberately misleading WVMI employees by reviving the concocted conflict-of-interest ruse, suggesting that the termination of the subcontractual arrangement has been mutually agreed upon due to a conflict of interest per CMS Guidelines.

57. The targeted employees are critical to WVMI's ability to currently perform under the Contract, to perform in the final two months of the Contract, and to prepare and submit a competitive bid in the Upcoming RFP.

58. Upon information and belief, APS and KEPRO established the poached employees' start date as August 25, 2015 — before the end of even the Four-Month Extension — in an effort to undermine WVMI's ability to perform its current obligations, cripple WVMI's ability to perform in the final two months of the Contract, and, most importantly, to eliminate WVMI's ability to compete with APS and KEPRO in the Upcoming RFP.

59. Such actions have severely and irreparably harmed WVMI's business, lessened competition for the Upcoming RFP, and threatened delays in the treatment of Medicaid patients and reimbursements to Medicaid providers.

60. Such actions breach the Contract, LOA, Extension Amendment, and Four-Month Extension; violate the duty of good faith and fair dealing; and violate state purchasing laws.

61. WVMI is continuing to perform its obligations under the Contract to the best of its ability notwithstanding the fact that the LOA, Extension Amendment, and Four-Month Extension have not been extended for the full six months, commensurate with the Second Extension, as originally intended by all the parties. KEPRO and APS have unlawfully, tortiously, and in bad faith used this precarious position to their advantage in negotiating with WVMI.

62. KEPRO's and APS's poaching of WVMI employees is hindering WVMI's ability to perform its obligations to APS and DHHR for the Four-Month Extension, let alone the entirety of the Contract to which it is entitled.

63. WVMI has suffered compensable damages and irreparable harm due to the actions alleged above.

64. WVMI will continue to suffer compensable damages and irreparable harm if not granted the relief prayed for below.

### *Hobbs's and Taylor's conduct*

65. Hobbs and Taylor were employed at WVMI.

66. As a condition of their employment with WVMI, Hobbs and Taylor were prohibited from disclosing WVMI's confidential, proprietary, and trade secret information. Hobbs and Taylor were also required, as a condition of their employment contracts, to return all of WVMI's confidential,

proprietary, and trade secret information and data in their possession upon termination of their employment with WVMI.

67. Hobbs and Taylor were recruited by KEPRO and APS as part of their unlawful and tortious effort to cripple WVMI's business and ability to compete in the Upcoming RFP.

68. Hobbs and Taylor resigned from their employment effective on or about August 21, 2015.

69. Prior to Hobbs's and Taylor's departure from WVMI, Hobbs and Taylor forwarded over one thousand (1,000) WVMI emails to their personal email accounts and downloaded over one hundred (100) WVMI documents to personal thumb drives. This conduct was unauthorized.

70. These emails and documents contain WVMI's confidential, proprietary, and trade secret information and data. Specifically, this included procedures, processes, criteria, and training materials.

71. This information and data derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

72. Upon information and belief, these emails and documents were or are still in Hobbs's and Taylor's possession and/or the possession of KEPRO and APS.

73. Upon information and belief, Hobbs and Taylor possessed and/or continue to possess these emails and documents while employed by KEPRO and/or APS.

## COUNT I: Corrupt Actions to Lessen Competition in Violation of W. Va. Code § 5A-3-31

*Defendants APS and KEPRO*

74. WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

75. APS and KEPRO have corruptly acted with respect to the purchasing of services to the State with the purpose and effect of lessening competition among prospective vendors, causing the State to pay a higher price for such services than would be paid in the absence of such actions, and causing one prospective vendor to be preferred over another prospective vendor, all in violation of W. Va. Code § 5A-3-31.

76. APS and KEPRO have violated W. Va. Code § 5A-3-31 by, among other things:

    a.  APS's bad faith attempts to squeeze WVMI out of its critical subcontractor role;

    b.  APS's concocted conflict of interest ruse;

    c.  APS's insistence on WVMI agreeing to forgo competing for the Upcoming RFP in exchange for obtaining the full six-month extension to which it is entitled;

    d.  APS's aggressive recruiting of WVMI's key employees to undercut WVMI's ability to perform under the Contract and to undercut WVMI's ability to submit a bid in the Upcoming RFP.

77. WVMI has suffered compensable damages and irreparable harm caused by APS's and KEPRO's unlawful actions, and WVMI will continue to suffer compensable damages and irreparable harm caused by APS's and KEPRO's unlawful actions if WVMI is not granted the relief prayed for below.

78. WHEREFORE, WVMI respectfully requests that this Court grant as follows:

    a.  Declare that APS and KEPRO have violated W. Va. Code § 5A-3-31 as described above;

    b.  Issue a temporary restraining order, preliminary injunction, and permanent injunction enjoining APS and KEPRO from engaging in the unlawful actions

described above (*see* WVMI's Motion for Preliminary Injunction and Temporary Restraining Order filed contemporaneously with this Complaint);

c. Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

d. Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

### COUNT II: Breach of Contract

*Defendant APS*

79. WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

80. APS, WVMI, DHHR, and DOA intended that WVMI role as the critical subcontractor for utilization review and prior authorization services would be co-terminous with the Contract.

81. APS and WVMI expressly agreed that WVMI's role as the subcontractor for utilization review and prior authorization services would be "co-terminous" with the Contract.

82. APS breached the Contract, LOA, and Extension Amendment by APS's refusal to allow WVMI to perform utilization review and prior authorization services and by APS's refusal to grant WVMI an extension on the LOA and Extension Amendment through the Second Extension.

83. WVMI is legally entitled to this extension pursuant to the Contract, LOA, Extension Amendment, and all other relevant contracts.

84. Additionally, as a result of the foregoing, APS breached the Contract by APS's refusal to allow WVMI to perform utilization review and prior authorization services as required by the Contract; by APS's refusal to grant WVMI an extension on the LOA and Extension Amendment

though the Second Extension, and by changing the Contract by eliminating WVMI without a formal change order as required by the Contract.

85. APS breached the implied duty to refrain from preventing or hindering another party's performance, which was implied in the Contract, LOA, Extension Amendment, and Four-Month Extension, by its aggressive recruiting of WVMI's key employees.

86. These breaches of the respective contracts have caused WVMI to suffer compensable damages and irreparableharm and will continue to cause WVMI to suffer compensable damages and irreparable harm if WVMI is not granted the relief prayed for below.

87. WHEREFORE, WVMI respectfully requests that this Court grant as follows:

      e.  Declare that APS is in breach of the LOA, Extension Amendment, and Contract as described above;

      f.  Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

      g.  Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## COUNT III: Breach of Duty of Good Faith and Fair Dealing

*Defendant APS*

88. WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

89. Pursuant to the Contract, LOA, Extending Amendment, Four-Month Extension, and by operation of law, APS owed WVMI a duty of good faith and fair dealing.

90. As a result of the foregoing, APS breached the duty of good faith and fair dealing that it owed to WVMI, including but not limited to the following:

    a.  APS's bad faith attempts to squeeze WVMI out of its critical subcontractor role;

    b.  APS's concocted conflict of interest ruse;

    c.  APS's insistence on inclusion of an unlawful anti-competitive clause in order for WVMI to obtain the six-month extension to which it is entitled; and

    d.  APS's aggressive recruiting of WVMI's employees to undercut WVMI's ability to perform under the Contract and to undercut WVMI's ability to submit a bid in the Upcoming RFP.

91. This breach has caused WVMI to suffer compensable damages and irreparable harm and will continue to cause WVMI to suffer compensable damages and irreparable harm if WVMI is not granted the relief prayed for below.

92. WHEREFORE, WVMI respectfully requests that this Court grant as follows:

    a.  Declare that APS has breached its duty of good faith and fair dealing, as described above;

    b.  Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

    c.  Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## COUNT IV: Tortious Interference with Contractual Relations

*Defendant KEPRO*

93. WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

94. Upon information and belief, KEPRO directed APS to breach the LOA, Extension Amendment, Four-Month Extension, Contract, and other relevant agreements upon its purchase of APS.

95. WVMI had a contractual and business relationship and interests with APS and with DHHR and DOA through its provision of utilization review and prior authorization services pursuant to the Contract, LOA, Extension Amendment, Four-Month Extension, and other relevant agreements between APS, WVMI, DHHR, and DOA.

96. KEPRO is not a party to the Contract, LOA, Extension Amendment, Four-Month Extension, or any other relevant agreements between APS, WVMI, DHHR, and DOA.

97. Upon information and belief, KEPRO intentionally interfered with the contractual and business relationship and interests that WVMI had with APS and with DHHR and DOA by directing APS to breach the Contract, LOA, Extension Amendment, Four-Month Extension, and other relevant agreements as described above and by attempting to unlawfully prevent WVMI from competing in the Upcoming RFP in violation of antitrust and state purchasing law.

98. Upon information and belief, KEPRO did so with gross fraud, malice, oppression, with wanton, willful, reckless conduct, and with criminal indifference to civil obligations.

99. This interference has caused WVMI to suffer compensable damages and irreparable harm and will continue to cause WVMI to suffer compensable damages and irreparable harm if WVMI is not granted the relief prayed for below.

100.    The actions of KEPRO as described above and otherwise described herein constitute tortious interference with contractual relations.

101.    WHEREFORE, WVMI respectfully requests that this Court grant as follows:

    a.   Declare that KEPRO tortuously interfered with WVMI's contractual and business relations and interests, as described above;

    b.   Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

    c.   Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## Count V: Tortious Interference with Contractual Relations

*Defendants KEPRO and APS*

102.      WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

103.      WVMI had contractual and business relations with its employees.

104.      KEPRO and APS, who are not parties to those contracts, tortiously interfered with WVMI's contractual and business relations with its employees, as described herein, by aggressively recruiting them.

105.      KEPRO and APS engaged in this conduct with the intent to cripple WVMI's business and its ability to compete in the Upcoming RFP.

106.      WVMI has suffered damages as a result of this tortious conduct.

107.      WHEREFORE, WVMI respectfully requests that this Court grant as follows:

    a.   Declare that KEPRO and APS tortuously interfered with WVMI's contractual and business relations and interests with its employees, as described above;

    b.   Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

c.  Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

### Count VI: Declaratory Relief

*Defendants KEPRO, APS, DOA, and DHHR*[2]

108.     WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

109.     APS's Bid constitutes an offer to DHHR and DOA, and the inclusion of WVMI as a "proposed subcontractor" in the Bid constitutes an offer by APS that it would employ WVMI as the critical subcontractor to perform utilization review and prior authorization services under the Contract.

110.     The inclusion of WVMI as the critical subcontractor was a material term to the offer.

111.     By awarding the Contract to APS, DOA and/or DHHR accepted accepted the offer, including the material term in which WVMI is identified as a "proposed subcontractor."

112.     By operation of law and by the express terms of the RFP, the terms of the Bid became part of the Contract itself, including the material term in which WVMI is identified as a "proposed subcontractor." Specifically, the RFP states that "the RFP and the Vendor's response will be included as part of the contract by reference."

113.     Neither the First nor the Second Extensions to the Contract changed the material term regarding WVMI's role as the critical subcontractor.

114.     Indeed, the RFP requires that the successful bidder seek and obtain DHHR approval to use a subcontractor, which it did by accepting the offer to use WVMI as a subcontractor.

---

[2]      Defendants DOA and DHHR were included here because they are parties to the contracts at issue and thus would be affected by the declaration. "When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration . . . ." W. Va. Code § 55-13-11.

115.     In the Bid, APS specifically requested formal approval to use WVMI as a subcontract for the critical functions of utilization review and prior authorization services.

116.     This request was formally granted by DHHR.

117.     The RFP and the Contract state that if changes to the Contract become necessary,

> a formal contract change order will be negotiated by the State [DOA], the Agency [DHHR] and the Vendor [APS], to address changes to the terms and conditions, costs of work included under the contract. Approved contract change order is defined as one approved by the Purchasing Division and approved as to form by the West Virginia Attorney General's Office . . . .

118.     Additionally, the RFP and the Contract emphatically state that **"NO CHANGE SHALL BE IMPLEMENTED BY THE VENDOR UNTIL SUCH TIME AS THE VENDOR RECEIVES AN APPROVED WRITTEN CHANGE ORDER"** (emphasis in original).

119.     Thus, any attempted change to the Contract — including an elimination of WVMI's critical subcontractor role providing utilization review and prior authorization services comprising nearly 50% of the total contract — is ineffective and unlawful without a formal change order.

120.     Upon information and belief, APS has not sought, nor has DOA granted, any change orders to the Contract that would eliminate or modify WVMI's critical subcontractor role.

121.     Despite this, KEPRO and APS seek to prematurely eliminate WVMI's critical subcontractor role in breach of the Contract.

122.     WVMI is an intended third-party beneficiary of the Contract, including all extensions.

123.     WVMI has a substantial and direct interest in the Contract.

124.     As a result of the foregoing, an actual, justiciable controversy exists regarding the interpretation of the Contract, the LOA, the Extension Amendment, and other agreements between the parties.

125.     Pursuant to Rule 57 of the West Virginia Rules of Civil Procedure, as well as the Uniform Declaratory Judgment Act, W. Va. Code § 55-12-1, *et seq.*, WVMI requests that this Court enter a Declaratory Judgment that WVMI is entitled to perform under the Contract as the critical subcontractor for utilization review and prior authorization services for the entirety of the Contract, including all extensions.

126.     WHEREFORE, WVMI respectfully requests that this Court declare as follows:

 a. Declare that WVMI's role as a critical subcontractor providing utilization review and prior authorization services is a material term to the Contract;

 b. Declare that DOA and/or DHHR must approve a formal change order before WVMI's role as a critical subcontractor under the Contract can be changed, modified, or eliminated in any way, as required by the Contract;

 c. Declare that WVMI is legally entitled to continue performing through the entirety of the Contract, including the Second Extension and all future extensions, as a result of the Contract, LOA, Extension Amendment, and all other relevant contracts;

 d. Declare that APS's and KEPRO's heavy-handed negotiation tactics, including but not limited to the trilemma, were unlawful, tortious, in breach of all relevant contracts, and in bad faith;

 e. Award costs and attorneys' fees associated with this declaratory judgment action, pursuant to W. Va. Code § 55-13-10; and

 f. Award any and all other further relief, including but not limited to further declaratory relief, that the Court and jury deem just and proper.

## Count VII: Violations of the West Virginia Computer Crimes and Abuse Act

127.     WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

128.     Hobbs and Taylor, following their resignation of employment from WVMI, knowingly, willfully, and without authorization, directly or indirectly, possessed WVMI's computer data.

129.     Hobbs and Taylor possessed this computer data while employees and/or agents of KEPRO and/or APS.

130.     WVMI has suffered damages resulting from this conduct.

131.     The conduct alleged herein violates the West Virginia Computer Crime and Abuse Act, W. Va. Code § 61-3C-1, *et seq.*

132.     WHEREFORE, WVMI respectfully requests that this Court grant as follows:

    a.  Declare that Defendants violated the West Virginia Computer Crimes and Abuse Act, as described above;

    b.  Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

    c.  Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## Count VIII: Violations of the Uniform Trade Secrets Act

133.     WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

134.     By engaging in the conduct alleged herein, Hobbs and Taylor, individually and as employees and/or agents of KEPRO and/or APS, have misappropriated WVMI's trade secret information and data from which WVMI derives independent economic value, actual or potential,

23

from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and is the subject of efforts by WVMI reasonable under the circumstances to maintain their secrecy.

135.     Hobbs and/or Taylor have used improper means, including theft, breach or inducement of a breach of a duty to maintain secrecy, breach or inducement of a breach of Hobbs's and Taylor's employment contract, and/or espionage through electronic or other means to obtain WVMI's confidential, proprietary, and trade secret information and data.

136.     Upon information and belief, Hobbs and Taylor possessed WVMI's confidential, proprietary, and trade secret information while employees and/or agents of KEPRO and/or APS, all without WVMI's express or implied consent.

137.     Hobbs's and Taylor's misappropriation of WVMI's trade secret information was willful and malicious.

138.     The conduct alleged herein violates the Uniform Trade Secrets Act, W. Va. Code § 47-22-1, *et seq.*

139.     WHEREFORE, WVMI respectfully requests that this Court grant as follows:

    a.   Declare that Defendants violated the Uniform Trade Secrets Act, as described above;

    b.   Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

    c.   Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

**Count IX: Conversion**

140.     WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

141.     The conduct alleged herein constitutes wrongful exertion of dominion over WVMI's business property in denial of WVMI's rights.

142.     The conduct alleged herein constitutes an unlawful conversion for which WVMI is entitled to recover all available damages and/or the converted property.

143.     WHEREFORE, WVMI respectfully requests that this Court grant as follows:

    a.   Declare that Defendants converted WVMI's property, as described above;

    b.   Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

    c.   Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

**Count X: Breach of contract**

*Defendants Hobbs and Taylor*

144.     WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

145.     As a condition of Hobbs's and Taylor's employment with WVMI, they were under a duty to return all WVMI information and data and to not disclose WVMI's confidential, proprietary, and trade secret information.

146.     The conduct alleged herein violates these duties.

147.     WHEREFORE, WVMI respectfully requests that this Court grant as follows:

a.  Declare that Hobbs and Taylor breached their employment contracts, as described above;

b.  Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

c.  Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

Respectfully submitted,

West Virginia Medical Institute, Inc.,

*By counsel,*

Carte P. Goodwin (W. Va. Bar 8039)
James A. Kirby, III (W. Va. Bar 8564)
Lucas R. White (W. Va. Bar 12501)
GOODWIN & GOODWIN, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
(304) 346-7000

## VERIFICATION

West Virginia Medical Institute, Inc., by David Lambert, its Chief Administrative Officer, being duly sworn, states that he has been authorized by West Virginia Medical Institute, Inc. to bring the above-styled Complaint; that he has read the foregoing Complaint; that he has personal knowledge of the facts and allegations contained therein; and that the facts and allegations contained herein are true to the best of his knowledge.


David Lambert
Chief Administrative Officer
West Virginia Medical Institute, Inc.


STATE OF WEST VIRGINIA,

COUNTY OF Kanawha, TO WIT:

Taken, subscribed, and sworn before me, a Notary Public in and for the County and State aforesaid, this 3rd day of September 2015.

My Commission expires: August 1, 2022


Shella R. Rauen
Notary Public

OFFICIAL SEAL
STATE OF WEST VIRGINIA
NOTARY PUBLIC
SHELLA R. RAUEN
331 BELVUE DRIVE
HURRICANE, WV 25526
MY COMM. EXP AUGUST 1, 2022

1