CASE  15-C-1680      KANAWHA                                      PAGE    1

WEST VIRGINIA MEDICAL INSTITUT vs.  INNOVATIVE RESOURCES GROUP, LL

LINE   DATE      ACTION

1   09/04/15   # CASE INFO SHEET; COMPLAINT; ISSUED SUM & 9 CPYS; F FEE: RCPT
2              # 532672: $200.00; (3) S/P BY RESTRICTED DELIVERY BY CM: $60.00
3              # P'S MOT FOR PRELIMIN INJ & TEMP RESTRAINING O W/EXH'S & COS
4   09/14/15   # NOT OF HRG W/COS (9/25/15 @ 1:30 PM)
5   09/10/15   @ LET FR SS DTD 9/8/15; SUM W/RET & MOT (9/8/15 SS) AS TO
6              # KEPRO ACQUISITIONS, INC
7   09/10/15   @ LET FR SS DTD 9/8/15; SUM W/RET & MOT (9/8/15 SS) AS TO
8              # INNOVATIVE RESOURCE GROUP LLC
9   09/11/15   @ WV DEPT OF ADMIN, PURCHASING DIV'S MOT TO QUASH & MOT TO
10             # DISMISS W/EXH'S & COS
11  09/11/15   @ RMR AS TO DAVID TINCHER DTD 9/9/15
12  09/11/15   @ RMR AS TO PATRICK MORRISEY DTD 9/9/15
13  09/11/15   @ RMR AS TO KAREN BOWLING
14  09/11/15   # DHHR'S MOT TO DIS W/COS
15  09/15/15   # E-CERT FR SS AS TO INNOVATIVE RESOURCE GROUP LLC DTD 9/10/15
16  09/22/15   # E-CERT FR SS AS TO KEPRO ACQUISITIONS INC DTD 9/14/15

A TRUE COPY
TESTE: [signature] CLERK
CIRCUIT COURT KANAWHA COUNTY, WVA

EXHIBIT B

## CIVIL CASE INFORMATION STATEMENT
### CIVIL CASES
(Other than Domestic Relations)

FILED

In the Circuit Court, __Kanawha County__ _____ County, West Virginia

2015 SEP -4 PM 3:29

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

## I. CASE STYLE:

**Plaintiff(s)**                          Case # __15-C-1680__

West Virginia Medical Institute, Inc.     Judge: __Stucky__

vs.

| Defendant(s) | Days to Answer | Type of Service |
|---|---|---|
| Innovative Resource Group, LLC | 30 | Secretary of State |
| c/o Corporation Service Company **Street** | | |
| 209 West Washington Street Charleston, WV 25301 | | |
| KEPRO Acquisitions, Inc. - PA Corp. | | |
| 777 East Park Drive | | |
| Harrisburg, PA 1711 **Street** | 30 | Secretary of State |
| **City, State, Zip** | | |
| David Tincher, Dept. of Admin | | |
| 2019 Washington Street, E. | | |
| Charleston, WV 25305 **Street** | 20 | Certified Mail |
| **City, State, Zip** | | |
| Karen Bowling, DHHR | | |
| One Davis Square, Suite 100, E | | |
| Charleston, WV 25305 **Street** | 20 | Certified Mail |
| **City, State, Zip** | | |

Original and _____ copies of complaint enclosed/attached.

SCA-C100.02 / 1 of 2

SCANNED

PYMT Type
Rcpt # S 32 672    $200 X $135
lss. Sum.+ ☐ cc     No Sum. lss
X Ret. to Atty.     V $20cm X 3
Mailed CM/RM     X $5 clk X
X Mailed to sos w/ck# S992
Sent to _____ w/ck# _____

**CIVIL CASE INFORMATION STATEMENT**
**CIVIL CASES**
(Other than Domestic Relations)

In the Circuit Court, _Kanawha County_ _____ **County, West Virginia**

**I. CASE STYLE:**

**Plaintiff(s)**                                        Case # _____

West Virginia Medical Institute, Inc. _____        Judge: _____

_____

_____

**vs.**

| Defendant(s) | Days to Answer | Type of Service |
|---|---|---|
| Angela Hobbs | 20 | Personal |
| 713 Coal Fork Drive **Street** | | |
| Charleston, WV 25306 | | |
| Kristyn Taylor | | |
| 868 S. Washington Street | | |
| St. Albans, WV 25177 **Street** | 20 | Personal |
| **City, State, Zip** | | |
| Patrick Morrisey, AG | | |
| Building 1, Room E-26 | | |
| Charleston, WV 25305 **Street** | n/a | Certified Mail |
| **City, State, Zip** | | |
| _____ | | |
| **Street** | | |
| _____ | | |
| **City, State, Zip** | | |

Original and _____ copies of complaint enclosed/attached.

SCA-C100.02 / 1 of 2

| PLAINTIFF:<br>DEFENDANT: | CASE NUMBER: |
| --- | --- |

## II. TYPE OF CASE:

☑ **General Civil**

☐ **Mass Litigation**
(As defined in T.C.R. Rule XIX (c))

    ☐ **Asbestos**
    ☐ **Carpal Tunnel Syndrome**
    ☐ **Diet Drugs**
    ☐ **Environmental**
    ☐ **Industrial Hearing Loss**
    ☐ **Silicone Implants**
    ☐ Other: _____

☐ **Habeas Corpus/Other Extraordinary Writ**

☐ Other: _____

☐ **Adoption**

☐ **Administrative Agency Appeal**

☐ **Civil Appeal from Magistrate Court**

☐ **Miscellaneous Civil Petition**

☐ **Mental Hygiene**

☐ **Guardianship**

☐ **Medical Malpractice**

## III. JURY DEMAND: ☑ Yes ☐ No

CASE WILL BE READY FOR TRIAL BY (MONTH/YEAR): 03 / 2016

## IV. DO YOU OR ANY OF YOUR CLIENTS OR WITNESSES IN THIS CASE REQUIRE SPECIAL ACCOMMODATIONS DUE TO A DISABILITY? ☐ YES ☑ NO

IF YES, PLEASE SPECIFY:

☐ Wheelchair accessible hearing room and other facilities
☐ Interpreter or other auxiliary aid for the hearing impaired
☐ Reader or other auxiliary aid for the visually impaired
☐ Spokesperson or other auxiliary aid for the speech impaired
☐ Other:_____

Attorney Name: Carte P. Goodwin

Firm: Goodwin & Goodwin, LLP

Address: 300 Summers Street, Suite 1500 Charleston, WV 25301

Telephone: 304-346-7000

Dated: 09/04/2015

*Representing:*

☑ Plaintiff ☐ Defendant

☐ Cross-Complainant ☐ Cross-Defendant

_____
Signature

☐ **Proceeding Without an Attorney**

# SUMMONS

## THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**WEST VIRGINIA MEDICAL INSTITUTE, INC.,**

        **Plaintiff,**

2015 SEP -4  PM 3: 40

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

**v.**                          **Civil Action No.:** 15-C-1680

**INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
a West Virginia Agency,**

        **Defendants.**

**To the above-named Defendant:**    **Karen Bowling, Secretary
West Virginia Department of
Health and Human Resources
One Davis Square
Suite 100, East
Charleston, WV 25301**

      **IN THE NAME OF THE STATE OF WEST VIRGINIA,** you are hereby summoned

and required to serve upon **CARTE P. GOODWIN,** Plaintiff's attorney, whose address is

**GOODWIN & GOODWIN, LLP, 300 Summers Street, Charleston, West Virginia 25301,** an

Answer, including any related Counterclaim you may have, to the Complaint filed against you in

the above-styled civil action, a true copy of which is herewith delivered to you. You are required

to serve your answer within 20 days after service of this summons upon you, exclusive of the day

of service. If you fail to do so, judgment by default will be taken against you for the relief

demanded in the Complaint and you will be thereafter barred for asserting in another action any

claim you may have which must be asserted by counterclaim in the above-styled civil action.

Dated:  September 4, 2015

**Cathy S. Gatson, Clerk**
_____
Clerk of Court
by MStead Deputy Clerk

2015 SEP -4  FM 3: 41

CARC
KANAWHA COURT    CIRCUIT COURT

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*

Certified Mail Fee

$                    RESTRICTED DELIVERY

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $

RETURN RECEIPT REQUESTED

Postmark
Here

15-C-1680

Postage

$

Total Postage and Fees

$

Sent To
Karen Bowling, Secretary WVDHHR
Street and Apt. No., or PO Box No.
One Davis Square Ste 1002
City, State, ZIP+4®
Charleston WJ 25301

PS Form 3800, April 2015 PSN 7530-02-000-9047        See Reverse for Instructions

# SUMMONS

## THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**WEST VIRGINIA MEDICAL INSTITUTE, INC.,**

        **Plaintiff,**

v.                                 **Civil Action No.:** $\underline{15\text{-}C\text{-}1680}$

**INNOVATIVE RESOURCE GROUP, LLC**
**d/b/a APS HEALTHCARE MIDWEST, a**
**Wisconsin Limited Liability Company,**
**KEPRO ACQUISITIONS, INC., a Pennsylvania**
**Corporation, WEST VIRGINIA**
**DEPARTMENT OF ADMINISTRATION,**
**PURCHASING DIVISION, a West Virginia**
**Agency, WEST VIRGINIA DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES,**
**a West Virginia Agency,**

        **Defendants.**

**To the above-named Defendant:**    **Patrick Morrisey, Attorney General**
                                       **West Virginia Attorney General**
                                       **State Capitol Complex**
                                       **Bldg. 1, Room E-26**
                                       **Charleston, WV 25305**

       **IN THE NAME OF THE STATE OF WEST VIRGINIA**, you are hereby summoned

and required to serve upon **CARTE P. GOODWIN**, Plaintiff's attorney, whose address is

**GOODWIN & GOODWIN, LLP, 300 Summers Street, Charleston, West Virginia 25301**, an

Answer, including any related Counterclaim you may have, to the Complaint filed against you in

the above-styled civil action, a true copy of which is herewith delivered to you. You are required

to serve your answer within 20 days after service of this summons upon you, exclusive of the day

of service. If you fail to do so, judgment by default will be taken against you for the relief

demanded in the Complaint and you will be thereafter barred for asserting in another action any

claim you may have which must be asserted by counterclaim in the above-styled civil action.

Dated: September 4, 2015

                                             **Cathy S. Gatson, Clerk**

                                                Clerk of Court

2015 SEP -4  PM 3: 48

KANAWHA COUNTY CIRCUIT COURT

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

Certified Mail Fee

$                    RESTRICTED DELIVERY

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)        $
☐ Return Rec RETURN RECEIPT REQUESTE
☐ Certified Mail Restricted
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage

$                                  15-C-1680

Total Postage and Fees

Sent To Patrick Morrisey, Attorney General

Street and Apt. No., or PO Box No. State Capitol Complex
Bldg. 1, Room E-26

City, State, ZIP+4 Charleston WV 25305

PS Form 3800, April 2015 PSN 7530-02-000-9047      See Reverse for Instructions

# SUMMONS

## THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

WEST VIRGINIA MEDICAL INSTITUTE, INC.,

2015 SEP -4  FM 3: 40

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

       Plaintiff,

v. 

Civil Action No.: 15-C-1680

INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
a West Virginia Agency,

       Defendants.

To the above-named Defendant:    David Tincher, Purchasing Director
                              West Virginia Department of Administration,
                              Purchasing Division
                              2019 Washington Street, East
                              Charleston, WV 25305

       **IN THE NAME OF THE STATE OF WEST VIRGINIA**, you are hereby summoned

and required to serve upon **CARTE P. GOODWIN**, Plaintiff's attorney, whose address is

**GOODWIN & GOODWIN, LLP, 300 Summers Street, Charleston, West Virginia 25301**, an

Answer, including any related Counterclaim you may have, to the Complaint filed against you in

the above-styled civil action, a true copy of which is herewith delivered to you.  You are required

to serve your answer within 20 days after service of this summons upon you, exclusive of the day

of service.  If you fail to do so, judgment by default will be taken against you for the relief

demanded in the Complaint and you will be thereafter barred for asserting in another action any

claim you may have which must be asserted by counterclaim in the above-styled civil action.

Dated:  September 4, 2015

### Cathy S. Gatson, Clerk

_____
                         Clerk of Court

2015 SEP -4 PM 3: 41

CATH...
KANAWHA COUNTY CIRCUIT COURT

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)      $ _____
☐ Return Receipt (electronic)    $ _____         Postmark
☐ Certified Mail Restricted Delivery  $ _____     Here
☐ Adult Signature Required       $ _____
☐ Adult Signature Restricted Delivery $ _____

Postage
$

Total Postage and Fees
$                                         15 C-1680

Sent To
David Tincher Purchasing Director
Street and Apt. No., or PO Box No.
2019 Washington St. E
City, State, ZIP+4®
Charleston W 25305

PS Form 3800, April 2015 PSN 7530-02-000-9047      See Reverse for Instructions

7015 1520 0003 1445 9133

**IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA**

2015 SEP -4 PH 3: 29

KANAWHA COUNTY CIRCUIT COURT

**WEST VIRGINIA MEDICAL INSTITUTE, INC.,**

**Plaintiff,**

v.

Civil Action No.: **15-C- 1680**
Judge Stucky

**INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
a West Virginia Agency, ANGELA HOBBS, an
individual, and KRISTYN TAYLOR, an
individual,**

**Defendants.**

## COMPLAINT

### *Parties*

1. Plaintiff West Virginia Medical Institute, Inc. ("WVMI") is a private, not-for-profit corporation incorporated pursuant to W. Va. Code § 31E-1-I, *et seq*, that does business in Kanawha County, West Virginia.

2. Defendant Innovative Resource Group, LLC d/b/a APS Healthcare Midwest ("APS") is a private, for-profit foreign limited liability company organized under the laws of Wisconsin that does business in Kanawha County, West Virginia.



1

3. Defendant KEPRO Acquisitions, Inc. ("KEPRO") is a private, for-profit foreign corporation organized under the laws of Pennsylvania that does business in Kanawha County, West Virginia. However, KEPRO is not authorized to do business in West Virginia.

4. Defendant West Virginia Department of Administration, Purchasing Division ("DOA") is the state government body charged by law to provide procurement and purchasing services to various state agencies. *See* W. Va. Code § 5A-3-1, *et seq.*

5. Defendant West Virginia Department of Health and Human Resources ("DHHR") is a state government body charged by law to provide various medical services.[1]

6. Defendant Angela Hobbs ("Hobbs") is a resident of Kanawha County, West Virginia.

7. Defendant Kristyn Taylor ("Taylor") is a resident of Kanawha County, West Virginia.

8. This case involves tortious and anti-competitive actions in the bidding of public contracts. Currently, WVMI and APS are parties to a contract whereby both parties have provided services to West Virginia's Medicaid program for almost six years. The parties' contract with the State has been extended twice and is scheduled to once again expire and be rebid later this year.

9. The amicable and cooperative relationship between APS and WVMI abruptly ended when a competitor, KEPRO, purchased APS. Six years ago, KEPRO competed unsuccessfully against the WVMI and APS team when WVMI and APS won the Medicaid contract. Rather than compete against them once again, KEPRO simply *bought* APS, and it is now using its subsidiary to cripple WVMI, KEPRO's strongest competitor in West Virginia. Immediately after the acquisition, KEPRO and APS began efforts to squeeze WVMI out of the final months of the six-year contract; to poach WVMI's crucial employees; and to engage in aggressive, tortious, and bad-faith actions

---

[1]     Pursuant to W. Va. Code § 55-17-3(a)(1), pre-suit notice is not required for DOA and DHHR because WVMI seeks only injunctive relief from those agencies and irreparable harm would occur to WVMI if the institution of this action were delayed any further, as explained further in this Complaint and WVMI's contemporaneously filed Motion for Preliminary Injunction and Temporary Restraining Order.

2

to undercut WVMI's ability both to perform in the contract's remaining months and to compete in the upcoming rebid process. If left unchecked, APS's and KEPRO's unlawful actions will cause irreparable harm to WVMI, stifle competition in the upcoming bidding process, and disrupt the provision of necessary medical care to West Virginia Medicaid recipients.

10. Hobbs and Taylor were formerly employees of WVMI that left to work for KEPRO and APS. Prior to leaving WVMI for APS, however, Hobbs and Taylor, both now employees of KEPRO and/or APS, took with them significant amounts of confidential, proprietary, and trade secret information and data.

## *The RFP*

11. On or about January 25, 2009, DHHR and DOA released Request for Proposals BMS90007 ("RFP") seeking bids for the provision of utilization management and prior authorization services to three DHHR bureaus: the Bureau for Medical Services, the Bureau for Children and Families, and the Bureau for Health and Health Care Facilities.

12. Prior to and at the time the RFP was released, WVMI had been an incumbent provider of utilization review and prior authorization services to West Virginia's Medicaid program for over 32 years.

13. The 2009 RFP was intended to combine the utilization review and prior authorization services provided by WVMI pursuant to its previous contracts with other behavioral health and child welfare services provided pursuant to separate contracts, effectively combining all utilization review and prior authorization services under a single agreement. APS was the incumbent provider of these other behavioral health and child welfare services.

3

### *The Teaming Agreement: WVMI and APS join forces for the RFP*

14. On or about March 11, 2009, APS and WVMI agreed to combine their respective talents and jointly respond to the RFP with a bid ("Bid").

15. Pursuant to this agreement ("Teaming Agreement"), WVMI agreed to offer its utilization review and prior authorization services to DHHR. APS acted nominally as the prime bidder, with WVMI listed as the "proposed subcontractor" for utilization review and prior authorization services. WVMI was the *only* subcontractor named in the Bid.

16. The Bid touted the significant advantages of this arrangement, stating:

> We [APS] propose to subcontract with West Virginia Medical Institute (WVMI) for review resources, an approach that benefits [DHHR] with decades of utilization management review experience in all aspects of review required by the scope of work, enabling us to streamline authorization and other services, and assuring a smooth and timely provider and member transition to the integrated service model within timeframes required by the RFP and minimizing disruption to [DHHR], the provider community, and West Virginia consumers.

17. In several other portions throughout the Bid, APS described and detailed the extensive services that WVMI would provide to DHHR as the "proposed subcontractor."

18. Pursuant to the Bid, WVMI was proposed to perform — and has in fact performed — services equal to roughly 50% of the value of the total Contract.

### *The winning bid and the contract*

19. Following a review of the bid submissions, DOA awarded contract BMS90007 ("Contract") to APS and WVMI. KEPRO was the only other bidder.

20. A substantial and critical factor in the award of the Contract was the inclusion of WVMI as the critical "proposed subcontractor" for utilization review services that were touted in the Bid and described in paragraphs 13 and 14, *supra*.

4

21. As expressed in the Contract, it was the intent of APS, WVMI, DHHR, and DOA that WVMI would serve as the critical subcontractor and provide utilization review and prior authorization services for the entirety of the Contract's five-year term.

22. Effective December 1, 2009, APS and WVMI formally became the providers of utilization management and prior authorization services to DHHR, pursuant to the five-year Contract, set to expire on November 30, 2014.

### *The Letter of Agreement cements APS's and WVMI's relationship*

23. Following the Contract award, WVMI and APS entered into a Letter of Agreement ("LOA") to outline the obligations and rights of the parties regarding the Contract.

24. The LOA states that "[t]he parties intend that WVMI shall provide services as a subcontractor to APS under the Prime Contract."

25. Absent certain occurrences such as breach or sufficient notice, the LOA's term was for the full five-years of the Contract, expiring on November 30, 2014, "unless extended by mutual agreement of the parties in writing."

26. As expressed in the LOA, it was the intent of APS and WVMI that WVMI would serve as the critical subcontractor and provide utilization review and prior authorization services for the entirety of the Contract.

27. WVMI has performed its duties consistent with the LOA and the Contract and has provided a substantial portion of the value of the Contract.

### *The First Extension*

5

28. With the Contract's original expiration date of November 30, 2014 looming, DHHR extended the Contract for six months until May 31, 2015. Upon information and belief, this six-month extension ("First Extension") was due to delays in preparing the request for proposals for a new contract covering the same services ("Upcoming RFP").

29. Because APS, WVMI, DHHR, and DOA intended that WVMI serve as the critical subcontractor for the entirety of the contract and because the parties intended that WVMI's service be co-terminous with the Contract, WVMI and APS sought to amend the LOA to reflect DHHR's First Extension.

30. Thereafter, on or about December 16, 2014, APS and WVMI amended their LOA ("Extension Amendment") to extend its provisions until May 31, 2015, commensurate with the First Extension of the Contract.

31. The Extension Amendment states that **"the term of the Prime Contract has been extended to May 31, 2015, and the parties desire to extend the [Letter of] Agreement and its current terms and conditions to be co-terminous with the Prime Contract"** (emphasis added).

32. As expressed in the Extension Amendment, it was the intent of APS, WVMI, DHHR, and DOA that WVMI would serve as the critical subcontractor and provide utilization review and prior authorization services (comprising a substantial portion of the total value) for the entirety of the Contract including extensions.

### *The Second Extension and APS/KEPRO's bad-faith tactics*

33. As the extended May 31, 2015, expiration date approached, the State had yet to issue the Upcoming RFP. Thus, on or about May 4, 2015, DHHR once again extended the Contract for another six months until November 30, 2015 ("Second Extension").

6

34. Upon information and belief, it is DOA's and/or DHHR's intent to release the Upcoming RFP and award the new contract by December 1, 2015.

35. APS and WVMI once again were intending to submit a joint bid in response to the Upcoming RFP, and had begun negotiating an updated teaming agreement.

36. On or about May 6, 2015, KEPRO notified WVMI that it acquired APS effective May 1, 2015. APS became a wholly owned subsidiary of KEPRO.

37. Shortly after purchasing APS, KEPRO contended that federal conflict-of-interest rules precluded KEPRO and APS from continuing the contractual relationship with WVMI. These rules stem from unrelated contracts that KEPRO and WVMI had with the United States Centers for Medicare and Medicaid Services.

38. On account of this purported conflict of interest, KEPRO informed WVMI that it would not extend the LOA commensurate with the Second Extension. KEPRO asserted that, because of the conflict of interest, it could only allow three additional months, in exchange for WVMI agreeing to not compete "in perpetuity" and to transition all of its Medicaid employees to KEPRO.

39. Contrary to KEPRO's specious claims, on or about May 29, 2015, the Centers for Medicare and Medicaid Services informed WVMI that a six-month extension of the LOA would be "fair and reasonable" and would "not pose a conflict of interest" under the applicable federal regulations. In turn, WVMI provided this information to KEPRO and APS.

40. Faced with this guidance from the governing federal authority, KEPRO abandoned its "conflict" argument that it could continue the relationship for no more than three months and indicated a willingness to extend for six additional months, but only if WVMI agreed to anti-competitive provisions and to transition its employees.

7

41. As this abrupt about-face suggests, APS's and KEPRO's allegation of a conflict of interest was a manufactured justification concocted in bad faith after KEPRO had decided it wanted to force out WVMI and impermissively take its business in West Virginia.

42. Upon information and belief, KEPRO directed APS to squeeze WVMI out of its critical subcontractor role and to impermissively take WVMI's business. The concocted conflict of interest issue was a ruse to accomplish these true intentions.

43. Yet, after being forced to abandon the pretextual conflict of interest objection, KEPRO and APS concocted new bad-faith maneuvers to harm WVMI's business and ability to compete in the Upcoming RFP.

44. In June 2015, in furtherance of their tortious, unlawful, unconscionable, and bad-faith intentions, KEPRO and APS provided to WVMI the following trilemma of unlawful and unacceptable options:

> a. that KEPRO and APS agree to a six-month extension to the LOA in exchange for WVMI agreeing to forgo submitting a bid for the Upcoming RFP, in violation of applicable antitrust and purchasing laws; or
>
> b. that KEPRO and APS agree to a three-month extension to the LOA and WVMI forfeits half of the remaining value of the Contract (approximately $2.2 million) under the Second Extension; or
>
> c. that the parties simply let the LOA and Extension Amendment expire, causing WVMI to lose all of its remaining business under the Contract entirely (approximately $4.3 million).

45. The first option was untenable because, in addition to depriving WVMI of its lawful right to compete in the Upcoming RFP, it also would run afoul of the following statutory provisions:

8

a. W. Va. Code § 5A-3-31 (emphasis added)

   (a) It shall be unlawful for any person to corruptly **act alone** or combine, collude or conspire with one or more other persons with respect to the purchasing or supplying of services, commodities or printing to the state under the provisions of this article if the purpose or effect of such action, combination, collusion or conspiracy is either to:

   (1) **Lessen competition among prospective vendors**; or

   (2) **Cause the state to pay a higher price for such services,** commodities or printing than would be or would have been paid in the absence of such action, combination, collusion or conspiracy; or

   **(3) Cause one prospective vendor or vendors to be preferred over one or more other prospective vendor or vendors.**

   (b) Any person who violates any provision of this section is guilty of a felony and, upon conviction thereof, shall be imprisoned in a state correctional facility not less than one nor more than five years, and be fined not exceeding $10,000.

b. W. Va. Code § 47-18-3

   (a) **Every contract**, combination in the form of trust or otherwise, or conspiracy **in restraint of trade or commerce in this State shall be unlawful.**

   (b) Without limiting the effect of subsection (a) of this section, the following shall be deemed to restrain trade or commerce unreasonably and are unlawful:

   \* \* \*

   (2) A contract, combination or conspiracy between two or more persons whereby, in the letting of any public or private contract:

   (A) The price quotation of any bid is fixed or controlled; or

   **(B) One or more persons . . . refrains from the submission of a bid.**

46. The second option was unattractive insofar as it would conflict with the parties' original intent and nearly six-year understanding of the Bid, Contract, LOA, and Extension Amendment ("[T]he parties desire to extend the Agreement and its current terms and conditions *to be co-terminous with the Prime Contract*."). Additionally, accepting this option would result in irreparable harm to WVMI, leaving its roughly seventy (70) West Virginia employees out of work and, more importantly, causing substantial service disruptions to West Virginia's Medicaid program and recipients.

9

47. The third option, of course, was untenable as it would not only run counter to the parties' contractual agreements, but would also irreparably harm WVMI, leaving its roughly seventy (70) West Virginia employees out of work and, more importantly, causing substantial service disruptions to West Virginia's Medicaid program and recipients.

48. These unlawful and heavy-handed negotiation tactics were intended to unlawfully eliminate any competition in the Upcoming RFP and thereby deprive the State of its ability to maximize the purchasing value of public funds.

49. KEPRO was clear and brazen regarding the anti-competitive intent of these tactics, even conceding that allowing WVMI to compete "with us directly during the upcoming rebid is untenable to KEPRO."

50. After WVMI refused KEPRO's and APS's unlawful and anti-competitive offers, the parties engaged in contentious negotiations and *finally* agreed to a four-month extension of the LOA, until October 1, 2015 ("Four-Month Extension").

51. The Four-Month Extension was agreed to and executed on June 10, 2015, ten days *after* the First Extension had expired. For the intervening time, WVMI continued to perform its obligations to the State under the Contract, without any guarantee that it would be compensated for its services. If WVMI had not continued to perform these utilization review and prior authorization obligations, West Virginia's Medicaid program and patients would have experienced significant service delays.

52. APS and KEPRO unlawfully, tortiously, and in bad faith exploited this precarious position that they themselves created by making unlawful demands for contractual provisions that would violate purchasing law.

10

53. Rather than jeopardize future business *and* payment for services that it had *already rendered*, WVMI had no other commercially reasonable alternative but to accept the Four-Month Extension in an effort to maintain the status quo, continue working towards an amicable resolution regarding the final two months of the Contract, and preserve its ability to compete in the Upcoming RFP.

54. Within days of executing the Four-Month Extension, KEPRO's and APS's true intentions were laid bare as they began aggressively poaching WVMI's utilization review and prior authorization employees, including directors, managers, and reviewers, all done in an effort to undercut WVMI's ability to perform its current obligations and impair WVMI's ability to compete in the Upcoming RFP.

55. To date, 23 employees have resigned or provided resignation notice, as many as 15 of which have gone or will go to KEPRO and APS.

56. KEPRO and APS are deliberately misleading WVMI employees by reviving the concocted conflict-of-interest ruse, suggesting that the termination of the subcontractual arrangement has been mutually agreed upon due to a conflict of interest per CMS Guidelines.

57. The targeted employees are critical to WVMI's ability to currently perform under the Contract, to perform in the final two months of the Contract, and to prepare and submit a competitive bid in the Upcoming RFP.

58. Upon information and belief, APS and KEPRO established the poached employees' start date as August 25, 2015 — before the end of even the Four-Month Extension — in an effort to undermine WVMI's ability to perform its current obligations, cripple WVMI's ability to perform in the final two months of the Contract, and, most importantly, to eliminate WVMI's ability to compete with APS and KEPRO in the Upcoming RFP.

11

59. Such actions have severely and irreparably harmed WVMI's business, lessened competition for the Upcoming RFP, and threatened delays in the treatment of Medicaid patients and reimbursements to Medicaid providers.

60. Such actions breach the Contract, LOA, Extension Amendment, and Four-Month Extension; violate the duty of good faith and fair dealing; and violate state purchasing laws.

61. WVMI is continuing to perform its obligations under the Contract to the best of its ability notwithstanding the fact that the LOA, Extension Amendment, and Four-Month Extension have not been extended for the full six months, commensurate with the Second Extension, as originally intended by all the parties. KEPRO and APS have unlawfully, tortiously, and in bad faith used this precarious position to their advantage in negotiating with WVMI.

62. KEPRO's and APS's poaching of WVMI employees is hindering WVMI's ability to perform its obligations to APS and DHHR for the Four-Month Extension, let alone the entirety of the Contract to which it is entitled.

63. WVMI has suffered compensable damages and irreparable harm due to the actions alleged above.

64. WVMI will continue to suffer compensable damages and irreparable harm if not granted the relief prayed for below.

### *Hobbs's and Taylor's conduct*

65. Hobbs and Taylor were employed at WVMI.

66. As a condition of their employment with WVMI, Hobbs and Taylor were prohibited from disclosing WVMI's confidential, proprietary, and trade secret information. Hobbs and Taylor were also required, as a condition of their employment contracts, to return all of WVMI's confidential,

12

proprietary, and trade secret information and data in their possession upon termination of their employment with WVMI.

67. Hobbs and Taylor were recruited by KEPRO and APS as part of their unlawful and tortious effort to cripple WVMI's business and ability to compete in the Upcoming RFP.

68. Hobbs and Taylor resigned from their employment effective on or about August 21, 2015.

69. Prior to Hobbs's and Taylor's departure from WVMI, Hobbs and Taylor forwarded over one thousand (1,000) WVMI emails to their personal email accounts and downloaded over one hundred (100) WVMI documents to personal thumb drives. This conduct was unauthorized.

70. These emails and documents contain WVMI's confidential, proprietary, and trade secret information and data. Specifically, this included procedures, processes, criteria, and training materials.

71. This information and data derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

72. Upon information and belief, these emails and documents were or are still in Hobbs's and Taylor's possession and/or the possession of KEPRO and APS.

73. Upon information and belief, Hobbs and Taylor possessed and/or continue to possess these emails and documents while employed by KEPRO and/or APS.

## COUNT I: Corrupt Actions to Lessen Competition in Violation of W. Va. Code § 5A-3-31

### *Defendants APS and KEPRO*

74. WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

13

75. APS and KEPRO have corruptly acted with respect to the purchasing of services to the State with the purpose and effect of lessening competition among prospective vendors, causing the State to pay a higher price for such services than would be paid in the absence of such actions, and causing one prospective vendor to be preferred over another prospective vendor, all in violation of W. Va. Code § 5A-3-31.

76. APS and KEPRO have violated W. Va. Code § 5A-3-31 by, among other things:

  a. APS's bad faith attempts to squeeze WVMI out of its critical subcontractor role;

  b. APS's concocted conflict of interest ruse;

  c. APS's insistence on WVMI agreeing to forgo competing for the Upcoming RFP in exchange for obtaining the full six-month extension to which it is entitled;

  d. APS's aggressive recruiting of WVMI's key employees to undercut WVMI's ability to perform under the Contract and to undercut WVMI's ability to submit a bid in the Upcoming RFP.

77. WVMI has suffered compensable damages and irreparable harm caused by APS's and KEPRO's unlawful actions, and WVMI will continue to suffer compensable damages and irreparable harm caused by APS's and KEPRO's unlawful actions if WVMI is not granted the relief prayed for below.

78. WHEREFORE, WVMI respectfully requests that this Court grant as follows:

  a. Declare that APS and KEPRO have violated W. Va. Code § 5A-3-31 as described above;

  b. Issue a temporary restraining order, preliminary injunction, and permanent injunction enjoining APS and KEPRO from engaging in the unlawful actions

14

described above (*see* WVMI's Motion for Preliminary Injunction and Temporary Restraining Order filed contemporaneously with this Complaint);

c. Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

d. Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## COUNT II: Breach of Contract

### *Defendant APS*

79. WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

80. APS, WVMI, DHHR, and DOA intended that WVMI role as the critical subcontractor for utilization review and prior authorization services would be co-terminous with the Contract.

81. APS and WVMI expressly agreed that WVMI's role as the subcontractor for utilization review and prior authorization services would be "co-terminous" with the Contract.

82. APS breached the Contract, LOA, and Extension Amendment by APS's refusal to allow WVMI to perform utilization review and prior authorization services and by APS's refusal to grant WVMI an extension on the LOA and Extension Amendment through the Second Extension.

83. WVMI is legally entitled to this extension pursuant to the Contract, LOA, Extension Amendment, and all other relevant contracts.

84. Additionally, as a result of the foregoing, APS breached the Contract by APS's refusal to allow WVMI to perform utilization review and prior authorization services as required by the Contract; by APS's refusal to grant WVMI an extension on the LOA and Extension Amendment

15

though the Second Extension, and by changing the Contract by eliminating WVMI without a formal change order as required by the Contract.

85. APS breached the implied duty to refrain from preventing or hindering another party's performance, which was implied in the Contract, LOA, Extension Amendment, and Four-Month Extension, by its aggressive recruiting of WVMI's key employees.

86. These breaches of the respective contracts have caused WVMI to suffer compensable damages and irreparableharm and will continue to cause WVMI to suffer compensable damages and irreparable harm if WVMI is not granted the relief prayed for below.

87. WHEREFORE, WVMI respectfully requests that this Court grant as follows:

 e. Declare that APS is in breach of the LOA, Extension Amendment, and Contract as described above;

 f. Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

 g. Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## COUNT III: Breach of Duty of Good Faith and Fair Dealing

### *Defendant APS*

88. WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

89. Pursuant to the Contract, LOA, Extending Amendment, Four-Month Extension, and by operation of law, APS owed WVMI a duty of good faith and fair dealing.

90. As a result of the foregoing, APS breached the duty of good faith and fair dealing that it owed to WVMI, including but not limited to the following:

16

    a. APS's bad faith attempts to squeeze WVMI out of its critical subcontractor role;

    b. APS's concocted conflict of interest ruse;

    c. APS's insistence on inclusion of an unlawful anti-competitive clause in order for WVMI to obtain the six-month extension to which it is entitled; and

    d. APS's aggressive recruiting of WVMI's employees to undercut WVMI's ability to perform under the Contract and to undercut WVMI's ability to submit a bid in the Upcoming RFP.

91. This breach has caused WVMI to suffer compensable damages and irreparable harm and will continue to cause WVMI to suffer compensable damages and irreparable harm if WVMI is not granted the relief prayed for below.

92. WHEREFORE, WVMI respectfully requests that this Court grant as follows:

    a. Declare that APS has breached its duty of good faith and fair dealing, as described above;

    b. Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

    c. Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## COUNT IV: Tortious Interference with Contractual Relations

### *Defendant KEPRO*

93. WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

17

94. Upon information and belief, KEPRO directed APS to breach the LOA, Extension Amendment, Four-Month Extension, Contract, and other relevant agreements upon its purchase of APS.

95. WVMI had a contractual and business relationship and interests with APS and with DHHR and DOA through its provision of utilization review and prior authorization services pursuant to the Contract, LOA, Extension Amendment, Four-Month Extension, and other relevant agreements between APS, WVMI, DHHR, and DOA.

96. KEPRO is not a party to the Contract, LOA, Extension Amendment, Four-Month Extension, or any other relevant agreements between APS, WVMI, DHHR, and DOA.

97. Upon information and belief, KEPRO intentionally interfered with the contractual and business relationship and interests that WVMI had with APS and with DHHR and DOA by directing APS to breach the Contract, LOA, Extension Amendment, Four-Month Extension, and other relevant agreements as described above and by attempting to unlawfully prevent WVMI from competing in the Upcoming RFP in violation of antitrust and state purchasing law.

98. Upon information and belief, KEPRO did so with gross fraud, malice, oppression, with wanton, willful, reckless conduct, and with criminal indifference to civil obligations.

99. This interference has caused WVMI to suffer compensable damages and irreparable harm and will continue to cause WVMI to suffer compensable damages and irreparable harm if WVMI is not granted the relief prayed for below.

100.    The actions of KEPRO as described above and otherwise described herein constitute tortious interference with contractual relations.

101.    WHEREFORE, WVMI respectfully requests that this Court grant as follows:

18

a. Declare that KEPRO tortuously interfered with WVMI's contractual and business relations and interests, as described above;

b. Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

c. Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## Count V: Tortious Interference with Contractual Relations

### *Defendants KEPRO and APS*

102.    WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

103.    WVMI had contractual and business relations with its employees.

104.    KEPRO and APS, who are not parties to those contracts, tortiously interfered with WVMI's contractual and business relations with its employees, as described herein, by aggressively recruiting them.

105.    KEPRO and APS engaged in this conduct with the intent to cripple WVMI's business and its ability to compete in the Upcoming RFP.

106.    WVMI has suffered damages as a result of this tortious conduct.

107.    WHEREFORE, WVMI respectfully requests that this Court grant as follows:

a. Declare that KEPRO and APS tortuously interfered with WVMI's contractual and business relations and interests with its employees, as described above;

b. Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

19

c. Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## **Count VI: Declaratory Relief**

*Defendants KEPRO, APS, DOA, and DHHR*[2]

108. WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

109. APS's Bid constitutes an offer to DHHR and DOA, and the inclusion of WVMI as a "proposed subcontractor" in the Bid constitutes an offer by APS that it would employ WVMI as the critical subcontractor to perform utilization review and prior authorization services under the Contract.

110. The inclusion of WVMI as the critical subcontractor was a material term to the offer.

111. By awarding the Contract to APS, DOA and/or DHHR accepted accepted the offer, including the material term in which WVMI is identified as a "proposed subcontractor."

112. By operation of law and by the express terms of the RFP, the terms of the Bid became part of the Contract itself, including the material term in which WVMI is identified as a "proposed subcontractor." Specifically, the RFP states that "the RFP and the Vendor's response will be included as part of the contract by reference."

113. Neither the First nor the Second Extensions to the Contract changed the material term regarding WVMI's role as the critical subcontractor.

114. Indeed, the RFP requires that the successful bidder seek and obtain DHHR approval to use a subcontractor, which it did by accepting the offer to use WVMI as a subcontractor.

---

[2]    Defendants DOA and DHHR were included here because they are parties to the contracts at issue and thus would be affected by the declaration. "When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration . . . ." W. Va. Code § 55-13-11.

20

115.      In the Bid, APS specifically requested formal approval to use WVMI as a

subcontract for the critical functions of utilization review and prior authorization services.

116.      This request was formally granted by DHHR.

117.      The RFP and the Contract state that if changes to the Contract become necessary,

> a formal contract change order will be negotiated by the State [DOA], the
> Agency [DHHR] and the Vendor [APS], to address changes to the terms and
> conditions, costs of work included under the contract. Approved contract
> change order is defined as one approved by the Purchasing Division and
> approved as to form by the West Virginia Attorney General's Office . . . .

118.      Additionally, the RFP and the Contract emphatically state that **"NO CHANGE**

**SHALL BE IMPLEMENTED BY THE VENDOR UNTIL SUCH TIME AS THE VENDOR**

**RECEIVES AN APPROVED WRITTEN CHANGE ORDER"** (emphasis in original).

119.      Thus, any attempted change to the Contract — including an elimination of WVMI's

critical subcontractor role providing utilization review and prior authorization services comprising

nearly 50% of the total contract — is ineffective and unlawful without a formal change order.

120.      Upon information and belief, APS has not sought, nor has DOA granted, any

change orders to the Contract that would eliminate or modify WVMI's critical subcontractor role.

121.      Despite this, KEPRO and APS seek to prematurely eliminate WVMI's critical

subcontractor role in breach of the Contract.

122.      WVMI is an intended third-party beneficiary of the Contract, including all

extensions.

123.      WVMI has a substantial and direct interest in the Contract.

124.      As a result of the foregoing, an actual, justiciable controversy exists regarding the

interpretation of the Contract, the LOA, the Extension Amendment, and other agreements between

the parties.

21

125.     Pursuant to Rule 57 of the West Virginia Rules of Civil Procedure, as well as the Uniform Declaratory Judgment Act, W. Va. Code § 55-12-1, *et seq.*, WVMI requests that this Court enter a Declaratory Judgment that WVMI is entitled to perform under the Contract as the critical subcontractor for utilization review and prior authorization services for the entirety of the Contract, including all extensions.

126.     WHEREFORE, WVMI respectfully requests that this Court declare as follows:

   a.  Declare that WVMI's role as a critical subcontractor providing utilization review and prior authorization services is a material term to the Contract;

   b.  Declare that DOA and/or DHHR must approve a formal change order before WVMI's role as a critical subcontractor under the Contract can be changed, modified, or eliminated in any way, as required by the Contract;

   c.  Declare that WVMI is legally entitled to continue performing through the entirety of the Contract, including the Second Extension and all future extensions, as a result of the Contract, LOA, Extension Amendment, and all other relevant contracts;

   d.  Declare that APS's and KEPRO's heavy-handed negotiation tactics, including but not limited to the trilemma, were unlawful, tortious, in breach of all relevant contracts, and in bad faith;

   e.  Award costs and attorneys' fees associated with this declaratory judgment action, pursuant to W. Va. Code § 55-13-10; and

   f.  Award any and all other further relief, including but not limited to further declaratory relief, that the Court and jury deem just and proper.

22

## Count VII: Violations of the West Virginia Computer Crimes and Abuse Act

127.    WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

128.    Hobbs and Taylor, following their resignation of employment from WVMI, knowingly, willfully, and without authorization, directly or indirectly, possessed WVMI's computer data.

129.    Hobbs and Taylor possessed this computer data while employees and/or agents of KEPRO and/or APS.

130.    WVMI has suffered damages resulting from this conduct.

131.    The conduct alleged herein violates the West Virginia Computer Crime and Abuse Act, W. Va. Code § 61-3C-1, *et seq.*

132.    WHEREFORE, WVMI respectfully requests that this Court grant as follows:

    a. Declare that Defendants violated the West Virginia Computer Crimes and Abuse Act, as described above;

    b. Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

    c. Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## Count VIII: Violations of the Uniform Trade Secrets Act

133.    WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

134.    By engaging in the conduct alleged herein, Hobbs and Taylor, individually and as employees and/or agents of KEPRO and/or APS, have misappropriated WVMI's trade secret information and data from which WVMI derives independent economic value, actual or potential,

23

from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and is the subject of efforts by WVMI reasonable under the circumstances to maintain their secrecy.

135.     Hobbs and/or Taylor have used improper means, including theft, breach or inducement of a breach of a duty to maintain secrecy, breach or inducement of a breach of Hobbs's and Taylor's employment contract, and/or espionage through electronic or other means to obtain WVMI's confidential, proprietary, and trade secret information and data.

136.     Upon information and belief, Hobbs and Taylor possessed WVMI's confidential, proprietary, and trade secret information while employees and/or agents of KEPRO and/or APS, all without WVMI's express or implied consent.

137.     Hobbs's and Taylor's misappropriation of WVMI's trade secret information was willful and malicious.

138.     The conduct alleged herein violates the Uniform Trade Secrets Act, W. Va. Code § 47-22-1, *et seq.*

139.     WHEREFORE, WVMI respectfully requests that this Court grant as follows:

    a. Declare that Defendants violated the Uniform Trade Secrets Act, as described above;

    b. Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

    c. Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

24

### Count IX: Conversion

140.    WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

141.    The conduct alleged herein constitutes wrongful exertion of dominion over WVMI's business property in denial of WVMI's rights.

142.    The conduct alleged herein constitutes an unlawful conversion for which WVMI is entitled to recover all available damages and/or the converted property.

143.    WHEREFORE, WVMI respectfully requests that this Court grant as follows:

   a.   Declare that Defendants converted WVMI's property, as described above;

   b.   Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

   c.   Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

### Count X: Breach of contract

*Defendants Hobbs and Taylor*

144.    WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

145.    As a condition of Hobbs's and Taylor's employment with WVMI, they were under a duty to return all WVMI information and data and to not disclose WVMI's confidential, proprietary, and trade secret information.

146.    The conduct alleged herein violates these duties.

147.    WHEREFORE, WVMI respectfully requests that this Court grant as follows:

a.  Declare that Hobbs and Taylor breached their employment contracts, as described above;

b.  Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

c.  Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

Respectfully submitted,

West Virginia Medical Institute, Inc.,

*By counsel,*

Carte P. Goodwin (W. Va. Bar 8039)
James A. Kirby, III (W. Va. Bar 8564)
Lucas R. White (W. Va. Bar 12501)
GOODWIN & GOODWIN, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
(304) 346-7000

26

## **VERIFICATION**

West Virginia Medical Institute, Inc., by David Lambert, its Chief Administrative Officer, being duly sworn, states that he has been authorized by West Virginia Medical Institute, Inc. to bring the above-styled Complaint; that he has read the foregoing Complaint; that he has personal knowledge of the facts and allegations contained therein; and that the facts and allegations contained herein are true to the best of his knowledge.

David Lambert
Chief Administrative Officer
West Virginia Medical Institute, Inc.

STATE OF WEST VIRGINIA,

COUNTY OF Kanawha, TO WIT:

Taken, subscribed, and sworn before me, a Notary Public in and for the County and State aforesaid, this 3rd day of September 2015.

My Commission expires: August 1, 2022

Shella R. Rauen
Notary Public

OFFICIAL SEAL
STATE OF WEST VIRGINIA
NOTARY PUBLIC
SHELLA R. RAUEN
331 BELVUE DRIVE
HURRICANE, WV 25526
MY COMM. EXP. AUGUST 1, 2022

1

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E.
Charleston, WV 25305



2015 SEP 10 PM 2: 23

CATHY ..... CLERK
KANAWHA COUNTY CIRCUIT COURT



**Natalie E. Tennant**
Secretary Of State
State Of West Virginia
**Phone:** 304-558-6000
866-767-8683
**Visit us online:**
www.wvsos.com

Cathy Gatson
Kanawha County Courthouse
111 Court Street
Charleston, WV 25301-2500

**Control Number:** 73233

**Defendant:** KEPRO ACQUISITIONS, INC.
777 EAST PARK DRIVE
HARRISBURG, PA 17111 US

**County:** Kanawha
**Civil Action:** 15-C-1680
**Certified Number:** 92148901125134100000791901
**Service Date:** 9/8/2015

I am enclosing:

**1 summons and complaint, 1 other: (MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER)**

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in the name and on behalf of your unauthorized foreign corporation.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in the name and on behalf of your unauthorized foreign corporation as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper, **not to the Secretary of State's office**.*

Sincerely,

Natalie E Tennant

Natalie E. Tennant
Secretary of State

# SUMMONS

## THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**WEST VIRGINIA MEDICAL INSTITUTE, INC.,**

2015 SEP 10 PM 2: 23

        **Plaintiff,**

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

**v.**

Civil Action No.: 15-C-1680

**INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
a West Virginia Agency,**

        **Defendants.**

**To the above-named Defendant:**    **KEPRO
777 East Park Drive
Harrisburg, PA 17111**

      **IN THE NAME OF THE STATE OF WEST VIRGINIA,** you are hereby summoned

and required to serve upon **CARTE P. GOODWIN,** Plaintiff's attorney, whose address is

**GOODWIN & GOODWIN, LLP, 300 Summers Street, Charleston, West Virginia 25301,** an

Answer, including any related Counterclaim you may have, to the Complaint filed against you in

the above-styled civil action, a true copy of which is herewith delivered to you. You are required

to serve your answer within 20 days after service of this summons upon you, exclusive of the day

of service. If you fail to do so, judgment by default will be taken against you for the relief

demanded in the Complaint and you will be thereafter barred for asserting in another action any

claim you may have which must be asserted by counterclaim in the above-styled civil action.

Dated:  September 4, 2015

                             **Cathy S. Gatson, Clerk**
                                   Clerk of Court

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E.
Charleston, WV 25305

2015 SEP 10 PM 2: 23
CATHY
KANAWHA COUNT 7 CIRCUIT COURT



**Natalie E. Tennant**
Secretary Of State
State Of West Virginia
**Phone:** 304-558-6000
866-767-8683
**Visit us online:**
www.wvsos.com

Cathy Gatson
Kanawha County Courthouse
111 Court Street
Charleston, WV 25301-2500

**Control Number:** 73232

**Defendant:** INNOVATIVE RESOURCE GROUP,
LLC
209 West Washington Street
Charleston, WV 25302 US

**Agent:** Corporation Service Company
**County:** Kanawha
**Civil Action:** 15-C-1680
**Certified Number:** 92148901125134100000791895
**Service Date:** 9/8/2015

I am enclosing:

**1 summons and complaint, 1 other: (MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER)**

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in your name and on your behalf.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in your name and on your behalf as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper, **not to the Secretary of State's office**.*

Sincerely,

Natalie E Tennant

Natalie E. Tennant
Secretary of State

# SUMMONS

## THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

WEST VIRGINIA MEDICAL INSTITUTE, INC.,

**Plaintiff,**

2015 SEP 10   PM 2: 23

CATHY S. G.
KANAWHA COUNTY CIRCUIT COURT

v.

Civil Action No.: 15 -C- 1680

INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
a West Virginia Agency,

**Defendants.**

To the above-named Defendant:   **INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST
c/o Corporation Service Company
209 West Washington Street
Charleston, WV 25302**

IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby summoned

and required to serve upon **CARTE P. GOODWIN**, Plaintiff's attorney, whose address is

**GOODWIN & GOODWIN, LLP, 300 Summers Street, Charleston, West Virginia 25301**, an

Answer, including any related Counterclaim you may have, to the Complaint filed against you in

u are required

ive of the day

for the relief

her action any

vil action.

| Total | Check | Payment type | Total | Service - US defendant | Service | GOODWIN & GOODWIN, LLP | Date: 9/8/2015 | Invoice #280230 | West Virginia Secretary of State |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 15-C-1680 | | | | | |
| | | | | | | | | | Qty   Sub |
| | | | | | | | | | 2 |
| $40.00 | $40.00 | Amount | $40.00 | $40.00 | | | | | |

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

FILED

2015 SEP -4 PH 3:30

KANAWHA COUNTY CIRCUIT COURT

WEST VIRGINIA MEDICAL INSTITUTE, INC.,

        Plaintiff,

v.                              Civil Action No.:  15-C-1680

INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
a West Virginia Agency, ANGELA HOBBS, an
individual, and KRISTYN TAYLOR, an
individual,

        Defendants.

## PLAINTIFF WEST VIRGINIA MEDICAL INSTITUTE, INC.'S MOTION FOR
## PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

        COMES NOW Plaintiff West Virginia Medical Institute, Inc. ("WVMI"), by counsel, and

files this Motion for Preliminary Injunction and Temporary Restraining Order against Defendants

Innovative Resource Group, LLC d/b/a APS Healthcare Midwest ("APS") and KEPRO

Acquisitions, Inc. ("KEPRO"). WVMI and APS provide services to West Virginia's Medicaid

program pursuant to a six-year contract that will soon be rebid. A mutual competitor, KEPRO, has

since purchased APS and now both entities seek to deprive WVMI of its contract in its final days,

in an unlawful, tortious, and bad-faith effort to eliminate competition with WVMI in the upcoming

rebid. Additionally, KEPRO and APS are aggressively poaching WVMI's employees in an effort

1

*1-4*

to undermine WVMI's ability to perform its services and to compete in the rebid, while simultaneously threatening to disrupt services to West Virginia's Medicaid program and its patients and providers. Two of these poached employees, Angela Hobbs ("Hobbs") and Kristyn Taylor ("Taylor") took significant amounts of WVMI's confidential, proprietary, and trade secret information prior to their resignations from WVMI. Upon information and belief, Hobbs and Taylor possessed and may still possess this information individually and as employees and/or agents of KEPRO and/or APS.

These actions are tortious, in bad faith, in breach of contract, and violate West Virginia's purchasing laws. WVMI has been irreparably harmed by these actions and will continue to be harmed in more drastic ways if KEPRO and APS are not stopped and its misappropriated computer data is not returned. For these reasons, WVMI respectfully requests that this Court issue a preliminary injunction enjoining APS's and KEPRO's tortious actions and breaches for the pendency of this litigation and requiring immediate return of WVMI's property. Additionally, because time is of the essence and significant irreparable harm *is already occurring*, WVMI also respectfully requests that this Court issue a temporary restraining order, as well, in order to maintain the status quo. In further support of this Motion, WVMI states as follows:

**I.     Facts**

For nearly 40 years, WVMI has provided utilization review, prior authorization, and other services to West Virginia's Medicaid program. Essentially, "utilization review" or "utilization management" refers to the review of health care services provided to a health insurer's members — in this case, Medicaid beneficiaries — to confirm that the treatments are medically necessary and cost-effective. This review is performed by physicians, nurses, and other health care professionals. "Prior authorization" is a type of review where approval is required before services

2

are rendered; if prior authorization is not given, the insurer (Medicaid) in most cases will not pay the provider. High-cost services typically requiring prior authorization include hospital stays, certain surgeries, in-home care, and medical equipment. WVMI has provided these services to the State for years and pursuant to multiple contracts awarded through competitive bidding. In addition to these utilization review services, WVMI also assesses the medical needs of Medicaid beneficiaries in their homes to determine if they are medically eligible for in-home care under the Medicaid Aged and Disabled Waiver program. These assessments and annual reassessments are performed by trained nurses geographically located across West Virginia.

On January 30, 2009, the Department of Health and Human Resources ("DHHR"), in conjunction with the Department of Administration ("DOA"), released a Request for Proposals ("RFP") for these utilization management and prior authorization services across three different DHHR bureaus, effectively combining several piecemeal contracts into one, overall utilization management and prior authorization review contract for the entire State ("Contract"). *See* RFP, attached hereto as Exhibit A.

APS and WVMI sought to combine their respective talents and submit a bid in response to the RFP ("Bid"). Specifically, APS and WVMI entered into an agreement ("Teaming Agreement") whereby APS would submit the formal Bid as the prime vendor, and the Bid would specifically list WVMI as the critical "proposed subcontractor" for the provision of utilization review and prior authorization services for West Virginia's Medicaid program. *See* Teaming Agreement, attached hereto as Exhibit B. The Bid's structure relied heavily on WVMI's long history and vast experience as the provider of Medicaid utilization review and prior authorization services to the State. *See, e.g.*, Bid, relevant portions of which attached hereto as Exhibit C. Additionally, structuring the Bid in this way insured that there was continuity of service, as WVMI had been the incumbent provider

3

for over 30 years. This teaming strategy was successful, and APS and WVMI won the contract, beating out the only other bidder, which happened to be KEPRO. *See* Purchase Order BMS90007 and Bid Tabulation, attached hereto as Exhibits D and E, respectively. Effective December 1, 2009, APS and WVMI became the providers of utilization management and prior authorization services to DHHR, and WVMI's portion accounted for nearly 50% of the total value of the Contract. *See* contract value table, attached hereto as Exhibit F. In order to formalize the relationship between WVMI and APS, they entered into a Letter of Agreement ("LOA") outlining each other's rights and obligations with respect to the Contract. *See* LOA, attached hereto as Exhibit G.

The Contract provided for a five-year term and was set to expire on November 30, 2014. However, because of internal delays in preparing the request for proposals for the new contract ("Upcoming RFP"), DHHR extended the original contract for an additional six months to May 31, 2015 ("First Extension"). WVMI and APS quickly and amicably amended the LOA to reflect this extension, expressly stating their "**desire to extend the Agreement and its current terms and conditions to be co-terminous with the Prime Contract.**" Extension Amendment at pg. 1, attached hereto as Exhibit H. (emphasis added). Thus, WVMI and APS intended and agreed at this time — as they had always intended since the Teaming Agreement — that WVMI would provide utilization review and prior authorization services for the entire Contract.[1] Throughout the six-month period of the First Extension, WVMI and APS were performing their respective duties under the Contract. Simultaneously, WVMI and APS were negotiating another teaming agreement to once again join forces for the Upcoming RFP. *See* draft teaming agreement, attached hereto as Exhibit I.

---

[1]     Consistent with the parties' stated intent, the Extension Amendment admittedly included a term provision providing that the LOA, as extended, would expire on May 31, 2015, the same date as the underlying Contract. *See* Exhibit H at pg. 1.

4

On May 4, 2015, in response to further delays in preparing the Upcoming RFP, DHHR once again extended the Contract for another six months, until November 30, 2015 ("Second Extension"). On May 6, 2015, two days after the Second Extension, KEPRO (which was the only other bidder during the 2009 RFP) informed WVMI that it had acquired APS as a wholly owned subsidiary. *See* letter from S. Schlager, attached hereto as Exhibit J. Shortly thereafter, KEPRO informed WVMI it believed that federal conflict-of-interest rules regarding separate contracts that both KEPRO and WVMI had with the United States Centers for Medicare and Medicaid ("CMS") precluded WVMI's continuing performance.[2] Because of this purported conflict of interest, KEPRO contended that it had to sever APS's contractual relationship with WVMI at the end of the First Extension (even though the LOA, as amended, provides that WVMI's role is "co-terminous"). KEPRO cited no express opinion from CMS regarding this issue; its supposed interpretation of the law was its own. KEPRO presented WVMI with a draft agreement that terminated WVMI's services after three months, transferred all of WVMI's Medicaid reviewing employees to APS, and contained an absurd clause that prevented WVMI from ever competing against KEPRO "in *perpetuity*."[3] *See* initial proposed agreement (emphasis added), attached hereto as Exhibit K.

This purported conflict of interest struck WVMI as particularly suspicious. In response, WVMI sough guidance directly from CMS, which informed WVMI that "a six-month transition period is fair and reasonable and does not pose a conflict of interest." *See* letter to K. Tatum and email from K. Tatum, attached hereto as Exhibits L and M, respectively. After its conflict-of-interest strategy proved unsuccessful, KEPRO became brazen in its anti-competitive intent,

---

[2]    WVMI and KEPRO both have Quality Improvement Organization contracts with CMS, the provisions of which generally prohibit them from contracting together to provide Medicare-related services.

[3]    As explained below, such anti-competitive clauses violate West Virginia purchasing laws. *See* W. Va. Code § 5A-3-31.

informing WVMI that any extension would be contingent upon WVMI's agreement to forgo competing in the Upcoming RFP: "competing with us directly during the upcoming re-bid is not tenable to KEPRO." *See* email from S. Schlager, attached hereto as Exhibit N.

With their true motivation laid bare, APS and KEPRO engaged in bad-faith and heavy-handed negotiation tactics, providing WVMI with the following trilemma of unacceptable options:

1. that KEPRO and APS agree to a six-month extension of the LOA in exchange for WVMI agreeing to forgo submitting a bid for the Upcoming RFP, in brazen violation of applicable antitrust and purchasing laws;

2. that KEPRO and APS agree to a three-month extension of the LOA in which WVMI would forfeit half of the remaining value of the Contract (approximately $2.1 million) under the Second Extension; or

3. that the parties simply let the LOA and Extension Amendment expire, causing WVMI to lose all of its remaining business under the Contract entirely.

The first option was unacceptable because it required giving up the chance to compete in the Upcoming RFP. In fact, the first option is patently illegal. By pressuring WVMI to enter into such an anti-competitive agreement, KEPRO and APS acted to "[l]essen competition among prospective vendors" in violation of West Virginia Code § 5A-3-31. Additionally, agreeing to this clause would also constitute a restraint of trade in violation of West Virginia's antitrust laws. *See, e.g.*, W. Va. Code § 47-18-3 (prohibiting contracts whereby "[o]ne or more persons . . . refrains from the submission of a bid" in competitive contracts).

The second option was unacceptable because it conflicted with the parties' original intent and nearly six-year understanding that WVMI's service would be "co-terminous" with the

6

Contract with DHHR. This option would cause WVMI to lose three months of business and over two million dollars, forcing it to lay off much of its staff, who would no doubt go to work for KEPRO and APS. With this severe loss of income and flight of talent, WVMI would then be in a severely weakened position to compete for the Upcoming RFP. Thus, while this second option did not include an explicit anti-competitive clause, it would still have the same effect. Finally, the third option was as unacceptable as the first, but doubly so: instead of losing three months of business, WVMI would lose six.

After WVMI rejected these unacceptable options, the parties continued contentious negotiations through late May and early June of this year. As of May 31, the First Extension ended and the Second Extension began, and WVMI and KEPRO/APS had not agreed to an extension. Yet there was still utilization review and prior authorization work that needed to be done. WVMI was effectively forced to continue to perform its obligations under the Contract without a formal extension agreement. And WVMI did so: it performed these services without *any* guarantee that it would be compensated. Finally, on June 10, ten days *after* the First Extension ended, the parties agreed to a four-month extension of the LOA, until October 1, 2015 ("Four-Month Extension").[4] *See* Four-Month Extension, attached hereto as Exhibit O. While WVMI is entitled to the full six months in order to be "co-terminous" with the Contract, WVMI had no commercially reasonably alternative than to accept this insufficient Four-Month Extension due to APS's and KEPRO's heavy-handed negotiation tactics and their unfair exploitation of their position as the nominal prime vendor. Otherwise, WVMI would jeopardize not only its future business in the Upcoming RFP, *but also* payment for services *already rendered*. The Four-Month Extension was therefore

---

[4]     The Four-Month Extension was silent as to the final two months of the Contract and did not waive WVMI's right to perform those services.

accepted to maintain the status quo, to continue working towards an amicable resolution regarding the final two months, and to preserve WVMI's ability to compete in the Upcoming RFP.

Within days of executing the Four-Month Extension, KEPRO went for the mortal blow. KEPRO and APS began aggressively targeting, recruiting, and poaching WVMI's highly trained, essential employees. *See* affidavits of S. Holstine and S. Leadman, attached hereto as Exhibits P and Q, respectively. KEPRO and APS have deliberately lied in these efforts, reviving the concocted conflict-of-interest ruse, and stating that "the termination of our subcontractual arrangement has been mutually agreed upon due to a conflict of interest per CMS Guidelines related to current Medicare business performed by both parties." *See* letter from H. Snyder, attached hereto as Exhibit R. To date, 23 WVMI employees have resigned or have turned in resignation notices, with as many as 15 going to KEPRO and APS. *See* affidavit of D. Lambert, attached hereto as Exhibit S. These include employees at all levels of WVMI's Medicaid operation, including reviewers, clerical staff, a manager, and a director. WVMI's reviewing resources were already stretched thin due to the recent Medicaid expansion. All of its prior authorization employees were working on mandatory overtime *before* the issues with KEPRO and APS, so WVMI cannot make up for these resignations with its remaining employees. Because of the compressed timeframe, WVMI does not have time to hire and train new reviewers, either. Minimum training is at least three months. *See id.* The loss of these employees — especially at this time — will undermine WVMI's ability to perform its services and cripple WVMI's ability to submit a bid in the Upcoming RFP. In fact, KEPRO and APS have apparently set the poached employees' start date as August 25 — *even before the end of the Four-Month Extension. See id.* Not content to hobble WVMI for the final two months and the Upcoming RFP, KEPRO also wants to sabotage the Four-Month Extension itself.

Two of these poached employees, Hobbs and Taylor, were recently discovered to have taken over one hundred (100) WVMI documents and forwarded over one thousand (1,000) WVMI emails to their personal accounts. These documents and emails contain WVMI's confidential, proprietary, and trade secret information, including internal processes, reviewing criteria, and training materials — everything competitors like KEPRO and APS would need to entirely replicate WVMI's business. Upon information and belief, Hobbs and Taylor possessed and may in fact still possess this information, in their individual capacity and as employees and/or agents of KEPRO and/or APS.

APS, at KEPRO's direction, has exploited its position as the nominal prime vendor to force WVMI out of the Contract, in breach of the Letter of Agreement and in violation of the duty of good faith and fair dealing. Moreover, KEPRO and APS have sought to destroy their competition in the Upcoming RFP by poaching WVMI's employees and attempting to extract illegal anti-competitive agreements. Because of the irreparable harm that WVMI has suffered and will continue to suffer if KEPRO and APS continue their unlawful actions, WVMI now respectfully requests that this Court issue a preliminary injunction enjoining these actions and maintaining the status quo for the pendency of the litigation until such time as a permanent injunction can be issued. Also, WVMI requests that this Court order the immediate return of all of WVMI's confidential, proprietary, and trade secret information and data in the possession of KEPRO, APS, Hobbs, or Taylor. Because time is of the essence, WVMI also requests that this Court issue a temporary restraining order, as well, until a hearing can be held on the preliminary injunction.

## II.     Standard of Review

Rule 65 of the West Virginia Rules of Civil Procedure provides for preliminary injunctive relief through the pendency of an action. However, because preliminary injunctions can only be

9

issued with notice to the adverse party, Rule 65 also provides for a temporary restraining order

("TRO") which can control until such time as a hearing can be held on a preliminary injunction.

As the Supreme Court of Appeals has described,

> When circumstances are not urgent, an aggrieved party will ask a court for a preliminary injunction, which requires notice to the adverse party. However, when circumstances show that 'immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party' can be heard, a party may ask a court to issue, in lieu of a preliminary injunction, an *ex parte* temporary restraining order.

*Camden-Clark Mem. Hosp. Corp. v. Turner*, 575 S.E. 2d 362, 367 (W. Va. 2002) (footnote

omitted) (quoting W. Va. R. Civ. P. 65(b)).

> The Supreme Court of Appeals has instructed that

> The customary standard applied in West Virginia for issuing a preliminary injunction is that a party seeking the temporary relief must demonstrate by a clear showing of a reasonable likelihood of the presence of irreparable harm; the absence of any other appropriate remedy at law; and the necessity of a balancing of hardship test including: '(1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest.'

*State By and Through McGraw v. Imperial Mrktg.*, 472 S.E. 2d 792, 798 n.8 (W. Va. 1996)

(quoting *Jefferson Cnty. Bd. Educ. v. Jefferson Cnty. Educ. Ass'n*, 393 S.E. 2d 653, 662 (W. Va.

1990)). Furthermore, the Court has stated that the balancing of hardship factors are seen in

"flexible interplay," meaning that a weak finding of one factor can be outweighed by a strong

finding of another. *Jefferson Cnty*, 393 S.E. 2d at 663 (quoting *Merrill Lynch, Pierce, Fenner &*

*Smith, Inc. v. Bradley*, 756 F. 2d 1048, 1054 (4th Cir. 1985).

The standard for a TRO is essentially the same, except that the party seeking one must

demonstrate by affidavit or verified complaint that "immediate and irreparable injury, loss, or

damage will result" before a hearing can be held. W. Va. R. Civ. P. 65(b).

## III. Argument

Absent injunctive relief, WVMI will suffer immediate and irreparable harm. It will lose the benefits of the final two months of the Contract to which it is entitled, and it will be severely hobbled in bidding for the Upcoming RFP. KEPRO's harm, by comparison, is minimal. WVMI has a high likelihood of success given the Defendants' brazen flouting of their own anti-competitive intent. Moreover, the Letter of Agreement evinces the parties' intent that it be "co-terminous" with the Contract. Finally, the public interest weighs heavily in favor of fostering competition in the Upcoming RFP and avoiding service disruptions to West Virginia's Medicaid program. KEPRO and APS are engaging in unlawful activity *right now*, and that conduct is causing substantial and irreparable harm to WVMI *right now*. Immediate action is necessary to prevent further and deeper harm that cannot be undone. As such, not only a preliminary injunction is necessary, but also a TRO as well.

### a. WVMI will suffer further irreparable harm if the injunctive relief is not granted because it will lose its crucial employees and the ability to submit a bid in the Upcoming RFP.

Without the final two months of the Contract, WVMI will be in a dire economic situation. Its Medicaid work constitutes a substantial portion of its business, and going without it for the final two months would cause deep lay-offs in staff — the staff left behind by KEPRO, at least — and would seriously threaten WVMI's finances. Of course, the other threat to WVMI is KEPRO's and APS's aggressive poaching of critical WVMI employees at all levels, from the nurses and administrative staff who do most of the review work, to their managers and directors who oversee operations. These critical employees are necessary to perform WVMI's services for both the Four-Month Extension and the final two months of the Contract. Moreover, these employees,

11

particularly the higher-level managers and directors, are necessary to prepare and submit a bid in the Upcoming RFP. The most egregious fact, though, is that KEPRO and APS are setting many of the poached employees' start date as August 25, before the end of the Four-Month Extension and in the midst of WVMI's pre-bid preparation. If such flight of employees is left unabated, WVMI's ability to submit a competitive bid in the Upcoming RFP will be crippled, as will its ability to perform even for the remainder of the Four-Month Extension, let alone the final two months to which it is entitled. Finally, and worst of all, if WVMI's ability to perform its utilization review and prior authorization services is further undermined, West Virginia's Medicaid program risks serious service disruptions, including delays in medical care that requires prior authorization and delays in reimbursement to providers. As for the misappropriated proprietary information, the harm WVMI suffers is substantial and irreparable. It essentially provides a roadmap for competitors — namely KEPRO and APS — to entirely replicate WVMI's business and train employees to perform WVMI's utilization review and prior authorization services.

WVMI simply seeks injunctive relief to prevent the active recruitment of WVMI employees and to maintain the status quo of the Letter of Agreement for the remainder of the Contract. Failure to grant this injunctive relief now will cause WVMI to lose the final two months of the Contract, undermine its ability to perform even through the Four-Month Extension, cripple its ability to submit a competitive bid, and risk service disruption to West Virginia's Medicaid beneficiaries and providers. These are all bells that cannot be unrung.

### b. *KEPRO and APS will not suffer irreparable harm if the injunctive relief is granted because the relief would only preserve the status quo.*

In contrast, the harm to KEPRO and APS if the injunctive relief is granted is minimal. All that would happen is that the status quo would be maintained, just as it has been for over five and a half years. The parties would continue in the same relationship that they have been all this time

12

(and to which they have contractually agreed, no less). If WVMI is ultimately unsuccessful in this litigation, KEPRO and APS would of course then be free to proceed to take the remaining two months of the Contract and WVMI employees, as if nothing ever happened.

### c. *WVMI will likely succeed on the merits because KEPRO and APS are undoubtedly seeking to stifle competition in the Upcoming RFP and because the parties clearly intended WVMI's role to be "co-terminous" with the Contract.*

WVMI has brought several claims against KEPRO and APS: (1) violation of state purchasing law prohibiting anti-competitive conduct, (2) breach of contract, (3) breach of the duty of good faith and fair dealing, (4) tortious interference with contractual relations, (5) tortious interference with WVMI's employees, and (6) declaratory judgment. Essentially, WVMI's success on all six of these counts turns on two basic legal questions:

- Whether KEPRO and APS have acted to "[l]essen competition among prospective vendors" (Count I and V); and

- Whether the LOA, as amended, is "co-terminous" with the overall Contract (Counts II–IV and VI).

The answer to both of these questions is yes, thus providing WVMI with a high likelihood of success on the merits.

The first question goes to Count I, which alleges a violation of West Virginia Code § 5A-3-31. This statute prohibits actions detrimental to competition among bidders on public contracts and provides:

> (a) It shall be unlawful for any person to corruptly **act alone** or combine, collude or conspire with one or more other persons with respect to the purchasing or supplying of services, commodities or printing to the state under the provisions of this article if the purpose or effect of such action, combination, collusion or conspiracy is either to:
>   (1)   **Lessen competition among prospective vendors**; or

13

(2) **Cause the state to pay a higher price** for such services, commodities or printing than would be or would have been paid in the absence of such action, combination, collusion or conspiracy; or

**(3) Cause one prospective vendor or vendors to be preferred over one or more other prospective vendor or vendors.**

(b) Any person who violates any provision of this section is guilty of a felony and, upon conviction thereof, shall be imprisoned in a state correctional facility not less than one nor more than five years, and be fined not exceeding $10,000.

W. Va. Code § 5A-3-31 (emphasis added). The rationale of this statute is obvious: to foster a strong market and a lower price for services paid for by the public. That KEPRO and APS have been attempting to keep WVMI out of the running for the Upcoming RFP cannot seriously be denied, not even by KEPRO and APS themselves. *They have already admitted as much.* APS's own Chief Operating Officer baldly stated to WVMI that "competing with us directly during the upcoming re-bid is not tenable to KEPRO." *See* Exhibit N. When considering whether KEPRO and APS intended to lessen competition among vendors, this Court should take them at their word. KEPRO's statements, when combined with their calculated conduct and employee poaching, provide a high likelihood of success on the merits of WVMI's first claim.

All of the remaining counts turn on the interpretation of the LOA, namely, whether it is intended to be "co-terminous" with the Contract. Obviously WVMI's breach of contract claim (Count II) turns on this, but so does its claims for breach of the duty of good faith and fair dealing (Count III), tortious interference with contractual relations (Count IV), and declaratory relief (Count V). As described above, APS and WVMI entered into the LOA, which provided that they would work together for the five-year term of the Contract. *See* Exhibit G at pg. 2 (providing a five-year term for the LOA from December 1, 2009 to November 30, 2014, absent termination and notice provisions). Given the finite term of the overall Contract, it only made sense that the LOA

14

also have a corresponding finite term, as well.[5] When the five-year Contract suddenly became a

five-and-a-half-year Contract with the First Extension, WVMI and APS quickly executed the

Extension Amendment, stretching out the terms of the LOA accordingly, expressly stating that

"**the parties desire to extend the Agreement and its current terms and conditions to be co-**

**terminous with the Prime Contract.**" Exhibit H at pg. 1 (emphasis added). Add this express text

to the course of dealing between the parties, and the intent of the parties becomes clear. WVMI

and APS had joined forces pursuant to the Teaming Agreement to submit a joint bid to DHHR for

the Contract. APS, acting as the nominal prime vendor, relied on WVMI's history and experience

performing utilization review and prior authorization services for West Virginia's Medicaid

program and its then-incumbent position. When the Contract was extended, the LOA was

extended. Obviously, the parties intended this relationship to last as long as the Contract.

This all changed when APS was acquired by KEPRO. It was only then, when it was

controlled by the only other bidder in the 2009 RFP, that APS reneged on the nearly six-year

understanding between the parties. KEPRO and APS have since stated in absolute and unequivocal

terms that WVMI will not be performing the final two months of the Contract, despite the LOA.

Moreover, KEPRO and APS have taken definitive steps detrimental to WVMI in furtherance of

this intent to breach. In so doing, APS, at KEPRO's direction, has repudiated the LOA, thereby

breaching it. As the Supreme Court of Appeals has instructed,

> It is well established . . . that the renunciation or repudiation of a contract before
> the time for performance, which amounts to a refusal to perform at any time, gives
> the adverse party the option to treat the entire contract as broken and to sue
> immediately for damages as for a total breach.

*Annon v. Lucas*, 185 S.E. 2d 343, 350 (W. Va. 1971) (citations and quotations omitted).

---

[5]     The LOA provides for termination without cause, but only with 120 days' notice. *See* Exhibit G at pg. 2. APS
never complied with this notice provision.

Moreover, KEPRO's and APS's aggressive poaching of employees is hindering WVMI's ability to perform not only the final two months of the Contract, but even the Four-Month Extension. With fewer employees doing more work, WVMI is suffering backlogs and is in danger of service disruptions. *See* Exhibit S. In recruiting these essential employees away from WVMI, APS (at KEPRO's direction) has breached the duty implied in every contract to refrain from hindering the other's performance. *See, e.g., Millan v. Bartlett*, 71 S.E. 13 (W. Va. 1911) ("An express covenant to perform certain acts implies a covenant to refrain from performance of other acts which operate to defeat performance of the express covenant."); *Whitt v. Godwin*, 193 S.E. 2d 841, 844 (Va. 1965) ("There is an implied condition of every contract that one party will not prevent performance by the other party."); 23 Williston on Contracts § 63:26 (4th ed.) ("[W]here a party stipulates that another shall do a certain thing, that party consequently impliedly promises that he or she will personally do nothing that will hinder or obstruct the other in doing that thing.").

Given the express "co-terminous" text, the course of dealing between WVMI and APS, and the breach of the implied term to not prevent the other party's performance, WVMI has a high likelihood of success on the contractual claims, as well. As for the misappropriated proprietary information and data, WVMI also has a high likelihood of success on the merits. This information is undoubtedly WVMI's, not Hobbs's or Taylor's, and should be returned immediately.

### d. The public interest demands that this injunctive relief be granted in order to prevent disruption of services to West Virginia's Medicaid patients and providers and to ensure competition in the Upcoming RFP.

The public interest is the most important reason why injunctive relief should be granted in this case. The public has a strong interest in fostering vigorous competition among bidders on public contracts to ensure the most efficient use of taxpayers' funds. Given the fast-approaching rebid and KEPRO's and APS's present actions to scuttle any hope of a competitive WVMI bid,

the public interest weighs heavily in favor of injunctive relief enjoining such anti-competitive conduct. The actions that KEPRO and APS are engaging in *right now* are having — and will continue to have — irreparable harm on WVMI's ability to compete. *See* Exhibit S. The less competition in the Upcoming RFP, the more public funds will be needlessly expended. Additionally, KEPRO's and APS's poaching of employees is not only harming WVMI's ability to submit a competitive bid, but also threatening disruptions in the provision of its services to West Virginia's Medicaid program. With employees leaving to go to KEPRO and APS *even before the end of the Four-Month Extension*, WVMI is dangerously close to delays, which will cause longer wait times for Medicaid beneficiaries who need prior authorizations and denial or delays in payment to providers who render services without prior authorization. *See id.*

### e. *Because time is of the essence, this Court should issue a temporary restraining order until the preliminary injunction can be ruled upon.*

WVMI faces immediate and irreparable harm if injunctive relief is not granted now. KEPRO's and APS's actions are undermining WVMI's ability to submit a bid, which it is preparing for now. This new contract will be put out to bid only once, and if WVMI misses this chance now due to KEPRO's and APS's misconduct, WVMI will not have another chance for several years, if ever. Moreover, the poaching of employees is threatening WVMI's ability to perform its utilization review and prior authorization services *now*, particularly given the August 25 start date that KEPRO and APS have instituted. If services are delayed, WVMI will not be able to turn back the clock and complete reviews on time. There simply is not enough time to provide both a full hearing on the preliminary injunction and to forestall the irreparable harm to WVMI — and the public — if KEPRO's and APS's actions are not stopped now.

In compliance with Rule 65 of the West Virginia Rules of Civil Procedure, the undersigned counsel for WVMI certifies that immediate and irreparable harm will occur before the adverse

parties can be heard in opposition. All parties of record will be served through the formal Rule 4 process with the Summons, Complaint, and this Motion. Additionally, in order to provide notice as soon as practicably possible, the undersigned will also endeavor to email these documents to all parties (or their attorneys, as appropriate). Finally, because such injunctive relief would simply hold the status quo, no bond should be required.

### IV.   Conclusion

For the forgoing reasons, WVMI respectfully requests that this Court:

    a.  Issue a temporary restraining order prohibiting KEPRO and APS from engaging in any acts in violation of West Virginia Code 5A-3-31, including the recruiting of WVMI's current employees;

    b.  Issue a temporary restraining order prohibiting KEPRO and APS from breaching the LOA, including the implied duty to refrain from hindering WVMI's performance, by recruiting any current WVMI employees and taking away work assigned to WVMI under the LOA;

    c.  Issue a temporary restraining order maintaining the status quo with WVMI performing its obligations pursuant to the LOA throughout the duration of the Contract, including any extensions, and prohibiting KEPRO and APS from moving any utilization review or prior authorization services away from WVMI or preventing WVMI from providing its utilization review and prior authorization services;

    d.  Issue an order requiring KEPRO, APS, Hobbs, and Taylor to immediately return all of WVMI's information, documents, and data and to destroy all copies from their computers and other data systems; and

18

e.   Set a hearing for consideration of WVMI's Motion for Preliminary Injunction as
soon as practicable, but within ten (10) days, pursuant to Rule 65(b) of the West
Virginia Rules of Civil Procedure.

Respectfully submitted,

West Virginia Medical Institute, Inc.,

*By counsel,*

Carte P. Goodwin (W. Va. Bar 8039)
James A. Kirby, III (W. Va. Bar 8564)
Lucas R. White (W. Va. Bar 12501)
GOODWIN & GOODWIN, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
(304) 346-7000

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**WEST VIRGINIA MEDICAL INSTITUTE, INC.,**

     **Plaintiff,**

v.                                **Civil Action No.:** _____

**INNOVATIVE RESOURCE GROUP, LLC**
**d/b/a APS HEALTHCARE MIDWEST, a**
**Wisconsin Limited Liability Company,**
**KEPRO ACQUISITIONS, INC., a Pennsylvania**
**Corporation, WEST VIRGINIA**
**DEPARTMENT OF ADMINISTRATION,**
**PURCHASING DIVISION, a West Virginia**
**Agency, WEST VIRGINIA DEPARTMENT OF**
**HEALTH AND HUMAN RESOURCES,**
**a West Virginia Agency,**

     **Defendants.**

## CERTIFICATE OF SERVICE

     I, Carte P. Goodwin, certify that, on September 4, 2015, a true and exact copy of the foregoing **Plaintiff West Virginia Medical Institute, Inc.'s Motion for Preliminary Injunction and Temporary Restraining Order** was directed to be served with the Complaint and Summons upon the following:

Innovative Resource Group, LLC
c/o Corporation Service Company
209 West Washington Street
Charleston, WV 25301
*via Secretary of State*

KEPRO
777 East Park Drive
Harrisburg, PA 17111
*via Secretary of State*

David Tincher, Director
West Virginia Department of Administration, Purchasing Division
2019 Washington Street, East
Charleston, WV 25305
*via certified mail, return receipt requested*

Karen Bowling
West Virginia Department of Health and Human Resources
One Davis Square
Suite 100 East
Charleston, WV 25301
*via certified mail, return receipt requested*

Angela Hobbs
713 Coal Fork Drive
Charleston, WV 25306
*via personal service*

Kristyn Taylor
868 S. Washington Street
St. Albans, WV 25177
*via personal service*

Patrick Morrisey
West Virginia Attorney General
State Capitol Complex
Bldg. 1, Room E-26
Charleston, WV 25305
*via certified mail, return receipt requested*

Carte P. Goodwin

BMS90007 Utilization/Prior Authorization

## REQUEST FOR PROPOSAL
## BUREAU FOR MEDICAL SERVICES

### PART 1  GENERAL INFORMATION, TERMS AND CONDITIONS

#### 1.1    Purpose:
The Acquisition and Contract Administration Section of the Purchasing Division, hereinafter referred to as "State", is soliciting proposals for the Department of Department of Health and Human Resources (DHHR),  Bureau for Medical Services, hereinafter referred to as "Agency", to provide all utilization management and prior authorization services for the Agency and specifically the Bureau for Medical Services (BMS), the Bureau for Behavioral Health and Health Facilities (BHHF), and the Bureau for Children and Families (BCF). This solicitation serves as notice, pursuant to West Virginia Code §5A-3-10b, of the commodity or service being sought and is to be considered the opportunity for vendors to indicate their interest in bidding on such commodity or service.

#### 1.2    Project:
The mission or purpose of the project is to obtain the services of a qualified vendor that has Medicaid and child welfare experience and expertise in utilization management.  The agency prefers to contract with a qualified (federally designated quality improvement organization) (QIO) firm experienced in conducting medical necessary review, social necessary, and utilization management (UM).

#### 1.3    **RFP Format:**
This RFP has four parts. "Part 1" contains general information, terms and conditions; "Part 2" describes the background and working environment of the project; "Part 3" is a statement of the specifications for the services requested pursuant to this RFP, contractual requirements, and special terms and conditions; and "Part 4" explains the required format of the Bidder's response to the RFP, the evaluation criteria the State will use in evaluating the proposals received and how the evaluation will be conducted.

#### 1.4    **Inquiries:**
Additional information inquiries regarding specifications of this RFP must be submitted in writing to the State Buyer with the exception of questions regarding the proposal submission which may be oral.   The deadline for written inquiries is identified in the Schedule of Events, Section 1.16. All inquiries of specification clarification must be addressed to:

> Roberta Wagner, Senior Buyer
> Purchasing Division
> 2019 Washington Street, East
> P.O. Box 50130
> Charleston, WV  25305-0130
> Fax:  (304) 558-4115
> roberta.a.wagner@wv.gov

**The vendor, or anyone on the vendor's behalf, is not permitted to make any contact whatsoever with any member of the evaluation committee.**   Violation may result in rejection of the bid. The State Buyer named above is the sole contact for any and all inquiries after this RFP has been released.

<table>
<tr><td><b>EXHIBIT</b></td></tr>
<tr><td>bbbler    <i>A</i></td></tr>
</table>

### 1.5   Vendor Registration:

Vendors participating in this process should complete and file a **Vendor Registration and Disclosure Statement** (Form WV-1) and remit the registration fee. Vendor is not required to be a registered vendor in order to submit a proposal, but the **successful bidder must** register and pay the fee prior to the award of an actual purchase order or contract.

### 1.6   Oral Statements and Commitments:

Vendor must clearly understand that any verbal representation made or assumed to be made during any oral discussion held between Vendor's representatives and any State personnel is **not** binding. Only the information issued in writing and added to the Request for Proposal specifications file by an official written addendum are binding.

### 1.7   Economy of Preparation:

Proposals should be prepared simply and economically, providing a straightforward, concise description of Vendor's abilities to satisfy the requirements of the RFP. Emphasis should be placed on completeness and clarity of content.

### 1.8   Labeling of RFP Sections:

The sections within this RFP contain instructions governing how the Vendor's proposal is to be arranged, submitted and to identify the material to be included therein.

#### 1.8.1   Mandatory Requirements.

Any specification or statement containing the word "must", "shall", or "will" are mandatory. Section 3 contains mandatory deliverables required upon contract execution. By signing and submitting a response to this RFP, the vendor agrees to all mandatory deliverables described herein. Section 4 describes RFP response requirements, which may be mandatory. The vendor is required to meet all mandatory requirements in order to be eligible for consideration and to continue in the evaluation process. Failure to meet or agree to mandatory items shall result in disqualification of the Vendor's proposal and the evaluation process will be terminated for that vendor. Decisions regarding compliance with any mandatory requirement shall be at the sole discretion of the State.

#### 1.8.2   Contract Terms and Conditions:

This Request for Proposals contains all the contractual terms and conditions under which the State of West Virginia will enter into a contract.

#### 1.8.3   Informational Sections:

All non-mandatory information specifications do not require a response from the Vendor. They are intended to aid the vendor in structuring an effective proposal capable of meeting the needs of the issuing agency.

### 1.9   Proposal Format and Submission:

1.9.1   Each proposal should be formatted as per the outline in Part 4 of this RFP. No other arrangement or distribution of the proposal information may be made by the bidder. Failure on the part of the bidder to respond to specific requirements detailed in the RFP may be the basis for disqualification of the proposal. The State reserves the right to waive any informality in the proposal format and minor irregularities.

1.9.2   State law requires that the original technical and cost proposal be submitted to the Purchasing Division.   All proposals must be submitted to the Purchasing Division **prior** to the

date and time stipulated in the RFP as the opening date. All bids will be dated and time stamped to verify official time and date of receipt.

1.9.3   Vendors mailing proposals should allow sufficient time for mail delivery to ensure timely arrival. In accordance with West Virginia Code §5A-3-11, the Purchasing Division cannot waive or excuse late receipt of a proposal which is delayed and late for any reason. Any proposal received after the bid opening date and time will be immediately disqualified in accordance with State law and the administrative rules and regulations.

### Vendors responding to this RFP shall submit:
One original technical and cost plus (6) convenience copies to:

> Purchasing Division
> 2019 Washington Street, East
> P.O. Box 50130
> Charleston, WV  25305-0130

The outside of the envelope or package(s) should be clearly marked:

> Buyer:   RW - 22
> Req#:    BMS90007
> Opening Date:   _____
> Opening Time:   1:30 pm

### 1.9.4. Best Value Purchasing Standard Format
All Requests for Proposals should follow the standard format defined by the Purchasing Division. This format addresses required areas and enables the agency to modify the background and scope of work to meet its needs.

1.9.4.1 *Evaluation Criteria*: All evaluation criteria must be clearly defined in the specifications section and based on a 100 point total score. Based on a 100 point total, cost shall represent a minimum of 30 of the 100 total points in the criteria.

1.9.4.2 *Proposal Format and Content*: Proposals shall be requested and received in two distinct parts: Technical and Cost. The cost portion shall be sealed in a separate envelope and will not be opened initially.

1.9.4.3 *Technical Bid Opening*: The Purchasing Division will open only the technical proposals on the date and time specified in the Request for Proposal. The Purchasing Division representative will read aloud the names of those who responded to the solicitation. The Purchasing Division Buyer will confirm that the original packages contain a separately sealed cost proposal prior to providing the courtesy copies to the agency to begin the evaluation process.

1.9.4.4 *Technical Evaluation*: The pre-selected, approved evaluation committee will review the technical proposals, deduct appropriate points for deficiencies and make a final written consensus recommendation to the Purchasing Division Buyer. If the Buyer approves the committee's recommendation, the technical evaluation will be forwarded to an internal review committee within the Purchasing Division.

1.9.4.5 *Cost Bid Opening*: Upon approval of the technical evaluation from the internal review

3

committee, the Purchasing Division shall schedule a time and date to publicly open and read aloud the cost proposals. The agency and the vendors shall be notified of this date.

1.9.4.6 *Cost Evaluation and Resident Vendor Preference*: The evaluation committee will review the cost proposals, assign appropriate points and make a final consensus recommendation to the Purchasing Division. In accordance with West Virginia Code §5A-3-37, the Purchasing Division will make the determination of the Resident Vendor Preference, if applicable. Resident Vendor Preference provides an opportunity for qualifying vendors to request at the time of bid preference for their residency status. Such preference is an evaluation method only and will be applied only to the cost bid in accordance with the West Virginia Code. A certificate of application is used to request this preference. A West Virginia vendor may be eligible for two 2.5% preferences in the evaluation process.

1.9.4.7 *Contract Approval and Award*: After the cost proposals have been opened, the evaluation committee completes its review and prepares the final evaluation making its recommendation for contract award based on the highest scoring vendor. The final evaluation is submitted to the Purchasing Division buyer. Once approved by the buyer, the final evaluation must be reviewed and approved by the Purchasing Division internal review committee. The contract is prepared and signed in the Purchasing Division, forwarded to the Attorney General's Office for approval as to form, encumbered and mailed to the appropriate parties.

1.10   Rejection of Proposals:
The State shall select the best value solution according to the evaluation criteria. However, the State reserves the right to accept or reject any or all proposals, in part or in whole at its discretion. The State reserves the right to withdraw this RFP at any time and for any reason. Submission of, or receipt by the State of proposals confers no rights upon the bidder nor obligates the State in any manner.

A contract based on this RFP and the Vendor's proposal, may or may not be awarded. Any contract resulting in an award from this RFP is not valid until properly approved and executed by the Purchasing Division and approved as to form by the Attorney General.

1.11   Incurring Costs:
The State and any of its employees or officers shall not be held liable for any expenses incurred by any bidder responding to this RFP for expenses to prepare, deliver the proposal, or to attend any mandatory prebid meeting or oral presentations.

1.12   Addenda:
If it becomes necessary to revise any part of this RFP, an official written addendum will be issued by the State to all bidders of record.

1.13   Independent Price Determination:
A proposal will not be considered for award if the price in the proposal was not arrived at independently without collusion, consultation, communication or agreement as to any matter relating to prices with any competitor unless the proposal is submitted as a joint venture.

1.14   Price Quotations:
The price(s) quoted in the bidder's proposal will not be subject to any increase and will be considered firm for the life of the contract unless specific provisions have been provided for

4

adjustment in the original contract.

### 1.15 Public Record:

#### 1.15.1 Submissions are Public Record.
All documents submitted to the State Purchasing Division related to purchase orders or contracts are considered public records. All bids, proposals or offers submitted by bidders shall become public information and are available for inspection during normal official business hours in the Purchasing Division Records and Distribution center after the bid opening.

#### 1.15.2 Written Release of Information.
All public information may be released with or without a Freedom of Information request, however, only a written request will be acted upon with duplications fees paid in advance. Duplication fees shall apply to all requests for copies of any document. Currently the fees are $0.50/page, or a minimum of $10.00 per request which ever is greater.

#### 1.15.3 Risk of Disclosure.
The only exemptions to disclosure of information are listed in West Virginia Code §29B-1-4. Primarily, only trade secrets, as submitted by a bidder, are exempt to public disclosure. The submission of any information to the State by a vendor puts the risk of disclosure on the vendor. The State does not guarantee non-disclosure of any information to the public.

### 1.16 Schedule of Events:

| | |
|---|---|
| Release of the RFP............................................................. | _____ |
| Vendor's Written Questions Submission Deadline............. | _____ |
| Response to Questions....................................................... | _____ |
| Mandatory Prebid Conference............................................ | _____ |
| Addendum Issued............................................................... | _____ |
| Bid Opening Date............................................................... | _____ |

### 1.17 Mandatory Prebid Conference:
A mandatory prebid conference shall be conducted on the date specified above at 1:30 PM. Said conference will be held at 350 Capitol Street, Room 251, Charleston, West Virginia 25301. **All interested bidders are required to be present at this meeting. Failure to attend the mandatory prebid conference shall automatically result in disqualification. No one person can represent more than one vendor.**

### 1.18 Purchasing Affidavit:
West Virginia Code §5A-3-10a requires that all bidders submit an affidavit regarding any debt owed to the State. The affidavit must be signed and submitted prior to award. It is preferred that the affidavit be submitted with the proposal.

### 1.19 General Terms and Conditions:

By signing and submitting its proposal, the successful Vendor agrees to be bound by all the terms contained in this RFP.

#### 1.19.1 Conflict of Interest:
Vendor affirms that it, its officers or members or employees presently have no interest and shall not acquire any interest, direct or indirect, which would conflict or compromise in any manner or degree with the performance or its services hereunder. The Vendor further

5

covenants that in the performance of the contract, the Vendor shall periodically inquire of its officers, members and employees concerning such interests. Any such interests discovered shall be promptly presented in detail to the Agency.

### 1.19.2 Prohibition Against Gratuities:

Vendor warrants that it has not employed any company or person other than a bona fide employee working solely for the vendor or a company regularly employed as its marketing agent to solicit or secure the contract and that it has not paid or agreed to pay any company or person any fee, commission, percentage, brokerage fee, gifts or any other consideration contingent upon or resulting from the award of the contract.

For breach or violation of this warranty, the State shall have the right to annul this contract without liability at its discretion or to pursue any other remedies available under this contract or by law.

### 1.19.3 Certifications Related to Lobbying:

Vendor certifies that no federal appropriated funds have been paid or will be paid, by or on behalf of the company or an employee thereof, to any person for purposes of influencing or attempting to influence an officer or employee of any Federal entity, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment or modification of any Federal contract, grant, loan or cooperative agreement.

If any funds other than federally appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee or any agency, a Member of Congress, an officer or employee of Congress or an employee of a Member of Congress in connection with this Federal contract, grant, loan or cooperative agreement, the Vendor shall complete and submit a disclosure form to report the lobbying.

Vendor agrees that this language of certification shall be included in the award documents for all sub-awards at all tiers, including subcontracts, sub-grants, and contracts under grants, loans, and cooperative agreements, and that all sub-recipients shall certify and disclose accordingly. This certification is a material representation of fact upon which reliance was placed when this contract was made and entered into.

### 1.19.4 Vendor Relationship:

The relationship of the Vendor to the State shall be that of an independent contractor and no principal-agent relationship or employer-employee relationship is contemplated or created by the parties to this contract. The Vendor as an independent contractor is solely liable for the acts and omissions of its employees and agents.

Vendor shall be responsible for selecting, supervising and compensating any and all individuals employed pursuant to the terms of this RFP and resulting contract. Neither the Vendor, nor any employees or contractors of the vendor, shall be deemed to be employees of the State for any purposes whatsoever.

Vendor shall be exclusively responsible for payment of employees and contractors for all wages and salaries, taxes, withholding payments, penalties, fees, fringe benefits, professional

6

liability insurance premiums, contributions to insurance and pension or other deferred compensation plans, including but not limited to, Workers' Compensation and Social Security obligations, and licensing fees, etc. and the filing of all necessary documents, forms and returns pertinent to all of the foregoing.

Vendor shall hold harmless the State, and shall provide the State and Agency with a defense against any and all claims including but not limited to the foregoing payments, withholdings, contributions, taxes, social security taxes and employer income tax returns.

The Vendor shall not assign, convey, transfer or delegate any of its responsibilities and obligations under this contract to any person, corporation, partnership, association or entity without expressed written consent of the Agency.

### 1.19.5 Indemnification:

The Vendor agrees to indemnify, defend and hold harmless the State and the Agency, their officers, and employees from and against: (1) Any claims or losses for services rendered by any subcontractor, person or firm performing or supplying services, materials or supplies in connection with the performance of the contract; (2) Any claims or losses resulting to any person or entity injured or damaged by the Vendor, its officers, employees, or subcontractors by the publication, translation, reproduction, delivery, performance, use or disposition of any data used under the contract in a manner not authorized by the contract, or by Federal or State statutes or regulations; and (3) Any failure of the Vendor, its officers, employees or subcontractors to observe State and Federal laws, including but not limited to labor and wage laws.

### 1.19.6 Contract Provisions:

After the successful Vendor is selected, a formal contract document will be executed between the State and the Vendor. In addition, the RFP and the Vendor's response will be included as part of the contract by reference. The order of precedence is the contract, the RFP and the Vendor's proposal in response to the RFP.

### 1.19.7 Governing Law:

This contract shall be governed by the laws of the State of West Virginia. The Vendor further agrees to comply with the Civil Rights Act of 1964 and all other applicable laws and regulations, Federal, State and Local Government.

### 1.19.8 Compliance with Laws and Regulations:

The vendor shall procure all necessary permits and licenses to comply with all applicable laws, Federal, State or municipal, along with all regulations, and ordinances of any regulating body.

The Vendor shall pay any applicable sales, use or personal property taxes arising out of this contract and the transactions contemplated thereby. Any other taxes levied upon this contract, the transaction, or the equipment, or services delivered pursuant here to shall be borne by the contractor. It is clearly understood that the State of West Virginia is exempt from any taxes regarding performance of the scope of work of this contract.

### 1.19.9 Subcontracts/Joint Ventures:

The Vendor is solely responsible for all work performed under the contract and shall assume prime contractor responsibility for all services offered and products to be delivered under the terms of this contract. The State will consider the Vendor to be the sole point of contact with

regard to all contractual matters. The Vendor may, with the prior written consent of the State, enter into written subcontracts for performance of work under this contract; however, the vendor is totally responsible for payment of all subcontractors.

### 1.19.10 *Term of Contract & Renewals*:

This contract will be effective (date set upon award) and shall extend for the period of one (1) year, at which time the contract may, upon mutual consent, be renewed. Such renewals are for a period of up to one (1) year, with a maximum of four (4) one year renewals, or until such reasonable time thereafter as is necessary to obtain a new contract. The "reasonable time" period shall not exceed twelve (12) months. During the "reasonable time" period the Vendor may terminate the contract for any reason upon giving the Agency ninety (90) days written notice. Notice by Vendor of intent to terminate will not relieve Vendor of the obligation to continue to provide services pursuant to the terms of the contract.

Any change in Federal or State law, or court actions which constitute binding precedent in West Virginia, and which significantly alters the Vendor's required activities or any change in the availability of funds, shall be viewed as binding and shall warrant good faith renegotiation of the compensation paid to the Vendor by the Agency and of such other provisions of the contract that are affected. If such renegotiation proves unsuccessful, the contract may be terminated by the State upon written notice to the Vendor at least thirty (30) days prior to termination of this contract.

### 1.19.11 *Non-Appropriation of Funds*:

If the Agency is not allotted funds in any succeeding fiscal year for the continued use of the service covered by this contract by the West Virginia Legislature, the Agency may terminate the contract at the end of the affected current fiscal period without further charge or penalty. The Agency shall give the vendor written notice of such non-allocation of funds as soon as possible after the Agency receives notice. No penalty shall accrue to the Agency in the event this provision is exercised.

### 1.19.12 *Contract Termination*:

The State may terminate any contract resulting from this RFP immediately at any time the Vendor fails to carry out its responsibilities or to make substantial progress under the terms of this RFP and resulting contract. The State shall provide the Vendor with advance notice of performance conditions which are endangering the contract's continuation. If after such notice the Vendor fails to remedy the conditions contained in the notice, within the time period contained in the notice, the State shall issue the Vendor an order to cease and desist any and all work immediately. The State shall be obligated only for services rendered and accepted prior to the date of the notice of termination.

The contract may also be terminated by the State with thirty (30) days prior notice.

### 1.19.13 *Changes*:

If changes to the original contract become necessary, a formal contract change order will be negotiated by the State, the Agency and the Vendor, to address changes to the terms and conditions, costs of work included under the contract. An approved contract change order is defined as one approved by the Purchasing Division and approved as to form by the West Virginia Attorney General's Office, encumbered and placed in the U.S. Mail prior to the effective date of such amendment. An approved contract change order is required whenever the change affects the payment provision or the scope of the work. Such changes may be

8

necessitated by new and amended Federal and State regulations and requirements.

As soon as possible after receipt of a written change request from the Agency, but in no event more than thirty (30) days thereafter, the Vendor shall determine if there is an impact on price with the change requested and provide the Agency a written statement to identifying any price impact on the contract or to state that there is no impact. In the event that price will be impacted by the change, the Vendor shall provide a description of the price increase or decrease involved in implementing the requested change.

## NO CHANGE SHALL BE IMPLEMENTED BY THE VENDOR UNTIL SUCH TIME AS THE VENDOR RECEIVES AN APPROVED WRITTEN CHANGE ORDER.

### 1.19.14 *Invoices, Progress Payments, & Retainage*:
The Vendor shall submit invoices, in arrears, to the Agency at the address on the face of the purchase order labeled "Invoice To" pursuant to the terms of the contract. Progress payments may be made at the option of the Agency on the basis of percentage of work completed if so defined in the final contract. Any provision for progress payments must also include language for a minimum 10% retainage until the final deliverable is accepted.

If progress payments are permitted, Vendor is required to identify points in the work plan at which compensation would be appropriate. Progress reports must be submitted to Agency with the invoice detailing progress completed or any deliverables identified. Payment will be made only upon approval of acceptable progress or deliverables as documented in the Vendor's report. Invoices may not be submitted more than once monthly and State law forbids payment of invoices prior to receipt of services.

### 1.19.15 *Liquidated Damages*: (Agency Option if appropriate)
According to West Virginia State Code §5A-3-4(8), Vendor agrees that liquidated damages shall be imposed at the rate of $1,000.00 per week for failure to provide deliverables. This clause shall in no way be considered exclusive and shall not limit the State or Agency's right to pursue to any other additional remedy to which the State or Agency may have legal cause for action including further damages against the Vendor.

### 1.19.16 *Record Retention (Access & Confidentiality)*:
Vendor shall comply with all applicable Federal and State of West Virginia rules and regulations, and requirements governing the maintenance of documentation to verify any cost of services or commodities rendered under this contract by Vendor. The Vendor shall maintain such records a minimum of five (5) years and make available all records to Agency personnel at Vendor's location during normal business hours upon written request by Agency within 10 days after receipt of the request.

Vendor shall have access to private and confidential data maintained by Agency to the extent required for Vendor to carry out the duties and responsibilities defined in this contract. Vendor agrees to maintain confidentiality and security of the data made available and shall indemnify and hold harmless the State and Agency against any and all claims brought by any party attributed to actions of breach of confidentiality by the Vendor, subcontractors or individuals permitted access by Vendor.

## PART 2 OPERATING ENVIRONMENT

2.1    Location: Agency is located at 350 Capitol Street, Room 251, Charleston, WV 25301.

2.2    Background: The Bureau for Medical Services (BMS), the Bureau for Children and Families (BCF), and the Bureau for Behavioral Health and Health Facilities (BHHF) are seeking a vendor to provide a quality comprehensive utilization management system that would be used across Bureaus. The program would prior authorize both behavioral health and medically necessary services as well as socially necessary services. The system will also be able to provide accurate and timely data reports on service utilization for all services under this RFP.

## PART 3 SCOPE OF WORK

### 3.1 General Requirements

3.1.1    Vendor is to manage program utilization through prior authorization and intensive case management to assure that those services, which are covered by Medicaid, BCF and BHHF, are sufficient in extent, duration, and scope, that the provision of those services are appropriately documented in provider and recipient files, and that the services rendered are authorized within the Medicaid, Child Welfare and Behavioral Health Program coverage and benefit limitations in effect as of the date of service.

3.1.2    Vendor is responsible for any data processing or systems modifications required to accomplish systems access during the life of the contract without the requiring of modifications to the existing (agency) systems.

3.1.3    Vendor is to maintain secure electronic communication with Bureau for Medical Services (BMS), BCF, BHHF, and/or contractors which have financial, case management, and/or custody responsibilities for members.

3.1.4    Vendor is to have a communication plan that will provide feedback to the Medicaid Program and our sub contractors, which will assist in the statewide administration of the Medicaid Program, Child Welfare and BHHF, through generating utilization profiles on all the program areas subject to review and utilization management.

3.1.5    Vendor is to communicate denial notices to the provider, member, and/or member's legal representative when appropriate, and how they will specify what elements of admission and continued stay criteria were not met, and include provider/ practitioner reconsideration and the member's right to appeal for state fair hearing.

3.1.6    Vendor is to meet the same requirements concerning the Medicaid agency's obligation to assure that services reimbursed by Medicaid are medically necessary, appropriate, provided in the appropriate setting, and most cost effective manner for that target population identified. – (such as the Bureau for Children and Families and covered under their "special medical card" process, for out of state residential facilities under a provider agreement with the Bureau for Children and Families.)

3.1.7    Vendor is to perform functions necessary to support compliance with state and federal requirements for medically necessary services.

3.1.8    Vendor is to have the capacity to accept all prior authorizations in a web based format.

3.1.9 Vendor is responsible for providing service and retrospective reviews for authorizations requests as outlined in policy.

3.1.10 Vendor is responsible for providing start-up and operations tasks and subtasks including access to agency or other systems including the Medicaid Management Information System (MMIS) and the Family and Children's Tracking System (FACTS), utilization review and authorization of utilization management of all behavioral and medical services listed and socially necessary services in this document. The Families and Children Tracking System (FACTS) bi-directional interface and all of the associated electronic data structures, data transmittal processing and application functionality will remain unchanged. The Vendor is required to accept data transfers in the current formats and correct exceptions for processing. This includes but is not limited to changes in the client identification that supports utilization reporting.

3.1.11 Vendor is to provide timely reports and accurate reporting and analysis of practices for all areas of review. This plan may be accomplished through, but not limited to, such activities as accurate and timely data reporting, trend analysis, and retrospective reviews for authorization and meeting of invoicing requirements of BCF, BMS, and BHHF.

3.1.12 Vendor is to assure that denial notices specify criteria which were deemed "not met" in the behavioral or medical necessity review or socially necessary review.

3.1.13 Vendor is to receive requests via secure electronic media, web based, telephonic, or written request through the mail for all services that require medical necessity. Vendor is to receive web based requests for all socially necessary services.

3.1.14 Vendor is to develop, utilization and on-going analysis of a basic medical/behavioral health assessment (which may be standardized and specified by the Department) to be used for initial and on-going assessment of consumer progress in treatment, identification of appropriateness of level of service, and for preparation of certain federal reports ( NOMS , TEDS, URS tables, Block grant report requirement); said assessment shall include a specific subsection for individuals with addictive disorders and/or children/adolescents; information to be collected from State psychiatric hospitals, upon entry into the system, at regular intervals and at critical treatment junctures; production of requested reports as necessary; also, collection of the same basic demographic information regarding individuals admitted to private free-standing or distinct part psychiatric hospitals as diversion from state-operated psychiatric hospitals upon admission.

3.1.15 Vendor is to collect and process basic information about persons served under the Clinic and Rehabilitation, Psychology, and other behavioral health specialty manuals including demographic information, diagnosis, medical eligibility for service, level of service need and other basic service information; information to be collected upon initial entry into the system, at regular intervals and at critical junctures.

3.1.16 Vendor is to collect and process the same basic information submitted by licensed behavioral health providers and socially necessary providers as required by the Department in contract/enrollment for individuals who are uninsured, other third party insured, or receiving services not funded by Medicaid; information to be collected upon initial entry into the system, at regular intervals, and at critical treatment junctures.

3.1.17    Vendor is to collaborate with the Department's fiscal agent in order to collect data necessary to produce quarterly reports regarding service utilization, prior authorization, and demographics; processing of such reports as necessary.

3.1.18    Vendor is to provide technical assistance and training for BHHF providers regarding trends/performance/documentation/assessment/medical eligibility for services as requested not to exceed one per month in each agency region.

The Department agrees to provide the following:

Arrange for meetings with appropriate Department personnel for ongoing discussions and briefings with Vendor personnel as necessary and/or requested in order to meet the service requirements of this contract.

Use its best efforts to process for payment, in accordance with State law, Vendor's legitimate and uncontested invoice, for goods and services which have been delivered and accepted. Contractual charges must be submitted in a State approved invoice format.

Provide to the Vendor copies of all current administrative regulations, policies and guidelines which are applicable to the performance of the Vendor's duties. At the scope of this contract, but not included in its initial implementation. The Department will define such additional work requirements to the Vendor in writing. Department acceptance of the work plan and pricing proposal will also be provided to the Vendor in writing following State Purchasing approval of appropriate contract change order. In no instance shall any extra contractual work be commenced prior to State Purchasing approval of contract addendum.

The Department may identify the need for additional work activities within the scope of this contract, but not included in its initial implementation. The Department will define such additional work requirements to the Vendor in writing. Department acceptance of the work plan and pricing proposal will also be provided to the Vendor in writing following State Purchasing approval of appropriate contract change order. In no instance shall any extra contractual work be commenced prior to State Purchasing approval of contract addendum.

### 3.1.2  Mandatory Requirements

3.1.2.1    Vendor shall meet the federal requirements concerning the Medicaid agency's obligation to assure that services reimbursed by Medicaid are necessary and appropriate and provided in the appropriate setting and most cost effective manner. (42 CFR Part 456 Subpart B)

3.1.2.2    Vendor shall be responsible for authorizing services in conformance with current Medicaid Program coverage policy and benefit limitations. To meet this requirement, the Vendor must validate the member eligibility and Managed Care Organization (MCO) enrollment status of each request. If the member is assigned to an MCO or has other primary insurance coverage, the provider must be notified that the request must be submitted to the primary payer in conformance with the coverage, rules and procedures of the MCO or primary payer. If service is not covered by the MCO or primary payer, Medicaid will not cover.

3.1.2.3    Vendor shall provide prior authorize services as outlined in the member's benefit plan and the vendor is to respond within a 48 hour time frame for any prior authorizations requests. Vendor shall provide a process for reconsideration to that takes no longer than 48 hours.

12

3.1.2.4    Vendor shall authorize the most economically advantageous item or service deemed to meet the member's behavioral or medical requirements.

3.1.2.5    Vendor shall refer any instances of suspected fraud to the Bureau's Office of Quality and Program Integrity (OQPI). Instance of suspected fraud in the delivery of socially necessary services shall be reported to the BCF Office of Finance and Administration.

3.1.2.6    Vendor shall attend and participate in member hearings as requested or on behalf of a member who disputes their denial of services.  The Vendor is to attend the hearing either in person or telephonically, whatever is required by the Bureau's.

3.1.2.7    Vendor shall maintain an office and professional staff in Charleston, West Virginia. Vendor's office location shall be in a separate location from the state agency or Medicaid bureau. Vendor must carry out professional review and administrative activities from their Charleston, WV office location because of frequent meetings with the BMS, BCF, and BHHF.

3.1.2.8    Professional staff shall include at a minimum registered nurses, physician advisors, psychiatrists, licensed psychologists, licensed MSW's, and physicians available for review and reconsideration.

3.1.2.9    For all review activities for which there is national standard criteria available, the Vendor must identify those criteria (Interqual is preferred but not required), and provide an analysis of the pros and cons of utilizing said criteria in the West Virginia Medicaid contract.  In evaluating the proposals, the Bureau may, at its option, require use of any or all criteria sets so identified. Also, Council on Accreditation (COA) standards or other standards as identified and recommended by BCF.

3.1.2.10   Vendor must review and stay current with evidenced based criteria, and if appropriate and necessary, recommend updates and/or alternative criteria.  If there is no specified criteria for a requested non-covered service at the request of the bureau the vendor will research and render a recommendation subject to Bureaus' approval.

3.1.2.11   All tracking of information for statistical and reporting purposes must be performed utilizing Medicaid member ID, Family and Children's Tracking System (FACTS) Client ID, and provider ID numbers, in addition to any Social Security numbers and/or provider FEIN numbers.

3.1.2.12   Any denial notices, shall be communicated in writing to the referring practitioner, provider of services, admitting facility, member and legal representative.  Any approval notices shall be communicated in writing as deemed appropriate by Bureau.

3.1.2.13   Any denial notices shall identify criteria which were deemed not met during the review process and advise the practitioner of the reconsideration process and the member of their right to appeal.

3.1.2.14   Vendor shall have a system to ensure emergency admissions, or an admission in which member eligibility for the service is determined retroactively, will be subject to retrospective review.

3.1.2.15   Vendor shall issue prior authorizations through direct entry into the prior authorization module of the Medicaid Management Information System (MMIS) or

13

through the electronic interface with FACTS and MMIS or other means with approval from the Bureau.

3.1.2.16 Vendor shall review both in network and out of network services for medically necessity at the closest in network location. This also applies to the services covered by the BCF "special medical card", group residential facilities and Psychiatric Residential Treatment Facilities (PRTF's) located outside the borders of WV, the WV Children's Home and Socially Necessary Services.

3.1.2.17 Retroactive Quality Review - A review for Socially Necessary Services covered by the Bureaus shall be conducted by the vendor. This review process shall include analysis of the services provided by the specific provider, an assurance that the staff providing the service and/or the agency have the appropriate and current credentials necessary and that the case documentation and invoice reflect that the service was provided according to the established UM Guidelines. Providers shall be reviewed on an 18 month cycle unless a request is made by either Bureau for a specific provider(s).

3.1.2.18 Vendor shall provide the BCF OF&A a schedule of retroactive quality reviews to be conducted on Socially Necessary service providers. The BCF OF&A shall provide a sampling of invoices to the vendor for claims made for socially necessary services. As a part of the retrospective review, the vendor shall review the supporting documentation in the provider records to ensure the services invoiced and paid for have been provided and all reports have been sent to the Department.

3.1.2.19 Any work product developed during the course of implementation can not be considered proprietary.

3.1.2.20 Vendor shall provide BMS a schedule of all retroactive quality reviews to be conducted for BMS service providers. As a part of the review process the vendor shall propose a quality management plan for the BMS services as well as a schedule of the review cycle. This will include all the total quality management services for the Title XIX Mental Retardation/ Developmental Disabilities Waiver in order to meet the CMS standards for the program.

3.1.2.21 Vendor shall indicate use of any subcontractor and obtain BMS approval for the subcontractor.

3.1.2.22 Vendor shall submit to a readiness review at least 30 days prior to implementation.

3.1.2.23 Vendor shall at the expiration of this contract or at anytime that the Agency desires a transition of all or any part of the duties or obligations the Vendor will be given sixty day notice. A turnover process will commence immediately at no cost to the agency.

3.1.2.24 In the event that a subsequent vendor is unable to assume operations on the planned date of transfer, the Vendor will continue to perform all services on a month to month basis for up to six months beyond the planned turnover date.

3.1.2.25 The vendor will complete a turnover plan within 180 days of the contract award and the plan must be approved by BMS.

### 3.1.3 REPORTING (Mandatory)

3.1.3.1 Standard on-going reports shall be generated at a fixed time each month as agreed upon by all parties. Any change in the agreed upon time for generating standard reports will be agreed to in a formal written document. Only upon the written

14

   direction of agency, shall the Vendor supply copies of information and reports to other parties.

3.1.3.2  Vendor shall provide the agency and its sub contractors with ad hoc reports as requested. No report request should take longer than 14 days to complete.

3.1.3.3  Vendor shall generate accurate and timely monthly reports to the agency and its sub contractors.

3.1.3.4  Monthly Report on service utilization with year to date totals.

3.1.3.5  Monthly Number of members approved, denied services, and overall approval and denial rates.

3.1.3.6  Monthly Number and disposition of requests for reconsideration and overall approval and denial rates.

3.1.3.7  Monthly Reports to include the cost of the services and the cost of UM activity.

3.1.3.8  Quarterly Report on all training and technical assistance activities related to utilization management activities.

3.1.3.9  Vendor is to provide diagnostic, and symptom otology reports for behavioral health services.

### 3.1.4.1  UTILIZATION/PRIOR AUTHORIZATION SERVICES

Vendor is to assure that the following factors are considered or verified prior to issuing approval for covered services. Note: the fiscal agents of Medicaid and subcontractors' online system can assist with the verification of some of the following factors:

- Verify member eligibility and Managed Care Organization (MCO) coverage.
- Verify BHHF eligibility.
- Verify referral for socially necessary services by BCF workers.
- Verify provider and facility enrollment.
- Verify and communicate to agency if there are other payer sources involved with the services being requested, i.e., Rehabilitation, Workers' Compensation, Third Party.
- Verify that the service requested is actually covered by the Benefit Plan.
- Verify service limits or if there are limitations attached to the coverage.
- Verify that the appropriate CPT/HCPCS codes and service codes have been identified for the service requested.
- Professional staff ( such as Physician Advisor, Nurse Reviewer, Social Worker) must be able to review for behavioral and medical necessity, social necessity, appropriateness, cost efficiency and approve services based on Medicaid coverage, SN coverage, and behavioral health coverage guidelines, limitations, and eligibility.
- Accommodate the use of the National Provider Number (NPI)

## 3.1.4.2  BUREAU FOR CHILDREN & FAMILIES

The BUREAU OF CHILDREN & FAMILIES provides and/or arranges for a variety of social services that are socially necessary (SN) for children, youth and families in WV. The Social Services to be covered are those direct services covered under Child Protective Services

(CPS), Youth Services (YS), Foster Care and Adoption. Vendor is to utilize established Socially Necessary definitions according to BCF policies and standards. Any deviation from these standards must have BCF prior approval. Vendor is to work collaboratively with the Department and to perform functions necessary to support compliance with state and federal requirements for Child Welfare Services (Family Support, Family Perseveration, Foster Care, Reunification and Adoption.)

The following list of services require prior authorization. Specific definitions of services may be subject to change due to changes in federal or state regulations, or changes in state child welfare policy.

a) Needs Assessment/Service Plan
b) Case Management
c) Adult Life Skills
d) General Parenting
e) Individualized Parenting
f) Child-Oriented Activity
g) Group Child-Oriented Activity
h) Public Transportation Family
i) Private Transportation
j) Agency Transportation
k) Safety Services
l) Emergency Respite
m) Supervision
n) Social/ Emotional Support
o) Comprehensive Assessment and Planning System (CAPS) Family Assessment
p) Case Management (CAPS)
q) Family Crisis Response
r) Respite
s) Home Maker Services
t) Supervised Visitation One
u) Supervised Visitation Two
v) Multi disciplinary treatment team (MDT) Attendance
w) In State Home Study
x) Out of State Home Study
y) Intervention Travel Time
z) Transport Time
aa) Connection Visit
bb) Daily Respite
cc) Tutoring
dd) Lodging
ee) Meals
ff) Intensive Therapeutic Recreation Exp
gg) Pre-Reunification Support
hh) Away From Supervision Support
ii) Public Transportation One
jj) Public Transportation Two
kk) Public Transportation Three
ll) Private Transportation One Foster Family
mm) Private Transportation Two Foster Family
nn) Private Transportation Three Foster Family
oo) Agency Transportation One

16

pp) Agency Transportation Two
qq) Agency Transportation Three
rr) Chafee Pre Placement
ss) Chafee 2/1
tt) Chafee 2/2
uu) Crisis Respite
vv) Lodging Pre Adoptive
ww) Meals Pre Adoptive
xx) Family and Needs Assessment
yy) Individual Review
zz) Community Based Teams

### 3.1.4.3 BUREAU FOR HEALTH & HEALTH FACILITIES

Current list of BHHF services or programs requiring prior authorization. Specific codes or services may be subject to change due to changes in national codes, changes in federal or state regulations, or changes in state BHHF policy.

a) Forensic Psychiatric
b) Forensic Psychological
c) Targeted Case Management
d) Service Coordination
e) Behavioral Health Specialty, Clinic and Rehab
f) Behavioral Health Services for the uninsured
g) Psychiatric Admissions- Inpatient private and state
h) Psychiatric Residential Treatment Facilities (PRTF)
i) Substance Abuse Residential
j) Preparation of Waiver Packets
k) Behavioral Health Support Services
l) Peer support services
m) Mental Health Supervised Residential
n) Crisis Intervention

### 3.1.4.4 BUREAU FOR MEDICAL SERVICES

Current list of Bureau for Medical Services (Medicaid) services or programs requiring prior authorization. Specific codes or services may be subject to change due to changes in national codes, changes in federal or state regulations, or changes in state Medicaid policy.

Each of the broad general service areas listed below have a number of different components which will be subject to medical necessity review, authorization, and reporting. The Bureau utilizes MCO services for a part of its population. For those services which are MCO covered, and for members who are assigned to an MCO, the utilization review prior approval requirements are the responsibility of the MCO, (subject to the coverage, rules, and authorization procedures specific to the MCO) not to be subject to review by the potential vendor bidding on this RFP.

a) Targeted Case Management (TCM)

Vendor is to review all targeted case management service requests requiring prior authorization. Vendor may only PA TCM requests for one provider per member if requested by BMS.

17

b) Clinic, Rehab Services and Crisis Stabilization

The Vendor is to review all clinic, rehabilitation services, and crisis stabilization requests requiring prior authorization.

c) General and Acute Care Inpatient Hospital Admission and Continued Stay review.

All inpatient admissions are to be reviewed subject to the Agency approved criteria.

All inpatient psychiatric admissions are subject to continued stay reviews. The initial admission will be assigned a length of stay not to exceed four (4) days, with continued stay re-certification consistent with the patient's needs as defined by the applicable criteria. Any inpatient stays not paid by DRG will be subject to continues stay.

Prior authorization/review of extended stay beyond four (4) days for individuals diverted to private free-standing or distinct part psychiatric hospitals as diversion from state-operated psychiatric hospitals; authorization to be provided or denied within 24 hours of request (excepting weekends/holidays); evaluation of appropriateness to be conducted by a licensed clinical behavioral health professional or medical professional with behavioral health experience.

d) Psychiatric Inpatient Facilities, Psych Under 21years of age, and PsychiatricResidential Treatment Facilities (PRTF) for Individuals under 21 years of age (In State and Out of State)

Vendor is to prior authorize all PRTF services (In State and Out of State), to be provided within 48 hours of request; authorization to be evaluated by a licensed clinical behavioral health professional or medical professional with behavioral health experience or behavioral health professional in direct supervision for licensure.

Documentation will consist of State specified, plus any other Vendor specified documentation. Any admission or continued stay approval must establish subsequent review intervals.

Approval and denial notices will be communicated electronically to the referring practitioner or facility, the admitting facility, the member's legal representative, and if the child is involved in the child welfare system of agency, the specific Bureau within agency (BCF/BHHF) and the agency case worker must also receive a copy of the notice.

Notices of children/youth who have stabilized or are not making satisfactory progress to where they may not meet medical necessity criteria will be communicated electronically to the facility at which the child/youth is placed and the appropriate Bureau(s) within agency.

e) Organ Transplant Services

Vendor is to review all requests for organ transplant services for prior authorization. Vendor may recommend additional or alternative criteria, which may be implemented upon approval by the Bureau for Medical Services. Vendor is to perform continuing medical case management for post operative organ transplant patients.

f) Partial Hospital Services

Vendor is to review all requests for partial hospital services for prior authorization.
Vendor is to review for medical necessity and authorize services subject to coverage, policy,
and limitations with established criteria.

g) Inpatient Rehabilitation Services for Individuals through 20 years of age in Freestanding
   Rehabilitation Facilities

Review admission referrals from professional medical practitioners, and make a determination
based on the referral information treatment plan, and in light of established criteria, that the
services required by the member can only be provided in an inpatient setting.

The Vendor is to certify medical necessity for initial admission and designate an initial length of
stay and perform periodic re-certifications for continued stay until the member has either aged
out of the rehabilitation service, or reached maximum rehabilitation potential.

h) General Dentistry, Orthodontic and Oral Health Services

Vendor is to review general dentistry, orthodontic and oral/maxillofacial procedures/services
that require prior authorization. Requests for prior authorization must include x-rays and dental
molds as appropriate.

i) Occupational Therapy (OT)/ Physical Therapy (PT)

Vendor is to review occupational and physical therapy requests after members have received
twenty (20) visits per calendar year.

Vendor is to monitor the members benefit plan to assure that the allowances (20 therapies
Occupational Therapy, Physical Therapy, Speech Therapy combined) are not exceeded for
basic plan members.

j) Speech (ST)/ Language, and Audiology Services

All specified speech/language and audiology services to include hearing aids, speech
generating devices and cochlear implants require prior authorization.

Vendor is to monitor the members benefit plan to assure that the allowances (20 therapies
Occupational Therapy, Physical Therapy, Speech Therapy combined) are not exceeded for
basic plan members.

k) Durable Medical Equipment/Medical Supplies

Vendor is to review all durable medical equipment/ medical supplies requests for
equipment/supplies requiring prior authorization.

l) Orthotic and Prosthetic Services

Vendor is to review all orthotic and prosthetic requests for devices requiring prior authorization.

m) Chiropractic Services

Vendor is to review all chiropractic service requests for services requiring prior authorization regardless of place of service.

n) Diagnostic Imaging/Radiology Services

Vendor is to review all radiology services requiring prior authorization, regardless of place of service.

o) Elective Surgery Procedures

All elective surgery procedures regardless of place of service (ie. Inpatient or out patient setting, ambulatory surgery center or physician office) will require medical necessity review and prior authorization. This includes the gastric bypass procedures.

p) Out-of-Network Services

All out-of-network procedures/ services, whether performed in inpatient or outpatient settings, will require prior authorization from the vendor. Vendor will be required to inform the out-of-network provider of the process for enrollment. Vendor will need to assure that services can not be provided in the network. Vendor will assure that the out-of-network enrollment will be time limited to coincide to the prior authorization period. All out of network requests must be requested by a WV Medicaid enrolled practitioner. All documentation supporting the request must be from the Medicaid enrolled practitioner. Vendor is to request follow up from the referring physician - if appropriate and available to be completed in network.

q) Podiatry

Vendor is to review all podiatry procedure/service requests requiring prior authorization.

r) Cardiac Rehabilitation

Vendor is to review covered cardiac rehabilitation services for medical necessity.

s) Pulmonary Rehabilitation

Vendor is to review covered pulmonary rehabilitation services for medical necessity.

t) Medical Case Management

Certain categories of members will automatically be assigned to case management. Those include organ transplant patients, private duty nursing services members, and members who have had gastric bypass. Others may be identified based on claims history reflecting inordinately high costs or intensity of services and /or other populations as defined by the Bureau for Medical Services or recommended by the vendor. The Vendor must evaluate referrals from medical case management to determine the feasibility of achieving significant improvements in member outcomes from coordination of services or fiscal advantages to managing the member services required. Vendor is to coordinate member services upon referral from BMS as needed.

20

u) Psychiatric Services

Vendor is to review all psychiatric service requests requiring prior authorization.

Prior authorization of court-ordered forensic psychiatric evaluations for which the provider is requesting payment exceeding the cap(s) set by policy at BHHF; authorization to be provided within the same day of request if clinician is on site performing evaluation as request is made, within 48 hours if clinician is not on site; authorization to be provided by a licensed psychiatrist, licensed psychologist or an individual under direct supervision for a license as a psychologist (with gold card);

v) Psychological services

Vendor is to review all psychological service requests requiring prior authorization.

Prior authorization of court-ordered forensic psychological evaluations for which the provider is requesting payment exceeding the cap(s) set by policy at BHHF; authorization to be provided within the same day of request if clinician is on site performing evaluation as request is made, within 48 hours if clinician is not on site; authorization to be provided by a licensed psychologist or an individual under direct supervision for a license as a psychologist (with gold card);

Review admission referrals from professional medical practitioners and/or facilities, and make a determination based on the referral information treatment plan, and in light of established criteria, for out of state group residential settings and the WV children's Home in which children/youth are in agency custody, is an open Child Protective Services (CPS) / Youth Services (YS) customer.

Prior authorization on certain high volume and/or high cost community-based outpatient or residential services as identified by BHHF and according to standards to be developed in conjunction with the contractor, within 24 hours if a crisis service, within 48 hours if otherwise; assessment to be made by a licensed clinical behavioral health professional or an individual under direct supervision for licensure;

w) Home health

Vendor is to prior authorize home health services after sixty (60 units) of all home health services per individual in a calendar year. For those in the basic benefit prior authorization is required for all services, to a maximum benefit of 25 units a year.

x) Hospice

Vendor is to prior authorize all hospice service requests for diagnosis and documentation on the member with less than 6 months of life expectancy.

y) Personal Care

Vendor is to prior authorize personal care services and any provision of dual services to Aged and Disabled Waiver members.

z) Socially Necessary Services

Vendor is to review all socially necessary services requests requiring prior authorization.

aa) MR/DD Waiver Packets

Vendor is to provide a system for prior authorization of BHHF funded MR/DD waiver packets.

bb) Private Duty Nursing

Vendor is to review and prior authorize all private duty nursing requests.

## 3.3 **Special Terms and Conditions:**

### 3.3.1 Bid and Performance Bonds:

A Performance Bond is only required of the successful Vendor. The Performance Bond will be in the amount of one and one half million dollars ($1,500,000). Prior to the issuance of each renewal option, the Vendor must present the Bureau with proof of a Performance Bond.

### 3.3.2 Insurance Requirements:

The Vendor as an independent Contractor is solely liable for the acts and omissions of its employees and agents. Proof of insurance will be provided by the Vendor at the time the contract is awarded. The Vendor will maintain and furnish proof of coverage of liability insurance for loss, damage, or injury (including death) of third parties arising from acts, and omissions on the part of the Vendor, its agents and employees in the following amounts:

- a. For bodily injury (including death): minimum of $500,000.00 per person and a minimum of $1,000,000.00 per occurrence.
- b. For property damage and professional liability: a minimum of $1,000,000.00 per occurrence.

### 3.3.3 License Requirements:

Provide certification that Vendor is registered with the Secretary of State's Office to do business in West Virginia; provide evidence that Vendor is in good standing with the State Agency of Employment Programs as to Unemployment Compensation coverage and Worker's Compensation coverage or exempt from such coverage.

3.3.4 Litigation Bond: Non-applicable to this proposal.

### 3.3.5 HIPAA Business Associate Addendum:

The West Virginia State Government HIPAA Business Associate Addendum (BAA), approved by the Attorney General, and available online at the Purchasing Division's web site (http://www.state.wv.us/admin/purchase/vrc/hipaa.htm) is hereby made part of the agreement. Provided that, the Agency meets the definition of a Covered Entity (45 CFR§160.103) and will be disclosing Protected Health Information (45 CFR§160.103) to the vendor.

### 3.3.6 Debarment and Suspension:

Vendor will not be considered in proposal process if debarred or suspended. Vendor must certify that no entity, agency or person associated with the vendor is debarred or suspended

from conducting business with any federal or state agency of the United States of America.

## PART 4    PROPOSAL FORMAT

### 4.1    Vendor's Proposal Format:

The proposal should be formatted in the same order, as listed below:

**Title page** - Should state the RFP Subject and number, the name of the Vendor, Vendor's business address, telephone number, name of authorized contact person to speak on behalf of the Vendor, dated and signed.

**Table of Contents** - Clearly identify the material by section and page number.

### Section I    Understanding of the Project Objectives and Time Lines

Vendor is to respond with a proposal that reflects their understanding of the project objectives in Part 3 and a process for accomplishing the prior authorization services in a professional and efficient manner in accordance with federal and state requirements for each bureau. In addition to the services identified in Part 3, the Vendor is requested to provide the Optional Services listed below for each bureau.

### BUREAU FOR CHILDREN & FAMILIES

aaa)    **Other Socially Necessary Services - (Optional)**
Prior authorization and retrospective reviews of additional SN services approved by the BCF.

### BUREAU FOR HEALTH & HEALTH FACILITIES

No optional services listed.

### BUREAU FOR MEDICAL SERVICES

**Optional List of Services: Bureau for Medical Service's may implement.**

cc)    Aged and Disabled Waiver **(Optional)**

Vendor is requested to propose a methodology for conducting both the initial evaluation for individuals referred to the Aged and Disabled Waiver program who are not currently enrolled, as well as periodic re-evaluation to establish eligibility for continued participation. Both the initial evaluation for new patients seeking to enter the Waiver Program, and the first re-evaluation of patients currently receiving waiver services, will require a comprehensive evaluation of all the Preadmission Screening instrument's elements and all components of the criteria. The purpose of requiring that level of review or evaluation is to determine that patients coming into the program fully meet eligibility criteria, and to assure that member's currently in the program also fully meet all elements of criteria. Subsequent annual re-evaluations need not be as comprehensive or intensive as the initial evaluation and the first re-evaluation. Subsequent re-evaluations may focus on only those elements of a patient's condition, which might reasonably be expected to change over time. Vendor is to propose a review process which meets the following:

23

Assure that the medical eligibility determination process is conducted pursuant to approved criteria, and that the process is fair, equitable, and consistently applied throughout the state.

All initial evaluations is to be completed within thirty (30) working days following receipt of referrals. Annual re-evaluations must occur prior to the anniversary date of the initial evaluation.

Contact must be establish with the initial applicant, and arrange for a face to face evaluation in order to meet the time frame of a completed review within 30 days of the referral date.

Contact if done via telephone must be from a telephone that can be easily identified as the vendor's telephone number. Vendor must have standard toll free number applicants/members to contact.

This timeframe includes the contact if made with the applicant and/or contact person (if applicable), to schedule a home visit allowing at least two weeks notice. It also includes the two weeks for additional information to be obtained in the event a potential denial is issued.

If the applicant has identified a guardian, no home visit shall be scheduled without presence of the guardian, contact person or legal representative; and/or if the physician referral form indicates that the applicant suffers from Alzheimer's multi-infarct, senile dementia, or related condition, no home visit shall be scheduled without another individual designated by the applicant present to assist the individual during the interview. BMS will be notified with a remedial action plan, of any extenuating circumstances that may impact the turn around time for initial evaluations.

If the field staff is unable to establish contact after three exhaustive episodes of attempts, the referral source must be notified of the fact within three days of referral receipt

At the time of the field staff face to face visit with the member/applicant, information will be obtained on which to base the medical eligibility determination for participation in the Waiver Program. Additionally, the applicant will at that time be provided a list of available case management and homemaker agencies within their region, and requested to indicate their selection should they be approved for Waiver services. That information will be submitted as a part of the approval document. If selection is not made by the applicant, that also will be indicated on the evaluation document for use by the Bureau for Medical Services and Bureau of Senior Services Program staff.

Vendor staff (registered nurses) will be available by telephone or in person in the event of an appeal of a PAS 2000 determination.

Vendor staff will assure that all state and federal guidelines are met in determining medical eligibility for the Aged and Disabled Waiver program.

dd)     Mental Retardation/Developmental Disabilities (MR/DD) Waiver Services **(Optional)**

The State of West Virginia has submitted a plan that has been approved by the Centers for Medicare and Medicaid Services (CMS) for the methodology for determining the support/service need of individuals in the MR/DD Waiver program.

In order to address the approved plan, the vendor should propose a plan for the following:

- To provide the member and family/guardian education in self direction, available services, budgeting, policy and program parameters, provider choices, consumer rights, and assessment of risk.

- A process for independently assessing member certification and recertification, and the needs and determining a budget that includes the member, family/guardian, and other significant individuals in the life of the member in completing the Client & Agency Planning Assessment (ICAP) and Supports Intensity Scale (SIS).

- A process to determine a waiver service allowance allocated to the member based upon the ICAP and SIS that takes into account the service and the supports that will be needed by the member along with variables that may be unique to West Virginia.

- A methodology whereas the member along with their service coordinator can purchase the services selected. After the member has selected services based upon the service allowance allocated and also within policy and program parameter, and the ability to link the request with the claims processor.

- A methodology for over riding or extending the budget level for unplanned events such as consumer or family crisis or a member or family medical need.

- A quality management plan and activities to assure compliance with CMS MR/DD Waiver standards.

ee) Vision Services – **(Optional)**

Vendor is to review all vision procedure/service and vision training requests requiring prior authorization.

ff) Laboratory Services – **(Optional)**

Vendor is to review all laboratory services requiring prior authorization regardless of place of service.

gg) Nursing Home Eligibility and PASRR Eligibility - **(Optional)**

Request for determination of medical necessity for nursing facility services are to be received by the Vendor via fax, web based, or mail. Request will be received in written form only, and only those items submitted according to the prescribed format identified as the state designated long term care eligibility pre-admission assessment (PAS) instrument. Reviewed decisions must be communicated to the requesting party in writing via fax or mail within 48 hours of receipt of a request that can be approved at the registered nurse level of review. If a decision cannot be made at the RN level of review, the referral for physician review must be made within 24 hours of receipt of the original

25

request. If the RN reviewer requires additional information, that information will be requested on the date the PAS is received. A decision of eligibility at the RN level, must be made within 24 hours after receipt of the requested additional information. If a case requires referral for physician review, the approval denial must be made within 24 hours of the referral. Additional information required by the physician reviewer must be requested within 24 hours of referral to the physician, with the physician review determination transmitted to the originating facility within 24 hours of receipt of the additional information. Requests received after 12:00 PM on Friday, or a day preceding a holiday, must be acted upon the first working day following the holiday or weekend. The above time frames will then apply.

As part of the medical determination process, the Vendor is to review the information submitted to identify possible presence of mental retardation, developmental disability, and/or an associated condition, or major mental illness. If as part of the medical necessity determination, the Vendor identifies the presence of, or there is a need to rule out mental illness, mental retardation, an associated condition, or a developmental disability diagnosis, the referring party, whether a hospital, physician, or other agency, will be notified of that determination. It is the responsibility of the referring facility, practitioner, or agency to initiate the Level II Pre-admission Screening and Resident Review (PASRR).

All notices, approval and denial from the Vendor, will be transmitted to the originating provider, as well as to the member/ legal representative. Denial notices must identify criteria which were deemed not met in the review process and advise provider/member/legal representative. The member / legal representative is also notified of their right of an appeal and provide the appeal form to the member/ legal representative.

Vendor is to request additional information from the provider as credible evidence (ie. Minimum Data Set (MDS) Section "G," Activities of Daily Living (ADL) sheets, care plan notes, physician progress notes, nurses notes, other pertinent needed information) within 5 days to be reviewed during appeal hearings. The Vendor will attend and participate in all fair hearings for denials of covered services. The Vendor will support/ review/ identify, during the hearing process, the documentation that provides supporting/ contradicting information.

hh) **Other Public Payers PEIA and SCHIP (Optional)**

Other government payers can opt to utilize the services of the vendor. Propose a system with timelines and internal controls that could accommodate other government payers such as SCHIP and PEIA.

## Section II  Vendor Experience

Vendor should provide assurances of capability and experience related to the type review defined in this RFP, as defined in Part 3, Section 3.1. Additionally, the Vendor should comment on specific experience as related to review requirements. The Vendor should have

served as the primary contractor in at least one contract covering the type of review defined in this RFP in Part 3, Section 3.1.

## Section III    Qualifications of Project Staff

Vendor should identify the qualifications of current and anticipated staff, and the credentials of the staff members, specific to the required review functions defined in this RFP.

## Section IV    Project Work Plan

Vendor should have a work plan with time lines, policies, procedures, and internal controls for start up activities, systems development and implementation for all prior authorization processes for all services listed including retroactive quality reviews, and all optional services in the RFP.

Vendor should comment on plans for establishment of its administrative offices locally, and of the interface between that office and the state administrative offices, Bureau for Medical Services and other Bureaus. Additionally, Vendor should describe how they will interface with the Department of Health and Human Resources (AGENCY) data systems and any data processing subcontractors as necessary and how they will utilize the current fiscal agents system to enter authorizations on line for in network and out-of-network services within specified timeframes.

Vendor should define a project work plan which graphically displays project, deliverables and milestones with specific completion dates leading to implementation of statewide review within ninety (90) days of contract award. Project work plan should address plans for implementing the review functions in time lines, and for reporting requirements.

Vendor will have a transition plan with time lines, policy, processes, and internal controls to transition all services including optional services to a new vendor, if needed to assure no loss of service occurs during any transition.

## Section V    Cost Proposal

Potential vendors are bidding on a five (5) year project, with original first year, and option to review for (4) four renewal years. The bids shall be separated by Agency, (BCF, BHHF and BMS), but the overall total is the evaluated cost. Bid prices must be expressed as a fixed price bid for each of the (5) five years. Proposal must identify cost associated with each review function. The review cost will include all costs, including reporting costs associated with each function. Where there are optional activities and/or optional components of a bid, the per year and total fixed cost for (5) five years, must be stated in such a way as to reflect the cost of the bid with the options and cost of the bid, minus the options. Potential vendors may utilize the sample bid sheets transmitted as Part 4.5 bid sheets, or submit equivalent information in vendor design formats.

4.2    **Evaluation Process:**

> The proposals will be evaluated by a committee of three (3) or more individuals in accordance with the criteria stated. The Vendor who meets all the mandatory specifications, attains the final highest point score of all vendors (possible one-hundred (100) points maximum) shall be awarded the contract. The selection of the successful vendor will be made by a consensus of the evaluation committee.

4.3    **Evaluation Criteria:** The following are the evaluation factors and maximum points possible for technical point scores:

27

| | | |
|---|---|---|
| Section I | Understanding of the Project Objective and Time Line<br>(Part 4, Section I, Part 3, Scope of work) | 25 Points Possible |
| Section II | Vendor Experience<br>(Part 4, Section II) | 15 Points Possible |
| Section III | Qualifications for Project Staff<br>(Part 4, Section III) | 15 Points Possible |
| Section IV | Project Work Plan<br>(Part 4, Section IV) | 15 Points Possible |
| Section V | Cost Proposal<br>(Part 4, Section V) | 30 Points Possible |
| | | Total 100 Points Possible |

Each cost proposal cost will be evaluated by use of the following formula for all vendors who attained the Minimum acceptable score only:

$$\frac{\text{Lowest price of all proposals}}{\text{Price of Proposal being evaluated}} \times 30 = \text{Price Score}$$

## 4.4 Minimum Acceptable Score:

Vendors must score a minimum of 70% of the total technical points possible. The minimum qualifying score on the technical portion is 49 points. All vendors not attaining the minimum acceptable score (MAS) shall be disqualified and removed from further consideration.

The State will select the successful vendor's proposal based on best value purchasing which is not necessarily the vendor with the lowest price. Cost is considered but is not the sole determining factor for award. The State does reserves the right to accept or reject any or all of the proposals, in whole or in part, without prejudice, if to do so is felt to be in the best interests of the State.

Vendor's failure to provide complete and accurate information may be considered grounds for disqualification. The State reserves the right, if necessary, to ask vendors for additional information to clarify their proposals.

BMS90007 Utilization/Prior Authorization

## 4.5 Cost Proposal Format/Bid Sheets
## Bureau for Children and Families

| Reviewed Service/Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Annual Total | | | | | | |

_____

Bidder

_____

Signature

_____

Date

BMS90007 Utilization/Prior Authorization

## 4.5 Cost Proposal Format/Bid Sheets

### Bureau for Behavioral Health and Health Facilities

| Reviewed Service/Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **Annual Total** | | | | | | |

_____

Bidder

_____

Signature

_____

Date

30

BMS90007 Utilization/Prior Authorization

**4.5 Cost Proposal Format/Bid Sheets**

## Bureau for Medical Services

| Reviewed Service/Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **Annual Total** | | | | | | |

_____

Bidder

_____

Signature

_____

Date

31

## 4.5 Cost Proposal Format/Bid Sheets

### TOTAL ALL INCLUSIVE ANNUAL FEE FOR ALL BUREAUS

Year 1_____

Year 2_____

Year 3_____

Year 4_____

Year 5_____


Grand Total   $_____


Grand Total With Optional Services   $_____


### TOTAL ALL INCLUSIVE ANNUAL FEE FOR OPTIONAL SERVICES

**AGED AND DISABLED WAIVER ....**   Year 1_____
    **(BMS Option)**   Year 2_____

Year 3_____

Year 4_____

Year 5_____


**MR/DD WAIVER .........................**   Year 1_____
    **(BMS Option)**   Year 2_____

Year 3_____

Year 4_____

Year 5_____

· BMS90007 Utilization/Prior Authorization

## 4.5 Cost Proposal Format/Bid Sheets

**VISION** ......................................      Year 1_____

    **(BMS Option)**      Year 2_____

         Year 3_____

         Year 4_____

         Year 5_____

**LABORATORY** ..........................      Year 1_____

    **(BMS Option)**      Year 2_____

         Year 3_____

         Year 4_____

         Year 5_____

**NURSING FACILITY** .....................      Year 1_____

    **(BMS Option)**      Year 2_____

         Year 3_____

         Year 4_____

         Year 5_____

**Other Public Payers PEIA and SCHIP..**      Year 1_____

    **(BMS Option)**      Year 2_____

         Year 3_____

         Year 4_____

         Year 5_____

**Other Socially Necessary Services....**      Year 1_____

    **(BCF Option)**      Year 2_____

         Year 3_____

         Year 4_____

         Year 5_____

_____
Bidder

_____
Signature

_____
Date

## DEFINITIONS

**Retroactive Quality Review**- A review for Socially Necessary Services covered by BCF and those behavioral health services covered by BHHF shall be conducted by the vendor. This review process shall include analysis of the services provided by the specific provider, an assurance that the staff providing the service and/or the agency have the appropriate and current credentials necessary and the case documentation and invoice reflect that the service was provided according to the established UM Guidelines. Providers shall be reviewed on the 18th month cycle unless a request is made by either Bureau for a specific provider(s).

**Member**- for the purpose of this RFP, member is utilized to identify service recipient.

**Retrospective Review** – A review for medical necessity of covered Medicaid services denied by primary payers, retroactive Medicaid eligibility, or emergent covered services provided to enrolled members on weekends, holidays, or at a time the review process is unavailable. A request for retrospective review must be submitted within seven business days following the service. Retrospective review does not guarantee approval or payment.

## TEAMING AGREEMENT

This Teaming Agreement ("**Teaming Agreement**" or "**Agreement**") is made and entered into this 11th day of March, 2009 ("**Effective Date**"), by and between, APS Healthcare Bethesda, Inc. including its subsidiaries and affiliates which shall include but not be limited to Innovative Resource Group, LLC dba APS Healthcare Midwest (collectively "APS"), and West Virginia Medical Institute, Inc., located at 3001 Chesterfield Place, Charleston, WV 25304. APS and Vendor are referred to herein individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, the State of West Virginia ("the State") has published a Request for Proposal ("**RFP**"), and the State is authorized to enter into contracts with various entities for provision of those services set forth in the RFP (the "**Program**") and may issue a contract for the provisions of these services ("**Contract**");

WHEREAS, APS intends to submit a proposal in response to RFQ Number BMS 90007 ("**Proposal**");

WHEREAS, APS desires Vendor to assist it in developing its Proposal and enter into an arrangement with Vendor in the event APS is awarded the Contract;

WHEREAS, the Parties believe that by combining their respective and complementary skills, capabilities and expertise, they can design, develop, and produce a Proposal that best meets the goals and objectives of the RFP so as to obtain and successfully perform the Contract;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

## ARTICLES

1.  **Relationship of the Parties**

    1.1  Except as otherwise provided herein, each Party shall exert its commercially reasonable efforts in support of APS' Proposal so that the State will award the Contract to APS and will accept Vendor as a subcontractor for Vendor's scope of work as described in Exhibit A attached hereto and incorporated into this Agreement as if recited herein in its entirety ("**Scope of Work**"). Each Party shall continue to exert such efforts toward these objectives throughout any and all discussions and negotiations concerning the proposed Contract. The parties shall agree to financial terms which shall be incorporated herein as Exhibit A-1.

    1.2  APS reserves the right, upon notification to Vendor, to add additional members to APS' team pursuant to proposed subcontracts for portions of the Proposal and/or Contract, provided that no additional team members shall be added to perform Vendor's Scope of Work or in competition thereof. Upon termination of this Agreement in accordance with Section 9, neither Party shall have any further



obligation to the other (other than the provisions of this Agreement, any previously executed Non-Disclosure or Confidentiality or other agreements which survive termination).

1.3     The Parties shall remain as independent contractors at all times. Neither Party shall act as agent for or partner of the other or shall have authority to bind the other except to the extent authorized herein or as otherwise provided by mutual written agreement. This Teaming Agreement is not intended by the Parties to constitute or create a joint venture, pooling arrangement, partnership, or a formal business organization of any kind, other than a teaming arrangement in anticipation of a prime/subcontractor relationship, and the rights and obligations of the Parties shall be only those expressly set forth herein.

1.4     Nothing in this Teaming Agreement is intended to affect the rights of the State to negotiate directly with either Party hereto on any basis the State may desire; however, Vendor agrees that APS is the State contact for any issues involving the Proposal. Vendor further agrees that if contacted by the State, it shall not engage in negotiations of any kind with the State regarding the Proposal without notice to APS. Vendor agrees not to engage in any direct contact with the State, and to provide notice of and include APS in any communications with the State regarding the Proposal. In the Proposal and in all discussions with State related to the Proposal, APS will identify Vendor as its subcontractor, state the relationship between the two parties, and disclose the Scope of Work and responsibilities of each party under the Proposal.

1.5     APS shall have the rights of a prospective prime contractor in connection with the Proposal, the Contract and the subcontract arrangement (including, but not limited to, the right to make the final decision as to the form, content and submission of the Proposal and all related information provided to the State in connection with the Proposal). APS may not make any representations of Vendor's positions, or any positions that materially affect Vendor or its products or services, including but not limited to Vendor's Scope of Work or financial terms for the Scope of Work, or disclose any of Vendor's Confidential Information (as defined in Section 7 below) without Vendor's prior written consent. APS may not impose any obligations on Vendor that materially affect Vendor or its products or services unless Vendor has already agreed to such obligations in writing.

## 2.     Cooperation and Support of APS' Proposal Efforts

2.1     Both Parties shall cooperate fully to produce a competitive Proposal for the Contract in full satisfaction of the RFP's requirements and reflecting commercially reasonable terms. The Parties shall cooperate with each other in all respects under this Teaming Agreement. The commercially reasonable efforts of Vendor in supporting APS' effort to obtain award of the Contract shall include, but are not limited to, the provision of advice and reasonable technical assistance, the preparation of information and materials relative to Vendor's services for incorporation into APS' Proposal to the State, as well as any subsequent or

supplemental proposals or related submissions that the State may request that APS submit in support or explanation of its Proposal, and the provision of all necessary certifications with respect to Vendor's proposed subcontract of services.

2.2    Vendor will furnish access to qualified personnel with respect to Vendor's Scope of Work to ensure that APS' Proposal and related submissions to the State are accurate, competitive and responsive to the RFP, and to meet Vendor's other obligations as set forth in this Teaming Agreement. Upon reasonable request by APS, Vendor shall assure the availability of management and technical personnel representing Vendor and authorized to act on its behalf to support and assist APS in any written or oral communications, discussions, presentations and/or negotiations with the State concerning APS' Proposal or the Program. APS shall promptly provide Vendor with notice of the opportunity for such communications, as well as the requested or proposed content thereof, subject to any limitations imposed on APS. Unless the State objects, Vendor shall have the right to be present and participate as appropriate at meetings with the State when the terms or performance of the Vendor's Scope of Work is scheduled to be the subject of discussions. APS agrees to keep Vendor advised of all changes in the State's requirements and APS' opinion on the probability of its receipt of the contract award. APS will consult with Vendor to obtain input and approval prior to making changes to the Proposal or prime contract that affect Vendor's Scope of Work. The Parties recognize the State may take action that results in changes to Vendor's Scope of Work (e.g., by amending the RFP, modifying the Contract, or identifying issues during the evaluation and/or discussions process). Vendor shall take all reasonable steps necessary to implement such changes, while reserving all legal rights including but not limited to a reasonable equitable adjustment based on such changes.

2.3    Vendor represents and warrants that it has no agreement with any other entity that will prevent Vendor from fully performing all tasks to which Vendor contractually commits to perform in this Teaming Agreement and will, if possible, represent and warrant that it has no agreement with any other entity that will prevent it from fully performing all tasks to which it contractually commits to perform in the Subcontract.

2.4    Each Party shall bear all costs, risks and liabilities that it incurs that arise out of its performance of this Teaming Agreement, including all costs for staff, offices, equipment, supplies, audits, and other costs of doing business. Neither Party shall have any right to any reimbursement, payment or compensation of any kind from the other Party with respect to costs incurred during the period up to the award of the Contract unless otherwise specifically agreed in a separate writing between the Parties.

2.5    Each Party shall, within three (3) days of execution of this Agreement, designate in writing one or more individuals within its organization as its representative(s) responsible for supervision and performance of the Parties' obligations and

functions under this Teaming Agreement. Each Party shall ensure that its representative(s) will be reasonably available to the other Party in order to resolve promptly any issues that arise under this Teaming Agreement.

3.   **Subcontract Arrangement and Support for the Preparation of APS' Proposal**

3.1   Vendor will prepare and furnish information and material relevant to Vendor's Scope of Work, and related explanations and descriptions in support of the Proposal and APS' efforts to obtain award of the Contract and shall continue to provide such information and material as may be reasonably required until a Contract is awarded by the State pursuant to the RFP.

3.2   If cost data for cost realism analysis are requested by the State with respect to Vendor's Scope of Work, then Vendor shall submit to APS all pricing information and detailed supporting schedules requested by APS, consistent with directions and guidance by the State. The Parties agree that such pricing information and supporting schedules are highly confidential and proprietary to Vendor, and APS agrees to abide by all obligations herein regarding the confidentiality of such information. Certain pricing information requested by the State may require the provision by Vendor of sanitized pricing information to APS and sealed, unsanitized pricing information to the State.

3.3   Vendor shall provide to APS each of the other representations, certifications, disclosures and statements that are required by the RFP or otherwise requested by the State.

3.4   Subject to the provisions of this Agreement, APS shall have the sole right to determine the contents and form of the Proposal, as well as ultimate responsibility for the production and submission of the Proposal and all documents submitted to the State, its agencies, departments or other subdivisions thereto in connection with the Proposal. APS will prepare and direct the preparation of the Proposal and integrate the information provided by Vendor into such Proposal, provided that APS will consult with Vendor on all matters concerning its Scope of Work (including without limitation related technical requirements and contractual terms and conditions) and pricing information.

3.5   APS shall, in its Proposal and in discussions with the State in connection with its Proposal, identify Vendor as a proposed subcontractor for Vendor's Scope of Work.

3.6   If the Contract is awarded to APS, Vendor shall support APS' efforts to retain the Contract including the provision of reasonable assistance in defending against any protest filed by any person or entity other than APS relating to the Contract, at APS' expense.

4.    **Compliance with Laws, RFP Requirements and Indemnification**

4.1    The Parties expressly covenant and agree to comply with all current federal and state law and regulations applicable to the RFP, the Contract and/or the Program or otherwise governing the negotiation and/or performance of any Contract awarded under the RFP (the **"Procurement Laws"**), as well as any current State instructions, directives and policies, and the representations, certifications, disclosures or statements that have been or shall have been provided in connection with the Proposal, the RFP or the Program.

4.2    Each Party shall be responsible for providing the necessary resources and expertise to develop systems and reports to protect the integrity of the procurement process and to comply with all Procurement Laws and other requirements applicable to the RFP and the Contract, and shall preserve all books, records, data and evidence of procedures and policies relating to each Party's compliance therewith.

4.3    Vendor will protect and maintain all confidential information including Protected Health Information (PHI) gained by reason of this RFP against unauthorized use, access, disclosure, modification or loss.  This duly requires Vendor to employ reasonable security measures, which include restricting access to any confidential information by:

   a)    Encrypting electronic confidential information during transport;

   b)    Physically securing and tracking media containing confidential information during transport;

   c)    Limiting access to staff that have an authorized business requirement to view the confidential information;

   d)    Using access lists, Unique Used ID and hardened password authentication to protect confidential information on computer systems;

   e)    Physically securing any computers, documents or other media containing confidential information;

   f)    Encrypting all confidential information that is stored on portable devices, including but not limited to, laptop computers and flash memory devices.

The Parties will also protect and maintain all confidential information in accordance with the Business Associate Agreement ("BA") attached to this Agreement as ("**Exhibit B**").

5

5. **Subcontract Arrangement**

5.1   APS agrees to negotiate with Vendor in good faith the pricing and other terms as required for the Scope of Work. The Scope of Work is set out in **Exhibit A** hereto.

5.2   Vendor agrees to accept a flow down of the indemnification provisions in APS' prime contract with the State whereby liability may be assumed to a maximum of the extent of six (6) months of annual fees received by Vendor under the subcontract, for failures or delays in performance to the extent such failure or delay arises solely from the action or inaction of Vendor.

5.3   The Parties understand and agree that the arrangement will be contingent upon award of the Contract to APS and State approval of the subcontract arrangement with Vendor, and subject to suspension or termination by the State of performance in the event of a bid protest or otherwise. It is further understood that the State may disapprove of the subcontract arrangement and may direct APS to assign Vendor's Scope of Work to another party. In such cases, however, APS, in consultation and cooperation with Vendor, shall seek to determine the cause for the disapproval of Vendor and how best to convince the State to accept Vendor as the subcontractor. If such efforts by APS are unsuccessful, then Vendor acknowledges and agrees that APS shall comply with the State direction and that APS shall have no further obligations or limitation of rights under this Article, except that APS shall so advise Vendor in writing and provide to Vendor any written disapproval and directions that are provided to APS by the State. Under such circumstances, this Teaming Agreement shall terminate pursuant to Section 9.1.

6. **Communications and Publicity**

6.1   The Parties agree that APS, as the potential prime contractor, shall control all direct communications and interfacing with the State concerning APS' Proposal in response to the RFP. In the event it becomes desirable for Vendor to contact the State concerning APS' Proposal, such contact shall be approved in writing by APS to ensure coordination of efforts and understanding of commitments prior to such contact.

6.2   Except as required by law or legal process, Vendor shall not publicize (except to its own employees and within its organization) the terms of this Teaming Agreement, the Proposal, any resulting Contract, or any subcontracts to be carried out under this Teaming Agreement or any actions or activities relating thereto, without the specific consent of APS. Except as required by law or legal process, APS shall not publicize (except to its own employees and within its organization) Vendor's participation in the Proposal or any resulting Contract or the terms of the Teaming Agreement without Vendor's consent. Notwithstanding the foregoing provisions, this Teaming Agreement and the terms thereof may be made known to the State. Any such publicity shall give due credit to the contribution of each Party. In the event disclosure is required by law or legal

6

process, the Party of whom disclosure is required shall, where possible, give the other Party prior notice before making the disclosure and consult with the other Party concerning the content of the disclosure.

**7.    Confidentiality and Non-disclosure**

7.1    For the purposes of this Agreement, confidential and proprietary information entitled to protection hereunder means all such information originating from the furnishing Party, or from persons acting on behalf of the furnishing Party, or which the furnishing Party has received in confidence from a third party (**"Confidential Information"**).    Confidential Information shall include all information, in any form, including, written, verbal or electronic, that concerns the business or affairs of a Party, its products, services, systems, software, finances (including prices, costs and revenues), marketing plans, programs, methods of operation, prospective and existing contracts and other business arrangements and/or business plans, procedures, strategies, systems and programs of third parties that have granted rights to the Party, as well as accompanying documents and related business plans. Confidential Information shall include all information and materials based on or derived by the Receiving Party from any of the foregoing.

7.2    The Party receiving Confidential Information (the **"Receiving Party"**) shall not, without the prior written consent of the Party providing the Confidential Information (the **"Providing Party"**):

(a)    use any portion of the Providing Party Confidential Information (including information of third parties furnished by the Providing Party) for any purpose other than preparation and support of the Proposal or related responses to the RFP on behalf of APS, and/or performance of the Contract and/or subcontract arrangement; or

(b)    disclose any portion of the Confidential Information to any persons other than the officers, employees and agents of the Receiving Party: (i) who reasonably need to have access to the Confidential Information for purposes of preparing proposals or related responses to the RFP on behalf of APS, and/or performance of the Contract and Subcontract or (ii) in the case of persons other than licensed professionals who are bound by rules of professional conduct not to disclose any Confidential Information, who have previously agreed in writing to be bound by these requirements.

7.3    Without in any way limiting the foregoing, the Vendor and APS shall use commercially reasonable efforts to prevent any disclosure of each other's Confidential Information (including information of third parties furnished by a Providing Party) in breach of this Article 7.  If either Party is in breach of this Article 7, such Party (the **"Breaching Party"**) shall be responsible for all losses to either Party which arise as a result of any such breach by the Breaching Party. The Party receiving Confidential Information under this section agrees that the

7

Providing Party furnishing such information shall have the right to obtain immediate injunctive relief to enforce obligations under this Section 7, in addition to any other rights and remedies the Providing Party may have in law or in equity. If any legal action is necessary to enforce this Section, the Providing Party shall be entitled to reasonable attorney's fees and expenses in addition to any other allowable relief. In addition, the Breaching Party shall defend, indemnify and hold harmless the other Party from any and all claims, lawsuits, damages and financial losses arising as a result of the Breaching Party's noncompliance with the terms and conditions of this Article 7.

7.4   Neither Party shall have an obligation to hold Confidential Information in confidence to the extent that: (i) such Confidential Information becomes generally available to the public, other than as a result of unauthorized disclosure by Vendor, APS or by persons to whom Vendor or APS has made such Confidential Information available; (ii) such Confidential Information was received by Vendor or APS on a non-confidential basis from a third party lawfully possessing and lawfully entitled to disclose such Confidential Information; (iii) disclosure of such Confidential Information is specifically authorized in writing by the Providing Party; or (iv) disclosure of such Confidential Information is required by court order (subject to an appropriate protective order), but only after such advance notice to the Providing Party as may be possible under the circumstances and cooperation with Providing Party to permit an opportunity to object to the disclosure of such Confidential Information.

7.5   Confidential Information furnished by the Providing Party pursuant to this Article 7 shall remain the property of the Providing Party and shall, at the Providing Party's direction, forthwith be returned to the Providing Party or, at the direction of the Providing Party, be destroyed, together with all copies made by the other Party and by anyone to whom such Confidential Information has been made available by the other Party.

8.   **Participation in Other Proposals**

8.1   In light of the Confidential Information to be exchanged between the Parties, as well as the need for both Parties to devote substantial effort and resources to the preparation of the Proposal and the pursuit of the Contract, Vendor represents and warrants that it has not and agrees it shall not, during the term of this agreement, act as a prime or subcontractor to another prime for participation in the Contract. Similarly, APS represents and warrants it has not and agrees it shall not, during the term of this agreement, enter into any other teaming agreement, subcontract or other agreement with a person other than Vendor for Vendor's Scope of Work. The Parties understand and agree that it is APS' intention to submit a bid proposal and to serve as prime contractor for the Proposal. If a Proposal is submitted by APS and if an award is granted APS by State under the Proposal, Vendor agrees that this Teaming Agreement shall supersede any existing agreement between Vendor and APS with respect to the Contract.

8

8.2   If the APS and Vendor proposal does not result in an award to APS, nothing contained herein shall prevent either party from pursuing work or entering into teaming agreements, subcontracts and other agreements or arrangements with other parties for any services described in the RFP. Nothing contained herein shall prevent any Party from pursuing work not directly related to the RFP.  Nothing contained herein shall prevent either Party from subcontracting or pursuing any work which is the subject of this Agreement, individually or in association with the successful contractor or a third party, following Contract award or in the event that this Agreement is terminated.

8.3   Nothing in this Agreement is intended to impair the ability of State to procure products and services through a full and open competition.  If the State, including any State governmental agency, raises concerns about this Agreement, the Parties shall seek to respond fully to these concerns (including, if necessary, by modifying or terminating this Agreement).

## 9.   Term and Termination

9.1   **Automatic Expiration or Mutual Termination**: Unless extended by mutual written agreement of the Parties, the term of this Teaming Agreement shall commence on the Effective Date and shall continue until the first occurrence of any of the following events of termination:

9.1.1   An official State announcement that the RFP or Program has been canceled or terminated or that an award will not be made based on the RFP; provided, however, that if the RFP is reinstated or reissued without material change within 12 months of said announcement, then this Teaming Agreement shall continue in full force and effect.

9.1.2   The award of a contract under the RFP without an award of the Contract to APS; provided, however, that the obligations of this Teaming Agreement shall continue in full force in the event of a subsequent award of the Contract to APS following a bid protest concerning the award, subject to the other provisions of this Teaming Agreement.

9.1.3   APS is unable to obtain State approval of Vendor as a subcontractor to APS, and the terms of the proposed Subcontract between APS and Vendor cannot reasonably be altered or changed to effect approval thereof by the State.

9.1.4   By mutual consent of both Parties in writing.

9.1.5   One year after the Effective Date of this Teaming Agreement or the date upon which the last proposal or best and final offer is submitted by APS.

9

9.1.6   Dissolution of either Party, the filing by either Party of a petition for bankruptcy or reorganization, the making by either Party of a general assignment for the benefit of creditors, the assignment or subcontract by Vendor of substantially all of its obligations under this Teaming Agreement, unless permitted in accordance with Article 11 of this Teaming Agreement or either Party ceases conducting business as a going concern or becomes insolvent.

9.1.7   The debarment or suspension of either Party by the State or conviction by either party of a criminal offense material to the performance of this Agreement or to the award of the Contract to APS.

9.2   Notwithstanding Article 9.1, the covenants, obligations and prohibitions in Articles 4 and 12 herein shall survive termination of this Teaming Agreement and shall continue in full force and effect for a period of six (6) years after such termination or the completion or termination of any Contract (or successor contract under the Program) that is awarded to APS (or its successor), whichever is later; and the covenants, obligations and prohibitions in Article 7 herein shall survive termination of this Teaming Agreement and shall continue in full force and effect for a period of three (3) years after such termination or the completion or termination of any Contract (or successor contract under the Program) that is awarded to APS (or its successor), whichever is later.   These covenants, obligations and prohibitions that survive termination shall be interpreted in accordance with the other provisions of this Teaming Agreement.

9.3   Termination for Cause.   If APS or Vendor fails to perform a material obligation under this Teaming Agreement, the non-breaching Party shall give written notice by Certified Mail to the alleged breaching Party of such alleged breach.   The alleged breaching Party shall have no more than thirty (30) days from receipt of the Certified Mail notice to correct the deficiency, or to present a good faith plan to correct the deficiency within a "reasonable period of time."   What is a "reasonable period of time" shall depend on the nature of the deficiency and its impact on the critical path for accomplishing the objectives of this Teaming Agreement.   If the alleged breaching Party does not correct the deficiency in a timely fashion or present a good faith plan to correct the deficiency "within a reasonable time," the non-breaching Party shall have the right to terminate this Teaming Agreement.

9.4   If the parties fail or are unable to mutually agree in writing to the financial terms to be attached as Exhibit A-1 by 2 PM EDT March 13, 2009, either APS or WVMI may terminate this Teaming Agreement effective as of that date.

10.   **Notices**

All notices, certificates, acknowledgements and other reports required of the Parties under this Teaming Agreement shall be in writing and shall be deemed properly delivered when mailed or transmitted if dispatched by: a) certified mail, postage prepaid, return receipt requested; b) hand delivery; c) overnight courier prepaid; or d) via facsimile transmission with written confirmation of receipt.   Such items should be addressed:

10

To APS:

APS Healthcare Bethesda
Richard Surles
Chief Development Officer
44 South Broadway
White Plains, NY 10601

To Vendor:

West Virginia Medical Institute
John C. Wiesendanger
Chief Executive Officer
3001 Chesterfield Place
Charleston, WV 25304


With copy to:

Innovative Resource Group, LLC.
d/b/a APS Healthcare Midwest
Attention: General Counsel
44 South Broadway
White Plains, NY 10601

With copy to:

West Virginia Medical Institute
Kathleen D. Merrill
Chief Financial Officer
3001 Chesterfield Place
Charleston, WV 25304

The method of delivery and addresses for notices listed above may be changed by written agreement of the Parties.

**11.   Successors and Assignment**

This Teaming Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their respective successors and assigns and delegates; provided, however, that neither Party may assign or transfer its interest hereunder, or delegate its c. without the prior written consent of the other Party, except that prior written consent is not required in the event of a corporate name change of either party or assignment to an affiliated entity.  The consent required under this Section 11 shall not be unreasonably withheld by either Party.  In the event of an attempted assignment that is not in accordance with these requirements, the Party attempting the assignment shall continue to remain subject to all obligations to the other Party as set forth in this Teaming Agreement.

**12.   Lower-Tier Subcontracts**

Vendor recognizes and agrees that any lower-tier subcontract for any portion of Vendor's Scope of Work must incorporate certain terms and conditions in accordance with the RFP and the Contract, and that Vendor shall not enter into any such lower-tier subcontract without the prior written consent of APS.  Such consent shall not unreasonably be withheld by APS, although APS may reasonably require assurances from Vendor prior to giving consent to any such lower-tier subcontract.

**13.   Exclusion of "Punitive, Special, Consequential or Indirect Damages"**

NOTWITHSTANDING ANY OTHER PROVISION OF THIS TEAMING AGREEMENT, IN NO EVENT SHALL EITHER PARTY HERETO BE LIABLE TO THE OTHER PARTY HERETO FOR PUNITIVE, SPECIAL, CONSEQUENTIAL OR

11

INDIRECT DAMAGES THAT ARE CLAIMED TO BE INCURRED BY THE OTHER PARTY WHETHER SUCH CLAIM ARISES UNDER CONTRACT, TORT (INCLUDING STRICT LIABILITY) OR OTHER THEORY OF LAW.

14. **Modification**

This Teaming Agreement shall not be amended or modified, nor shall any waiver of any right hereunder be effective unless set forth in a document executed by duly authorized representatives of both APS and Vendor.  The waiver of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same.

15. **Severability**

If any part, term, or provision of this Teaming Agreement shall be held void, illegal, unenforceable, or in conflict with any law, rule, regulation or requirement of a federal, state, or local State entity, the validity of the remaining portions of provisions shall not be affected thereby.

16. **Taxes**

Each Party shall be responsible for their respective present and future taxes, duties, tariffs, fees, imposts, and other charges imposed by any federal, state, local or foreign governmental authority, including but not limited to such impositions on income, excise, import, purchase, sales, use, turnover, added value, consular, gross receipts, gross wages, and similar assessments imposed upon the Party by any taxing authority as a result of t! performance of the Party's duties and responsibilities hereunder.

17. **Conflict of Law**

This Agreement, including all rights, duties and obligations arising from or relating in any manner to the subject of this Agreement, shall be governed, construed and enforced under the laws of the State of New York (excepting any conflicts of law provisions, which would serve to defeat the application of New York substantive law).  Vendor agrees to submit to the exclusive personal jurisdiction of the state and federal courts of the State of New York for any actions, suits or proceeding arising out of or relating to the interpretation, construction, or enforcement of this Agreement or otherwise relating to the Information.

18. **General Provisions**

18.1 Nothing contained in this Teaming Agreement shall, by express grant, implication, estoppel or otherwise, create in either Party any right, title, interest, or license in or to the inventions, patents, copyrights, technical data, computer software, software documentation or any other intellectual property of the other Party ("**Intellectual Property Rights**").  Any joint developments will be subject to a separate written joint development agreement, which Vendor and APS agree will be executed prior to engaging in any joint development activities.  Neither

12

party will own any Confidential Information of the other party that may be included in any joint development.

18.2   This Agreement shall not be amended or modified, nor shall any waiver or any right hereunder be effective unless set forth in a document executed by duly authorized representatives of both Parties. The waiver of any breach of any term, covenant or conditions herein contained shall not be deemed to be a waiver of such term, covenant or condition of any subsequent breach of the same or any other term, covenant or condition herein contained.

18.3   This Teaming Agreement shall be enforced and interpreted under the laws of the State of New York, exclusive of the choice of law rules thereof.

18.4   If any part, term or provision of this Agreement shall be held void, illegal, unenforceable, or in conflict with any law of a federal, state or local government having jurisdiction over this Agreement, the validity of the remaining portions or provisions shall not be affected thereby.

18.5   Neither Party and it affiliates will (i) hire or attempt to induce an employee of the other, or its affiliates, to terminate his or her employment or (ii) offer employment to a former employee of the other during the twelve (12) month period immediately following the former employee's termination, other than an exception is approved by mutual agreement of the parties.

18.6   This Teaming Agreement and its exhibits contain all of the agreements, representations and understandings of the Parties hereto and supersedes and replaces any and all previous understandings, commitments or agreements, oral or written, related to the Program, RFP, the Proposal and any award of a Contract or subcontract in relation to the foregoing.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Teaming Agreement effective as of this 11th day of March, 2009.

For APS Bethesda                                   For West Virginia Medical Institute, Inc.

By: _____          By: _____

Its: _____          Its: _____

13

**State of West Virginia – Bureau for Medical Services**
**Utilization Management/Prior Authorization Services for the Bureau for Medical Services,**
**Bureau for Children and Families and Bureau for Behavioral Health and Health Care**
**Facilities**
**Proposal due March 17, 2009**
**Scope of Work – West Virginia Medical Institute, Inc.**

1. The scope of work for review will consist of review workloads documented in Appendix A1.

2. Medical review and medical eligibility review will be conducted by WVMI and entered into APS CareConnection®. APS will provide access to APS CareConnection®, including training on using the application and technical support. APS CareConnection® will be available on a 24/7 basis with the exception of regularly scheduled updates and maintenance. APS will notify WVMI in advance of these scheduled activities. APS will provide 1 day of training for reviewers with technical assistance provided on request during normal business hours. APS will train WVMI physician reviewers and providers.

3. WVMI will conduct activities as indicated by Request for Proposal Section 3.1.4.1. Utilization/Prior Authorization Services are included as required for the review process as relevant to the review function being performed.

4. Request for Proposal and Contract clauses will flow down to the subcontract as relevant subject to award. APS will comply with clauses in the RFP that describe reasons for potential adjustment of contract costs; these clauses will also flow down to the subcontractor level.

5. WVMI will facilitate the review process and contract by:

   a. Assist with the development of training materials at a level of effort estimated at 8 hours per month from the WVMI-designated project coordinator; WVMI may attend any provider training sessions at the discretion of WVMI.

   b. Responding to provider questions, complaints, and other correspondence, calls, emails, and/or faxes as relevant.

   c. Attending and participating in Bureau meetings as requested by APS.

   d. Meeting with the APS management team as requested and at least on a monthly basis.

   e. Providing meeting space for the APS Contract Monitor, who will be available onsite at specific times during the work week to provide technical assistance, respond to questions, or discuss review or other activities as needed with reviewers or other WVMI staff members and management. APS understands that the Contract Monitor will not access workspace used for review owing to HIPAA/contract confidentiality requirements.

   f. Completing necessary APS CareConnection® data entry / actions within timeframes specified by the RFP.

   g. Providing facilities, local hardware, software, and support needed to complete review activities.

    h. Providing data / information necessary for APS to complete DHHR-requested ad hoc and other reports within RFP specified timeframes, or within five working days of completion of review activities for data not entered into APS CareConnection®.

    i. Providing and documenting training and technical assistance activities, including documenting the review workflow.

    j. Participating with APS in the development and utilization of metrics to monitor quality and productivity for services / activities in WVMI scope of work.

    k. QI activities to monitor WVMI and provider activities and satisfaction.

6. WVMI shall meet all review timelines and requirements as specified in West Virginia regulation, the Request for Proposal, or other requirements for medical review and medical eligibility determinations and notifications as specified from time to time by the Bureau for Medical Services, the Bureau for Children and Families, and/or the Bureau for Behavioral Health and Health Care Facilities.

7. All written communications utilized by WVMI shall meet all requirements specified in applicable West Virginia laws and regulations, the Request for Proposal, and other requirements that may be specified from time to time by the West Virginia Department of Health and Human Resources. WVMI shall provide all standard written communications to APS for review and approval prior to use (which includes if required review and approval by the Bureau for Medical Services or designee).

8. WVMI shall use appropriately qualified and licensed personnel to provide all services hereunder, and shall use credentialing standards and procedures for such personnel that are acceptable to APS and consistent with the requirements of the RFP.

9. Pricing for review activities will be defined by Appendix A1 of the Teaming Agreement, to be agreed upon after execution of the Teaming Agreement by both parties. APS will reimburse WVMI on a monthly basis within 10 days of APS receipt of reimbursement by the Bureau for Medical Services, in an amount equal to 1/12 of the total agreed upon for an annual level of effort.

10. Activities that are associated with review are listed in Appendix A1, which documents level of effort and assumptions for completing key components of the review process. Volumes for existing contract review workloads are indicated as of the most recent contract year. Volumes for work new in the next contract period will be based on responses to questions by the Bureau for Medical Services. Appendix A, Scope of Work, and Appendix A1, Financial Terms, will be amended to incorporate volumes and pricing for these review activities.

Appendix A
Scope of Work

| RFP BMS90007 - Requirements | Year 1 Volume Nurse Review | | Year 1 Volume Physician Review | |
|---|---|---|---|---|
| | Number of Reviews | Hours | Number of Reviews | Hours |
| **Mandatory Services** | | | | |
| Acute Inpatient Hospital (except Adult Psych) <br> Assumptions: | | | | |
| Organ Transplant <br> Assumptions: | | | | |
| Inpatient Rehab < 20 <br> Assumptions: | | | | |
| General dental, orthodontic, oral health <br> Assumptions: | | | | |
| OT & PT <br> Assumptions: | | | | |
| Speech/Language, Audiology Services <br> Assumptions: | | | | |
| DME <br> Assumptions: | | | | |
| Orthotic & Prosthetic Services <br> Assumptions: | | | | |
| Chiropractic <br> Assumptions: | | | | |

| RFP BMS90007 - Requirements | Year 1 Volume Nurse Review | | Year 1 Volume Physician Review | |
|---|---|---|---|---|
| | Number of Reviews | Hours | Number of Reviews | Hours |
| Imaging/Radiology<br>Assumptions: | | | | |
| Elective/Outpatient Surgery<br>Assumptions: | | | | |
| Out of Network Services<br>Assumptions: | | | | |
| Podiatry<br>Assumptions: | | | | |
| Cardiac Rehab<br>Assumptions: | | | | |
| Pulmonary Rehab<br>Assumptions: | | | | |
| Medical Case Management<br>Assumptions: | | | | |
| Home Health<br>Assumptions: | | | | |
| Hospice<br>Assumptions: | | | | |

| RFP BMS90007 - Requirements | Year 1 Volume Nurse Review | | Year 1 Volume Physician Review | |
|---|---|---|---|---|
| | Number of Reviews | Hours | Number of Reviews | Hours |
| **Personal Care**<br>Assumptions: | | | | |
| **Private Duty Nursing**<br>Assumptions: | | | | |
| **Optional Services** | | | | |
| **Aged & Disabled Waiver**<br>Assumptions: | | | | |
| **Vision Services**<br>Assumptions: | | | | |
| **Laboratory Services**<br>Assumptions: | | | | |
| **NH LOC/PASRR Level I**<br>Assumptions: | | | | |

Definitions:

Nurse Review: Includes first level nurse review and activities to document referrals to initial physician review.

Physician Review: Includes initial physician medical record review, language for potential denial letter if required for review type, and costs of sending potential denial letters to providers if required by review type.

Key Workload Assumptions:

Please briefly document any workload assumptions that are relevant to pricing, such as setting of review activity (e.g., field or office-based), use of current automated systems, provider entry of review requests, and credentials of coordinators/reviewers.

# EXHIBIT A-1

## FINANCIAL TERMS

## EXHIBIT B

### BUSINESS ASSOCIATE AGREEMENT

This Agreement is effective as of the Effective Date of the Teaming Agreement between **Vendor Communications ("Business Associate")** in favor, and for the benefit of **APS Bethesda** and its subsidiaries and affiliates (**"APS" or "Covered Entity"**). For purposes of this Agreement, all capitalized terms contained in this Agreement, not otherwise defined herein, shall have the meanings ascribed to them in 45 CFR Part 160 and part 164, subparts A and E, pursuant to the Health Insurance Portability and Accountability Act of 1996, attached hereto and made a part hereof.

## R E C I T A L S:

A.    APS provides Administrative Services to Plans and/or Covered Entities under HIPAA.

B.    Business Associate provides, or will provide, under the terms of a Teaming Agreement, Services to APS which will require access to Protected Health Information (PHI).

C.    APS requires that Business Associate comply, and Business Associate is willing to comply, with the HIPAA Privacy Rules and other Federal and State Laws (collectively referred to herein as "Privacy Rules") regarding confidentiality in providing the Services to APS, all upon the terms and conditions set forth herein.

NOW THEREFORE, for and in consideration of the premises, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Business Associate does hereby covenant and agree as follows:

1.    Term. The term of this Agreement shall commence on the date in which the Services Agreement underlying this Agreement is effective ("Effective Date") and shall continue for so long as Business Associate is providing the Services, unless earlier terminated pursuant to this Agreement.

2.    Permitted Uses and Disclosures of PHI. Unless otherwise specifically provided in this Agreement or authorized in writing by APS, and except as required or permitted by law, Business Associate, for itself and for the Business Associate Representatives, hereby agrees (a) to keep all PHI confidential and in its possession except as necessary to provide the Services; (b) to restrict access to PHI to those employees of Business Associate or other workforce members under the control of Business Associate who are actively and directly participating in providing the Services and who need to know such information in order to fulfill such responsibilities; (c) not to copy or duplicate any PHI except as necessary to provide the Services; (d) to treat any and all copies of, and notes, memoranda, analyses, compilations, abstracts, synopses, studies of other material produced from PHI as PHI; (e) to communicate only with the authorized representatives of APS concerning PHI; (f) not to disclose any PHI or Summary Health Information to any Plan

or any Plan Sponsor in connection with providing the Services; (g) not to use any PHI for any purpose other than the purpose for which such PHI was provided in connection with providing the Services; and (h) not to use PHI in any manner that would violate the Privacy Rules if APS were providing the Services or in any other manner that may be detrimental to APS.

3.    Uses and Disclosures of PHI for Business Associate Operations. Business Associate may use PHI, if necessary, for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate. Business Associate may disclose PHI for its proper management and administration or to carry out its legal responsibilities if the disclosure is required by law, or if Business Associate obtains reasonable written assurances from the Person to whom PHI will be disclosed that: (a) PHI will be held confidentially and used or further disclosed only for the purpose for which it was disclosed to such Person or only as required by law; and (b) such Person will notify Business Associate of any instances of which it becomes aware in which the confidentiality of PHI was breached.

4.    Unauthorized Use or Disclosure. Business Associate shall not use or further disclose PHI other than as permitted by this Agreement or as required by law.

5.    Safeguards. Business Associate will develop, implement, maintain and use appropriate administrative, technical and physical safeguards, in compliance with the Social Security Act § 1173(d) (42 U.S.C. § 1320d-2(d)), § 164.530(c) of the Privacy Rules, and any other implementing regulations issued by the U.S. Department of Health and Human Services to prevent use or disclosure of PHI other than as provided in this Agreement or as required by law.

Business Associate agrees to notify APS as soon as practicable, by facsimile or telephone, of any breach, or attempted breach, of its security related to areas, locations, or computer systems which contain any PHI, including (without limitation) any instance of theft, unauthorized access by fraud, deception, or other malfeasance or inadvertent access. In the event of any such breach or attempted breach, Business Associate shall further provide to APS, in writing, such details concerning the incident in question as APS may request.

For as long as Business Associate shall be in possession of any PHI, in any form, Business Associate shall periodically test, monitor and audit Business Associate's information security systems, measures and procedures (and those of the Business Associate Representatives) in order to insure that such systems, measures and procedures are consistent with industry best practices and standards. If any audit or review by Business Associate reveals any material security defects, problems, weaknesses or vulnerabilities, Business Associate shall remedy such issues. For any such issues which result in a Disclosure not permitted by this Agreement, Business Associate shall abide by the terms in Section 9 of this Agreement. Failure of Business Associate to correct such problems, defects, weaknesses or vulnerabilities which effect APS within the reasonable time period specified by APS, which shall be no less than 30 days, shall be considered a material breach for purposes of this Agreement and any agreement between APS and Business Associate under which Business Associate is providing the Services.

6.    Subcontractors and Agents. Business Associate will ensure that any and all Persons who have access to PHI by or through Business Associate, including (without limitation)

the Business Associate Representatives, agrees to the same restrictions and conditions that apply to Business Associate hereunder.

7.      APS Access to PHI.  Upon receipt of a request from APS, and in accordance with the written policies of APS then in effect to which Business Associate has been informed of through a written communication, Business Associate will, within the time period specified by APS, with no less than 10 business days being available to Business Associate, make available to APS for inspection and obtaining copies of any PHI about said individual that is in Business Associate's custody or control, so that APS may meet its access obligations under the Privacy Rules or to its clients.  Upon receipt of such a request from an individual with respect to PHI, Business Associate will promptly forward such request to APS.

8.      Amendment of PHI.  Business Associate will, upon receipt of notice from APS, and in accordance with the written policies of APS then in effect to which Business Associate has been informed through a written communication, amend, or permit APS access to amend any portion of PHI within the time period specified by APS, with no less than 10 business days being available to Business Associate so that APS may meet its amendment obligations under § 164.526 of the Privacy Rules or to its clients.  Upon receipt of a request for amendment of PHI from an individual, Business Associate will promptly forward such request to APS.

9.      Disclosure Accounting.  Except for Excepted Disclosures, Business Associate will record the Disclosure Information for each disclosure of PHI that Business Associate makes to any Person (including APS) and promptly forward such Disclosure Information to APS. Business Associate need not record Disclosure Information or otherwise account for Excepted Disclosures.  Upon receipt of a request from APS and in accordance with the written policies of APS then in effect, Business Associate will, within the time period specified by APS to which Business Associate has been informed through a written communication, make available to APS the Disclosure Information that Business Associate has not given to APS as provided hereinabove for the six (6) years preceding APS's request for the Disclosure Information (except for disclosures occurring before the Effective Date), so that APS may meet its disclosure accounting obligations under § 164.528 of the Privacy Rules or to its clients.  Upon receipt of such a request from an individual, Business Associate will promptly forward such request to APS.

10.     Security Standards.    Business Associate will:

(a)     Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of electronic PHI that it creates, receives, maintains, or transmits on behalf of APS as required by the security provisions of the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations at 45 C.F.R. Part 164, as the same may be amended, modified or superseded from time to time (the "Security Rules");

(b)     Ensure that any agent, including a subcontractor, to whom Business Associate provides such electronic PHI agrees to implement reasonable and appropriate safeguards to protect it; and

(c)     Report to APS any security incident effecting APS of which Business Associate becomes aware in accordance with the Security Rules.

11.     Inspection of Books and Records. Business Associate will make its internal practices, books, and records relating to its use and disclosure of PHI under this Agreement available to APS for the purposes of determining Business Associate's compliance with this Agreement and to the U.S. Department of Health and Human Services for the purposes of determining APS's compliance with the Privacy Rules.

12.     Report to APS. Business Associate will report to APS promptly any use or disclosure of PHI that violates, or threatens to violate, this Agreement of which Business Associate becomes aware. Business Associate will further provide to APS, in writing, such details concerning the incident in question as APS may reasonably request.

13.     Termination of Agreement for Cause. In the event of a material breach by Business Associate of any of its obligations hereunder, APS shall have, in addition to any other rights and remedies available at law or in equity, the right to terminate this Agreement at any time by providing to Business Associate written notice of termination setting forth the details of the incident that is the basis for such termination and the effective date of termination. APS and Business Associate hereby agree that any material breach of this Agreement by Business Associate shall constitute a material breach under any oral or written agreements between APS and Business Associate affected by such breach of this Agreement and shall entitle APS to terminate such agreements, without penalty, in addition to any other rights or remedies available to APS under such agreements.

14.     Obligations upon Termination.

A.      Return or Destruction. Upon termination or expiration of this Agreement, Business Associate will, if feasible, return to APS or destroy all PHI, in whatever form or medium (including in any electronic medium under Business Associate's custody or control), including all copies of and any data or compilations derived from and allowing identification of any individual who is a subject of PHI. Business Associate will, in accordance with the written policies of APS then in effect and previously provided to Business Associate in written form, complete such return or destruction and identify any PHI that is infeasible to return or destroy as promptly as possible after the effective date of the termination or expiration of this Agreement. Business Associate will limit its further use or disclosure of PHI to those purposes that make return or destruction infeasible. Upon termination or expiration of this Agreement, Business Associate will give to APS copies of all documents in Business Associate's possession or control that are required to be maintained by or on behalf of APS by the Privacy Rules or the Security Rules other than what Business Associate is permitted or required by law to retain.

B.      Continuing Privacy and Other Obligations. Business Associate's obligation to protect the privacy of PHI hereunder will be continuous and survive termination or expiration of this Agreement. The obligations of the parties hereto under Sections 7, 8, 9, 14, 15 and 16 of this Agreement shall survive the termination or expiration of this Agreement.

15. Duty to Mitigate. Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Agreement.

16. Modification and Amendment. Except as expressly modified or amended herein, all other terms and conditions of any agreement between APS and Business Associate related to the Goods/Services shall remain in full force and effect. This Agreement shall not be modified or amended in any respect except by a written instrument executed by the parties; provided, that in the event the provisions of this Agreement shall conflict with the requirements of applicable law concerning the use, handling, disclosure and/or treatment of PHI (including, without limitation, the Privacy Rules), as such laws may be modified, amended, or superseded from time to time, this Agreement shall be deemed amended as necessary to conform to such legal requirements at all times.

17. No Third Party Beneficiaries. This Agreement shall not be construed to confer any rights or remedies upon any Person, other than APS and its officers, directors, employees, agents, successors, and assigns.

18. Conflicts. The terms and conditions of this Agreement will override and control any conflicting terms and conditions in any agreement between APS and Business Associate related to the privacy and security of PHI.

19. Compliance with Laws. Business Associate will comply with any and all federal, state and local laws, rules and regulations applicable to the use or disclosure by Business Associate of PHI hereunder.

20. Remedies Cumulative. The remedies afforded to APS in this Agreement are not intended to be exclusive, and each remedy shall be cumulative and shall be in addition to all other remedies available to APS at law or in equity.

21. Waivers. No delay or omission by APS in exercising any rights or remedies under this Agreement or applicable law shall impair such right or remedy or be construed as a waiver of any such right or remedy. Any single or partial exercise of a right or remedy shall not preclude further exercise of that right or remedy or the exercise of any other right or remedy. No waiver shall be valid unless in writing signed by the party to be bound.

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement effective as of this 11th day of March, 2009.

APS Healthcare Bethesda

By: _____

Its: _____

West Virginia Medical Institute

By: _____

Its: _____

State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
**Utilization Management/Prior Authorization Services for the Bureau for Medical Services,**
**Bureau for Children and Families and Bureau for Behavioral Health and Health Care Facilities**

| | |
|---|---|
| RFP Subject | State of West Virginia Bureau for Medical Services for Utilization Management/Prior Authorization Services for the Bureau for Medical Services, Bureau for Children and Families and Bureau for Behavioral Health and Health Care Facilities |
| RFP Number | BMS90007 |
| Vendor Name | Innovative Resource Group, LLC, d/b/a APS Healthcare Midwest (APS Healthcare) |
| Vendor Address | 100 Capitol Street Suite 600 Charleston, WV 25301 |
| Vendor Telephone Number | 1-800-305-3720 |
| Authorized Contact Person who will receive all official notices concerning this RFP. | John McDonough, Chief Financial Officer, APS Healthcare 44 South Broadway Suite 1200 White Plains, NY 10601 (Tel) 800-305-3720 ext 3438 (Fax) 914-288-4603 (Email) publicsector@apshealthcare.com |
| Local Contact Person for information concerning this RFP. | Jennifer Britton, Executive Director, APS Healthcare 100 Capitol Street Suite 600 Charleston, WV 25301 (Tel) 800-305-3720 ext 6901 (Email) jwbritton@apshealthcare.com |

_John McDonough_  
John McDonough  
Chief Financial Officer

6/4/09  
Date

APS HEALTHCARE

EXHIBIT
C

**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

| Table of Contents | |
| --- | --- |
| **Section** | **Page Number** |
| **Section I – Understanding The Project Objectives and Time Lines** | |
| Introduction | I-1 |
| **1. General Requirement (RFP 3.1)** | **I-3** |
| **1.1** Program Utilization through Prior Authorization and Intensive Case Management (RFP 3.1.1) | I-3 |
| **1.2** Data Processing or Systems Modifications (RFP 3.1.2) | I-5 |
| **1.3** Maintenance of Secure Electronic Communication (RFP 3.1.3) | I-6 |
| **1.4** Communication Plan (RFP 3.1.4) | I-8 |
| **1.5** Communication of Denial Notices (RFP 3.1.5) | I-11 |
| **1.6** Meeting Medical Necessity Requirements (RFP 3.1.6) | I-13 |
| **1.7** Support Compliance with State and Federal Requirements for Medically Necessary Services (3.1.7) | I-13 |
| **1.8** Capacity to Accept Prior Authorizations in a Web Based Format (RFP 3.1.8) | I-16 |
| **1.9** Providing Service and Retrospective Reviews for Authorization Requests (RFP 3.1.9) | I-17 |
| **1.10** Providing Start-Up and Operations Tasks and Sub-Tasks Including Access To Systems (RFP 3.1.10) | I-18 |
| **1.11** Timely Reports and Accurate Reporting and Analysis  (RFP 3.1.11) | I-39 |
| **1.12** Denial Notices (RFP 3.1.12) | I-41 |
| **1.13** Methods for Receiving Requests (RFP 3.1.13) | I-42 |
| **1.14** Develop Utilization and On-Going Analysis of a Basic | I-44 |



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

| | |
|---|---|
| Medical/Behavioral Health Assessment (RFP 3.1.14) | |
| **1.15** Collection and Processing of Information for Persons Services under the Clinic and Rehabilitation, Psychology, and Other Behavioral Health Specialty Manuals (RFP 3.1.15) | I-45 |
| **1.16** Collection and Processing of Information Submitted By Licensed Behavioral Health Providers and Socially Necessary Providers (RFP 3.1.16) | I-45 |
| **1.17** Collaboration with the Department's Fiscal Agent (RFP 3.1.17) | I-46 |
| **1.18** Technical Assistance and Training for BHHF Providers (RFP 3.1.18) | I-47 |
| **2. Mandatory Requirement (RFP 3.1.2)** | **I-48** |
| **2.1** Meeting Federal Requirements Concerning The Medicaid Agency's Obligation To Assure That Services Reimbursed By Medicaid Are Necessary and Appropriate (RFP 3.1.2.1) | I-48 |
| **2.2** Authorizing Services in Conformance with Current Medicaid Program Coverage Policy and Benefit Limitations (RFP 3.1.2.2) | I-51 |
| **2.3** Providing Prior Authorization Services According to the Member's Benefit Plan (RFP 3.1.2.3) | I-51 |
| **2.4** Authorization of the Most Economically Advantageous Item or Service (RFP 3.1.2.4) | I-52 |
| **2.5** Suspected Fraud Referral (RFP 3.1.2.5) | I-53 |
| **2.6** Attendance and Participation in Member Hearings (RFP 3.1.2.6) | I-53 |
| **2.7** Office Location and Staffing (RFP 3.1.2.7) | I-54 |
| **2.8** Use of National Standard Criteria for All Review Activities (RFP 3.1.2.8) | I-55 |

APS HEALTHCARE

**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

| | | |
|---|---|---|
| 2.9 | Use of Evidence-Based Criteria (RFP 3.1.2.9) | I-59 |
| 2.10 | Tracking Identifiers (RFP 3.1.2.10) | I-60 |
| 2.11 | Communication of Denial Notices (RFP 3.1.2.11) | I-60 |
| 2.12 | Denial Notices Detail (RFP 3.1.2.12) | I-61 |
| 2.13 | Emergency Admissions (RFP 3.1.2.13) | I-62 |
| 2.14 | Issuance of Prior Authorizations (RFP 3.1.2.14) | I-62 |
| 2.15 | Review Of Both In Network and Out-Of-Network Services for Medical Necessity (RFP 3.1.2.15) | I-63 |
| 2.16 | Retroactive Quality Review for Socially Necessary Services (RFP 3.1.2.16) | I-64 |
| 2.17 | Schedule for Retroactive Quality Reviews for Socially Necessary Service Providers (RFP 3.1.2.17) | I-64 |
| 2.18 | Implementation Work Product  (RFP 3.1.2.18) | I-65 |
| 2.19 | Schedule of All Retroactive Quality Reviews (RFP 3.1.2.19) | I-65 |
| 2.20 | Subcontractor Approval (RFP 3.1.2.20) | I-67 |
| 2.21 | Readiness Review (RFP 3.1.2.21) | I-67 |
| 2.22 | Transition (RFP 3.1.2.22) | I-69 |
| 2.23 | Continuation of Services (RFP 3.1.2.23) | I-69 |
| 2.24 | Turnover Plan. (RFP 3.1.2.24) | I-69 |
| **3. Reporting (Mandatory) (RFP 3.1.3)** | | **I-70** |
| 3.1 Standard On-Going Reports (RFP 3.1.3.1) | | I-70 |
| 3.2 Ad Hoc Reports (RFP 3.1.3.2) | | I-70 |
| 3.3 Monthly Reports (RFP 3.1.3.3) | | I-71 |

**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

| | |
|---|---|
| **3.4** Monthly Reports on Utilization (RFP 3.1.3.4) | I-72 |
| **3.5** Monthly Summaries (RFP 3.1.3.5) | I-72 |
| **3.6** Monthly Reports To Include Number and Disposition Of Requests (RFP 3.1.3.6) | I-73 |
| **3.7** Monthly Reports Include Cost Of Services and UM Activity (RFP 3.1.3.7) | I-74 |
| **3.8** Quarterly Report on Training and Technical Assistance Activities (RFP 3.1.3.8) | I-74 |
| **3.9** Diagnostic and Symptomotology Reports.(RFP 3.1.3.9) | I-77 |
| **4.1 Utilization/Prior Authorization Services (RFP 3.1.4.1)** | **I-77** |
| **4.2** Bureau For Children & Families (RFP 3.1.4.2) | I-84 |
| **4.3** Bureau For Behavioral Health & Health Facilities (RFP 3.1.4.3) | I-87 |
| a. Forensic Psychiatric | I-88 |
| b. Forensic Psychological | I-88 |
| c. Targeted Case Management | I-88 |
| d. Service Coordination | I-88 |
| e. Behavioral Health Specialty, Clinic and Rehab | I-88 |
| f. Behavioral Health Services, For The Uninsured | I-88 |
| g. Psychiatric Admissions – Inpatient Private and State | I-89 |
| h. Psychiatric Residential Treatment Facilities (PRTF) | I-89 |
| i. Substance Abuse Residential | I-89 |
| j. Preparation Of Waiver Packets | I-89 |
| k. Behavioral Health Support Services | I-89 |



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

| | |
|---|---|
| l. Peer Support Services | I-89 |
| m. Mental Health Supervised Residential | I-89 |
| n. Crisis Intervention | I-89 |
| Other Activities | I-90 |
| 4.4  Bureau For Medical Services (RFP 3.1.4.4) | I-92 |
| a. Targeted Case Management (TCM) | I-93 |
| b. Clinic, Rehab Services and Crisis Stabilization | I-94 |
| c. General and Acute Case Inpatient Hospital Admission and Continued Stay Review | I-96 |
| d. Psychiatric Inpatient Facilities, Psych Under 21 years of age, and Psychiatric Residential Treatment Facilities (PRTF) for Individuals under 21 years of age (in state and out of state) | I-99 |
| e. Organ Transplant Services | I-101 |
| f. Partial Hospital Services | I-103 |
| g. Inpatient Rehabilitation Services For Individuals Through 20 Years Of Age In Freestanding Rehabilitation Facilities | I-104 |
| h. General Dentistry, Orthodontic and Oral Health Services | I-105 |
| i. Occupational Therapy (OT)/ Physical Therapy (PT) | I-107 |
| j. Speech (ST)/Language, and Audiology Services | I-109 |
| k. Durable Medical Equipment/Medical Supplies | I-110 |
| l. Orthotic and Prosthetic Services | I-112 |
| m. Chiropractic Services | I-113 |



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

| | |
|---|---|
| n. Diagnostics Imaging/Radiology Services | I-115 |
| o. Elective Surgery Procedures | I-116 |
| p. Out-Of-Network Services | I-117 |
| q. Podiatry | I-119 |
| r. Cardiac Rehabilitation | I-121 |
| s. Pulmonary Rehabilitation | I-122 |
| t. Medical Case Management | I-124 |
| u. Psychiatric Services | I-125 |
| v. Psychological Services | I-126 |
| w. Home Health | I-128 |
| x. Hospice | I-130 |
| y. Personal Care | I-131 |
| z. Socially Necessary Services | I-136 |
| aa. MR/DD Waiver Packets | I-136 |
| bb. Private Duty Nursing | I-136 |
| cc. Aged and Disabled Waiver (Optional) | I-137 |
| dd. Mental Retardation/Development Disabilities (MR/DD) Waiver Services (Optional) | I-144 |
| ee. Vision Services – (Optional) | I-149 |
| ff. Laboratory Services – (Optional) | I-150 |
| gg. Nursing Home Eligibility and PASRR Eligibility – (Optional) | I-151 |



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

| | |
|---|---|
| hh. Other Public Payers PEIA and SCHIP (Optional) | I-154 |
| **Section II – Vendor Experience** | |
| Overview Of APS Experience and Capabilities | II-1 |
| APS Experience – West Virginia | II-4 |
| APS Experience In Other States | II-17 |
| APS Experience With Public Employee Health Programs and SCHIP | II-25 |
| APS-WV Subcontractor Experience: West Virginia Medical Institute | II-30 |
| Summary Of Experience | II-33 |
| **Section III – Qualifications Of Project Staff** | |
| Project Organizational Staff | III-2 |
| WV-APS Key Personnel | III-7 |
| Subcontracted Key Personnel | III-15 |
| **Section IV - Project Work Plan** | |
| Agency Work Plans | IV-1 |

APS HEALTHCARE

**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

## Section I – Understanding the Project Objectives and Time Lines

*Vendor is to respond with a proposal that reflects their understanding of the projects objectives in Part 3 and a process for accomplishing the prior authorization services in a professional and efficient manner in accordance with federal and state requirements for each Bureau.*

### Introduction

The West Virginia Department of Health and Human Resources (the Department) seeks a single vendor to provide a comprehensive Administrative Services Organization that can be implemented across the Bureau for Medical Services, Bureau for Children and Families, and

> *APS-WV offers the State of West Virginia enhanced value* –experienced incumbents with a QIO-like designation *and* multiple QIO contracts, analytic expertise with demonstrated effectiveness, clinical credibility among the provider community, and a single vendor interface for the Department, providers, and recipients.

Bureau for Behavioral Health and Health Facilities. This vendor will authorize Medical, Behavioral Health, and Socially Necessary services for West Virginians served by Medicaid, Child Welfare, and Behavioral Health Programs, and work with the Bureaus to ensure that services are integrated and efficient. As the Department prepares to meet the challenges of scarce resources amid the growing needs of West Virginians, the objectives of the current RFP are the cornerstones of continued program development – equitable use of Medicaid and other state resources for medically necessary care, consistent and evidence-based decisions on the necessity of services, compliance with state and federal regulations for strong utilization control methods, and responsive support across the spectrum of Department agencies. These requirements have been – and will continue to be – hallmarks of the contracting approach of APS-WV.

APS-WV is prepared to be West Virginia's single vendor to provide the customer service that the Department has come to expect from our organization. APS-WV understands the health care needs of West Virginians and the mission and goals of the Department; we applaud the Department's vision to design and implement a model for service authorization that integrates approval and tracking of service utilization for various populations – one that is centered on accountability and service excellence. As the Department is aware, APS-WV has a proven record for innovation, reliability, flexibility and product customization. We will continue to build on these attributes to meet the State's current and future needs. Throughout our current contract, we have assisted the Department with many changes and improvements in both policy and operations to strengthen the effectiveness and efficiency of services to West Virginians. We have been able to do this with our qualified and experienced West Virginia staff, our commitment to customer service and satisfaction, our provision of consultation, training, and technical assistance to the Department, and strong



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

data analysis and reporting capabilities.

APS-WV has read and fully comprehends the combined and expanded scope of work within this RFP and we pledge to the Department to continue the strong and successful partnership we have already established. As the prime contractor, APS-WV will directly manage and control all aspects of program performance. We propose to subcontract with West Virginia Medical Institute (WVMI) for reviewer resources, an approach that benefits the Department with decades of utilization management review experience in all aspects of review required by the scope of work, enabling us to streamline authorization and other services, and assuring a smooth and timely provider and member transition to the integrated service model *within timeframes* required by the RFP and *minimizing disruption* to the Bureaus, the provider community, and West Virginia consumers. APS-WV will have primary responsibility for and control of all data generated from the project, including data produced by subcontractors and/or consultants, and will use this data to generate reports for the Bureaus. Under the direction of Executive Director Jennifer W. Britton, PhD, APS-WV Associate Director, Helen Snyder will act as senior director for medical and nursing facility services; APS-WV MR/DD Waiver Program Director Randall Hill will act as senior director for waiver services. These experienced APS-WV professionals will ensure that all subcontracted services meet the Bureaus' performance expectations.

With this approach to service delivery, APS-WV will be an integrated and cohesive point of contact for all Bureaus, providers, and recipients. As required by the RFP, APS-WV understands that any staff, subcontractors, and/or consultants must be approved by the Department in advance. APS-WV is fully prepared to comply with this approval process and has comprehensive contingency plans in place to respond appropriately to the Bureau's determination concerning subcontractors and consultants when received. It is important to note that all requirements in the scope of work are APS core capabilities; we therefore have the experience and expertise to monitor all subcontractor activities as well as the ability to conduct all review activities should it be necessary.

We present this proposal from Innovative Resource Group, LLC d/b/a APS Healthcare Midwest (APS). APS is a wholly owned subsidiary of APS Bethesda, Inc. (APS Bethesda). APS Bethesda was founded in 1993 and acquired the bidding entity in March 2002. APS has been designated as a QIO-like entity by the Centers for Medicare and Medicaid Services (CMS) for a third consecutive time, with the current designation received in June 2008 and effective through June of 2011. Our designation is a requirement for this procurement, enabling the Department of Health and Human Resources to receive an enhanced Federal Financial Participation (FFP) match of 75% for specific contracted services. In Section I, we describe our understanding of the project requirements and APS-WV's approach to fulfilling these requirements. In Section II, we document our team's extensive experience in similar work in West Virginia and other states. In Section III, we present the qualifications of the integrated APS-WV team and demonstrate our management and staffing model for the scope of work.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

modified as necessary to accommodate the expanded scope of work.

APS-WV currently adheres to requirements for notification of providers and recipients in the event of a denial. We will implement a similar process for notification of denials of medical services that meet all state and federal requirements. Provider notices will include information about requesting reconsiderations; member notices will assist members to understand denials of service and ensure that they are informed of appeal rights.

## Bureau for Medical Services (BMS)

### Medical Review, Medical Eligibility, and PASRR

Denial notices are an important component of a successful preauthorization program. To promote appropriate utilization of health services, denial notices help to educate providers and beneficiaries on the various federal and state requirements of the West Virginia Medicaid program. These notices also convey important appeal information to members.

In the current program, proposed APS subcontractor WVMI summarizes the specific review criteria and /or Medicaid administrative policies that were not met in each denial notice. In addition, denial letters inform the Medicaid participating provider and beneficiary, as may be applicable, of their respective rights to reconsideration and/or fair hearing. This process ensures that all providers and/or beneficiaries have the opportunity to contest adverse decisions regarding requests for Medicaid services. Denial notices are generated and mailed daily. In the next contract period, APS-WV will continue this process, with denial notices generated by APS CareConnection®. Denial information will therefore be accessible to the provider community through this Internet resource, and we will continue to distribute denial notices by mail to providers and members. Below we provide additional details on denial notifications for each Bureau.

## Bureau for Children and Families (BCF)

APS-WV notifies the DHHR worker, supervisor, Community Service Manager, Regional Program Manager/Child Welfare Consultant, the Director of Children and Adult Services and provider as indicated in the BCF Standard Operating Procedure ASO Denial Process effective 5/18/08. Letters to providers are sent certified mail and notices to BCF staff are sent through e-mail with identifiers removed. The SNS denial letters include the reason for the denial, recommendations, and instructions for providers and/or consumers regarding appeals.

## Bureau for Behavioral Health and Health Facilities (BHHF)

With the transition to service authorization in the new contract period, APS-WV recommends developing a process similar to that used for Medicaid-funded behavioral health services for ease of understanding for members who receive services in multiple program areas and reimbursed by multiple payers. APS will develop a denial notification process and letters that are consistent with the service authorization process and take into account the information needs of members receiving services reimbursed by more than one



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

Bureau or other payer. The denial notification process and letters for BHHF services will be approved by BHHF prior to implementation.

### 1.6 Meeting medical necessity requirements.

3.1.6 Vendor is to meet the same requirements concerning the Medicaid agency's obligation to assure that services reimbursed by Medicaid are medically necessary, appropriate, provided in the appropriate setting, and most cost effective manner for that target population identified. – (such as the Bureau for Children and Families and covered under their "special medical card" process, for out of state residential facilities under a provider agreement with the Bureau for Children and Families.)

*APS-WV will comply with the requirements of Section 3.1.6 of the RFP.* The eligibility verification and validation process will ensure that the services are reimbursed by the appropriate payer and the utilization management system is designed to determine that services are medically necessary, appropriate and are the most cost effective service to address the diagnosis, symptoms and/or functional impairments of the individual.

Specific to BCF, the medical and/or behavioral health services that are funded by state revenue or Federal grants are subject to the same medical necessity guidelines as those funded by Medicaid. For example, BCF special medical cards for behavioral health services and out of state residential placements are currently subject to the APS CareConnection® system's behavioral health utilization management clinical and process rules. This procedure has been followed since 2004 for licensed behavioral health centers and private practitioners. Out-of-state residential providers have been subject to the same clinical and process rules as equivalent in-state providers since the program's inclusion in the ASO.

### 1.7 Support compliance with state and federal requirements for medically necessary services.

3.1.7 Vendor is to perform functions necessary to support compliance with state and federal requirements for medically necessary services.

*APS-WV will comply with the requirements of Section 3.1.7 of the RFP.* The APS-WV prior authorization program has been developed specifically to support compliance with state and federal medical necessity requirements. APS-WV will provide services to support compliance in the next contract period for all current and expanded scope of work activities. In addition to prior authorizations for medically necessary services to support compliance with state and federal requirements, the retroactive review process includes a sample of provider charts to verify appropriate documentation of the service authorized; appropriate credentials of the provider and provider feedback; and training and technical assistance when necessary to improve compliance. Results of these reviews supplement the utilization profile. Below we describe how we propose to support the compliance requirements for medically necessary services for each Bureau, based on current procedures and modified to address new and/or expanded requirements.



Case 2:15-cv-13449 Document 2-2 Filed 09/24/15 Page 134 of 311 PageID #: 198

**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

## Bureau for Medical Services (BMS)

### Medical and Nursing Facility Review

The Bureau for Medical Services (BMS) administers West Virginia's Medicaid program
subject to oversight by the Centers for Medicare and Medicaid Services (CMS) in the U.S.
Department of Health and Human Services. Federal law outlines basic minimum
requirements that all state Medicaid programs must fulfill.

The West Virginia Medicaid program is administered pursuant to regulations promulgated
under Title XIX of the Social Security Act, as amended. State administrative authority for the
Medicaid program is provided pursuant to Chapter 9 of the West Virginia Code. BMS has
published a Provider Manual that includes general information regarding the legal basis of
Medicaid program and how it will be administered in West Virginia.

WVMI currently conducts prior authorization and medical necessity review services in a
manner consistent with applicable Federal and State laws, regulations, policies, and
procedures. Reviewers experienced in federal and state requirements will continue this
approach into the next contract period under the subcontracting arrangement and with
supervision from APS-WV managers and directors.

During previous contracts, WVMI systematically reviewed amendments, modifications,
additions and deletions to Federal and State law, regulations, policy and procedures in order
to ensure that work was completed in a timely, consistent, and compliant manner. Examples
of the types of activities initiated to ensure the program's compliance with applicable
federal and state requirements included, but were not limited to the following:

- Verification of a provider's participation status in the WV Medicaid program.
- Manual verification of an individual's Medicaid eligibility.
- Timeliness of review decisions.
- Attendance and representation at fair hearings convened to contest disputed decisions.
- Detection and reporting of possible instances of fraud and abuse.
- Compliance with HIPAA and related personal health information security requirements.

Enhancements to this approach in the next contract period will include reviewers' ability to
access an online provider file in APS CareConnection® that includes information about
providers' participation in the Medicaid program. This proposed enhancement will improve
the accuracy of information as well as increase the efficiency of our operations, offering the
Bureau better information and greater value.

### Inpatient and Outpatient Psychiatric Services

APS-WV will extend the current behavioral health outpatient utilization management
program approach to include inpatient requests as well. These requests are reviewed based
on appropriate clinical criteria for the level of care, guidelines set forth in the Medicaid
manuals and summarized in the approved Utilization Management Guidelines and in



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

- **Medical Review.**

APS-WV is fully prepared to move forward with all start up activities necessary to ensure implementation of the Medical Review program within the determined number of days after contract award. This start up plan will not interfere with or otherwise disrupt our ability to fulfill current review service responsibilities. Existing staff, equipment, operating policies and procedures, and information systems ensure reviewers' ability to sustain daily operations during all program development activities under the supervision of APS-WV managers and directors.

APS-WV offers this assurance based on the following:

- Through a proposed subcontract for clinical reviewers, our medical necessity and utilization management program is fully staffed, trained and equipped. Experienced review and support personnel understand and will follow the Bureau's medical necessity review requirements to ensure a consistent approach to medical review that is compliant with state and federal regulations and informed by national standard criteria and West Virginia-licensed clinicians.

- The combination of our experienced staff and reliable infrastructure ensures that the transition from one contract period to another, including the implementation of all new and expanded services, will be seamless to the Bureau, Medicaid beneficiaries and the Medicaid provider community.

The following is a high-level description of the approach used historically to medical necessity review and utilization management for services requiring preauthorization, which we propose to continue. A detailed, service specific description of our work processes, including flow charts for each service area, is included in our response to Section 4.4 (Section 3.1.4.4 of the RFP).

We will follow these general steps in processing preauthorization requests:

- Providers submit pre-authorization requests to the Medical Review Department electronically or by paper, facsimile or phone. Only approved Medicaid participating providers may submit requests for pre-authorization. We will receive all requests for pre-authorization and route them to the appropriate review unit for processing. We will review all requests as they are received.

- APS-WV will maintain all requests and supporting documentation in a safe and secure area consistent with all security and confidentiality requirements established by the Bureau. APS-WV will use APS CareConnection® for medical review, to help ensure a single interface for providers accessible through the Internet.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

- We will maintain a toll-free phone line that any Medicaid participating provider can call for information regarding a request he/she has submitted for review. We will automatically route calls to the appropriate service unit for follow up.

- We will record messages that come in after routine working hours and retrieve them the following business day. These calls are then directed to the appropriate service unit for follow up.

- Proposed APS-WV subcontractor WVMI currently uses Bureau-approved medical necessity review criteria and/or guidelines for the evaluation of each request for service, as described in Section 4.4 of our proposal. Such requests include only information that is necessary to determine medical necessity based on the applicable review criteria or guideline. APS-WV will continue this approach for the new contract period through utilization of subcontracted reviewers managed by designated APS-WV Directors.

The intake and information verification process determines whether all information required to conduct a review is complete and correct. If a request is incomplete (i.e. does not have all the required information) or if it is incorrect (i.e. has the wrong member ID for the name of the member), the review staff suspends the request and contacts the provider within one (1) working day to obtain the necessary additional information and/or correct errors. The suspended review process restarts when we receive the requested information.

If the request is denied, we will send the provider a denial notice. This notice includes the reason and the circumstances for the adverse decision, including those elements of the criteria/guideline that were not met. Notices also include information regarding the provider's and/or member's right to reconsideration and/or appeal.

- **Inpatient Psychiatric, Psychiatric Under 21, and PRTF.**

APS-WV will assume responsibility for all behavioral health review under the new contract in addition to providing executive and information systems management for the contract as a whole. The inpatient, Psychiatric under 21, and PRTF review process is initiated with the receipt of a review request. We will encourage facilities to adopt the use of APS CareConnection® for all requests, but will support use of telephone, fax, and mail requests from facilities. As we present throughout the proposal, we will verify Medicaid eligibility prior to initiating the review process, as well as validate that requested services are covered by the benefit package. In addition to verifying both provider and member eligibility, we will also identify potential third-party payer coverage. Through the application of national standard guidelines, West Virginia Medicaid regulations, and validation of eligibility, we will ensure that residential psychiatric services are appropriate in length, frequency, and setting.

As we currently do, APS-WV will meet all review timelines for this review component, as well as promptly notifying providers concerning prior authorization approvals and if services are

**APS HEALTHCARE**

**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

## 2.20 Subcontractor approval.

3.1.2.20 Vendor shall indicate the use of any subcontractor and obtain BMS approval for the identified subcontractor.

*APS-WV will comply with the requirements of Section 3.1.2.20 of the RFP.* We indicate the use of a subcontractor in the response to this section and describe the role of this subcontractor in Section III, Qualifications of Project Staff. After carefully evaluating the RFP timeframes and requirements, APS-WV proposes to subcontract with the West Virginia Medical Institute (WVMI), the incumbent BMS vendor for medical review. This proposed subcontracting arrangement enables APS-WV to meet requirement implementation timeframes and minimize disruption to the provider and member community as we make the important transition to a single vendor interface. APS-WV will discuss the proposed subcontracting arrangement with BMS upon contract award, including obtaining BMS approval for proposed subcontracting. Upon notification of BMS' determination, APS-WV will move forward either to finalize the subcontract or prepare a modified implementation plan and timeframes without subcontracted resources.

APS-WV will assume responsibility for all behavioral health prior authorizations, and subcontractor clinical personnel will continue to provide review of medical services currently subject to prior authorization as well as services that are new to the upcoming contract period; nursing facility eligibility review and PASRR Level I; and initial and repeat evaluations for the Aged and Disabled Waiver. Associate Director Helen Snyder will be responsible for supervision of medical review and nursing facility review activities and for overall management of subcontracted resources; Randall Hill will be responsible for management of A&D Waiver resources.

## 2.21 Readiness review.

3.1.2.21 Vendor shall submit to a readiness review at least 30 days prior to implementation.

*APS-WV will comply with the requirements of Section 3.1.2.21 of the RFP.* APS-WV will be prepared for the readiness review at least 30 days prior to implementation. We provide examples of areas important to evaluate for readiness of implementation in Table I-10. Our Work Plan, included in Section IV, includes details of these components and timelines for accomplishing activities and reaching milestones, including approval in advance by the Bureaus of policies, procedures, requirements documentation, communication plans and materials, and training plans and materials. For proposal purposes, we assume a 90-day implementation period between contract signing and "go live" or completion of implementation activities and readiness approval from the Department. Table I-10 presents a potential summary of readiness review areas.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

| Table I-10. Proposed Readiness Review Components | |
|---|---|
| **Component** | **Description** |
| Approved Implementation Work Plan | This plan will be revised with final timeframes on award of the contract and submitted to the Bureaus for review and approval as agreed upon by the Department. Once approved, APS-WV will initiate implementation activities, with weekly reports to the Department with status updates. |
| Requirements Definition | The Requirements Definition document details the specifications for the APS CareConnection® configuration, including requirements for exchange of interface files with the MMIS and other agency systems. Requirements definition will be complete as agreed upon with the Department. |
| New/revised Policies and Procedures | With some review functions transitioning from WVMI to APS-WV and new review functions included in the RFP, new policies and procedures will have to be developed, and other policies and procedures revised. APS-WV will prepare these materials for evaluation and approval during the readiness review process. |
| Notification to Providers & Stakeholders | Once the requirements definition and policies and procedures have been approved, APS-WV will determine timeframes and methods for training (to be approved by the Bureaus) and notify providers and recipients with information about training venues and timeframes. |
| Provider Training for Transitions | Provider Training will be conducted prior to initiation of review requirements. |
| System Configuration and Testing | System configuration to accommodate review functions will be completed according to the approved Work Plan and requirements documentation. |
| Reviewer Training | At least two weeks prior to initiation of review, APS-WV will train reviewers on criteria, policies and procedures, and APS CareConnection®. |

During planning for the Readiness Review process, APS-WV will document the specific
components to be evaluated for readiness, the timeframes, and the process to be used (e.g.,
site visits, review of materials and documentation) for each component of readiness. We
provide an example of this document in **Exhibit 9,** Readiness Review Checklist.

It is important to note that there are several components of the contract that require
significant preparation prior to implementation, and this preparation must be conducted in
consultation with one or more specific Bureaus. For example, providers currently



State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

6. The APS-WV reviewer will also evaluate the extent to which another payer may be responsible for the service, if an alternative payer is identified, we will notify the provider to that effect and close the review.

7. If the request is authorized by the APS-WV reviewer, the review determination will be documented in APS CareConnection®.

8. If the first level reviewer cannot approve the request, it will be referred to an APS-WV Consultant for review.

9. If the request is approved by the Consultant, the authorization will be documented in APS CareConnection®.

10. If the request is denied, we will issue a denial notice in writing to the provider and consumer, which states appeal rights and processes.

11. Authorizations for approved requests are submitted to the MMIS, the claims payer in the prescribed format and will be submitted in the format and location designated by BMS in the current RFP.

## c)    General and Acute Case Inpatient Hospital Admission and Continued Stay review.

The effective administration of the West Virginia Medicaid program requires a comprehensive and coordinated approach to utilization management, risk identification and mitigation, quality of care and cost control. To support BMS in critical decision making, data on the performance and integrity of the Medicaid program and individual Medicaid participating providers must be collected, analyzed and reported. This ability is particularly important given the significant changes anticipated in state and federal Medicaid expenditures in our current economic environment. These services have been reviewed under prior contracts with WVMI and, subject to BMS approval, will continue under subcontract with WVMI in the next contract period.

All review staff, including nurses reviewers, related health care professionals, consultants and physician reviewers are trained in the use/application of McKesson's Health Solutions' InterQual Criteria or Bureau approved criteria. Review personnel are also trained on current Medicaid guidelines, instructions, policies and procedures related to coverage requirements, benefits, service limitations, and other conditions related to provision of Medicaid services. A trained and efficient clinical staff and clear protocols are critical for effective review of increased volumes of services and additional services included for prior authorization in the current RFP. APS-WV has taken these volumes and services into account in our staffing.

### Process for Prior Authorization of General and Acute Care Inpatient Admissions

The flow diagram included in **Exhibit 24** illustrates the method Medicaid participating providers use for submitting requests for inpatient medical necessity review.

APS-WV will use the following procedure for inpatient medical necessity review requests:



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

8. If the request is approved by the Consultant, the review determination will be documented in APS CareConnection®.

9. If the request is denied, we will issue a denial notice in writing to the provider and consumer. The provider will be informed of our reconsideration process, which has been illustrated in a flowchart in Exhibit 6. The consumer will be provided their appeal rights and processes.

10. Authorizations for approved requests are submitted to the MMIS, the claims payer in the prescribed format and will be submitted in the format and location designated by BMS in the current RFP.

### e) Organ Transplant Services

The APS Team understands the cost of transplants can be a burden on the Medicaid budget. Therefore, it is necessary to provide careful oversight to the delivery of these services to ensure they are supported by medical necessity. APS-WV team member, WVMI, has provided organ transplant prior authorization and case management to the Bureau since 2005.

Prior authorization with case management follow-up of these cases assists BMS in containing cost and delivering medically necessary transplants in the appropriate setting, in the most cost effective manner.

APS-WV will review medical necessity and appropriateness using InterQual criteria for transplants for which McKesson has criteria sets. If a Medicaid covered transplant does not have an InterQual criteria set, we defer to Medicare guidelines or other Medicaid approved criteria. Due to the documentation requirements, labor intensity, and necessary clinical follow-up a case manager follows these cases. A workflow for the organ transplant prior authorization process has been included in Exhibit 26.

### Organ Transplant Prior Authorization Process

1. APS-WV will determine if the hospital is a Medicare certified transplant hospital and is in network.

2. We will determine if the transplant to be performed is listed as covered in the Hospital Provider Manual under Organ Transplant Services.

3. APS-WV will verify the name, address, age, and Medicaid identification number of the recipient.

4. If the request involves a child, the team will verify that the legal guardian/custodian's name and address are included.

5. APS-WV will verify the name and address of referring physician.

6. We will verify the name and address of the physician and medical facility where the transplant is to be performed.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

responsible for the service, if an alternative payer is identified, we will notify the facility to that effect and close the review.

6. If the request is approved by the initial reviewer, the review determination will be documented in APS CareConnection®.

7. If the first level reviewer cannot approve the request, it will be referred to an APS-WV Consultant for review.

8. If the request is approved by the Consultant, the review determination will be documented in APS CareConnection®.

9. If the request is denied, we will issue a denial notice in writing to the provider and consumer, which states appeal rights and processes.

10. Authorizations for approved requests are submitted to the MMIS, the claims payer in the prescribed format and will be submitted in the format and location designated by BMS in the current RFP.

### g) Inpatient Rehabilitation Services for Individuals through 20 years of age in Freestanding Rehabilitation Facilities

APS-WV understands inpatient rehabilitation services are a valuable resource to the individuals who qualify for this benefit through age 20. Successful rehabilitation will lead to a more independent member. Utilization management with case management follow-up of these cases assists BMS in containing cost and delivering medically necessary rehabilitation in the appropriate setting and in the most cost effective manner. These services have been reviewed under prior contracts with WVMI and, subject to BMS approval, will continue under subcontract with WVMI in the next contract period.

The prior authorization process for inpatient rehabilitation services for individuals through 20 years of age in freestanding rehabilitation facilities has been described below. In addition, the workflow for this process has been included in **Exhibit 28.**

- APS-WV will receive requests for inpatient medical rehabilitation services for individuals through age 20 by Web-based application, fax or mail. These requests must be accompanied by the requesting facility's or attending physician's initial evaluation, treatment plan, and tentative length of stay.

- A nurse reviewer will screen the initial information for Medicaid eligibility and determines if additional information is needed.

- APS-WV will refer members found to be part of an MCO to that MCO. If all necessary information is present, the nurse reviewer will evaluate the information for medical necessity based on Medicaid criteria.



Case 2:15-cv-13449 Document 2-2 Filed 09/24/15 Page 142 of 311 PageID #: 206

State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

- If criteria are met, we will issue an authorization number and next review date within 24 hours of the request or receipt of additional information.

- APS-WV will perform continued stay review on an ongoing basis, with a new authorization number issued for each review, until the patient has either reached maximum rehabilitation potential or aged out of the rehabilitation service.

- If the information does not support the need for inpatient rehabilitation, APS-WV will refer the case for physician review. We will act on these cases within 48 hours.

- If the request is approved, APS-WV will issue an authorization number and the continued stay review process applies.

- If the physician reviewer determines the services to be medically unnecessary, APS-WV will issue a denial letter to the member, provider and/or referring entity, indicating which criterion has not been met.

- We will send the member information on appeal rights, and instructions on how to request a fair hearing. We will send the provider information on how to request a reconsideration of the denial.

APS-WV will complete all reviews within 48 hours of receipt of all requested information.

If the provider or member requests a reconsideration, APS-WV will send the review to a second physician reviewer. If this physician reverses the initial decision, the team will issue an authorization number with subsequent continued stay review. If the second physician reviewer upholds the denial, the requesting party may ask for a DHHR appeals hearing. APS-WV may request additional information at any time to support the decision-making process.

Due to the documentation, labor intensity, and clinical follow-up these cases require, a APS-WV team case manager follows these cases, and maintains them in the case management system.

APS-WV will send approval and denial notifications to the referring party, admitting facility, and client or legal representative. For all denials, the team will identify the unmet criteria and will inform the member and/or facility of the right to appeal the decision. APS-WV will send the preauthorization to Medicaid through entry into the MMIS.

### h. General Dentistry, Orthodontic and Oral Health Services

Proposed APS-WV subcontractor WVMI has been providing prior authorization to BMS for dental, orthodontic and oral health services since 2001 and will continue to provide this service as a subcontractor to APS-WV subject to approval by BMS Services requiring prior authorization are outlined in Chapter 505 of the BMS Provider Manual.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

The West Virginia Medicaid program offers a comprehensive scope of dental services for members less than 21 years of age, and limited coverage for the adult population. BMS uses prior authorization in this service area to ensure that services provided are medically necessary and do not exceed service limits. The need for prior authorization and review of additional dental, orthodontic and oral health services is understood given the increased volume of review indicated in the current RFP (Appendix F, Addendum #7 Q&A) and current review protocols can accommodate this increase in scope.

The process for dental, orthodontic and oral health services review has been outlined below and illustrated in a workflow that has been included in **Exhibit 29**.

Requests for services must be submitted in writing and must include:

- Patient's name, address, Medicaid number and date of birth;
- Provider name, address, provider number, fax and phone numbers;
- Ordering physician's name and phone number;
- Date patient examined;
- Complete diagnosis;
- Current treatment status;
- Recommendations for comprehensive orthodontic treatment;
- Comprehensive orthodontic treatment procedure code;
- Post-treatment stabilization procedure code;
- Total fee (usual and customary charge);
- Orthodontist signature and date;
- Additional information required for assessing handicapping malocclusion;
- Dental molds and/or x-rays as appropriate.

1. APS-WV will receive requests for prior authorization of these services by fax, mail, or Web-based format. Requests submitted by Web-based format must also include supporting evidence such as x-rays and dental molds when appropriate to the service requested.

2. We will return all incomplete requests to the provider without processing them.

3. For requests that are complete upon receipt, APS-WV will verify the member's eligibility through the MMIS.

4. We will require provider verification to ensure that the practitioner is enrolled in the WV Medicaid Program.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

5.  If the member is in an MCO, we will refer the case to the appropriate MCO.

6.  We will enter requests with complete information into the database and verify codes.

7.  If the request meets requirements, we will forward it to an orthodontic or dental consultant for review. We will review the documentation for medical necessity, in accordance with approved and established BMS policy.

8.  If the request is approved, APS-WV will mail an authorization number to the provider with accompanying x-rays/molds. The authorization will include a six-month period for completion of the approved service.

9.  For requests that do not meet criteria, we will issue a denial letter to the member, provider and/or referring entity, indicating which criterion has not been met. We will also send the member information on appeal rights and instructions on how to request a fair hearing. We will send the provider information on how to request a reconsideration of the denial.

10. APS-WV will complete reviews within 48 hours of receipt of all requested information.

11. APS-WV will communicate authorizations to BMS through a batch update to the MMIS.

### i. Occupational Therapy (OT)/ Physical Therapy (PT)

Proposed subcontractor WVMI currently provides review for occupational therapy and physical therapy services for BMS and will continue to provide this service subject to approval by BMS. APS-WV understands the need to determine medical necessity for BMS, and realizes that prior authorization is needed for all therapies combined (OT, PT, and Speech) that exceed 20 visits per calendar year for basic plan members.

The process for physical therapy and occupational therapy review has been outlined in detail below and has been illustrated in a workflow that has been included in **Exhibit 30**.

1.  APS-WV will receive requests for prior authorization of occupational or physical therapy by fax, mail, or web-based format. All requests must contain the following information:

    - Request form completed by physical therapist or occupational therapist;

    - Patient's name, address, Medicaid number and date of birth;

    - Provider name, address, provider number, fax and phone numbers;

    - Ordering physician's name and phone number;

    - Diagnosis code (ICD-9), description;

    - Physician's prescription no older than 30 days with medical diagnosis;



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

- Frequency, duration of therapy, and date range requested;
- Start of care date;
- Current condition, treatment plan, short term and long-term goals and prognosis;
- Initial evaluation;
- Current treatment notes.

2. APS-WV will return all incomplete requests to the provider and will not process them.

3. For requests that are complete upon receipt, APS-WV will verify member's eligibility through the MMIS.

4. If the member is found to be in an MCO, APS-WV will refer the case to the appropriate MCO.

5. The APS-WV Reviewer enters the request into the database and reviews it to determine medical necessity, which is determined by criteria and established BMS policy.

6. If criteria are met, the RN reviewer will approve the case and provide an authorization.

7. If criteria are not met, the case is sent to a where a West Virginia licensed practitioner with appropriate credentials will review it for medical necessity, in accordance with approved and established BMS policy.

8. If the consulting practitioner needs additional information to complete the review, APS-WV will fax and/or phone the provider to request the specific information needed. When we receive the additional information, the team will resubmit the patient's complete record to the consulting physician for final review and decision.

9. APS-WV will provide authorization numbers for service requests that meet the established guidelines.

10. For requests that do not meet criteria, we will issue a denial letter to the member, provider and/or referring entity, indicating which criterion has not been met. We will also send information on appeal rights and instructions on how to request a fair hearing to the member. We will send information on how to request a reconsideration of the denial to the provider.

11. APS-WV will complete reviews within 48 hours of receipt of all requested information.

12. We will communicate the preauthorization to Medicaid through submission to the MMIS.




**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

### j. Speech (ST)/Language, and Audiology Services

Proposed APS-WV subcontractor WVMI currently conducts prior authorization reviews of speech, language and audiology services to include hearing aids, speech generating devices and cochlear implants for BMS under their current contract, and will continue to provide this service subject to BMS approval. Included in the staffing are licensed speech therapists who conduct reviews to ensure compliance with BMS policy for these services. We realize that prior authorization is needed for all therapies combined (OT, PT, and Speech) that exceed 20 visits per calendar year for basic plan members.

The process for speech therapy reviews has been outlined in detail below. In addition, this process has been illustrated in a workflow that has been included in **Exhibit 30**.

1. APS-WV will receive requests for prior authorization of speech, language and audiology therapy through fax, mail, or web-based format. All requests must contain the following information:
    - Patient's name, address, Medicaid number and date of birth
    - Provider name, address, provider number, fax and phone numbers
    - Ordering physician's name and phone number
    - Diagnosis code (ICD-9)and description
    - Physician's prescription with medical diagnosis, which is valid for one year
    - Request period, frequency and duration
    - Start of care date
2. We will verify the required documentation, including long-and short-term goals, detailed treatment plan, initial speech evaluation, hearing test (not required for adult requests), and letter from the Board of Education or parent if the patient is a school age child.
3. We will send all incomplete requests back to the provider without processing.
4. For requests that are complete upon receipt, the Eligibility Specialist will verify the member's eligibility manually in the MMIS.
5. If the member is found to be enrolled in an MCO, the case will be referred to the appropriate MCO.
6. We will then enter the request into APS CareConnection® if it was not received electronically, where it will be reviewed for medical necessity, which is determined by criteria and established BMS policy.
7. If criteria are met, the reviewer will approve and provide an authorization number.


APS HEALTHCARE

State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

8. If criteria are not met, by a West Virginia licensed practitioner with appropriate credentials, in accordance with approved and established BMS policy review to make the medical necessity determination.

9. If the consulting practitioner needs additional information to complete the review, APS-WV will fax or phone the request for the necessary information to the provider. When we receive the additional information, we will resubmit the patient's complete record to the consultant for final review and decision.

10. We will provide authorization numbers for service requests that meet the established guidelines.

11. For requests that do not meet criteria, we will issue a denial letter to the member, provider and/or referring entity, indicating which criterion has not been met. APS-WV will also send the member information on appeal rights, and instructions on how to request a fair hearing. In addition, we will inform the provider how to request a reconsideration of the denial.

12. APS-WV will complete reviews within 48 hours of receipt of all requested information.

13. We will communicate the preauthorization to Medicaid through submission to the MMIS.

## k. Durable Medical Equipment/Medical Supplies

Proposed APS-WV subcontractor WVMI currently conducts prior authorization of durable medical equipment (DME) and medical supplies for BMS and we propose to continue this service if approved by BMS. This area of review offers opportunity for cost savings through appropriate utilization of services and equipment. BMS' policy to provide the most cost effective equipment that meets the members' need coupled with InterQual screening criteria for medical necessity has proven successful in cost containment in the current UM contract. APS-WV clinical reviewers will continue to work with BMS in the new contract to refine DME criteria and ensure that this program continues to be cost effective and efficient.

The process for prior authorization for durable medical equipment and medical supplies has been outlined in detail below. In addition, this process has been illustrated in a workflow that has been included in **Exhibit 30**.

1. APS-WV will receive requests for prior authorization of DME by fax, mail, or web-based format. Requests must contain the following required information:

    • Patient's name, address, Medicaid number and date of birth;

    • Provider name, and Medicaid number, contact person and phone number, and fax number;



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

- Diagnosis code (ICD-9); clinical diagnosis pertinent to requested services;
- HCPC codes, date of service, length of time needed, quantity ordered, and dollar amounts. Medical documentation must accompany requests for services exceeding allowable Medicaid limits;
- Verify that required documentation is included on request form;
- Physician's signature and date.

2. We will return all incomplete requests to the provider and will not process them.

3. For requests that are complete upon receipt, APS-WV will verify member's eligibility through the MMIS.

4. If the member is enrolled in an MCO, we will refer the case to the appropriate MCO.

5. APS-WV will also check MMIS for third party liability such as Rehabilitation, Worker's Compensation, Medicare, etc. If the review staff establishes that an alternative payer source may be responsible for the services being requested, we will notify the provider.

6. We will determine Medicaid coverage and service limits for the requested DME items.

7. We will enter requests into APS CareConnection® for any request not received electronically, and complete the review process to determine medical necessity in accordance with approved and established BMS policy (for appropriateness and cost efficiency) and criteria (InterQual). If extenuating circumstances exist, we will review the case with BMS for a coverage determination beyond service limitations.

8. If a provider submits a case with un-priced codes, the reviewer will require that the provider collect an invoice from the manufacturer along with additional pertinent forms, e.g., hospital bed, power wheelchair, patient lift, and therapeutic shoe(s) forms. These documents will be forwarded to our certified orthotics/prosthetic consultant reviewers for accuracy of codes and assistance in determining cost effectiveness.

9. If criteria are met, the reviewer will approve the case and provide an authorization number.

10. If criteria are not met, the reviewer will refer the request to a physician reviewer for determination.

11. We will issue an authorization number for requests approved at physician review.

12. For requests that do not meet criteria, the reviewer will issue a denial letter to the member, provider and/or referring entity, indicating which criterion has not been met. We will also send the member information on appeal rights and instructions on



Case 2:15-cv-13449  Document 2-2  Filed 09/24/15  Page 149 of 311  PageID #: 213

State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

how to request a fair hearing. In addition, we will inform the provider how to request
a reconsideration of the denial.

13. APS-WV will complete reviews within 48 hours of receipt of all requested
information.

14. We will communicate the preauthorization to Medicaid through submission to the
MMIS.

15. APS-WV will communicate potential third party liability to a BMS-designated contact.

## I. Orthotic and Prosthetic Services

Proposed APS-WV subcontractor WVMI currently conducts prior authorization of orthotic
and prosthetic services for BMS under its existing contract and will continue to provide
these services if approved by BMS.

These areas of service offer opportunity for cost savings through appropriate utilization of
services and equipment. BMS' policy to provide the most cost effective equipment that
meets the members need coupled with the use of InterQual screening criteria for medical
necessity has proven successful in cost containment in the current UM contract.

The process for prior authorization for orthotic and prosthetic services has been outlined in
detail below. In addition, this process has been illustrated in a workflow that has been
included in **Exhibit 30.**

1. APS-WV will receive requests for prior authorization of orthotic and prosthetic
equipment by fax, mail, or Web-based format. Requests must contain the following
required information:

   • Patient's name, address, Medicaid number and date of birth;

   • Provider name, and Medicaid number, contact person and phone number, and
   fax number;

   • Diagnosis code (ICD-9); clinical diagnosis pertinent to requested services;

   • HCPC codes, date of service, length of time needed, quantity ordered, and
   dollar amounts;

   • Medical documentation must accompany requests for services exceeding
   allowable Medicaid limits;

   • Physician's signature and date.

2. All incomplete requests will be returned to the provider, as we will not process them.

3. For requests that are complete upon receipt, we will verify the member's eligibility
through the MMIS.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

4. If the member is enrolled in an MCO, we will refer the case to the appropriate MCO.

5. APS-WV will check MMIS for third party liability such as Rehabilitation, Worker's Compensation, or Medicare. If the review staff establishes that an alternative payer source may be responsible for the services being requested, we will notify the provider.

6. We will also determine Medicaid coverage and service limits for the requested durable medical equipment (DME) items.

7. We will enter the request into APS CareConnection® for review to determine medical necessity, in accordance with approved and established BMS policy (for appropriateness and cost efficiency) and criteria (InterQual). If extenuating circumstances exist, we will review the case with BMS for a coverage determination beyond service limitations.

8. If the provider submits a case with un-priced codes, we will require that the provider collect an invoice from the manufacturer. We will forward these documents to our certified orthotics/prosthetic consultant reviewers for accuracy of codes and assistance in determining cost effectiveness.

9. If criteria are met, the reviewer will approve the case and provide an authorization number.

10. If criteria are not met, the reviewer will refer the request to physician review for determination.

11. The reviewer will issue an authorization number for requests approved at physician review.

12. For requests that do not meet criteria, we will issue a denial letter to the member, provider and/or referring entity, indicating which criterion has not been met. We will also send the member information on appeal rights and instructions on how to request a fair hearing. In addition, we will send the provider information on how to request a reconsideration of the denial.

13. APS-WV will complete reviews within 48 hours of receipt of all requested information.

14. We will communicate the preauthorization to Medicaid through submission to the MMIS.

15. We will communicate potential third party liability to a BMS-designated contact.

### m. Chiropractic Services

Proposed APS-WV subcontractor, WVMI, currently serves as the prior authorization agent for BMS for Chiropractic services and will continue to provide this service subject to BMS



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

approval. We understand that prior authorization is required for Chiropractic care beyond the initial twelve services. The process for prior authorization for chiropractic services has been outlined in detail below. In addition, this process has been illustrated in a workflow that has been included in **Exhibit 30**.

1. APS-WV will receive requests for prior authorization of chiropractic services by fax, mail, or Web-based format. Requests for chiropractic services must include:

    - Patient's name, address, Medicaid number and date of birth;
    - Date and history of onset;
    - Objective findings;
    - Primary and secondary ICD-9 diagnosis code(s);
    - Specific locations of subluxations and procedure codes;
    - Treatment plan (including passive and active care);
    - Dates of service for the past calendar year (12 units of chiropractic therapy per calendar year can be performed without prior authorization);
    - Prognosis;
    - Dates and history of exacerbation for current diagnosis;
    - Extenuating circumstances;
    - Frequency of requested visits;
    - If emergency request, must include an explanation of circumstances;
    - A copy of daily treatment records;
    - Treating physician's signature, address, Medicaid provider number, telephone and fax number.

2. We will send all incomplete requests back to the provider and they will not be processed.

3. For requests that are complete upon receipt, we will verify the member's eligibility through the MMIS.

4. If the member is enrolled in an MCO, we will refer the case to the appropriate MCO.

5. For all requests not submitted through APS CareConnection®, APS-WV will enter the request into our system for a medical necessity review.

6. The Reviewer enters the request into a database and reviews for medical necessity, which is determined by criteria and established BMS policy.



State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

7. If criteria are met, the RN reviewer will approve the case and provide an authorization.

8. If criteria are not met, we will refer the case to a West Virginia licensed practitioner with appropriate credentials. We will make decisions on referred cases in accordance with approved and established BMS policy

9. If the consulting chiropractor needs additional information to complete the review, we will fax and/or phone the provider with the request for the specific information. When we receive the additional information, we will resubmit the patient's complete record to the consultant for final review and decision.

10. We will provide authorization numbers for service requests that meet the established guidelines.

11. For requests that do not meet criteria, APS-WV will issue a denial letter to the member, provider and/or referring entity, indicating which criterion has not been met. We will also send the member information on appeal rights and instructions on how to request a fair hearing. In addition, we will send the provider information on how to request a reconsideration of the denial.

12. APS-WV will complete reviews within 48 hours of receipt of all requested information.

13. We will communicate the preauthorization to Medicaid through submission to the MMIS.

## n. Diagnostics Imaging/Radiology Services

Proposed APS-WV subcontractor WVMI began providing prior authorization of elective outpatient high cost imaging studies such as computerized topographies (CT), positron emission tomography (PET), magnetic resonance imaging (MRI) and angiography (MRA) for BMS on October 1, 2005, as a method to control costs in the West Virginia Medicaid program. We understand that these tests do not require prior authorization when provided in an emergency room, to avoid delaying emergency treatment for members. WVMI will continue to provide these services as a subcontractor to APS-WV subject to BMS approval.

The prior authorization process for diagnostic imaging and radiology services has been described below. An illustration of this process has been included in Exhibit 31.

1. APS-WV will receive requests for prior authorization of Diagnostic Imaging Studies by fax, mail, or Web-based format. We also have a direct data entry (DDE) system in place that we will receive these requests. Requests must contain the following information:

   • Patient's name, address, Medicaid number and date of birth;


APS HEALTHCARE

Case 2:15-cv-13449 Document 2-2 Filed 09/24/15 Page 153 of 311 PageID #: 217

State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

- Provider name, and Medicaid number, contact person and phone number, and fax number;
- Diagnosis code (ICD-9), clinical diagnosis pertinent to requested services;
- HCPC codes, date of service.

2. We will send all incomplete requests back to the provider and will not process them.

3. For requests that are complete upon receipt, we will verify the member's eligibility through the MMIS.

4. If the member is in an MCO, we will refer the case to the appropriate MCO.

5. APS-WV will then verify Medicaid coverage for the requested studies.

6. We will enter the request into the database and review it to determine medical necessity, using InterQual criteria.

7. If criteria are met, the RN reviewer will approve the case and provide an authorization.

8. If criteria are not met, the request will be referred to physician review for determination.

9. If the physician reviewer approves the request, the reviewer will issue an authorization number for the request.

10. For requests that do not meet criteria, we will send a denial letter to the member, provider and/or referring entity, indicating which criterion has not been met. We will also send the member information on appeal rights, and instructions on how to request a fair hearing. In addition, we will send the provider information on how to request a reconsideration of the denial.

11. APS-WV will complete all reviews within 48 hours of receipt of all requested information.

12. We will communicate pre-authorizations to Medicaid through the MMIS.

## o. Elective Surgery Procedures

Proposed APS-WV subcontractor WVMI currently conducts prior authorization of elective surgery cases under its existing contract with BMS, as outlined in Attachment 3 to Chapter 510 of the BMS Provider Manual and will continue to provide this prior authorization service subject to approval from BMS. APS-WV understands that this review helps to ensure medical necessity for elective surgery performed for West Virginia's Medicaid members.

The process to conduct prior authorizations for elective surgery procedures has been outlined below. A workflow of this process has been included in **Exhibit 32.**



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

1. APS-WV will receive requests for prior authorization of elective surgery procedures by fax, phone, mail, or Web-based format.

2. We will send all incomplete requests back to the provider and will not process them.

3. For requests that are complete on receipt, we will verify the member and provider's eligibility through the MMIS.

4. If the member is determined to be in an MCO, the case will be referred to the appropriate MCO.

5. We will establish the Medicaid coverage and prior authorization requirements for each requested procedure.

6. The request will be entered into the database for review it to determine medical necessity, in accordance with criteria (InterQual).

7. If criteria are met, an RN reviewer will approve the case and provide an authorization number.

8. If criteria are not met, the reviewer will refer the request to physician review for determination.

9. The reviewer will issue an authorization number for requests approved at physician review.

10. For requests that do not meet criteria, APS-WV will send a denial letter to the member, provider and/or referring entity, indicating which criterion has not been met. We will also send the member information on appeal rights and instructions on how to request a fair hearing. In addition, we will send the provider information on how to request a reconsideration of the denial.

11. APS-WV will complete all reviews within 48 hours of receipt of all requested information.

12. We will communicate pre-authorizations to Medicaid through the MMIS.

### p. Out-of-Network Services

APS-WV will prior authorize necessary services provided by out-of-network providers. Providers will be informed of the enrollment process and any prior authorizations will be time limited. Referrals to out-of-network must come from a West Virginia Medicaid practitioner and the request must be supported with sufficient documentation to determine the prior authorization is medically necessary and the service cannot be obtained through an in-network provider.

We currently provide out-of-network services for BMS on a case-by-case basis and understand the value of consistent monitoring of these providers for management of the



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

### r. Cardiac Rehabilitation

Cardiac rehabilitation is a comprehensive outpatient program that is designed to restore members with heart disease to active and productive lives. Proposed APS-WV subcontractor WVMI currently authorizes inpatient admissions for acute myocardial infarction, heart disease, and various heart surgeries and will continue to provide this service subject to BMS approval. APS-WV understands that by continuing the review process into the outpatient setting, we can better assist the Bureau in the management of utilization of services, as well as overall improvement in the health of members.

The process for the preauthorization for cardiac rehabilitation services has been outlined below. In addition, an illustration of this process has been provided as a workflow. This workflow has been included as **Exhibit 35**.

1. APS-WV will receive the review request by fax, mail, or web-based format. We will develop a form that collects the information needed for the review.

2. All incomplete forms will be sent back to the provider and will not be processed.

3. For reviews that are complete, we will verify member eligibility through the MMIS.

4. If the member is found to be in an MCO, we will refer the case to the appropriate MCO.

5. APS-WV review staff will use the MMIS system, as well as information gathered during the review process, to establish whether an alternative payer source may be responsible for the services being requested. If we can confirm an alternative payer, we will notify the provider.

6. We will only accept prior authorization requests from sources that have been authorized by BMS to participate in the Medicaid program. If the requestor is not a participating Medicaid provider, we will contact the provider within one working day and notify him/her that the request cannot be processed until we can establish his/her participation status in the program. (Please see section **p. Out-of-Network Services, above,** for more details on this process.)

7. We will enter the case into the database and will review it for medical necessity, in accordance with approved and established BMS policy/criteria. Currently, there is not InterQual criteria available for Cardiac Rehabilitation.

8. We will screen all reviews to determine if the member uses tobacco. Those members will be referred to the tobacco cessation program, in accordance with current BMS policy.

9. We will confirm that all reviews include a physician's order for cardiac rehabilitation, current diagnoses, and a treatment plan.



State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

10. A nurse reviewer will screen the information and determine if the criteria has been met.

11. If the criteria have not been met, the reviewer will refer the case to a physician reviewer for determination.

12. If a request for cardiac rehabilitation is approved, either at the nurse or physician level, the approval will be entered into the MMIS.

13. We will notify the provider and/or referring entity of the approval.

14. For requests that do not meet criteria, we will issue a denial letter to the member, provider and/or referring entity, indicating which criteria have not been met.

15. We will send the member information on appeal rights and instructions on how to request a fair hearing. In addition, we will send the provider information on how to request a reconsideration of the denial.

16. If a provider requests reconsideration, we will follow the reconsideration process described in **Exhibit 6**.

17. If subsequent requests for additional cardiac rehabilitation services are determined to be medically necessary, we will review these requests for further cardiac rehabilitation in conjunction with BMS policy and established criteria.

18. The remainder of the review will follow the same format as noted for initial requests, with consideration given as to the number of visits already approved and completed.

19. Reviews will be completed within 48 hours of receipt of all requested information.

APS-WV will refer requests for Cardiac Rehabilitation to our medical case management nurse for appropriate follow-up in that program, as deemed necessary. This will not only serve the member's best interests by ensuring that he/she receives all needed services and is not subjected to any unnecessary procedures, but will also serve the Bureau's need to control costs through utilization management to ensure that services are appropriate, unduplicated and as non-intrusive as possible. In the event of a denial, nurses in our case management program will be able to provide referrals for other services that may be more appropriate and available to the member.

### s. Pulmonary Rehabilitation

APS-WV understands that Pulmonary Rehabilitation (PR) is a multidisciplinary approach to assisting those members with pulmonary disease to improve their daily functioning and quality of life. Proposed APS-WV subcontractor WVMI currently authorizes inpatient admissions, as well as surgeries, for those members who have a variety of pulmonary disorders and will continue to provide this service subject to BMS approval.


**APS HEALTHCARE**

**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

The process for authorization for pulmonary rehabilitation has been provided below. This
process has also been illustrated in a workflow, included as **Exhibit 36.**

1. APS-WV will receive the review by fax, mail, or web-based format. We will develop a
   form that includes the information needed for the review.

2. We will send all incomplete forms back to the provider, as we will not process them.
   Additionally, we will screen the request to determine if it is a request for repeat
   pulmonary rehabilitation services. If we determine that the request is for repeat
   service, we will notify the provider that the benefit is not covered by BMS policy.

3. For reviews that are complete upon receipt, we will verify member eligibility through
   the MMIS. If the member is found to be in an MCO, we will refer the case to the
   appropriate MCO.

4. The APS-WV review staff will use the MMIS system as well as information gathered
   during the review process to establish whether an alternative payer source may be
   responsible for the services being requested. If an alternative payer can be
   established, we will notify the provider.

5. We will accept only prior authorization requests submitted by sources that have been
   authorized by BMS to participate in the Medicaid program. If the requestor is not a
   participating Medicaid provider, we will contact the provider within one working day
   and notify him/her that the request cannot be processed until his/her participation
   status in the program has been established. (Please see section **p. Out-of-Network
   Services, above**, for more details on this process.)

6. We will enter the case into the database and review for medical necessity, in
   accordance with approved and established BMS policy/criteria. Currently, there are
   no InterQual criteria available for Pulmonary Rehabilitation.

7. APS-WV will verify that the review includes information about possible use of
   tobacco.

8. Reviews will include a physician's order for pulmonary rehabilitation, current
   diagnoses, and a treatment plan.

9. A nurse reviewer will screen the information and determine if the criteria have been
   met.

10. If not, the case will be referred to the physician reviewer for determination.

11. If the request for pulmonary rehabilitation is approved, either at nurse level, or at
    physician review, we will enter the approval electronically to the MMIS.

12. The provider and/or referring entity will also be notified of the approval.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

13. For requests that do not meet criteria, we will issue a denial letter to the member, provider and/or referring entity, indicating which criteria have not been met.

14. We will send the member information on appeal rights, and instructions on how to request a fair hearing. In addition, we will send the provider information on how to request a reconsideration of the denial.

15. If the case is received for reconsideration, we will follow the reconsideration process illustrated in **Exhibit 6**.

16. APS-WV will complete all reviews within 48 hours of receipt of all requested information.

17. We will refer requests for Pulmonary Rehabilitation to our medical case management nurse for appropriate follow-up in that program, as deemed necessary. This will not only serve the member's best interests by ensuring that he/she receives all needed services and is not subjected to any unnecessary procedures, but will also serve BMS' need to control costs through utilization management to ensure that services are appropriate, unduplicated and as non-intrusive as possible. In the event of a denial, nurses in our case management program will be able to provide referrals for other services that may be more appropriate and available to the member.

**t. Medical Case Management**

APS-WV understands the importance of ensuring that high-cost cases such as private duty nursing and organ transplant patients are using appropriate services that meet their medical needs. Medical Case Management for BMS is currently conducted by a dedicated case manager. These case managers will continue to work under subcontract to APS-WV subject to BMS approval, identifying opportunities to improve care of Medicaid members while reducing cost. It is estimated that the Medical Case Management program realized over $675,000 in savings for BMS over the three previous years.

Certain categories of review are automatically assigned to case management, including organ transplant services, private duty nursing services, and gastric bypass patients. Other high-cost or service-intensive cases may also be assigned to case management. Case management staff from the preauthorization unit, hospitals, physician's offices, and BMS may refer patients for case management. Members or their legal representatives may also request case management services. In addition, APS-WV is proposing additional case management follow-up as noted in other service areas of this proposal, i.e., Hospice, Cardiac Rehabilitation, and Pulmonary Rehabilitation.

The process for Medical Case Management has been outlined below. This process has also been illustrated in a workflow, which has been included as **Exhibit 37**.

**APS HEALTHCARE**

Case 2:15-cv-13449 Document 2-2 Filed 09/24/15 Page 159 of 311 PageID #: 223

**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

management guidelines, also ensuring that the requested services are appropriate in type, duration, and frequency, and are a covered benefit.

5. The APS-WV reviewer will also evaluate the extent to which another payer may be responsible for the service, if an alternative payer is identified, we will notify the facility to that effect and close the review.

6. If the request is approved by the initial reviewer, the review determination will be documented in APS CareConnection®.

7. If the first level reviewer cannot approve the request, it will be referred to an APS-WV Consultant for review.

8. If the request is approved by the Consultant, the review determination will be documented in APS CareConnection®.

9. If the request is denied, we will issue a denial notice in writing to the provider and consumer, which states appeal rights and processes.

10. Authorizations for approved requests are submitted to the MMIS in the prescribed format and will be submitted in the format and location designated by BMS in the current RFP.

### w. Home health

APS-WV understands that for BMS to responsibly manage the fiscal requirements of the Medicaid Program, it will be beneficial to have consistent monitoring of Home Health Service providers. Proposed APS-WV subcontractor WVMI has conducted home-health review under previous contracts with BMS and will continue to conduct the prior authorizations for home health services subject to approval from BMS. APS-WV understands that as services are used, it may be necessary to change the requirements for prior authorization. In addition, APS-WV understands that BMS will now require authorization after 60 home health visits, or 25 for those in the basic benefit. We feel that this is a natural extension of review to follow the member across the healthcare continuum.

Below is the process for prior authorizations for home health services. This process has also been provided as a workflow. This workflow has been included as **Exhibit 40.**

### Home Health Prior Authorization Process

1. APS-WV will receive the review by fax, mail, or Web-based format. We will develop a form that addresses the information needed for the review.

2. We will send all incomplete forms back to the provider and we will not process them.

3. For reviews that are complete upon receipt, we will verify member eligibility through the MMIS.


**APS HEALTHCARE**

State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

4. If the member is found to be in an MCO, we will refer the case to the appropriate MCO.

5. APS-WV will confirm with the provider that the member has already received the home visits allowed under the appropriate plan, or is about to complete that number, and the provider believes that more are needed.

6. We will only accept prior authorization requests submitted by sources that have been authorized by BMS to participate in the Medicaid program. If the requestor is not a participating Medicaid provider, we will contact the provider within one working day and notify him/her that the request cannot be processed until their participation status in the program has been established. (Please see section **p. Out-of-Network Services,** above, for more details on this process.)

7. APS-WV will use the MMIS system, as well as information gathered during the review process, to establish whether an alternative payer source may be responsible for the services being requested. If an alternative payer can be established, we will notify the provider.

8. We will enter the case into the database and review it for medical necessity, in accordance with approved and established BMS policy/criteria, or InterQual, if available.

9. A nurse reviewer will screen the information and determine if the criteria has been met. If not, the case will be referred to the physician reviewer for determination.

10. If the request for home health services is approved, either at the nurse or physician level of review, we will send the approval electronically to the MMIS.

11. We will notify the provider and/or referring entity of the approval, which will include a date span and number of service units authorized.

12. APS-WV will complete concurrent review of additional requests in the same manner.

13. For requests that do not meet criteria, we will issue a denial letter to the member, provider and/or referring entity, indicating which criteria have not been met.

14. We will send the member information on appeal rights and instructions on how to request a fair hearing. We will send the provider information on how to request a reconsideration of the denial.

15. If the case is received for reconsideration, we will follow the reconsideration process illustrated in **Exhibit 6.**

16. When appropriate, APS-WV will refer requests for Home Health Services to our medical case management program for follow-up in that program.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

17. APS-WV will complete reviews within 48 hours of receipt of all requested information.

### x. Hospice

The WV Medicaid Hospice Services program is a comprehensive case management program for members who are terminally ill and in need of palliative care. Proposed APS-WV subcontractor WVMI currently reviews inpatient admissions, outpatient services, and nursing facility admissions for members who have terminal diagnoses. In addition, WVMI currently performs assessments for applicants and members of the Aged and Disabled Waiver program, some of whom are also receiving Hospice services, through either Medicaid or Medicare. WVMI will continue to provide these services as a subcontractor to APS-WV subject to BMS approval.

APS-WV understands that following a member through the continuum of services often needed in conjunction with a terminal diagnosis assists BMS in the management of utilization of services and addresses specific needs of members and their families.

The following outlines the process for the prior authorization for all hospice service requests. This process has also been illustrated with a workflow that has been included in **Exhibit 41.**

1. APS-WV will receive the review request by fax, mail, or Web-based format. We will develop a form that collects the information needed for the review.

2. All incomplete forms will be sent back to the provider and will not be processed.

3. For reviews that are complete, we will verify member eligibility through the MMIS.

4. If the member is found to be in an MCO, we will refer the case to the appropriate MCO.

5. The APS-WV review staff uses the MMIS system, as well as information gathered during the review process, to establish whether an alternative payer source may be responsible for the services being requested. If we can confirm an alternative payer, we will notify the provider.

6. We will only accept prior authorization requests from sources that have been authorized by BMS to participate in the Medicaid program. If the requestor is not a participating Medicaid provider, we will contact the provider within one working day and notify him/her that the request cannot be processed until we can establish his/her participation status in the program. (Please see section **p. Out-of-Network Services,** above, for more details on this process.)

7. We will enter the case into the database and will review it for medical necessity, in accordance with approved and established BMS policy and criteria (InterQual). Currently, InterQual criteria are not available for Hospice services.



State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

8. In accordance with BMS policy, all requests must include physician's diagnosis and determination that life expectancy is six months or less, the hospice provider's plan of care, and informed consent of the member. A completed Hospice Enrollment Form (HEF-01) must be submitted.

9. If the nurse reviewer is unable to approve the request based upon information provided, the nurse will refer the case to a physician reviewer.

10. If a request for Hospice Services is approved, either at the nurse or physician level, we will enter the approval into the MMIS.

11. We will notify the provider and/or referring entity of the approval. For requests that do not meet criteria, we will issue a denial letter to the member, provider and/or referring entity, indicating which criteria have not been met.

12. APS-WV will send the member information on appeal rights and instructions on how to request a fair hearing. We will send the provider information on how to request a reconsideration of the denial.

13. If a provider requests reconsideration, we will follow the reconsideration process illustrated in **Exhibit 6**.

14. We will complete reviews within 48 hours of receipt of all requested information.

As the need for service coordination is particularly acute for members with a terminal diagnosis, APS-WV will refer all requests for hospice services to our medical case management program. This will not only serve the member's best interests by ensuring that he/she receives all needed services and is not subjected to any unnecessary procedures, but will also serve BMS' need to control costs through utilization management to ensure that services are appropriate, unduplicated and as non-intrusive as possible. In the event of a denial, nurses in our case management program will be able to provide referrals for other services that may be more appropriate and available to the member.

### y. Personal Care

Currently all Prior Authorizations for Personal Care and any provision of dual services to Aged and Disabled Waiver members receive desk reviews by a Registered Nurse (RN) employed by the Bureau of Senior Services. APS-WV proposes to provide review function for services above the standard service limits for Personal Care, as well as for all provision of dual services under the Aged and Disabled Waiver Program.

Both systems proposed are a natural extension of the current review program and will seamlessly integrate all long-term care review processes, which include Aged and Disabled Waiver, Nursing Home Eligibility and PASRR, as well as Personal Care. In addition, once the changes are operational, APS-WV will work collaboratively with the Bureau of Medical Services and the Bureau of Senior Services to find cost-effective, efficient ways to streamline



State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

call. The nurse reviewer will support, review, and identify all information submitted in conjunction with current BMS policy/criteria for Personal Care services and standards. The workflow that illustrates the hearing process has been included in **Exhibit 42.**

### Proposed Review Process for Provision of Services to Aged and Disabled Waiver Members

As directed by BMS policy, approval of the provision of both Aged and Disabled Waiver and Personal Care services to the same person will be considered when the criteria set forth is met. As this is part of the overall long-term care service currently reviewed, we will act to integrate these services in a consistent, reliable and cost-effective manner and to best meet the needs of the member. Prior authorization is required for any provision of Aged and Disabled Waiver and Personal Care services, including the initial 60 hours of Personal Care services. Outlined below is the proposed review process for provision of dual services to Aged and Disabled Waiver members, to be conducted by proposed APS-WV subcontractor WVMI subject to BMS approval. The workflow has been provided in **Exhibit 43.**

1. A properly completed request for provision of dual services, by fax or mail will begin the application for prior authorization of these services. An expanded option of Direct Data Entry (DDE) will also be made available to providers, which will allow them to data enter demographics and information and to submit their requests electronically. Access to this system will be made available at any time 24 hours a day, 7 days a week.

2. We will return Provision of Dual Services Request packets that have incomplete or inaccurate information to the requesting entity, with a cover sheet indicating the reason we were unable to process. If this involves a new member with whom the entity is initiating services, we will also send a letter to the individual, noting the reason we were unable to process the request.

3. The Personal Care Agency Registered Nurse must initiate the request. This request must include the following: a complete copy of the Request form with original signatures ("signature on file" will not be accepted), a narrative describing how services will be used and verification that the Aged and Disabled Waiver and Personal Care services **will not** be duplicated, documentation of caregivers for both programs and their relationship to the member, Current Personal Care Medical Eligibility Assessment (PCMEA), Current Aged and Disabled Waiver and Personal Care RN assessments, current Aged and Disabled Waiver RN Plan of Care, a proposed Personal Care Plan of Care, and any additional documentation that substantiates the request.

4. Because APS-WV will provide prior authorization for the entire continuum of long-term care services, we will be able to verify the Aged and Disabled Waiver PAS 2000. Therefore, the agency will not have to submit this piece of documentation again. We

**APS HEALTHCARE**

**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

will verify member status of eligibility and Level of Care D using the current Aged and
Disabled Waiver data collection computerized system.

5. If the request and supporting documentation is complete and is not submitted
   through the DDE method, we will data enter it into the automated system. We will
   assign it to a Registered Nurse for review. This automated system will include a
   historical record of the member or applicant's request for services in order to track
   historical approvals and denials, as well as Personal Care Services. In accordance with
   the Personal Care Standards, we will enter the Personal Care Medical Eligibility
   Assessment into a database and use an algorithm to determine eligibility for the
   services and the number of hours for which a member might qualify.

6. APS-WV Registered Nurse's will review all required documentation using the
   criteria/standards set forth under each set of program guidelines. In order to ensure
   consistency and accuracy, we will send the request for Provision of Dual Services will
   be sent to the field nurse who completed the ADW PAS 2000 assessment instrument,
   for review, if available. This review for Dual Services will also include the initial service
   limit of up to 60 hours for Personal Care. The nurse reviewer will confirm that both
   service plans of care have been coordinated between the Personal Care Agency and
   the Aged and Disabled Waiver Agency. We will evaluate the documents from these
   agencies providing hands-on- direct services to prevent duplication of services. The
   nurse reviewer will also substantiate that Personal Care and Homemaker services are
   not being provided during the same hours on the same day.

7. The nurse reviewer will establish whether the current and valid Aged and Disabled
   Waiver PAS-2000, which is maintained within the database as historical data, and a
   current and valid Personal Care Medical Eligibility Assessment, reflect the need for
   both services in the home.

8. The decision to approve Provision of Dual Services will in part be based on a second
   algorithm that we will run using the criteria and data sets that already exist within the
   Aged Disabled Waiver data collection system. The automated system will calculate
   the number of deficits and level of care, as well as the total number of hours for
   Personal Care Services. The algorithms will ensure objectivity and consistency in the
   evaluation of each application.

9. Once we have identified a need for Provision of Dual Services, we will notify the
   referring entity, along with the Case Manager (or responsible party if self-directed),
   Homemaker agency, and the member or member's representative. The system
   currently in use automatically prints approval letters for the member, applicant and
   his or her physician or the providing/referring entity/Case Manager (if applicable), and
   Homemaker agency.



Case 2:15-cv-13449 Document 2-2 Filed 09/24/15 Page 165 of 311 PageID #: 229

State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

10. If we deny the request or approve fewer than the hours requested, the system will automatically print a denial letter notification that will be sent to the member, applicant, and his or her physician or the providing/referring entity, Case Manager (if applicable), and Homemaker agency. The notification will also include fair hearing information with instructions for completion.

11. If a member or applicant requests a fair hearing as part of the appeal process, a nurse reviewer will attend and participate in the fair hearing, either in person or by conference call. The nurse reviewer supports, reviews, and identifies all information submitted in conjunction with current BMS policy/criteria standards. The workflow that illustrates the hearing process has been included in **Exhibit 42**.

### z. Socially Necessary Services

APS-WV conducted reviews of socially necessary services in the prior contract period and will continue to provide these reviews. We have outlined the manner in which we will prior authorize socially necessary services for BCF in the mandatory and general requirements and in Section 3.1.4.2.

### aa. MR/DD Waiver Packets

APS-WV will conduct review of BHHF-funded Waiver packets in the new scope of work; we have outlined the manner in which we will provide prior authorization of BHHF funded Waiver packets in Section 3.1.4.3 and 3.1.4.4 dd.

### bb. Private Duty Nursing

Proposed APS-WV subcontractor WVMI conducted review of private duty nursing requests in the prior contract, and will continue to perform this function subject to BMS approval. Medical staff will review and prior authorize all private duty nursing requests within guidelines established in the BMS Medicaid manuals and approved by BMS. The following describes the process that APS-WV will follow to review and prior authorize private duty nursing requests. A workflow for this process has been included in **Exhibit 44**.

1. APS-WV will receive requests for Private Duty Nursing care by fax, mail, or Web-based format.
2. Requests confirm that the Physician's Request Form for Private Duty Nursing has been included as this is a requirement for review and/or prior authorization.
3. We will verify member eligibility through the MMIS.
4. If the member is in an MCO, the case will be referred to the appropriate MCO.
5. The APS-WV review staff will use the MMIS system, as well as information gathered during the review process, to establish whether an alternative payer source may be responsible for the services being requested. If an alternative payer can be established, we will notify the provider.

**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

APS-WV has an established role in the current QI process and looks forward to increased involvement in quality assurance and improvement activities of the MR/DD Waiver program. Through expanded data analysis, the QAI Advisory Council will be able to identify and act upon opportunities to improve service delivery, outcomes and compliance.

The following are examples of how data collected and analyzed through the QI process inform specific CMS Quality Assurance criteria:

- Provider Educators perform retrospective reviews of providers to gather QI data
- APS-WV developed a comprehensive Utilization Review tool in electronic format to evaluate specific criteria
- Through the CareConnection® each member's identified health & safety issues are flagged for the Service Coordinator and team to address.

APS-WV will continue to work with DHHR to assure that the program is appropriately implemented and monitored, and reporting is timely and sufficient to meet requirements.

### ee. Vision Services – (Optional)

Utilization review for Vision Services was required by BMS in 2001. Although currently vision services are not reviewed, subcontractor staff experience with Durable Medical Equipment and Vision services will provide continuity of review process for members. A variety of outpatient procedures involving the eyes is currently subject to prior authorization, for example, blepharoplasties, repairs for entropian and ectropian disorders, and lagopthalmos corrections. For this reason, the review process currently includes a board certified ophthalmologist who serves as a physician reviewer. APS-WV will provide the prior authorization services for vision services through a proposed subcontract with WVMI clinical staff, subject to BMS approval. The process for the prior authorization of vision services has been outlined below. An illustration of this process has been provided in a workflow that has been provided in **Exhibit 47**.

1. APS-WV will receive requests for Vision Services by fax, mail, or Web-based format. With direction from BMS, we will develop a form that collects the information needed for the review.
2. We will return all incomplete forms to the provider. For reviews that are complete upon receipt, we will verify member eligibility through the MMIS.
3. If the member is in an MCO, we will refer the case to the appropriate MCO.
4. The case will be entered into the database and be reviewed for medical necessity, in accordance with approved BMS policy/criteria, or InterQual, if available.
5. APS-WV review staff will use the MMIS system, as well as information gathered during the review process, to establish whether an alternative payer source may be


APS HEALTHCARE

**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

responsible for the services being requested. If an alternative payer can be established, we will notify the provider.

6. We will accept only prior authorization requests that are submitted by sources that have been authorized by BMS to participate in the Medicaid program. If the requestor is not a participating Medicaid provider, we will contact the provider within one working day and notify him/her that the request cannot be processed until his/her participation status in the program has been established. (Please see section p. **Out-of-Network Services, above**, for more details on this process.)

7. A nurse reviewer will screen the information and determine if the criteria have been met. If not, the case will be referred to the physician reviewer and/or a consultant with credentials in optometry, for determination.

8. If the request for vision services is approved, either at the nurse or physician level of review, we will send the approval electronically to the MMIS.

9. The provider and/or referring entity will also be notified of the approval.

10. For requests that do not meet criteria, we will issue a denial letter to the member, provider and/or referring entity, indicating which criteria have not been met.

11. We will also send the member information on appeal rights and instructions on how to request a fair hearing.

12. The provider notice will include information on requesting a reconsideration.

13. If the case is received for reconsideration, we will follow the reconsideration process in **Exhibit 6**.

14. APS-WV will complete reviews within 48 hours of receipt of all requested material.

## ff. Laboratory Services – (Optional)

We understand that BMS currently covers clinical laboratory services that reflect generally accepted standards of practice as defined by leading authorities, such as the Centers for Disease Control and Prevention (CDC). Current BMS policy does not require prior authorization of laboratory services, but will require such authorization in the next contract. We welcome the opportunity to assist BMS in development of prior authorization for laboratory services. We anticipate that BMS has identified a focus area of laboratory tests that appear to be excessive in volume, or which are high cost procedures. Large volumes may be indicative of inappropriate testing, for example, routine screening of healthy adults with blood chemistry panels. Inappropriate testing is not benign; one in twenty clinical tests returns "abnormal" results by chance, potentially starting a chain of further tests, consultations, and treatments. These may expose Medicaid recipients to risk of side effects or medical misadventure, while increasing costs to the program. Because the program has limited funding, it is important to assure that laboratory procedures, especially high cost



**APS HEALTHCARE**

**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

procedures, will address actual medical needs.

In consultation with BMS, APS-WV will develop and implement a prior authorization system for laboratory procedures to assure that recipients have quick access to tests that are medically indicated, while reducing unnecessary and duplicative procedures. Proposed APS-WV subcontractor WVMI will conduct this review subject to BMS approval. When this new policy is implemented, we will observe the process detailed below.

### Prior Authorization for Laboratory Services

1. APS-WV will receive requests by fax, mail, or web-based format.
2. Requests must include the physician's order for the study.
3. We will verify member eligibility through the MMIS.
4. If the member is enrolled in an MCO, the case will be referred to the correct MCO.
5. Review staff will use the MMIS system and information gathered during the review process to determine if alternative payer sources may be responsible. If an alternative payer can be established, we will notify the provider.
6. APS-WV staff will only accept prior authorization requests submitted by sources that have been authorized by BMS to participate in the Medicaid program. If the requestor is not a participating Medicaid provider, staff will contact the provider within one working day and notify him/her that the request cannot be processed until his/her participation status in the program has been established. (Please see section "P" of this response for out of network services.)
7. Staff will enter the case into APS CareConnection® (if not submitted electronically by the provider), where it will be reviewed by a nurse reviewer for medical necessity, in accordance with approved BMS policy/criteria or InterQual, if available.
8. For requests that do not meet criteria, we will refer the case to a physician reviewer.
9. If the case cannot be approved, we will issue a denial letter to the member, provider and/or referring entity, indicating which criteria were not met.
10. APS-WV will send information on appeal rights and instructions on how to request a fair hearing to the member, and information on how to request a reconsideration of the denial to the provider.
11. If we receive the case for reconsideration, we will follow the reconsideration process in **Exhibit 6.**

### gg. Nursing Home Eligibility and PASRR Eligibility – (Optional)

West Virginia is undergoing a demographic change that most other states will not see for another 10 to 15 years. The 15.5% of West Virginians aged 65 and older was the second highest in the nation in 2007 and is growing at rates that exceed national norms. This trend suggests that the demand and spending for various long-term care and related health services, including nursing home services will continue to soar over the next ten years, creating an immense challenge for the State and its Medicaid program. Perhaps the most urgent of these challenges include: securing adequate financing, improving the quality of



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

care in long term care facilities, including nursing homes and developing a work force that is sufficient in size and skill to address the State's long term health care requirements.

Currently, the West Virginia Bureau for Medical Services (BMS) is the primary payer source for approximately 75% of the State's nursing home residents. There is no indication that this level of support will decline. Medicaid has historically been the 'back up" payment source for most nursing home services when an individual's personal assets are depleted.

Nursing homes in West Virginia will continue to be an important and necessary component of the State's long-term care system. Therefore, it is incumbent upon BMS to ensure the effective, efficient, and appropriate use of these services.

BMS requires all individuals being placed in a nursing facility, or transferring between facilities, to have a medical necessity assessment completed, submitted and reviewed in accordance with BMS policy. BMS utilizes the Pre-Admission Screening assessment instrument, PAS-2000, (see Exhibit 1) as the basis for conducting the medical necessity review. Proposed APS-WV subcontractor WVMI has conducted NH/PASRR reviews for BMS for well over ten years and over the past four years has completed approximately 68,000 NH/PASRR reviews. This effort has helped to ensure that individuals seeking placement in a nursing facility meet BMS' medical eligibility requirements for this level of care as well as whether an alternative placement is warranted. The following is a detailed description of the nursing home review process that will be conducted under subcontract to APS-WV, subject to BMS approval. This process has been illustrated in a workflow in **Exhibit 2**.

1. Hospitals and physician's offices submit the completed PAS-2000 to APS-WV, by fax or mail. In addition, we will plan to make available an expanded version of the Direct Data Entry (DDE) that is presently offered in the Prior Authorization contract. This will allow providers to data enter demographics and information and to submit their requests electronically. It also allows providers to check the status of their referrals or reviews at any time 24 hours a day/7 days a week.

2. Once received, we will enter the data from the PAS-2000 (if not submitted using the DDE method) and assign the case to a Registered Nurse reviewer. The PAS-2000 will then be run through a computerized algorithm consistent with BMS policy/criteria for nursing facility services.

3. The nurse reviewer will also determine if a PASRR review is necessary, in accordance with BMS policy. We will use a fax back form to indicate the determination of medical necessity and the need for a PASRR. This form is the same as page 6 of the PAS-2000 assessment instrument **(See Exhibit 1)**.

4. We will base the determination of the need for a PASRR on submitted information indicating the presence of mental retardation, developmental disability and/or an


APS HEALTHCARE

Case 2:15-cv-13449 Document 2-2 Filed 09/24/15 Page 170 of 311 PageID #: 234

State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

associated condition, or major mental illness. Once we identify such a condition, the referring facility will be responsible for initiating the Level II PASRR process.

5. APS-WV will process all reviews submitted and issues a determination within 48 hours of receipt of the request. Requests received after 12pm on Friday, or a day preceding a holiday, will be acted upon the first working day following the holiday or weekend.

6. If the nurse reviewer needs additional information, he/she will request it from the provider. Once the nurse receives the additional information, she/he will issue a determination within 24 hours.

7. If a decision cannot be made at the nurse Review level, the referral to physician review will be made with in 24 hours of receipt of the original request.

8. Once a referral requires physician review, the approval/denial will be made within 24 hours of the referral.

9. If the physician reviewer requires additional information, that request will be made within 24 hours of referral to the physician.

10. The physician review determination will be transmitted to the originating facility within 24 hours of receipt of the additional information.

11. All approvals consist of page 6. A copy of the approval is mailed to the member and/or his/her legal representative.

12. For all denials, in addition to sending page 6, we will notify the individual and referring entity by mail and/or fax of the determination. The denial letter will include the criteria that were not met during the review process, as well as appeal rights. The denial packet will also include a Hearing Request form, with instructions for completion.

13. To be approved for the Nursing Facility benefit with WV Medicaid, the individual must have at least five deficits. The computerized algorithm ensures consistency and accuracy of the reviews consistent with BMS policy, within the scope of work, and across the long-term care continuum.

If a member requests a fair hearing as part of the appeal process, APS-WV will participate by requesting additional information. This includes, but is not be limited to, Minimum Data Set (MDS) section "G", Activities of Daily Living (ADL) sheets, care plan, and physician and nursing notes. We will request such information within five days of notice to APS-WV that a hearing has been requested and scheduled. APS-WV will provide a nurse reviewer to attend and participate in fair hearings, either in person or by conference call. The nurse reviewer will support, review, and verify all information submitted in conjunction with current BMS policy/criteria for long-term care. A workflow for the hearing process is in **Exhibit 48.**



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

eligible for these services.

- State of Nevada – Silver State Care Management. Nevada's program provides care coordination services to children with severe emotional disturbances, including SCHIP members.

- Hawaii Medical Service Association (HMSA) – APS contracts with HMSA to provide a variety of care coordination services to Medicaid members, with SCHIP members eligible for these services as well.

- Community Health Choice – State of Texas. APS subcontracts to Community Health Choice to provide behavioral health services to Texans eligible for public programs, including the SCHIP population.

### APS-WV Subcontractor Experience: West Virginia Medical Institute

The current RFP combines a wide variety of utilization and care management services previously delivered through separate contracts. The benefits of this approach are numerous: streamline contract management functions; achieve uniform levels of customer service across vendor interfaces; create an efficient and effective single point of contact for the Bureaus, providers, and members; and implement web-based information technology for all review functions. The challenges of this effort are also significant, and timeframes for implementation stringent. The imperative for the successful vendor, however, is to address the challenges and meet the timeframes *without disruption to the ability of West Virginia Medicaid members to access necessary and covered services.* APS-WV knows and deeply appreciates the confidence in performance and outcomes that the Bureaus have extended in the past to our work in West Virginia. For this reason, we have carefully evaluated all options and propose to subcontract specific review activities to West Virginia Medical Review Institute (WVMI). APS-WV will continue to be responsible for all contract management activities, data analysis, reporting, provider and member education, communications, and technical assistance. WVMI, as the following discussion illustrates, brings substantial clinical experience in specific review functions. The combination of APS-WV's management and review experience with the clinical background of WVMI's reviewers enables us to implement this very important program within timeframes. We understand that subcontractors must be approved by the Bureau, and are prepared to work with the Bureau to define timeframes and activities that reflect the Bureau's decision. In this section we describe the relevant experience of WVMI.

WVMI has assisted the Bureau for Medical Services' efforts to assure the necessity and quality of services provided to Medicaid beneficiaries for nearly 30 years. WVMI's objectives as a mission-based West Virginia company committed to improving health or healthcare are:

- Promote the most effective and appropriate use of health care services.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

- Ensure the provision of quality services in a timely manner to West Virginia's Medicaid beneficiary population.
- Provide West Virginia's Medicaid agency with actionable information that will assist the agency in the fulfillment of its federally delegated responsibility.
- Use established methods and procedures to reduce the unnecessary utilization of care and services.
- Support the State's efforts to meet the health care needs of all West Virginians.

### Medical Review Experience

WVMI has assisted the Bureau for Medical Services' to assure the necessity and quality of services provided to Medicaid beneficiaries for nearly 30 years. Through this ongoing relationship, WVMI's many other quality and review projects, and its 2008 URAC accreditation, they have developed expertise in the following areas:

- Design of review programs;
- Development and adoption of criteria;
- Training of staff;
- Conduct of reviews;
- Quality Assurance; and
- Reporting.

In WVMI's most recent Bureau contracts (2005 to present), the company provided a wide range of services, including preauthorization, concurrent reviews, post-service evaluation and case management services. Collectively, WVMI reviewed more than 300,000 cases.

WVMI has provided nearly all of the review services requested in section 3.1.4.4 of the RFP. Highlights of this experience include the following:

- Successful adoption and implementation of InterQual criteria – The use of this nationally recognized criteria set improved reliability and credibility of reviews, helped ensure provision of appropriate care in appropriate settings, and resulted in savings to the Bureau.

- Initiation of a Web-based Direct Data Entry (DDE) system for select service areas – This well-received option for Medicaid participating hospitals has increased the accuracy of information received and reduced processing time. To date, 29% of requests for inpatient admissions are submitted electronically.

- Initiation of Right Fax technology – For providers not using DDE, Right Fax has represented a substantial improvement to the process.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

- URAC Accreditation -- To demonstrate its commitment to a superior review process and ensure alignment with professionally recognized standards and practices, WVMI underwent the extensive URAC accreditation process. URAC Health Utilization Management Accreditation provides assurance to patients, providers, purchasers, regulators and employers that the practices of the organization performing these services are fair and equitable for all parties.

Table II-3 summarizes the number of reviews by area since 2005 and overall years of experience from all preauthorization and utilization review projects.

| Table II-3: WVMI Review Experience | |
|---|---|
| **Medicaid Service** | **Number of Reviews (1/1/05-12/31/08)** |
| General and acute care inpatient hospital services | 102,720 |
| Organ transplant services | 228 |
| Inpatient medical admission for rehabilitation for individuals through age 20 | 174 |
| General dental services and orthodontics | 25,871 |
| Occupational therapy and physical therapy | 1,651 |
| Speech therapy | 2,687 |
| Durable medical equipment (DME) | 62,866 |
| Orthotics and prosthetics | 3,864 |
| Chiropractic services | 1,025 |
| Diagnostic imaging services | 41,646 |
| Elective surgery procedures | 9,441 |
| Medical case management | 703* |
| Home health | 21 |
| Private duty nursing | 597 |
| Aged and Disabled Waiver program reviews | 51,973** |
| Nursing facility services and home- and community-based waiver services, including PAS | 68,432 |

* 7/1/04 – 12/31/08; ** 7/1/03 – 12/31/08

### Aged and Disabled Waiver Program Experience

APS-WV proposed subcontractor WVMI also assisted the Bureau for Medical Services' with conceptualization and implementation of the Aged and Disabled Waiver Program assessment process. WVMI has provided medical necessity reviews/assessments for in-home



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

services in support of BMS Aged and Disabled Waiver (ADW) program since inception of the
program in 2003. WVMI assisted the Bureau with the following activities:

- Designing, developing and implementing a process for conducting independent
  medical necessity evaluations.
- Assuring the necessity and appropriateness of services provided to eligible
  participants.
- Refining the assessment process as needed.

As noted in Table II-3, WVMI has reviewed 51,973 cases associated with ADW since 2003.
Overall, our goal has been to help the Bureau enhance the quality, operation and cost
effectiveness of the Waiver program. APS' knowledge and experience with disability groups
and Waiver programs together with our relationships with service providers and
stakeholders throughout West Virginia will enable us to effectively manage the Aged and
Disabled Waiver Program.  By managing both of the state's Waiver programs – ADW and
MR/DD – APS-WV will be able to identify and implement common practices and procedures
between the two programs for increased efficiencies and stakeholder satisfaction.

### Summary of Experience

As this discussion of experience indicates, APS-WV brings to the State of West Virginia the
resources and skills of our local staff as well as the perspective and experience garnered in
our other public sector programs. We propose to integrate experience clinical review
resources within our local model to continue to fully meet the requirements of West
Virginia's Department for Health and Human Resources. APS is eager to continue our
partnership with DHHR and pledges to provide the same level of responsive, flexible,
efficient and effective service the state has come to expect.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

## Section III – Qualifications of Project Staff

Vendor should identify the qualifications of current and anticipated staff, and the credentials of the
staff members, specific to the required review functions defined in this RFP.

APS-West Virginia (APS-WV) is pleased to propose a project approach that is fully
operational for existing functions and well-positioned to take on the work of the new
contract. In this section we discuss our proposed staffing plan, present the organizational
structure for the project, and describe the qualifications of staff members on the APS-WV
team.

As your incumbent, APS-WV is also able to include in our proposal a fully staffed team for all
existing functions. In addition, we are well-positioned to take on the work of all new
components as part of the RFP. APS-WV has employed staff with the expertise, experience
and knowledge to address the State's vision for the implementation and monitoring of a
service array to meet the needs of West Virginians utilizing Department of Health and
Human Resources (DHHR) programs and services. The location and management of all staff
for the project in West Virginia has facilitated the recruitment of culturally competent
qualified staff knowledgeable of West Virginia's service delivery system. APS fully
understands the value of local staff who know the culture, programs, and services provided
in West Virginia.

Leadership has extensive experience with the Medicaid State Plan and state and federal
requirements. Our local West Virginia staff members demonstrate the strength of this
approach with their timely response to DHHR needs and requests and their understanding
of, and support for, the vision, mission, and goals of DHHR.

As your incumbent, APS-WV employs qualified staff including licensed psychiatrists,
physicians, registered nurses, social workers, psychologists and counselors. In addition, we
propose West Virginia Medical Institute (WVMI) as our subcontractor, also an incumbent, to
provide the State with the most experienced team available. This APS-WV team has
experience with the entire continuum of behavioral health, physical health child welfare
services, and services to persons with mental retardation and developmental disabilities.
The diversity of staff disciplines and experience supports our corporate belief in the
integration of physical health and wellness services and as such, places APS-WV in an
excellent position to meet West Virginia's needs.

As the prime contractor, APS-WV will directly manage and control all aspects of program
performance, including staffing. Our proposal to subcontract with WVMI will provide the
Department with a West Virginia team that has decades of utilization management review
experience in all aspects of review required by the scope of work, enabling us to streamline
authorization and other services, and assuring a smooth and timely provider and member
transition to the integrated service model required by the RFP. APS-WV will ensure that the



State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

flexible and responsive service previously delivered to the Department for selected services is now the single model for all services – bringing APS-WV's high standards of quality and customer service to support Bureau requirements in all areas. With this approach to service delivery, the APS-WV team will be an integrated and cohesive point of contact for all Bureaus, providers, and recipients. As stated within the RFP, APS-WV understands that any staff, subcontractors, and/or consultants must be approved by the Department in advance. In this section, we present the qualifications of the integrated APS-WV team and demonstrate our management and staffing model for the scope of work.

APS-WV's Management Team consists of five core members – with all of whom West Virginia already has a working relationship. Each manager has been an integral to the design, development and implementation of the programs throughout their tenure with APS-WV. As your incumbent, you are familiar with all of our core members:

- Jennifer Britton, PhD, Executive Director

- Helen C. Snyder, MA, LPC, LCSW, Bureau for Medical Services Director

- Caroline Duckworth, MSW, LCSW, Bureau for Children and Families Director

- Rebecca Jamnick, MSW, Bureau for Behavioral Health and Health Facilities Director

- Randall K. Hill, BA, MR/DD Waiver Program Director

In addition to the dedicated and experienced leadership based in Charleston, West Virginia, the following APS executives and managers are also available for consultation:

- Joanne Brown Lee, Senior Vice President, South Region

- Ellen Grabowitz, M.D., Behavioral Health Medical Director

- Steve Saunders, M.D., M.P.H., Chief Medical Officer

- Gordon Rothrock, Senior Vice President, Finance

Resumes for the above team members have been included in **Exhibit 49.**

### Project Organizational Staff

Figure III-1 shows the staffing and support by the West Virginia Administrative Services Organization for the current scope of work. This chart includes the assignment of key staff members who support each Bureau.



State of West Virginia Bureau for Medical Services Request for Proposal BMS90007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

Figure III-1

APS Healthcare, Inc. - West Virginia
Existing Scope of Work



APS HEALTHCARE

**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

With additional responsibilities in the new contract period, APS-WV has planned staffing to direct and perform these responsibilities. Figure III-2 depicts staffing needed for APS-WV and proposed subcontractor WVMI to support expanded volume and additional scope of work in current activities for the relevant Bureaus. In these plans, APS-WV has addressed all areas of performance to ensure continuation of the high level of customer service and quality that the Bureau for Medical Services (BMS), Bureau for Children and Families (BCF), and Bureau for Behavioral Health and Health Facilities (BHHF) has come to expect of APS-WV for both the mandatory and optional scopes of work.

Figure III-3 represents staffing needed to support all the requirements of the current RFP. This staffing model includes existing, expanded, new, and optional scope of work activities.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

### SUBCONTRACTED KEY PERSONNEL

The Long Term Care and Medical Review Units discussed below will report directly to Helen Snyder, Bureau for Medical Services Director/Associate Director/Subcontractor Coordinator. Ms. Snyder will be responsible for overseeing these two groups to ensure that all clinical deliverables are being met. She will act as the interface with WVMI's clinical teams and APS to monitor productivity and ensure that review timelines are being met and that appropriate procedures are being followed. During implementation, Ms. Snyder will be responsible for ensuring that processes are integrated, coordinated, and congruent. This will include ensuring that subcontracted staff are trained and prepared to use APS CareConnection® so that the entire APS-WV team uses an integrated system and can achieve an efficient review process.

### *Long Term Care Unit Leadership and Team Qualifications*

#### Stacy Leadman, RN
#### Project Manager

Stacy Leadman, RN, is responsible for oversight of the WVMI Long Term Care Unit, which conducts reviews for the Aged and Disabled Waiver (ADW), Nursing Home/PASRR and Personal Care. In this role, she provides direction and supervision to the unit's registered nurse staff (both in the field and in-house) and clerical staff. She serves as a liaison to the West Virginia Bureau of Senior Services (BoSS) and Bureau for Medical Services (BMS), coordinates and monitors services, and researches and streamlines information for reporting. Ms. Leadman is also responsible for coordinating WVMI personnel's attendance at fair hearings related to nursing home, personal care or ADW denials and level of care appeals brought by Medicaid participating providers or beneficiaries. She analyzes records retrospectively for quality assurance and improvement of both clinical and support staff, and coordinates provider and staff training.

Prior to leading the Long Term Care Unit, Ms. Leadman was a medical necessity review nurse for WVMI for five years, specializing in long term care. Before joining WVMI, she served as a Registered Nurse Monitor for BoSS. In this position she was responsible for review of Waiver Prior Authorizations for changes in levels of care, Personal Care Prior Authorizations for excess of service limits, and requests for family waivers for both programs. Ms. Leadman also conducted field monitoring and review and provided technical assistance to provider agencies for the ADW and Personal Care programs. She came to WVMI with a solid knowledge and understanding of long term care, the ADW, Personal Care and the State's goals and policies for these programs which WVMI strives to implement through her leadership.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

### Long Term Care Unit Team Qualifications

West Virginia's ADW, Nursing Home/PASRR, and Personal Care program serve highly vulnerable people, enabling them, where appropriate, to remain in their homes and cope with the stresses of disability or age. Because the review function acts as a "gateway" to these critically-needed services, WVMI has a demonstrated history of balancing beneficiary need and providing professionally rigorous review services. Given the vulnerability of the people involved, WVMI has recruited review staff with the necessary empathy and compassion to conduct fair, clearly understandable, and standards-based review. Because these review staff often must visit the beneficiaries in their homes, they conduct these reviews in a manner that enhances the dignity of the beneficiary.

WVMI's long term care unit has extensive experience with ADW and Nursing Home/PASRR reviews and working closely with BMS and BoSS. It currently consists of 17 nurses with an average of 17 years of professional nursing experience, and 3.5 years of Medicaid Review experience at WVMI. Areas of individual experience include home health administration, occupational health, case management, long term care/geriatric services, and hospice.

Since 2003, WVMI's team has received more than 45,000 requests for ADW reviews and has completed approximately NH/PASRR 68,000 reviews. As a result, WVMI's personnel are uniquely experienced in using BMS' assessment tool and the PAS 2000, as well as the accompanying internal processes and procedures. In the area of in-home reviews, WVMI's experienced staff has the ability to efficiently, effectively, and compassionately evaluate the needs of the frail elderly and persons with disabilities, assuring that every individual applying for ADW services receives the benefits to which they are entitled.

The Long-term care unit consists of nurse reviewers and support personnel.

Nurse Reviewers perform professional medical necessity review using an assessment tool (PAS 2000) and applicable rules, regulations, and quality standards set forth by BMS. They use appropriate screening criteria in determining medical eligibility and use professional nursing judgment to make assessments.

For on-site review, the nurses conduct face-to-face assessment with beneficiaries and someone familiar with beneficiaries' care. The information they acquire as a result of that assessment is collected, recorded, transmitted, and scored based on contract deliverable timeframes. They also provide beneficiaries with lists of available case management agencies and homemaker agencies, and accurately record selection information. They maintain positive customer service relationships with health care providers, beneficiaries and BMS. Long-term care nurse reviewers maintain frequent communication with WVMI Review management, keeping them apprised of schedule changes, problems arising from review activities, or other relevant occurrences.

Long-Term Care Support Staff are often the first point of contact for the beneficiaries and



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

providers and, thus, are a critical part of the WVMI review process. The support team provides information, education, and responses to complaints from incoming callers. Support staff is also responsible for the centralized scheduling function conducted by WVMI and arrange all medical necessity visits that are conducted by WVMI's field staff in support of the ADW program. They communicate with field staff nurses and provide appropriate information regarding the status of referrals. They coordinate and track requests for individual reviews and notify providers of determination. They process and review information and are responsible for accurate data entry related to long-term care reviews. In addition, they distribute denial information to WVMI nurses assigned to attend appeal hearings, and subsequently document hearing results. Finally, they maintain tracking of appeal requests, nursing hearing assignments and results, and are responsible for maintaining lists and coordinating mailings to notify providers of appropriate information related to long-term care reviews.

A complete summary of experience for WVMI team members is included in **Exhibit 51.** Resumes for key staff with the Long Term Care Unit have been included in **Exhibit 52.**

## *Medical Review Unit Leadership and Team Qualifications*

### **Stacy Holstine, RN**
### **Project Manager**

Stacy Holstine, RN, oversees WVMI's Medical Review Unit, which conducts a wide range of prior authorization and utilization review activities, including acute care, outpatient, imaging, durable medical equipment (DME), consultant driven services, vision, lab and related ancillary health services requiring prior authorization. She currently supervises 20 RN reviewers and 10 clerical staff, as well as the physician and ancillary health care consultants utilized by WVMI to support the review process. Among her responsibilities are maintaining medical information in each area of review, maintaining compliance with program instructions as set forth by BMS, and providing resources and consultative services to BMS and West Virginia Medicaid providers. She also assists in training programs for new employees and keeps employees informed as BMS updates policies and procedures.

Prior to assuming responsibility for the medical review unit, Ms. Holstine served as Project Manager for the Aged and Disabled Waiver program project at WVMI for six years. She supervised field nurses; oversaw quality assurance and quality improvement; attended hearings; supervised in-house clerical support; and coordinated provider and staff training. She also served as a WVMI nurse reviewer in the prior authorization unit for five years and offers a total of 14 years experience with utilization management and review.

### *Medical Review Unit Team Qualifications*

Medical review services must strike a balance among the clinical needs of the beneficiary,



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

the time and resource stresses of the providers, and the need for efficiency and cost-containment on the part of the payer, in this case, BMS. WVMI has a demonstrated history of productively meeting these sometimes competing demands in a professional and empathetic manner. As a part of this history, the Medical review unit has been conducting prior authorization for BMS since the program's inception. Since 2005, this unit has reviewed more than 250,000 cases. WVMI conducts these medical reviews using nationally-recognized treatment guidelines or guidelines developed by BMS, as noted below.

The Unit currently consists of 20 nurses with an average of 24 years of professional nursing experience, and 3.5 years of Medicaid Review experience at WVMI. Areas of individual experience include pediatric nursing, pain management, operating room nursing and public health.

While new services have been added or changed over the years, WVMI's well established processes and procedures, comprehensive training program, ongoing quality monitoring and recent accreditation with URAC assure a continuing level of high service.

Medical review unit work is carried out by two groups: nurse reviewers and support personnel. Like the long term care nurses, the medical review unit nurse Reviewers perform professional medical review through the application of medical information received from a health care provider to the standards of medical necessity set forth by BMS. They use appropriate criteria and guidelines in determining medical necessity for various levels of care. They also make appropriate referrals of cases for physician review, provide information relevant to resolve such questionable issues, maintain a positive customer service relationship with health care providers, and utilize professional nursing judgment in rendering decisions regarding medical reviews.

Medical Review Support Staff provide clerical services to enable the timely and accurate preparation and distribution of letters and other correspondence to appropriate parties. They prepare correspondence, forms, reports, memos and other documents pertinent to Medicaid review, and prepare requests for reconsiderations for the Nurse Review Manager. Medical Review Support Staff also maintain request form files and provide miscellaneous clerical support as necessary.

As mentioned above, a complete summary of experience for WVMI team members is included in **Exhibit 51.** Resumes for key staff with the Medical Review Unit have been included in **Exhibit 52.**

Section III: Qualifications of Project Staff



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

## Section IV - Project Work Plan

Vendor should have a work plan with time lines, policies, procedures, and internal controls for start up
activities, systems development and implementation for all prior authorization processes for all services listed
including retroactive quality reviews, and all optional services in the RFP.

Vendor should comment on plans for establishment of its administrative offices locally, and of the interface
between that office and the state administrative offices, Bureau for Medical Services and other Bureaus.
Additionally, Vendor should describe how they will interface with the Department of Health and Human
Resources (AGENCY) data systems and any data processing subcontractors as necessary and how they will
utilize the current fiscal agents system to enter authorizations on line for in network and out-of-network
services within specified timeframes.

Vendor should define a project work plan which graphically displays project, deliverables and milestones with
specific completion dates leading to implementation of statewide review within ninety (90) days on contract
award. Project work plan should address plans for implementing the review functions in time lines, and for
reporting requirements.

Vendor will have a transition plan with time lines, policy, processes, and internal controls to transition all
services including optional services to a new vendor, if needed to assure no loss of service occurs during any
transition.

APS-WV proposes a project team and work plan that is uniquely positioned to implement the
scope of work described in this RFP within timeframes required by the Bureau for Medical
Services (BMS). Having worked with the individual Bureaus to establish many of the
Administrative Services Organization (AS) review and related activities in prior contract
periods, APS-WV understands the time lines, policies, and procedures that are needed to
successfully implement programs and manage them effectively throughout the life of the
contract. In Sections I through III we describe our technical approach, relevant experience,
and staff capabilities that are the foundation for our proposal. In this section, we present
work plans that illustrate our understanding of timelines and activities to transition to the
next contract period. We first address the discussion requirements of this Section, and then
present project work plans that graphically present project activities, responsible and/or
participating parties, completion dates, and which indicate deliverables and milestones.

### Agency Work Plans

We present our proposed work plan for each agency and major review area that describes
our approach to implementing scope of work requirements. We understand that proposed
timelines will be finalized with approval from BMS and other agencies. APS-WV is prepared
to modify these work plans to achieve the most effective implementation for the programs.

### Establishment of Local Offices and System Interfaces

APS-WV and our proposed review subcontractor, WVMI, currently maintain offices in
Charleston, West Virginia, and these offices will continue to be used. As incumbents, we
have the offices, systems, staffing, policies and procedures needed to efficiently continue
existing scope of work activities and implement expanded and new review responsibilities.



**State of West Virginia Bureau for Medical Services Request for Proposal BMS90007**
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

Our current working relationships with the Bureaus and the providers also means a more efficient implementation process, a much lower learning curve, and significantly lower risk to a seamless transition from multiple vendors to a single vendor interface. As we propose in Section III, Staff Capabilities, the APS-WV management team will continue to act as points of contact for their respective programs and agencies, thereby ensuring consistency of communication for agency staff members.

APS-WV is well prepared to work with the Bureau for Medical Services to implement an efficient method of interfacing with Department of Health and Human Resources systems. The Department's initiatives to improve efficiency of service, as well as the efficiency of the Administrative Services Organization's processes, encourage the adoption of health information technology. This approach is exemplified by the requirement that the Vendor be able to accept prior authorization requests from all providers through a web interface. In addition to improving the efficiency of the prior authorization request and review, data quality, completeness of documentation, and member confidentiality are all also enhanced through use of HIPAA-compliant systems. With these factors in mind, APS-WV will work collaboratively with the Bureaus to identify optimal methods for submitting data to the Medicaid Management Information System (MMIS) and other data processing systems.

**Transition to Other Vendors**

APS-WV will prepare a transition plan as directed by BMS and in compliance with RFP requirements, as clarified in Addendum 7 to the RFP, dated May 10, 2009.

**Work Plans, Milestones, and Deliverables**

Work plans are presented in the following tables, numbered consecutively for ease of reference. We also indicate individual task status as follows:

◈ – Deliverable to Agency.
■ – Project Milestone.

APS-WV will work with the Bureaus after contract award to finalize the work plans subject to BMS approval. At that time, we will amend these work plans with reference to specific dates for each activity, milestone, and deliverable.



State of West Virginia Bureau for Medical Services Request for Proposal BM590007
Utilization Management/Prior Authorization Services for the Bureau for Medical Services,
Bureau for Children and Families and Bureau for Behavioral Health and Health Facilities

TABLE IV-4. WV AGED & DISABLED WAIVER IMPLEMENTATION TASKS/SCHEDULE

| Item # | Project Area | Task/Activity | Due Date | Responsible | Task Status |
|---|---|---|---|---|---|
| 12 | Development | Develop specifications for A&D CareConnection® including provider, member, & MMIS interfaces and related file layouts | Within 60 days of award | APS-WV, BMS, BOSS, WVMI | |
| 13 | Development | Import member and provider files to A&D CareConnection® | Within 60 days specifications sign-off | APS-WV, BMS, BOSS, WVMI | |
| 14 | Development | Develop specifications for tracking member certification/recertification, maintenance of waitlist and slot allocation. | Within 60 days of specifications sign-off | APS-WV, BMS, BOSS, WVMI | |
| 15 | Training | Conduct statewide trainings for providers, members/legal representatives regarding APS A&D Waiver CareConnection® and prior authorization of services | Within 60 days of specifications sign-off | APS-WV, WVMI, PPI | ◈ |
| 16 | Testing | Develop comprehensive testing plan for A&D Waiver CareConnection®. | Within 90 days of specifications sign-off | APS-WV, APS Corp IT | |
| 17 | Testing | Implement internal, provider, Unisys, WVMI and member plans for testing A&D Waiver CareConnection® | Upon programming completion | APS-WV, APS Corp IT, Providers, WVMI, Members, Unisys | |
| 18 | Testing | Refine and make necessary modifications to A&D Waiver CareConnection® based on testing results | Upon completion of testing | APS-WV, APS Corp IT | |



## *Professional Experience Figure*

## Medical Review

| Name | Title | Degree(s) | Licenses/ Certification | Program Experience (areas) | WVMI Experience (years) | Professional Experience (years) |
|------|-------|-----------|------------------------|---------------------------|------------------------|--------------------------------|
| **Medical Review Key Staff** | | | | | | |
| Cathy Bowles | Director of Corporate Review | Nursing Diploma | RN | Supervisory Nursing Medical Review Medicaid | 24 | 33 |
| Emma Dahmer | Nurse Specialist: Quality Assurance | Nursing Diploma | RN CPUM CPUR | Supervisory Nursing Medical Review Information Technology Data Analysis Medicaid | 29 | 46 |
| Stacy Holstine | Project Manager : Pre-Authorization | Assoc/ Nursing | RN | Medical Review | 11 | 14 |
| John Marks | Director of State Services | BA MSW | N/A | Supervisory Medicaid | 8 | 29 |
| Mark Stephens | Medicaid Medical Director | BS MSHA MD | MD | Supervisory Medicine Medical Review Medicaid | 14 | 24 |
| **Medical Review Program Staff & Contractors** | | | | | | |
| Kathryn Cook | Acute Care Nurse Reviewer | Assoc/ Nursing | RN CCM | Acute Care Review | 1 | 16 |
| Virginia Craft | Acute Care Nurse Reviewer | Assoc/ Nursing BA | RN RNC CCM CRRN | Acute Care Review | 3 | 20 |
| Lisa Goodall | Imaging Nurse Reviewer | Assoc/ Nursing | RN LPN | Imaging Review | 5 | 9 |
| Barbara Green | Acute Care Nurse Reviewer | Assoc/ Nursing BA | RN | Acute Care Review | 2 | 27 |
| Angela Hobbs | Acute Care Nurse Reviewer | BSN | RN CPR AED ACLS | Acute Care Review | 2 | 16 |
| Karen Keaton | Resource Nurse | Assoc/ Nursing BA MS | RN CPHQ CCM CNA | Acute Care Review Imaging Review DME Review Surgery Review Medical Necessity Review | 8 | 18 |
| Judy Knowles | Acute Care Nurse Reviewer | AAS/ Nursing | RN CPR ACLS NALS | Acute Care Review | 5 | 25 |
| Vickie Phillips | Resource Nurse | Assoc/ Nursing BA MA | RN CPR | DME Review | 6 | 32 |
| Kathleen Levock | Imaging Nurse Reviewer | Assoc/ Nursing AD | RN | Imaging Review | 1 | 14 |
| Sharon Lopez | Surgery Review Nurse | Assoc/ Nursing BSN | RN CNOR ACLS | Surgery Review | 3 | 35 |
| Paula McComas | Acute Care Nurse Reviewer | AAS/ Nursing | RN CCM | Acute Care Review | 1 | 40 |

1

| Name | Title | Degree(s) | Licensure/Certification | Program Experience (areas) | WVMI Experience (years) | Professional Experience (years) |
|------|-------|-----------|-------------------------|----------------------------|-------------------------|----------------------------------|
| Julie Mobayed | Contracted Imaging Nurse Reviewer | BSN MPH | RN | Imaging Review | 4 | 20 |
| Cathy Montali | Imaging Nurse Reviewer | Assoc/ Nursing | RN | Imaging Review | 4 | 25 |
| Mary Naylor | Acute Care Nurse Reviewer | Nursing Diploma BSN | RN CCM | Acute Care Review | 3 | 47 |
| Jennifer Poff | DME Nurse Reviewer | BSN | RN CPR | DME Review | 2 | 7 |
| Barbara Reed | DME Nurse Reviewer | Assoc/ Nursing | RN | DME Review | .1 | 33 |
| Connie Sankoff | Resource Nurse | Assoc/ Nursing | RN CPR ACLS | DME Review | 1 | 25 |
| Stephanie Schiefer | Acute Care Nurse Reviewer | BS | RN CPR | Acute Care Review | 13 | 28 |
| Cynthia Sun | Resource Nurse | Nursing Diploma BSN MSN | RN | Medical Necessity Review | 1 | 24 |
| Natalie Tappe | Contracted Imaging Nurse Reviewer | BSN MSN | RN | Imaging Review | 4 | 26 |

*Note – All staff & contractors listed above are certified to conduct business with State & Federal Government
All licensed staff possess current and unrestricted licensure in the state of West Virginia

2

## Long-Term Care

| Name | Title | Degree(s) | Licensure/ Certification | Program Experience (areas) | WVMI Experience (years) | Professional Experience (years) |
|------|-------|-----------|--------------------------|----------------------------|-------------------------|---------------------------------|
| **Long-Term Care Key Staff** | | | | | | |
| Cathy Bowles | Director of Corporate Review | Nursing Diploma | RN | Supervisory Nursing Long-Term Care Review Medicaid | 24 | 33 |
| Stacy Leadman | Project Manager: Long Term Care | BSN | RN | Long-Term Care Review | 5 | 15 |
| John Marks | Director of State Services | BA MSW | N/A | Supervisory Medicaid | 8 | 29 |
| **Long-Term Care Program Staff & Contractors** | | | | | | |
| Sarah Carpenter | Long-Term Care Nurse Reviewer | Assoc/ Nursing BSN | RN | Long-Term Care Review | 1 | 16 |
| Paula Clark | Long-Term Care Nurse Reviewer | AAS/ Nursing | RN CPR | Long-Term Care Review DME Review | 5 | 23 |
| Traci Gillispe | Long-Term Care Nurse Reviewer | Assoc/ Nursing | RN | Long-Term Care Review | 5 | 15 |
| Tina Green | Long-Term Care Nurse Reviewer | Assoc/ Nursing | RN | Long-Term Care Review | 4 | 15 |
| Kathalene Gue | Long-Term Care Nurse Reviewer | Nursing Diploma BS | RN CPR | Long-Term Care Review | 4 | 24 |
| Selena Hall | Long-Term Care Nurse Reviewer | BSN | RN | Long-Term Care Review | 1 | 15 |
| Angela Hill | Long-Term Care Nurse Reviewer | LPN ADN | RN CPR | Long-Term Care Review | 4 | 16 |
| Tammy Kessel | Long-Term Care Nurse Reviewer | ADN | RN | Long-Term Care Review | 3 | 13 |
| Debra Lemasters | Long-Term Care Nurse Reviewer | Assoc/ Nursing | RN CPR | Long-Term Care Review | 5 | 24 |
| Christine Miller | Long-Term Care Nurse Reviewer | ASN BSN | RN CPR | Long-Term Care Review | 2 | 20 |
| Barbara Plum | Long-Term Care Nurse Reviewer | Assoc/ Nursing | RN CPR | Long-Term Care Review | 3 | 12 |
| Heather Randolph | Long-Term Care Nurse Reviewer | BSN | RN CPR CCM | Long-Term Care Review | 5 | 10 |
| Kimberly Sang | Long-Term Care Nurse Reviewer | Nursing Diploma | RN | Long-Term Care Review | 4 | 19 |
| Billie Sides | Long-Term Care Nurse Reviewer | Nursing Diploma | RN CPR | Long-Term Care Review | 5 | 30 |
| Courtenay Smith | Long-Term Care Nurse Reviewer | Assoc/ Nursing BSN | RN CPR | Long-Term Care Review | 1 | 14 |
| Teena Testa | Long-Term Care Nurse Reviewer | Assoc/ Nursing BSN | RN CPR | Long-Term Care Review | 4 | 18 |
| Michelle Wiley | Long-Term Care Nurse Reviewer | Assoc/ Nursing | RN CPR | Long-Term Care Review | 3 | 7 |

**\*Note** – All staff listed above are certified to conduct business with State & Federal Government
All licensed staff possess current and unrestricted licensure in the state of West Virginia.

3

*Consultant Figure/Medical Review*

| Medical Specialty | Beginning Date of Service to WVMI |
|---|---|
| Chiropractic Services | October 2001 |
| Physician Review | April 2004 |
| Physician Review | April 2004 |
| Audiology | September 2004 |
| Audiology | February 2004 |
| DME and Medical Supplies | October 2003 |
| Speech/Language Pathology | June 2003 |
| Dental Services/Orthodontics | July 2002 |
| Visual Therapy Services | October 2001 |
| Visual Therapy Services | December 2001 |
| Dental Services/Orthodontics | October 2001 |
| Chiropractic Services | December 2001 |
| Orthodontic Services | September 2001 |
| DME and Medical Supplies | September 2001 |
| Dental Services | September 2001 |
| Orthotics and Prosthetics | September 2001 |
| Speech Therapy | September 2001 |
| Podiatry | New/TBD |
| Vision | New/TBD |

4



West Virginia Medical Institute

# Stacy R. Leadman, RN
## Interim Project Manager

Contact Information **3001 Chesterfield Place, Charleston, WV 25304**
**(304) 346-9864**
**sleadman@wvmi.org**

Professional History

### 2008-Present
*Interim Project Manager, West Virginia Medical Institute, Charleston, WV*
As Interim Project Manager for the Aged and Disabled Waiver (ADW) and Nursing Home Pre-Admission Screening (PAS) Review programs, provides direction and supervision to registered nurse field staff and in-house clerical staff. Serves as a liaison to the state Bureau of Senior Services and the Bureau for Medical Services. Coordinates and monitors the ADW contract and services. Researches and streamlines information for reporting. Represents WVMI in hearings for both ADW denials and level of care as well as nursing home denials. Retrospectively analyzes records for quality assurance and improvement of both clinical field staff and support staff. Coordinates provider and staff trainings.

### 2003-2008
*Medical Necessity Review Nurse, West Virginia Medical Institute, Charleston, WV*
Performed professional medical review through the application of medical information extracted from medical records and patient visits, using utilization and quality standards set forth in the contract. Utilized appropriate screening criteria in determining medical eligibility for individuals seeking participation in the West Virginia Bureau for Medical Services' ADW Program. Reviewed Nursing Home PAS reviews and PASSR reviews for long-term care. Established contact and arranged face-to-face assessments with beneficiaries and those familiar with beneficiaries' care. Tracked reconciliations for Prior Authorization completion. Used laptop computer to perform objective PAS data collection and entry in an efficient manner. Provided beneficiaries with lists of resources and maintained a positive customer-service relationship with health care providers. Analyzed records for quality assurance and improvement for both clinical field staff and in-house clerical staff. Generated reviews of Prior Authorizations for Durable Medical Equipment and incontinent supplies. Participated in the preparation efforts for URAC accreditation

### 2002-2003
*Registered Nurse Monitor, West Virginia Bureau of Senior Services, Charleston, WV*
Assisted the Quality Assurance Director with quality assurance activities such as PAS validations, committee meeting attendance, and complaint investigations. Reviewed Medicaid Waiver Prior Authorizations for changes in levels of care. Reviewed Medicaid Personal Care Program Prior Authorizations for excess of service limits. Provided technical assistance to provider agencies for the ADW and Personal Care programs. Conducted field monitoring with on-site monitoring and review of provider agencies. Reviewed requests for family waivers for both programs. Maintained effective professional communication with providers.



1

**1993-2002**

***Private Duty Program Manager/RN Supervisor, West Virginia Home Health Services (formerly Strategic Health Services), Charleston, WV***

Managed day-to-day activities of Private Duty Department and its programs, including Medicaid ADW, Private Pay, and Skilled Nursing. Supervised home health aides, homemakers, CNAs, RNs and LPNs. Marketed services, recruited staff, hired and counseled employees. Performed quality improvement (QI) activities and developed QI monitoring tool. Served as a member of the QI and infection control teams. Made home visits to complete client admissions, monitoring and assessments. Planned, implemented, and evaluated client care and supervision of direct care. Reviewed and revised clients' home care plans. Coordinated and implemented homemaker training program. Initiated 485's and coordinated skilled care with Children with Special Health Care Needs. Obtained physician orders and coordinated care with local resources. Served as CPR trainer and AMAP trainer.

**Education**

BSN, The University of Charleston, 1991

**Professional Standing**

Current West Virginia RN licensure
Advanced Geriatric Educator Skills certification training in 2007

**Professional Memberships**

Participant in work group for Quality Assurance and Improvement Advisory Council (QAI) with BOSS and BMS



2


West Virginia Medical Institute

# Stacy L. Holstine, RN, BA, CPUM
## Interim Project Manager

Contact Information    **3001 Chesterfield Place, Charleston, WV 25304**
**(304) 346-9864**
**sholstine@wvmi.org**

Professional History

### 2009-Present
#### *Interim Project Manager, West Virginia Medical Institute, Charleston, WV*
Manages Medicaid utilization review activities for WVMI by contract with WVDHHR, Bureau for
Medical Services. Supervises maintenance of medical information in each area of review.
Maintains compliance with program instructions as set forth by WVDHHR, Bureau for Medical Services.
Provides resources and consultative services to Bureau for Medical Services and West Virginia Medicaid
providers. Assists in training programs for new employees and keeps employees informed as polices and
procedures are updated by the Bureau for Medical Services. Supervises 20 reviewers and 10 clerical staff
in eight areas of review: acute care, psychiatric (adolescent under age 21 & BMU), case management,
DME, nursing home, imaging, outpatient surgery and consultant review.

### 2003-2009
#### *Project Manager, West Virginia Medical Institute, Charleston, WV*
Coordinated and monitored Aged and Disabled Waiver contract. Supervised field nurses and oversaw
quality assurance and quality improvement. Attended hearings, supervised in-house clerical support,
coordinated provider and staff training. Served as liaison to the state Bureau of Senior Services and the
Bureau for Medical Services. Oversaw nursing home review and in-home visits.

### 1998-2003
#### *Senior Nurse Reviewer, West Virginia Medical Institute, Charleston, WV*
Performed telephonic and paper reviews of acute inpatient admissions, adult psychiatric admissions,
retrospective reviews, reconsideration reviews and physician reviews.

### 1996-1998
#### *Nurse Consultant, West Virginia Worker's Compensation, Charleston, WV*
Performed concurrent and retrospective reviews for injured workers, reviews for physical therapy and
chiropractic care, durable medical equipment, eligibility, IME reviews, physician recruitment for the IME
process, liaison for claims teams, physician, lawyers and others, in relation to care of injured workers.

### 1995-1996
#### *Nurse Case Manager, HCX, Inc., Charleston, WV*
Utilized CareScan for WV Worker's Compensation; concurrent and retrospective reviews for physical
medicine for multiple client accounts, weekly, monthly, quarterly reports; IME reviews; utilization
review.

### 1994-1996
#### *Clinical Nurse I (medical/surgical nursing), Charleston Area Medical Center, Charleston, WV*



**Education**

BA, West Virginia University Institute of Technology, 2007
AD Nursing, West Virginia University Institute of Technology, 1994
AD General Studies, West Virginia University Institute of Technology, 1994

**Professional Standing**

Current West Virginia RN licensure
Certified Professional Utilization Management (Inter-Qual)

**Professional Memberships**

Aged and Disabled Waiver Program Quality Assurance and Improvement Council, July 2003-Present



West Virginia Medical Institute

# Catherine F. Bowles, RN
## Director of Review Services

Contact Information    **3001 Chesterfield Place, Charleston, WV 25304**
                       **(304) 346-9864**
                       **cbowles@wvmi.org**

Professional History

### 1999-Present
#### *Director of Review Services, West Virginia Medical Institute, Charleston, WV*
Responsible for planning, implementation and administrative management of WVMI review programs.
Accountable for contract performance related to the complete medical review process, including criteria,
evaluation, internal quality control, development of policies and procedures, oversight of professional and
support staff, direction of special projects related to review activities.

### 1985-1999
#### *Medical Review Coordinator, West Virginia Medical Institute, Charleston, WV*
Performed utilization and quality review functions related to Medicare and Medicaid programs utilizing
preestablished criteria. Performed initial chart review for proper ICD-9-CM coding and DRG assignment.
Trained physicians in concepts and procedures for performing peer review. Coordinated physician review
of all cases failing screening criteria. Provided feedback and opportunity for discussion to providers and
attending physicians of any identified potential problems. Participated in development of screening
criteria for use by a pre-authorization unit. Participated in development of data abstraction collection
instruments to collect data specific to disease processes. Performed medical record abstraction for
compliance with quality indicators for specific disease processes. Led WVMI's HEDIS data abstraction
and validation project conducted for Coventry Health Plan, a West Virginia managed care provider.
Performed exit conferences with providers to outline deficiencies identified.

### 1984-1985
#### *Quality Assurance/Utilization Review Director, Greenbrier Valley Medical Center, Ronceverte, WV*
Responsible for overall management of hospital utilization review and quality review functions. Guided
hospital through successful JCAHO survey. Supervised hospital discharge planner.

### 1984
#### *DRG Coordinator, Summers County Hospital, Hinton, WV*
Implemented initial DRG program at hospital to comply with HCFA's initiation of the Prospective
Payment System.

### 1976-1984
#### *Utilization Review Coordinator, Summers County Hospital, Hinton, WV*
Responsible for day-to-day operations related to Medicare regulations for acute care hospitals.
Performed utilization review by applying medical necessity and length-of-stay criteria.
Assisted in bringing hospital into "Delegated" status.



**1976**
*Staff Nurse, Summers County Hospital, Hinton, WV*
Worked in a general Intensive Care Unit charged with providing care for all types of critical care, such as cardiac, gastrointestinal bleeding and neurological deficits.

**1975**
*Staff Nurse – Labor and Delivery, Raleigh General Hospital, Beckley, WV*
Managed patients in labor and delivery.

Education

RN Diploma, Roanoke Memorial School of Professional Nursing, 1975



# Emma Dahmer
## Project Manager and Nurse Specialist, Quality Assurance

 **3001 Chesterfield Place, Charleston, WV 25304**
**(304) 346-9864**
**edahmer@wvmi.org**

### Professional History

**2007-Present**
*Project Manager for ACC-NCDR, West Virginia Medical Institute, Charleston, WV*
Coordinates staffing, training and scheduling for the ACC Cath/PCI audit. Completed inter-rater reliability record abstraction. Served as the liaison for the nurse abstractors for all clinical and logistical questions.

**2007-Present**
*Project Manager for West Virginia Health Care Authority Audits, WVMI*
Coordinates staffing, training, scheduling, and inter-rater reliability.

**1999-Present**
*Nurse Specialist, Quality Assurance, WVMI*
**1998-1999**
*Resource Nurse, WVMI*
**1980-1998**
*Regional Review Supervisor, WVMI*
Responsible for WVMI's internal quality assurance with emphasis on inter-rater reliability. Performs quarterly internal monitoring activities and acts as preceptor for review nurses experiencing performance problems. Functions as a trainer on the pre-authorization process and on application of relevant criteria. Serves as WVMI's resource in reviewing quality assurance activities in all programs. Serves as an expert in area of criteria development and review. Responsible for supervision of all Medicare and Medicaid screening level review activities within assigned area of state. Assists resource nurses with technical as well as clinical issues relating to admission review generic quality screening, (Health Care Quality Improvement Projects), and in other special projects. Abstracts data when necessary for WVMI's Veterans Administration External Peer Review Program and performs medical record data abstraction and validation in support of WVMI's work with the American College of Cardiology.

**1977-1984**
*Nurse, Mediscreen, Buffalo, NY*
Completed insurance questionnaires concerning patient medical history and performed short exam consisting of blood pressure, weight, and urinalysis.

**1969-1973**
*Staff/Charge Nurse, Saint Mary's Hospital, Clarksburg, WV*



Responsible for direct patient care including administration of treatments and therapy. Developed patient care plans and provided patient education. Responsible for assigning patient care to appropriate nursing personnel in the unit and for coordinating overall unit function.

**Education**

Registered Nurse, Fairmont General Hospital School of Nursing, 1963

**Professional Standing**

Registered Nurse
Certified Professional Utilization Manager
Certified Professional in Utilization Review
Interqual Certified Instructor



West Virginia Medical Institute

# John L. Marks Jr.
## Director of State Services

 **3001 Chesterfield Place, Charleston, WV 25304**
**(304) 346-9864**
**jmarks@wvmi.org**

Professional History

### 2001-Present
#### *Director of State Services, West Virginia Medical Institute, Charleston, WV*
Responsible for the financial and operational performance of the company's state services contracts, including pre-authorization and medical management contracts. Plays a key role in establishing and servicing WVMI's strategic business partnerships with health-related organizations.

### 1999-2001
#### *Executive Director, CCO HealthCareSystem, Inc., Charleston, WV*
Developed a strategic plan and implemented strategies to achieve corporate objectives for a physician-hospital organization. Successfully negotiated two payer arrangements on behalf of the network. Led the development and implementation of the network's medical management program. Developed the company's first marketing program.

### 1995-1999
#### *Vice President of Provider Relations and Network Development, Carelink Health Plan Inc., Charleston, WV*
### 1992-1995
#### *Executive Director*
Senior management member of West Virginia's first and only provider-owned-and-operated managed care company. Developed and executed company's network expansion and provider-relations strategy. Expanded service area from four West Virginia counties to 28. Negotiated service agreements including various risk-sharing arrangements with individual providers and organizations. Served as project manager of the plan's Medicaid MCO program.

### 1991-1992
#### *Director, West Virginia Department of Health and Human Resources, Office of Medical Services, Charleston, WV*
Directed state agency that administered West Virginia's Medicaid program, which had a budget of $600 million and served 315,000. Reduced accounts payable to providers by 25 percent. Improved timeliness of reimbursement to Medicaid providers. Ensured that over 80 percent of claims were processed and paid within 45 days. Increased fees for certain providers by more than 60 percent.



1

**1989**
*Interim President/Chief Executive Officer, King's Daughters' Medical Center, Ashland, KY*
**1984-1990**
*Vice President of Professional Services,*
**1982-1984**
*Vice President of Human Resources,*

After serving as Vice President of Human Resources and Vice President of Professional Services, was requested by Board of Managers to serve as Interim Chief Executive Officer of hospital with a budget of $65 million and 950 employees.

Education

BS, Sociology/Psychology, Fairmont State College, 1972
MSW, West Virginia University, 1974

APS HEALTHCARE    2



West Virginia Medical Institute

# Mark K. Stephens
## Medical Director, WVMI Medicaid Prior Authorization Program

 **3001 Chesterfield Place, Charleston, WV 25304**
**(304) 346-9864**
**mstephens@wvmi.org**



#### 1993-Present
*Medical Director, Medicare Health Care Quality Improvement Program, West Virginia Medical Institute, Charleston, WV*
Directs clinical aspects of WVMI's Medicare Health Care Quality Improvement Program. Develops ideas for Cooperative Improvement Projects; directs statisticians in data analysis; coordinates studies; interacts with providers and physicians to initiate projects that address specific patterns of care; and assists in the implementation of new processes to improve care outcomes.

#### 1992-Present
*Physician Reviewer, External Peer Review Program, Dept. of Veterans Affairs, West Virginia Medical Institute, Charleston, WV*
Reviews records that do not pass screening algorithms for a particular topic, e.g., Gastrointestinal Bleeds, to determine if the care provided meets current standards of care. Works on the development of guidelines, criteria, and database question sets.

#### 1987-Present
*Medical Director, WVMI Medicaid Prior Authorization Program, West Virginia Medical Institute, Charleston, WV*
Supervises an all-board-certified team of primary care and specialty care review physicians. Maintains up to date Interqual training for physician reviewers. Assures the quality and timeliness of physician review. Interacts with the West Virginia provider community regarding the review process and education needs for the provider community on the prior authorization program.

#### 1988-Present, *Physician*
#### 1995-Present, *Medical Director*
#### *HealthPlus Professionals, Charleston, WV*
Works as a primary care physician in the five Urgent Care facilities owned by Healthplus Professionals. Diagnoses and treats patients of all ages and with a wide range of diseases, illnesses, and injuries.

#### 1995-Present
*Medical Advisory Committee Member, Carelink, Charleston, WV*
Works with other members of the Medical Advisory Committee to determine policy and strategy for Carelink, a statewide Health Maintenance Organization. This Committee determines standards for quality of care, accreditation and certification, and health care measurements.



1

**1994-Present**
*Physician Review, Mountain State Blue Cross & Blue Shield Inc., Charleston, WV*
Performs peer review for both the Fee-For-Service and Managed Care Plans offered by Mountain State
Blue Cross and Blue Shield, a statewide HMO.

**1986-1989**
*Physician Review, MedSelect (Public Employees Insurance Agency), Charleston, WV*

**1986-1989**
*Physician Review, WV Department of Health and Human Resources (Medicaid), Charleston, WV*
Performed medical review for both quality and utilization cases.

**1986-1988**
*Physician, Charleston Medical Group, Charleston, WV*
Served as a primary care physician in an Internal Medicine group practice.

**1986-1989**
*Medical Director, Drug and Alcohol Rehabilitation Unit, Charleston Area Medical Center, Charleston, WV*
Provided overall direction for services offered to clients in the Adult and Adolescent Drug and Alcohol
Rehabilitation Unit.

## Education

M.D., Medicine, Marshall University Medical School, 1983
M.S.H.A., Health Administration, College of Graduate Studies, 1995
B.S., Biology, University of Charleston (WV), 1979

## Professional Standing

### Board Certifications

Specialty: American Board of Internal Medicine
Subspecialties: American Board of Addictionology, American Board of Geriatrics

## Professional Memberships

Physician Volunteer, West Virginia Healthright Clinic
Member, American College of Physicians
Member, American Medical Association
Member, West Virginia Medical Association
Member, American College of Physician Executives
Member, American Medical Directors Association



**Purchase Order**



State of West Virginia
Department of Administration
Purchasing Division
2019 Washington Street East
Post Office Box 50130
Charleston, WV 25305-0130

| PURCHASE ORDER NO. | PAGE |
|---|---|
| BMS90007 | 1 |

BLANKET RELEASE

CORRECT PURCHASE ORDER NUMBER
MUST APPEAR ON ALL PACKAGES,
INVOICES, AND SHIPPING PAPERS.
QUESTIONS CONCERNING THIS PUR-
CHASE ORDER SHOULD BE DIRECTED
TO THE BUYER AS NOTED BELOW.

**INVOICE TO:**

HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES

350 CAPITOL STREET, ROOM 251
CHARLESTON, WV
25301-3709

CHANGE ORDER

**10**

SEE REVERSE SIDE FOR
TERMS AND CONDITIONS

FILE LOCATION _15110_

**VENDOR:**

\*323140235    800-305-3720
INNOVATIVE RESOURCE GROUP LLC
44 SOUTH BROADWAY STE 1200

WHITE PLAINS NY  10601

**SHIP TO:**

HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES
ROOM 251
350 CAPITOL STREET
CHARLESTON, WV
25301-3709    304-558-1737

| DATE PRINTED | TERMS OF SALE | | FEIN/SSN | FUND |
|---|---|---|---|---|
| 11/25/2009 | NET 30 | | 392013972 | FIMS |
| SHIP VIA | F.O.B. | | FREIGHT TERMS | ACCOUNT NUMBER |
| BEST WAY | DESTINATION | | PREPAID | P18664 -- |

| LINE | QUANTITY | UOP | VENDOR ITEM NO. | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | DELIVERY DATE | CAT. NO. | ITEM NUMBER | | |

Purchasing Division's File Copy

DHHR

THE VENDOR, INNOVATIVE RESOURCE GROUP LLC, D/B/A
APS HEALTHCARE MIDWEST, AGREES TO ENTER WITH THE
AGENCY, WV DEPARTMENT OF HEALTH AND HUMAN RESOURCES,
INTO A CONTRACT TO PROVIDE UTILIZATION MANAGEMENT/
AUTHORIZATION SERVICES FOR BUREAU FOR MEDICAL SERVICES,
BUREAU FOR CHILDREN AND FAMILIES, AND BUREAU FOR
BEHAVIORAL HEALTH AND HEALTH CARE FACILITIES FOR THE
STATE OF WEST VIRGINIA PER THE SPECIFICATIONS, TERMS &
CONDITIONS, BID REQUIREMENTS, ADDENDUM NO. 1 DATED
2/5/2009, ADDENDUM NO. 2 DATED 2/13/2009, ADDENDUM
NO. 3 DATED 3/6/2009, ADDENDUM NO. 4 DATED 3/23/2009,
ADDENDUM NO. 5 DATED 4/7/2009, ADDENDUM NO. 6 DATED
5/5/2009, ADDENDUM NO. 7 DATED 5/10/2009, ADDENDUM NO.
8 DATED 5/15/2009, ADDENDUM NO. 9 DATED 5/29/2009 AND
THE VENDOR'S PROPOSAL DATED 6/10/2009 INCORPORATED
HEREIN BY REFERENCE AND MADE A PART OF HEREOF.

PURCHASING DIVISION
CERTIFIED ENCUMBERED

DEC 11 2009

*Bee*

**EXHIBIT**

D

ENTERED

APPROVED FOR
APPROVAL AS TO FORM IS REQUIRED BY ATTORNEY GENERAL, CHECK HERE ☑
ONE FISCAL YEAR

APPROVED AS TO FORM BY

BY  ROBERTA WAGNER  304-558-

16,897,006.00

TOTAL

PURCHASING DIVISION AUTHORIZED SIGN - TURE

## GENERAL TERMS & CONDITIONS
## PURCHASE ORDER/CONTRACT

**1. ACCEPTANCE:** Seller shall be bound by this order and its terms and conditions upon receipt of this order.

**2. APPLICABLE LAW:** The laws of the State of West Virginia and the *Legislative Rules* of the Purchasing Division shall govern all rights and duties under the Contract, including without limitation the validity of this Purchase Order/Contract.

**3. NON-FUNDING:** All services performed or goods delivered under State Purchase Orders/Contracts are to be continued for the terms of the Purchase Order/Contract, contingent upon funds being appropriated by the Legislature or otherwise being made available. In the event funds are not appropriated or otherwise available for these services or goods, this Purchase Order/Contract becomes void and of no effect after June 30.

**4. COMPLIANCE:** Seller shall comply with all Federal, State and local laws, regulations and ordinances including, but not limited to, the prevailing wage rates of the WV Division of Labor.

**5. MODIFICATIONS:** This writing is the parties final expression of intent. No modification of this order shall be binding unless agreed to in writing by the Buyer.

**6. ASSIGNMENT:** Neither this Order nor any monies due, or to become due hereunder may be assigned by the Seller without the Buyer's consent.

**7. WARRANTY:** The Seller expressly warrants that the goods and/or services covered by this order will: (a) conform to the specifications, drawings, samples or other description furnished or specified by the Buyer; (b) be merchantable and fit for the purpose intended; and/or (c) be free from defect in material and workmanship.

**8. CANCELLATION:** The Director of Purchasing may cancel any Purchase Order/Contract upon 30 days written notice to the seller.

**9. SHIPPING, BILLING & PRICES:** Prices are those stated in this order. No price increase will be accepted without written authority from the Buyer. All goods or services shall be shipped on or before the date specified in this Order.

**10. LATE PAYMENTS:** Payments may only be made after the delivery of goods or services. Interest may be paid on late payments in accordance with the *West Virginia Code.*

**11. TAXES:** The State of West Virginia is exempt from Federal and State taxes and will not pay or reimburse such taxes.

**12. RENEWAL:** Any reference to automatic renewal is hereby deleted. The Contract may be renewed only upon mutual written agreement of the parties.

**13. BANKRUPTCY:** In the event the vendor/contractor files for bankruptcy protection, the State may deem this contract null and void, and terminate such contract without further order.

**14. HIPAA BUSINESS ASSOCIATE ADDENDUM:** The West Virginia State Government HIPAA Business Associate Addendum (BAA), approved by the Attorney General, and available online at the Purchasing Division's web site (http://www.state.wv.us/admin/purchase/vrc/hipaa.htm) is hereby made part of the agreement. Provided that, the Agency meets the definition of a Cover Entity (45 CFR §160.103) and will be disclosing Protected Health Information (45 CFR §160.103) to the vendor.

**15. WEST VIRGINIA ALCOHOL & DRUG-FREE WORKPLACE ACT:** If this Contract constitutes a public improvement construction contract as set forth in Article 1D, Chapter 21 of the West Virginia Code ("The West Virginia Alcohol and Drug-Free Workplace Act"), then the following language shall hereby become part of this Contract: "The contractor and its subcontractors shall implement and maintain a written drug-free workplace policy in compliance with the West Virginia Alcohol and Drug-Free Workplace Act, as set forth in Article 1D, Chapter 21 of the West Virginia Code. The contractor and its subcontractors shall provide a sworn statement in writing, under the penalties of perjury, that they maintain a valid drug-free work place policy in compliance with the West Virginia and Drug-Free Workplace Act. It is understood and agreed that this Contract shall be cancelled by the awarding authority if the Contractor 1) Fails to implement its drug-free workplace policy; 2) Fails to provide information regarding implementation of the contractor's drug-free workplace policy at the request of the public authority; or 3) Provides to the public authority false information regarding the contractor's drug-free workplace policy."

**Purchase Order**



State of West Virginia
Department of Administration
Purchasing Division
2019 Washington Street East
Post Office Box 50130
Charleston, WV 25305-0130

| PURCHASE ORDER NO | PAGE |
|---|---|
| BMS90007 | 2 |

BLANKET RELEASE

CORRECT PURCHASE ORDER NUMBER
MUST APPEAR ON ALL PACKAGES,
INVOICES, AND SHIPPING PAPERS.
QUESTIONS CONCERNING THIS PUR-
CHASE ORDER SHOULD BE DIRECTED
TO THE BUYER AS NOTED BELOW.

CHANGE ORDER

I
N
V
O
I
C
E
T
O

HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES

350 CAPITOL STREET, ROOM 251
CHARLESTON, WV
          25301-3709

**SEE REVERSE SIDE FOR
TERMS AND CONDITIONS**

V
E
N
D
O
R

*323140235      800-305-3720
INNOVATIVE RESOURCE GROUP LLC
44 SOUTH BROADWAY STE 1200

WHITE PLAINS NY  10601

S
H
I
P
T
O

HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES
ROOM 251
350 CAPITOL STREET
CHARLESTON, WV
          25301-3709    304-558-1737

| DATE PRINTED | | TERMS OF SALE | | FEIN/SSN | | FUND |
|---|---|---|---|---|---|---|
| 11/25/2009 | | NET 30 | | 392013972 | | FIMS |
| SHIP VIA | | F.O.B | | FREIGHT TERMS | | ACCOUNT NUMBER |
| BEST WAY | | DESTINATION | | PREPAID | P18664 | - - |

| LINE | QUANTITY DELIVERY DATE | UOP CAT NO. | VENDOR ITEM NO. ITEM NUMBER | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | 1 12/01/2009 | YR | 961-20 | 16897006.00000 | 16,897,006.00 |

MEDICAL NECESSITY AND UTILIZATION MANAGEMENT SERVICE

EXHIBIT 3

LIFE OF CONTRACT:   THIS CONTRACT BECOMES EFFECTIVE ON
12/1/2009    AND EXTENDS FOR A PERIOD OF ONE (1)
YEAR OR UNTIL SUCH "REASONABLE TIME" THEREAFTER AS IS
NECESSARY TO OBTAIN A NEW CONTRACT OR RENEW THE
ORIGINAL CONTRACT.   THE "REASONABLE TIME" PERIOD SHALL
NOT EXCEED TWELVE (12) MONTHS.  DURING THIS "REASONABLE
TIME" THE VENDOR MAY TERMINATE THIS CONTRACT FOR ANY
REASON UPON GIVING THE DIRECTOR OF PURCHASING 30 DAYS
WRITTEN NOTICE.

UNLESS SPECIFIC PROVISIONS ARE STIPULATED ELSEWHERE
IN THIS CONTRACT DOCUMENT, THE TERMS, CONDITIONS AND
PRICING SET HEREIN ARE FIRM FOR THE LIFE OF THE
CONTRACT.

RENEWAL: THIS CONTRACT MAY BE RENEWED UPON THE MUTUAL
WRITTEN CONSENT OF THE SPENDING UNIT AND VENDOR,
SUBMITTED TO THE DIRECTOR OF PURCHASING THIRTY (30)

APPROVAL AS TO FORM IS REQUIRED BY ATTORNEY GENERAL, CHECK HERE ☐

| | TOTAL |
|---|---|

APPROVED AS TO FORM BY

BY_____

PURCH*SING DIVISION *UTHORIZED SIGN*TURE

**Purchase Order**



State of West Virginia
Department of Administration
Purchasing Division
2019 Washington Street East
Post Office Box 50130
Charleston, WV 25305-0130

| PURCHASE ORDER NO. | PAGE |
|---|---|
| BMS90007 | 3 |

☐ BLANKET RELEASE

☐ CHANGE ORDER

CORRECT PURCHASE ORDER NUMBER
MUST APPEAR ON ALL PACKAGES,
INVOICES, AND SHIPPING PAPERS.
QUESTIONS CONCERNING THIS PUR-
CHASE ORDER SHOULD BE DIRECTED
TO THE BUYER AS NOTED BELOW

**SEE REVERSE SIDE FOR
TERMS AND CONDITIONS**

INVOICE TO:

HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES

350 CAPITOL STREET, ROOM 251
CHARLESTON, WV
                    25301-3709

VENDOR:

*323140235        800-305-3720
INNOVATIVE RESOURCE GROUP LLC
44 SOUTH BROADWAY STE 1200

WHITE PLAINS NY · 10601

SHIP TO:

HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES
ROOM 251
350 CAPITOL STREET
CHARLESTON, WV
           25301-3709    304-558-1737

| DATE PRINTED | | TERMS OF SALE | | FEIN/SSN | | FUND |
|---|---|---|---|---|---|---|
| 11/25/2009 | | NET 30 | | 392013972 | | FIMS |
| SHIP VIA | | F.O.B | | FREIGHT TERMS | | ACCOUNT NUMBER |
| BEST WAY | | DESTINATION | | PREPAID | PI8664 | -- |

| LINE | QUANTITY | UOP | VENDOR ITEM NO. | UNIT PRICE | | AMOUNT |
|---|---|---|---|---|---|---|
| | DELIVERY DATE | CAT NO. | ITEM NUMBER | | | |

DAYS PRIOR TO THE EXPIRATION DATE. SUCH RENEWAL SHALL
BE IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE
ORIGINAL CONTRACT AND SHALL BE LIMITED TO FOUR(4) ONE
(1) YEAR PERIODS.

CANCELLATION: THE DIRECTOR OF PURCHASING RESERVES THE
RIGHT TO CANCEL THIS CONTRACT IMMEDIATELY UPON WRITTEN
NOTICE TO THE VENDOR IF THE COMMODITIES AND/OR SERVICES
SUPPLIED ARE OF AN INFERIOR QUALITY OR DO NOT CONFORM
TO THE SPECIFICATIONS OF THE BID AND CONTRACT HEREIN.

OPEN MARKET CLAUSE: THE DIRECTOR OF PURCHASING MAY
AUTHORIZE A SPENDING UNIT TO PURCHASE ON THE OPEN
MARKET, WITHOUT THE FILING OF A REQUISITION OR COST
ESTIMATE, ITEMS SPECIFIED ON THIS CONTRACT FOR
IMMEDIATE DELIVERY IN EMERGENCIES DUE TO UNFORESEEN
CAUSES (INCLUDING BUT NOT LIMITED TO DELAYS IN TRANS-
PORTATION OR AN UNANTICIPATED INCREASE IN THE VOLUME
OF WORK.)

BANKRUPTCY: IN THE EVENT THE VENDOR/CONTRACTOR FILES
FOR BANKRUPTCY PROTECTION, THIS CONTRACT IS AUTOMATI-
CALLY NULL AND VOID, AND IS TERMINATED WITHOUT FURTHER
ORDER.

THE TERMS AND CONDITIONS CONTAINED IN THIS CONTRACT
SHALL SUPERSEDE ANY AND ALL SUBSEQUENT TERMS AND

APPROVAL AS TO FORM IS REQUIRED BY ATTORNEY GENERAL, CHECK HERE ☐

| TOTAL |
|---|

BY_____

APPROVED AS TO FORM BY

PURCHASING DIVISION AUTHORIZED SIGNATURE

## Purchase Order



State of West Virginia
Department of Administration
Purchasing Division
2019 Washington Street East
Post Office Box 50130
Charleston, WV 25305-0130

| PURCHASE ORDER NO. | PAGE |
|---|---|
| BMS90007 | 4 |

BLANKET RELEASE

CORRECT PURCHASE ORDER NUMBER
MUST APPEAR ON ALL PACKAGES,
INVOICES, AND SHIPPING PAPERS.
QUESTIONS CONCERNING THIS PUR-
CHASE ORDER SHOULD BE DIRECTED
TO THE BUYER AS NOTED BELOW.

CHANGE ORDER

**SEE REVERSE SIDE FOR
TERMS AND CONDITIONS**

I N V O I C E T O

HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES

350 CAPITOL STREET, ROOM 251
CHARLESTON, WV
                    25301-3709

V E N D O R

*323140235.      800-305-3720
INNOVATIVE RESOURCE GROUP LLC
44 SOUTH BROADWAY STE 1200

WHITE PLAINS NY  10601

S H I P T O

HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES
ROOM 251
350 CAPITOL STREET
CHARLESTON, WV
        25301-3709    304-558-1737

| DATE PRINTED | | TERMS OF SALE | | FEIN/SSN | | FUND |
|---|---|---|---|---|---|---|
| 11/25/2009 | | NET 30 | | 392013972 | | FIMS |
| SHIP VIA | | F.O.B | | FREIGHT TERMS | | ACCOUNT NUMBER |
| BEST WAY | | DESTINATION | | PREPAID | P18664 | -- |

| LINE | QUANTITY | UOP | VENDOR ITEM NO | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | DELIVERY DATE | CAT.NO. | ITEM NUMBER | | |

CONDITIONS WHICH MAY APPEAR ON ANY ATTACHED PRINTED
DOCUMENTS SUCH AS PRICE LISTS, ORDER FORMS, SALES
AGREEMENTS OR MAINTENANCE AGREEMENTS, INCLUDING ANY
ELECTRONIC MEDIUM SUCH AS CD-ROM.

REV. 05/26/2009

APPROVAL AS TO FORM IS REQUIRED BY ATTORNEY GENERAL, CHECK HERE ☐

| TOTAL |
|---|

APPROVED AS TO FORM BY

BY_____

PURCH*SING DIVISION AUTHORIZED SIGNATURE

BMS90007 Utilization/Prior Authorization

**4.5 Cost Proposal Format/Bid Sheets**

05

**TOTAL ALL INCLUSIVE ANNUAL FEE FOR ALL BUREAUS**

|  | | |
|---|---|---|
| Year 1 | | 9,874,150 |
| Year 2 | | 9,972,892 |
| Year 3 | | 10,072,621 |
| Year 4 | | 10,173,347 |
| Year 5 | | 10,275,080 |
| **Grand Total** | $ | **50,368,089** |
| **Grand Total With Optional Services** | $ | **87,093,219** |

**TOTAL ALL INCLUSIVE ANNUAL FEE FOR OPTIONAL SERVICES**

| | | |
|---|---|---|
| **AGED AND DISABLED WAIVER**............... | Year 1 | 3,160,509 |
| **(BMS Option)** | Year 2 | 3,192,114 |
| | Year 3 | 3,224,035 |
| | Year 4 | 3,256,275 |
| | Year 5 | 3,288,838 |
| **MR/DD WAIVER**........................................ | Year 1 | 3,085,544 |
| **(BMS Option)** | Year 2 | 3,243,542 |
| | Year 3 | 3,403,120 |
| | Year 4 | 3,437,152 |
| | Year 5 | 3,471,523 |
| **VISION**................................................... | Year 1 | 65,274 |
| **(BMS Option)** | Year 2 | 65,927 |
| | Year 3 | 66,586 |
| | Year 4 | 67,252 |
| | Year 5 | 67,924 |

BMS90007 Utilization/Prior Authorization

### 4.5 Cost Proposal Format/Bid Sheets

| LABORATORY...................................... | Year 1 | 20,662 |
|---|---|---|
| (BMS Option) | Year 2 | 20,869 |
| | Year 3 | 21,078 |
| | Year 4 | 21,288 |
| | Year 5 | 21,501 |

| NURSING FACILITY...................................... | Year 1 | 357,460 |
|---|---|---|
| (BMS Option) | Year 2 | 361,034 |
| | Year 3 | 364,645 |
| | Year 4 | 368,291 |
| | Year 5 | 371,974 |

| Other Public Payers PEIA and SCHIP..... | Year 1 | n/a - per Q&A question 16 |
|---|---|---|
| (BMS Option) | Year 2 | n/a - per Q&A question 16 |
| | Year 3 | n/a - per Q&A question 16 |
| | Year 4 | n/a - per Q&A question 16 |
| | Year 5 | n/a - per Q&A question 16 |

| Other Socially Necessary Services........ | Year 1 | 333,407 |
|---|---|---|
| (BCF Options) | Year 2 | 336,741 |
| | Year 3 | 340,109 |
| | Year 4 | 343,510 |
| | Year 5 | 346,945 |

Innovative Resource Group LLC d/b/a APS Healthcare Midwest (APS)
Bidder

*Jal Milonorgl*
Signature

*6/4/09*
Date

Note:
Given the economic pressures that the state is currently experiencing, APS has chosen to limit
the annual price escalation rate to one percent (as reflected in the numbers above).

BMS90007 Utilization/Prior Authorization

4.5 Cost Proposal Format/Bid Sheets

07

### APS HEALTHCARE COST PROPOSAL/BID SHEETS
### Bureau for Medical Services
### Behavioral Health Services

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Existing Scope of Work MANDATORY** | | | | | | |
| BH OP UM Services Review - TCM, Clinic, Rehab, Psychologist, Psychiatrist, LBHC Specialty BH OP Retro Review TCM, Clinic, Rehab, Psychologist, Psychiatrist, LBHC Specialty, SNS | | | | | | |
| Peer Review/Physician Consulting | | | | | | |
| Training/Technical Assistance | | | | | | |
| Medical Claims Analysis | | | | | | |
| Data Analysis and Reporting | | | | | | |
| QI | | | | | | |
| Consumer & Community Affairs | | | | | | |
| BH Inpatient UM Services Review - Adult, Psych <21, PRTF, Partial Psych * | | | | | | |
| BH PRTF Retro Review * | | | | | | |
| **Total Existing Scope** | $ 3,622,604 | $ 3,658,830 | $ 3,695,418 | $ 3,732,372 | $ 3,769,696 | $ 18,478,920 |

| New Scope of Work MANDATORY | | | | | | |
|---|---|---|---|---|---|---|
| Eligibility Verification | | | | | | |
| **Total New Scope** | $ 343,826 | $ 347,264 | $ 350,737 | $ 354,244 | $ 357,786 | $ 1,753,857 |

| Cost Breakout for New Scope of Work | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| Development/Start Up ** | $ 9,540 | $ 9,635 | $ 9,732 | $ 9,829 | $ 9,927 | $ 48,664 |
| Staff and Related Expenses | $ 334,286 | $ 337,629 | $ 341,005 | $ 344,415 | $ 347,859 | $ 1,705,193 |
| Operations | $ - | $ - | $ - | $ - | $ - | $ - |
| New Scope Cost | $ 343,826 | $ 347,264 | $ 350,737 | $ 354,244 | $ 357,786 | $ 1,753,857 |
| Existing Scope of Work Cost | $ 3,622,604 | $ 3,658,830 | $ 3,695,418 | $ 3,732,372 | $ 3,769,696 | $ 18,478,920 |

| **Grand Total - Existing Scope + New Scope** | $ 3,966,430 | $ 4,006,094 | $ 4,046,155 | $ 4,086,618 | $ 4,127,483 | $ 20,232,777 |
|---|---|---|---|---|---|---|

Notes:
* Represents scope of work transitioning from WVMI to APS
** Represents costs associated with implementation of new scope and/or expansion of existing scope.
These costs are spread over the five year term with the intention of addressing state economic pressures.

BMS90007 Utilization/Prior Authorization

### 4.5 Cost Proposal Format/Bid Sheets

08

### APS HEALTHCARE COST PROPOSAL/BID SHEETS
### Bureau for Medical Services
### Utilization Management Medical Services

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Existing Scope of Work**<br>**MANDATORY** | | | | | | |
| ASO Activity for general and acute inpatients, other specialty, rehab, dental and long term care. | | | | | | |
| Total Existing Scope | $ 4,192,724 | $ 4,234,652 | $ 4,276,998 | $ 4,319,768 | $ 4,362,966 | $ 21,387,108 |
| **New Scope of Work**<br>**MANDATORY** | | | | | | |
| Dental (Increase to existing) | | | | | | |
| Podiatry | | | | | | |
| Cardiac Rehabilitation | | | | | | |
| Pulmonary Rehabilitation | | | | | | |
| Home Health | | | | | | |
| Hospice | | | | | | |
| Personal Care | | | | | | |
| Total New Scope | $ 613,792 | $ 619,930 | $ 626,129 | $ 632,391 | $ 638,715 | $ 3,130,957 |

| Cost Breakout for New Scope of Work | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| Development/Start Up * | $ - | $ - | $ - | $ - | $ - | $ - |
| Staff and Related Expenses | $ - | $ - | $ - | $ - | $ - | $ - |
| Operations | $ 613,792 | $ 619,930 | $ 626,129 | $ 632,391 | $ 638,715 | 3,130,957 |
| New Scope Cost | $ 613,792 | $ 619,930 | $ 626,129 | $ 632,391 | $ 638,715 | 3,130,957 |
| Total Existing Scope Cost | $ 4,192,724 | $ 4,234,652 | $ 4,276,998 | $ 4,319,768 | $ 4,362,966 | 21,387,108 |

| Grand Total - Existing Scope + New Scope | $ 4,806,517 | $ 4,854,582 | $ 4,903,128 | $ 4,952,159 | $ 5,001,681 | $ 24,518,068 |

Notes:
\* Represents costs associated with implementation of new scope and/or expansion of existing scope.
  These costs are spread over the five year term with the intention of addressing state economic pressures.



## APS HEALTHCARE COST PROPOSAL/BID SHEETS
## Bureau For Medical Services
## OPTIONAL SERVICES

**MR/DD WAIVER OPTION**

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Existing Scope of Work Option** | | | | | | |
| Annual education, assessment and budget | | | | | | |
| On-site retrospective review of provider | | | | | | |
| Prior authorization of services | | | | | | |
| Quality Improvement: Provider & Consumer/Family Councils, and QI functions | | | | | | |
| Statistical budget model, claims analysis and data reporting | | | | | | |
| Total Existing Scope w/volume increase | $ 2,451,297 | $ 2,475,810 | $ 2,500,569 | $ 2,525,574 | $ 2,550,830 | $ 12,504,081 |
| **New Scope of Work Option** | | | | | | |
| On-site retrospective reviews of provider quality | | | | | | |
| Member Eligibility including management of wait list and appeals | | | | | | |
| CMS QI/QS plan | | | | | | |
| Total New Scope w/volume increases yrs 2 & 3 forward * | $ 634,246 | $ 767,732 | $ 902,552 | $ 911,577 | $ 920,693 | $ 4,136,801 |

| Cost Breakout for New Scope of Work | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| Development/Start Up ** | $ 54,903 | $ 55,452 | $ 56,008 | $ 56,586 | $ 57,132 | $ 280,058 |
| Staff and Related Expenses | $ 397,090 | $ 493,918 | $ 591,714 | $ 597,631 | $ 603,607 | $ 2,683,960 |
| Operations | $ 182,254 | $ 218,363 | $ 254,832 | $ 257,380 | $ 258,954 | $ 1,172,763 |
| New Scope Cost | $ 634,246 | $ 767,732 | $ 902,552 | $ 911,577 | $ 920,693 | $ 4,136,801 |
| Existing Scope Cost | $ 2,451,297 | $ 2,475,810 | $ 2,500,569 | $ 2,525,574 | $ 2,550,830 | $ 12,504,081 |

| Grand Total - Existing + New Scope | $ 3,085,544 | $ 3,243,542 | $ 3,403,120 | $ 3,437,152 | $ 3,471,523 | $ 16,640,881 |

Notes:

\* According to Q&A 2, additional SSFs will be added to meet demand of add'l caseloads (1 in yr 2 and 1 in yr 3)

\*\* Represents costs associated with implementation of new scope and/or expansion of existing scope.

These costs are spread over the five year term with the intention of addressing state economic pressures.

BMS90007 Utilization/Prior Authorization

**4.5 Cost Proposal Format/Bid Sheets**

10

### APS HEALTHCARE COST PROPOSAL/BID SHEETS
### Bureau For Medical Services
### OPTIONAL SERVICES CONTINUED

**A&D WAIVER OPTION**

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Existing Scope of Work MANDATORY** | | | | | | |
| Assessments | | | | | | |
| Eligibility determination/referral | | | | | | |
| Coordination with other stakeholders | | | | | | |
| Prior authorizations | | | | | | |
| Total Existing Scope | $ 2,995,953 | $ 3,025,913 | $ 3,056,172 | $ 3,086,734 | $ 3,117,601 | $ 15,282,373 |

| New Scope of Work MANDATORY | | | | | | |
|---|---|---|---|---|---|---|
| Eligibility: Management of wait list and appeal statuses | | | | | | |
| Prior authorization of services | | | | | | |
| Total New Scope | $ 164,555 | $ 166,201 | $ 167,863 | $ 169,541 | $ 171,237 | $ 839,397 |

| Cost Breakout for New Scope of Work | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| Development/Start Up * | $ 42,493 | $ 42,917 | $ 43,347 | $ 43,780 | $ 44,218 | $ 216,754 |
| Staff and Related Expenses | $ 108,384 | $ 109,468 | $ 110,562 | $ 111,668 | $ 112,785 | $ 552,867 |
| Operations | $ 13,679 | $ 13,816 | $ 13,954 | $ 14,093 | $ 14,234 | $ 69,775 |
| New Scope Cost | $ 164,555 | $ 166,201 | $ 167,863 | $ 169,541 | $ 171,237 | $ 839,397 |
| Existing Scope Cost | $ 2,995,953 | $ 3,025,913 | $ 3,056,172 | $ 3,086,734 | $ 3,117,601 | $ 15,282,373 |

| Grand Total - Existing Scope + New Scope | $ 3,160,509 | $ 3,192,114 | $ 3,224,035 | $ 3,256,275 | $ 3,288,838 | $ 16,121,770 |
|---|---|---|---|---|---|---|

Notes:
* Represents costs associated with implementation of new scope and/or expansion of existing scope.
These costs are spread over the five year term with the intention of addressing state economic pressures.

4.5 Cost Proposal Format/Bid Sheets

 **11**

## APS HEALTHCARE COST PROPOSAL/BID SHEETS
### Bureau For Medical Services
### OPTIONAL SERVICES CONTINUED

**VISION OPTION**

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| | | | | | | |
| Total Vision | $ 65,274 | $ 65,927 | $ 66,586 | $ 67,252 | $ 67,924 | $ 332,964 |

**LABORATORY OPTION**

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| | | | | | | |
| Total Lab | $ 20,662 | $ 20,869 | $ 21,078 | $ 21,288 | $ 21,501 | $ 105,399 |

**NURSING FACILITY OPTION**

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| Current Scope | $ 224,785 | $ 227,033 | $ 229,304 | $ 231,597 | $ 233,913 | 1,146,632 |
| New Scope | $ 132,674 | $ 134,001 | $ 135,341 | $ 136,694 | $ 138,061 | 676,772 |
| Total Nursing Facility | $ 357,460 | $ 361,034 | $ 364,645 | $ 368,291 | $ 371,974 | 1,823,403 |

## OTHER PUBLIC PAYERS PEIA AND
## SCHIP OPTION

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| Per Q&A Question #16 - Cost cannot be projected at this time | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |
| Total Other Public Payers PEIA & SCHIP | ——————— | ——————— | ——————— | ——————— | ——————— | ——————— |

Innovative Resource Group LLC d/b/a APS Healthcare Midwest (APS)

Bidder

Signature

Date  6/4/09

BMS90007 Utilization/Prior Authorization

**4.5 Cost Proposal Format/Bid Sheets**

12

## APS HEALTHCARE COST PROPOSAL/BID SHEETS
### Bureau for Children and Families

| ASG Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Existing Scope of Work**<br>**MANDATORY** | | | | | | |
| SNS UM Consulting and training | | | | | | |
| SNS Prior Authorization<br>SNS Retrospective Quality Reviews w/ financial<br>and credentialing | | | | | | |
| OOS UM consulting and training | | | | | | |
| OOS Prior authorization | | | | | | |
| OOS Retrospective Quality Reviews | | | | | | |
| Quality Improvement Functions | | | | | | |
| Consumer Education | | | | | | |
| Data Analysis | | | | | | |
| Total Existing Scope | $ 495,399 | $ 500,353 | $ 505,357 | $ 510,410 | $ 515,514 | $ 2,527,033 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **New Scope of Work**<br>**Option**<br>20 services added resulting in 9 codes for 8-9<br>payer groups | | | | | | |
| Total New Scope | $ 333,407 | $ 336,741 | $ 340,109 | $ 343,510 | $ 346,945 | 1,700,712 |

| Cost Breakout for New Scope of Work | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Totals |
|---|---|---|---|---|---|---|
| Development/Start Up* | $ 80,116 | $ 80,919 | $ 81,728 | $ 82,545 | $ 83,371 | $ 408,680 |
| Staff and Related Expenses | $ 168,813 | $ 170,501 | $ 172,206 | $ 173,928 | $ 175,668 | $ 861,116 |
| Operations | $ 84,477 | $ 85,322 | $ 86,175 | $ 87,036 | $ 87,907 | $ 430,916 |
| New Scope Cost | $ 333,407 | $ 336,741 | $ 340,109 | $ 343,510 | $ 346,945 | $ 1,700,712 |
| Existing Scope Cost | $ 495,399 | $ 500,353 | $ 505,357 | $ 510,410 | $ 515,514 | $ 2,527,033 |

| Grand Total - Existing Scope + New Scope | $ 828,806 | $ 837,094 | $ 845,465 | $ 853,920 | $ 862,459 | $ 4,227,745 |
|---|---|---|---|---|---|---|

Notes:
* Represents costs associated with implementation of new scope and/or expansion of existing scope.
These costs are spread over the five year term with the intention of addressing state economic pressures.

Innovative Resource Group LLC d/b/a APS Healthcare Midwest (APS)
Bidder

Signature

6/4/09
Date

BMS90007 Utilization/Prior Authorization

**4.5 Cost Proposal Format/Bid Sheets**

~~====~~ **13**

## APS HEALTHCARE COST PROPOSAL/BID SHEETS
### Bureau for Behavioral Health and Health Facilities

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Existing Scope of Work MANDATORY** | | | | | | |
| BHHF Specific Data Set Collection | | | | | | |
| Block Grant Reporting | | | | | | |
| Weekly & Monthly Data Submission Reports | | | | | | |
| YSS & YSS-F Survey & Report | | | | | | |
| OBHS Consumer Eligibility Determination | | | | | | |
| APS CareConnection Records Transfer | | | | | | |
| Total Existing Scope of Work plus volume increase | $ 217,247 | $ 219,419 | $ 221,613 | $ 223,829 | $ 226,068 | $ 1,108,176 |
| **New Scope of Work MANDATORY** | | | | | | |
| Eligibility Gatekeeping | | | | | | |
| Service Level Prior Authorizations | | | | | | |
| Training & Technical Assistance | | | | | | |
| Retrospective Reviews | | | | | | |
| Reporting: Standard and Ad Hoc | | | | | | |
| BHHF Specific Additional Data Set | | | | | | |
| **Total New Scope** | $ 388,558 | $ 392,444 | $ 396,368 | $ 400,332 | $ 404,335 | $ 1,982,038 |

| Cost Breakout for New Scope of Work | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Totals |
|---|---|---|---|---|---|---|
| Development/Start Up * | $ 38,558 | $ 38,943 | $ 39,333 | $ 39,726 | $ 40,123 | 196,682 |
| Staff and Related Expenses | $ 264,565 | $ 267,211 | $ 269,883 | $ 272,581 | $ 275,307 | 1,349,547 |
| Operations | $ 85,436 | $ 86,290 | $ 87,153 | $ 88,025 | $ 88,905 | 435,809 |
| New Scope Cost | $ 388,558 | $ 392,444 | $ 396,368 | $ 400,332 | $ 404,335 | 1,982,038 |
| Existing Scope Cost | $ 217,247 | $ 219,419 | $ 221,613 | $ 223,829 | $ 226,068 | 1,108,176 |

| Grand Total - Existing Scope + New Scope | $ 605,805 | $ 611,863 | $ 617,981 | $ 624,161 | $ 630,403 | 3,090,213 |

Notes
* Represents costs associated with implementation of new scope and/or expansion of existing scope.
These costs are spread over the five year term with the intention of addressing state economic pressures.

Innovative Resource Group LLC d/b/a APS Healthcare Midwest (APS)
Bidder

*[signature]*
Signature

*6/4/09*
Date

## BID TABULATION

Page 1 of 1

PO/Contract No:     BMS90007        Bid Opening Date:              10-Jun-09

Description:       Utilization Management/Propr Authorization Services for Bureau for Medical Services

| Bidder Name & Address | Bid Amount | RVP Requested | Amount w/ RVP | | Reciprocal Preference | Comments |
|---|---|---|---|---|---|---|
| Innovative Resource Group, LLC<br>100 Capital Street<br>Suite 600<br>Charleston, WV 25301 | | | $0.00<br>$0.00<br>$0.00 | 2.5%<br>3.5%<br>5.0% | | *Successful Bidder*<br>Contact: Jennifer Britton<br>Fax: 914-288-4603 |
| KePro, Inc.<br>777 East Park Drive<br>Harrisburg, PA 17111 | | | $0.00<br>$0.00<br>$0.00 | 2.5%<br>3.5%<br>5.0% | | Contact: Joseph A. Dougher<br>Fax: 717-564-3862 |
| | | | $0.00<br>$0.00<br>$0.00 | 2.5%<br>3.5%<br>5.0% | | Contact:<br>Fax: |
| | | | $0.00<br>$0.00<br>$0.00 | 2.5%<br>3.5%<br>5.0% | | Contact:<br>Fax: |
| | | | | | | |

Notes:

I do hereby certify that the above information is true and accurate.

EXHIBIT

Roberta Wagner        **Buyer**
Name-File/Title         **Supervisor**             Date:   6/10/2009

# Overview

## Current Medicaid SOW
## Projected Deliverables New SOW
## WV Bureau for Medical Services
## 2015 Procurement

Current SOW/Service Allocation and Contract Value:

| Service | WVMI | APS | Year 5 VALUE[1] | WVMI Share | APS Share |
|---|---|---|---|---|---|
| • BMS BH Review Services | | X | $4,127,483 | | $4,127,483 |
| • BMS UM Medical Services | X | | $5,001,681 | $5,001,681 | |
| • BMS Optional Services: | | | | | |
|    ○ IDD Waiver Services | | X | $3,471,523 | | $3,471,523 |
|    ○ A&D Waiver Services | X | | $3,288,838 | $3,288,838 | |
|    ○ Laboratory | X | | $21,501 | $21,501 | |
|    ○ Vision | X | | $67,924 | $67,924 | |
|    ○ NH PASSAR | X | | $371,974 | $371,974 | |
| • BCF Child/Family Services | | X | $862,459 | | $862,459 |
| • BHHF (MH related) | | X | $630,403 | | $630,403 |
| **TOTAL** | | | **$17,843,786** | **$8,751,918** | **$9,091,868** |

Service Description:

- BH Review Services – The medical necessity review/prior authorization of all inpatient and outpatient behavioral health services. **(BMS)**
- UM Medical Services - The medical necessity review/prior authorization of all inpatient and outpatient "medical and related" health services. **( BMS)**
- Optional Services:

---

: Note:

1. Source – APS Cost Proposal/Bid Sheets, June 2009
2. Total does not reflect/include revenue from subsequent contract amendments or other related awards (i.e. APS – TBI Waiver, WVMI Medicaid Expansion, etc.)



**EXHIBIT**

F



November 9, 2010

John C. Wiesendanger, CEO
West Virginia Medical Institute
3001 Chesterfield Place
Charleston, WV 25314

**Re: Letter of Agreement**

Dear Mr. Wiesendanger:

The purpose of this Letter of Agreement ("LOA") is to confirm and document the agreement between Innovative Resource Group, LLC, d/b/a APS Healthcare Midwest ("APS"), and the West Virginia Medical Institute, Inc. ("WVMI") with regard to the provision of services to the West Virginia Department of Health and Human Resources-Bureau for Medical Services (the "Agency") under the Agreement for Utilization Management and Prior Authorization Services for the Bureau for Medical Services, Bureau for Children and Families and Bureau for Behavioral Health and Health Care Facilities (Purchase Order No. BMS90007) awarded to APS (the "Prime Contract").

Effective December 1, 2009, APS was awarded the Prime Contract. The parties intend that WVMI shall provide services as a subcontractor to APS under the Prime Contract, consistent with the terms and conditions set forth below. Therefore, in furtherance of these objectives, and valuable consideration acknowledged as received, APS and WVMI mutually agree as follows:

**EFFECTIVE DATE**
The Effective Date of this LOA is December 1, 2009.

**SUBCONTRACTOR SERVICES**
WVMI shall provide Services described on Exhibit A, attached hereto and incorporated herein by reference. In providing these Services, WVMI shall at all times comply with the following:

(a) provisions of the Prime Contract as well as instructions, directives, requirements and polices of the Agency and the State of West Virginia that are applicable and required to flow-down to WVMI;

(b) all provisions of the Request for Proposal, the Proposal and related documents describing the services that are applicable to WVMI, unless modified by the Prime Contract or the Agency; and·

(c) all applicable provisions of State and federal law and regulation.

The parties further understand and agree that, in the event the Agency changes the scope of services under the Prime Contract, and/or its payment to APS for the services provided by WVMI hereunder, the parties shall agree upon a comparable and equitable adjustment to the services and compensation hereunder.

**COMPENSATION**
APS shall pay WVMI in the amount set forth on Exhibit B, attached hereto and incorporated herein, as payment in full for the subcontracted services. WVMI shall provide APS with detailed, monthly invoices. Payment shall be made by APS within fifteen (15) days of its receipt of payment from the Agency for the subcontracted services. The parties agree that this timeframe for payment shall not apply to payment for services rendered on or before November 1, 2010.

**EXHIBIT**

_G_



The parties understand and agree that APS shall have no obligation to pay WVMI unless and until such payment for work attributable to WVMI's Services is made by the Agency.

The parties further understand and agree that WVMI shall be solely liable for any and all performance penalties or liquidated damages imposed by the Agency or State of West Virginia that are attributable to WVMI's acts, omissions or performance under this LOA.

### NEGOTIATION OF DEFINITIVE SUBCONTRACT AGREEMENT

The parties shall exercise best efforts to negotiate in good faith a definitive subcontract agreement ("Definitive Subcontract"). The Definitive Subcontract shall contain terms and conditions consistent with this LOA, the applicable requirements of the Prime Contract, the applicable implementation decisions made by the Agency, the applicable provisions of the RFP and Proposal, and the requirements of applicable law and regulation.

### EFFECT ON TEAMING AGREEMENT

The parties understand and agree that this LOA shall supersede and replace in its entirety the Teaming Agreement between the parties dated March, 11, 2009 (the "Teaming Agreement") which shall have no further force or effect.

### TERM AND TERMINATION

This LOA shall commence on December 1, 2009, and shall continue until the first occurrence of any of the following events of termination:

(a) mutual agreement of the parties in writing;

(b) the execution by the parties of a Definitive Subcontract;

(c) either party may terminate in the event of material breach by the other party, upon thirty (30) days prior written notice, unless the breach is cured during the notice period;

(d) either party may terminate at any time without cause, upon at least one hundred twenty (120) days prior written notice to the other party;

(e) termination of the Prime Contract for any reason;

(f) a direction by the Agency to APS to terminate this LOA or the provision of WVMI's services hereunder;

(g) November 30, 2014, unless extended by mutual agreement of the parties in writing.

### COMMUNICATIONS

APS shall provide WVMI with prompt notification of all discussions and communications with the Agency which may have a material effect upon WVMI's services or compensation hereunder. To the extent that an opportunity is provided by the Agency, APS shall provide WVMI with an opportunity to provide input on any proposed change that has a material impact on WVMI's services or compensation. APS shall consult with WVMI to obtain its input before agreeing to any change requested or directed by the Agency to the Prime Contract that has a material impact on WVMI's services or compensation there under.



## CONFIDENTIALITY AND NONDISCLOSURE

Confidential and proprietary Information entitled to protection hereunder means all Information originating from the furnishing party, or from persons acting on behalf of the furnishing party, or which the furnishing party has received In confidence from a third party ("Confidential Information"). Confidential Information shall include all information, in any form, including written, verbal or electronic, that concerns the business affairs of a party, Its products, services, systems, software, finances (including prices, costs and revenues), marketing plans, programs, methods of operation, prospective and existing contracts and other business arrangements and/or business plans, procedures, strategies, systems and programs of third parties that have granted rights to the party, as well as accompanying documents and related business plans. Confidential Information shall include all information and materials based on or derived by the Receiving Party from any of the foregoing.

The party receiving Confidential Information (the "Receiving Party") shall not, without the prior written consent of the party disclosing the Confidential Information (the "Disclosing Party"), use or disclose all or any portion of the Confidential Information except as necessary for performing services in connection with the Prime Contract and this LOA.

Without limiting the foregoing, APS and WVMI shall use commercially reasonable efforts to prevent any use or disclosure of each other's Confidential Information in breach of this provision. If either party is in breach of this provision, such party (the "Breaching Party") shall be responsible for all losses to the other party which arise as a result of the breach. The parties shall each have the right to obtain immediate injunctive relief to enforce the obligations under this provision, in addition to any rights or remedies that they may have in law or equity. If any legal action is necessary to enforce this provision, the Disclosing Party shall be entitled to reasonable attorney's fees and expenses in addition to any other allowable relief. In addition, the Breaching Party shall defend, Indemnify and hold harmless the other party from any and all claims, lawsuits, damages and financial losses arising as a result of the Breaching Party's breach of the terms and conditions of this provision.

Neither party shall have an obligation to hold Confidential Information in confidence to the extent that:

(a) such Confidential Information becomes generally available to the public, other than as a result of unauthorized disclosure by the Receiving Party or by persons to whom the Receiving Party has made such Confidential Information available; or

(b) such Confidential Information was received by the Receiving Party on a non-confidential basis from a third party lawfully possessing and lawfully entitled to disclose such Confidential Information; or

(c) disclosure of such Confidential Information is specifically authorized in writing by the Disclosing Party; or

(d) disclosure of such Confidential Information is required by court order (subject to an appropriate protective order), but only after such advance notice to the Disclosing Party as may be possible under the circumstances and cooperation with the Disclosing Party to permit an opportunity to object to the disclosure of such Confidential Information.

Upon termination or expiration of this LOA, all Confidential Information shall be returned to the Disclosing Party or, at the direction of the Disclosing Party, destroyed, together with all copies made by the Receiving Party and by anyone to whom such Confidential Information has been made available by the Receiving Party.


APS Healthcare

## MEDICAL CONFIDENTIALITY/PROTECTED HEALTH INFORMATION

The parties shall at all times comply with all applicable laws and regulations regarding patient information , medical records, and protected health information,  including but not limited to the Health Insurance Portability and Accountability Act ("HIPAA") and  45 CFR Part 160 and Part 164 (the "HIPAA Privacy Rule") . The parties shall also execute a HIPAA Business Associate Agreement, attached hereto as Exhibit C and incorporated herein by reference.

Please sign and date this letter in the space provided below to document and confirm WVMI's agreement to these terms and conditions, and return a signed original to me at your earliest convenience. Thank you for your attention to this matter.

Very truly yours,

Jerome V. Vaccaro, M.D
President and Chief Operating Officer

Accepted and Agreed To:

West Virginia Medical Institute, Inc.

By: _____

Title: _CHIEF EXECUTIVE OFFICER_

Date: _Nov. 10, 2010_

## Exhibit A to Letter of Agreement

### Scope of Work

1. WVMI will conduct medical review and medical eligibility review services. Review activities shall be conducted in accordance with the requirements, timeframes and specifications set forth in the RFP and the Proposal.

    a. WVMI will continue to conduct medical necessity review and medical eligibility review services for specific psychiatric/mental health related services including adult psychiatric, BMU, Psy<21 and partial hospitalization. WVMI will provide medical necessity review for these services until review responsibility is assumed by APS.

    b. Medical necessity review and medical eligibility review conducted by WVMI will be entered into APS CareConnection®. APS will provide user access to APS CareConnection®, including training on using the application and technical support. Such access shall be made available to WVMI upon the completion of programming necessary to conform CareConnection to specifications and requirements of the Agency.

2. All services and reports provided by WVMI hereunder must meet deadlines established by APS that are necessary for APS to meet the deadlines and requirements specified by the Agency.

3. APS shall serve as the direct interface with the Agency on all matters involving the Contract. WVMI shall contact the Agency on Contract-related matters only upon request or with the permission of APS.

4. WVMI will facilitate the review process and contract by:

    a. Assisting with the development of training materials at a level of effort estimated at 8 hours per month from the WVMI-designated project coordinator; WVMI may attend any provider training sessions at the discretion of WVMI.

    b. Responding to provider questions, complaints, and other correspondence, calls, emails, and/or faxes utilizing formats/protocols approved by APS.

    c. Meeting with the APS management team as requested and at least on a monthly basis.

    d. Providing meeting space for the APS Contract Monitor, who will be available onsite at specific times during the work week to provide technical assistance, respond to questions, or discuss review or other activities as needed with reviewers or other WVMI staff members and management. APS understands that the Contract Monitor will not access workspace used for review owing to HIPAA/contract confidentiality requirements.

    e. Providing personnel, facilities, local hardware, software, and support needed to complete review activities.

    f. Providing data / information necessary for APS to complete Agency-requested/required reports, ad hoc, and other reports within RFP specified timeframes.

    g. Providing and documenting training and technical assistance activities, including documenting the review workflow.

    h. Participating with APS in the development and utilization of metrics to monitor quality and productivity for services / activities in WVMI's Scope of Work.

5. WVMI shall meet all review timelines and requirements as specified in West Virginia regulations, the Request for Proposal, or other applicable requirements for medical review and medical eligibility determinations and notifications as specified from time to time by the Bureau for Medical Services, the Bureau for Children and Families, and/or the Bureau for Behavioral Health and Health Care Facilities.

6. WVMI shall provide all standard written communications to APS for review and approval prior to use (which includes any required review and approval by the Agency or its designee).

7. WVMI shall use appropriately qualified and licensed personnel to provide all services hereunder, and shall use credentialing standards and procedures for such personnel that are acceptable to APS and consistent with the requirements of the RFP.

8. WVMI shall provide the following reports to APS:

   a. Medical Prior Authorization

      WV BMS Prior Authorization Summary Report (monthly submission to WV BMS)

   b. LTC/Waiver

      Managed Enrollment Table (daily submission to WV BoSS)
      Managed Enrollment Report (weekly submission to WV BMS)
      A/D Waiver Review Activity (monthly submission to WV BMS)
      A/D Waiver Tracking Report (bi-monthly submission to WV BMS)
      A/D Waiver Aged Report (bi-monthly submission to WV BMS)
      Timeliness of Waiver Re-Evaluations (monthly submission to WV BMS)

   c. Ad Hoc Requests

      The Parties acknowledge that BMS may submit requests for various ad hoc reports. WVMI and APS mutually agree to collaborate in the preparation of such reports. All reports shall be transmitted to BMS by APS.

9. WVMI will provide services in connection with the following programs

a. General and Acute Care Inpatient Hospital Admission and Continued Stay Review

b. Organ Transplant Services

c. Inpatient Rehabilitation Services for Individuals through 20 Years of Age in Freestanding Rehabilitation Facilities

d. General Dentistry, Orthodontic and Oral Health Services

e. Occupational Therapy (OT)/ Physical Therapy (PT)

f. Speech (ST)/ Language and Audiology Services

g. Durable Medical Equipment/Medical Supplies

h. Orthotic and Prosthetic Services

i. Chiropractic Services

j. Diagnostic Imaging/ Radiology Services

k. Elective Surgery Procedures

l. Out-of-Network Services

m Podiatry

n. Cardiac Rehabilitation

o. Pulmonary Rehabilitation

p. Medical Case Management

q. Home Health

r. Hospice

s. Personal Care

t. Private Duty Nursing

u. Aged and Disable Waiver

v. Vision Services

w. Laboratory Services

x. Nursing Home Eligibility and PASSR Eligibility

EXHIBIT B

| | Base Year | Base Year | Base Year | Base Year | Base Year Adj Summary | Option Year One | Option Year Two | Option Year Three | Option Year Four |
|---|---|---|---|---|---|---|---|---|---|
| | 12/09 - 02/10 | 04/10 - 06/10 | 07/10-9/10 | 10/10-11/10 | | 12/10-11/11 | 12/11-11/12 | 12/12-11/13 | 12/13-11/14 |
| Population | | | | | | | | | |
| Aged & Disabled Waiver | $ 247,191 | $ 247,191 | 247,191 | 247,191 | $ | 252,135 | $257,178 | $262,321 | $267,567 |
| 1 UM - Medical Services | $ 332,500 | $ 332,500 | 332,500 | 332,500 | $ | 339,150 | $345,933 | $352,852 | $359,909 |
| 1 UM - Behavioral Health Services | $ 45,000 | $ 45,000 | - | - | $ | - | | | |
| Nursing Home | $ 18,547 | $ 18,547 | 18,547 | 18,347 | $ | 18,918 | $19,296 | $19,682 | $20,075 |
| Total Monthly Before Adjustment | $ 643,238 | $ 643,238 | 598,238 | 598,238 | $ | 610,203 | $622,407 | $684,855 | $647,552 |
| Monthly Adjustment | $ | 25,000 | 25,000 | 42,227 | $ | 43,072 | $43,933 | $44,812 | $45,708 |
| Revised Monthly Amount | $ [illegible] | 668,238 | 623,238 | 640,465 | $ | 653,275 | $ 686,340 | $ 670,567 | $ 693,260 |
| Months Adjusted | | 4 | 3 | 2 | | | | | |
| Total Adjustment Base Year | | $100,000 | $75,000 | $84,454 | $259,454 | | | | |

## EXHIBIT C
## BUSINESS ASSOCIATE AGREEMENT

This Agreement is effective as of the Effective Date by and between West Virginia Medical Institute, Inc. **("Business Associate")** and APS Healthcare Bethesda, Inc., **including its subsidiaries and affiliates (collectively "APS")**. All capitalized terms contained in this Agreement, not otherwise defined herein, shall have the meanings ascribed to them in 45 CFR Parts 160 and 164 pursuant to the Health Insurance Portability and Accountability Act of 1996 made a part hereof.

### RECITALS:

A.      APS provides administrative services to Covered Entities.

B.      Business Associate provides, or will provide services to APS (the "Services") and those Services will require Business Associate to use and disclose Protected Health Information that Business Associate creates or receives on behalf of APS ("PHI").

C.      APS requires that Business Associate comply, and Business Associate is willing to comply, with all applicable provisions of the HIPAA Privacy and Security Rules and other Federal and State Laws (collectively referred to herein as "Privacy Rules") regarding the use and disclosure of PHI arising out of the provision of Services to APS, all upon the terms and conditions set forth herein.

NOW THEREFORE, for and in consideration of the premises, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Business Associate does hereby covenant and agree as follows:

1.      Term. The term of this Agreement shall commence on the date in which the service agreement underlying this Agreement is effective ("Effective Date") and shall continue for so long as Business Associate is providing the Services, unless earlier terminated pursuant to this Agreement.

2.      Permitted Uses and Disclosures of PHI. Unless otherwise specifically provided in this Agreement or authorized in writing by APS, and except as required or permitted by law, Business Associate, for itself and other workforce members under the control of Business Associate,,hereby agrees (a) to keep all PHI confidential and in its possession except as necessary to provide the Services; (b) to restrict access to PHI to those employees of Business Associate or other workforce members under the control of Business Associate who are actively and directly participating in providing the Services and who need to know such information in order to fulfill such responsibilities; (c) not to copy or duplicate any PHI except as necessary to provide the Services; (d) to treat any and all copies of, and notes, memoranda, analyses, compilations, abstracts, synopses, studies of other material produced from PHI ("documents") as PHI, except to the extent that all information in the documents has been de-identified pursuant to 45 C.F.R. § 164.514(b); (e) when communicating with APS concerning PHI, to communicate only with APS's authorized representatives; (f) not to disclose any PHI or Summary Health Information to any Health Plan or Health Plan Sponsor in connection with providing the Services; (g) not to use any PHI for any purpose other than the purpose for which such PHI was provided in connection with providing the Services; and (h) not to use PHI in any manner that would violate the Privacy Rules if APS were providing the Services.

3.      Uses and Disclosures of PHI for Business Associate Operations. Business Associate may use PHI, if necessary, for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate. Business Associate may disclose PHI for its proper management and administration or to carry out its legal responsibilities if the disclosure is required by law, or if Business Associate obtains reasonable written assurances from the Person to whom PHI will be disclosed that: (a) PHI will be held confidentially and used or further disclosed only for the purpose for which it was disclosed to such Person or only as required by law; and (b) such Person will notify Business Associate of any instances of which it becomes aware in which the confidentiality of PHI was breached.

4.    Unauthorized Use or Disclosure.  Business Associate shall not use or further disclose PHI other than as permitted by this Agreement or as required by law.

5.    Safeguards.

(i) Business Associate will develop, implement, maintain and use appropriate administrative, technical and physical safeguards, in compliance with §164.530(c) of the Privacy Rules, and any other implementing regulations issued by the U.S. Department of Health and Human Services to to prevent use or disclosure of PHI other than as provided in this Agreement or as required by law.

(ii) Business Associate shall have and currently use appropriate administrative safeguards in compliance with §§164.306 and 308 of the Security Rule contained in HIPAA, and any other relevant implementing regulations issued by the U.S. Department of Health and Human Services to prevent use or disclosure of PHI other than as provided in this Agreement or as required by law, including but not limited to:

a.    policies and procedures to prevent, detect, contain and correct security violations;

b.    policies and procedures to ensure that all members of its workforce have appropriate access to protected health information and to prevent those workforce members who do not have appropriate access from obtaining access to protected health information;

c.    policies and procedures to ensure that all members of its workforce have appropriate access to PHI; and that pursuant to §164.308(a)(3)(ii)(B), a workforce clearance procedure is implemented to determine that the access of a workforce member to PHI is appropriate.;

d.    policies and procedures to address security incidents;

e.    policies and procedures for responding to an emergency or other occurrence that that may damage systems that contain electronic health information;

f.    an identified security official who is responsible for the development and implementation of the policies and procedures required;

g.    implementation of security awareness training program for all members of its workforce, including management.  The policy shall require that all individuals with access to PHI pursuant to this Agreement complete security awareness refresher training at least annually.

h.    policies and procedures requiring the completion of, a periodic and thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and availability of PHI held by the Business Associate pursuant to this Agreement;

i.    Performance of a periodic technical and nontechnical evaluation in response to environmental or operational changes affecting the security of electronic PHI that establishes the extent to which the Business Associate's security policies and procedures meet the requirements of the Security Rule.

(iii) Business Associate shall have and currently use appropriate physical safeguards in compliance with §§164.306 and 310 of the Security Rule contained in HIPAA, and any other relevant implementing regulations issued by the U.S. Department of Health and Human Services to prevent use or disclosure of PHI other than as provided in this Agreement or as required by law, including but not limited to:

a.    policies and procedures to limit physical access to its electronic information systems and the facility or facilities where they are housed, while ensuring that properly authorized access is allowed;

b.    policies and procedures that specify the proper functions to be performed, the manner in which those functions are to be performed and the physical attributes of the surroundings of a workstation or class of workstation that can access electronic health information;

c.    policies and procedures that govern the receipt of and removal of hardware and electronic media that contain electronic protected health information into and out of a facility, and the movement of these items with the facility;

    d.     policies and procedures to address the final disposition of electronic protected health information, and/or the hardware or electronic media on which it is stored.

    (iv) Business Associate shall have and currently use appropriate technical safeguards in compliance with §§164.306 and 312 of the Security Rule contained in HIPAA, and any other relevant implementing regulations issued by the U.S. Department of Health and Human Services to prevent use or disclosure of PHI other than as provided in this Agreement or as required by law, including but not limited to:

    a.     policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access as more particularly specified in §164.308(a)(4);

    b.     procedures to verify that a person or entity seeking access to electronic protected health information is the one claimed;

    c.     mechanisms to ensure that electronic protected health information is encrypted whenever deemed appropriate, which encryption shall meet the current standards as promulgated by the Department of Health and Human Services.

    Business Associate agrees to notify APS within twenty-four (24) hours - electronically, by facsimile, or telephone, of any successful attempt at unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in Business Associate's Information Systems that affect PHI (a "Security Incident"). In the event of a successful Security Incident, Business Associate shall further provide to APS, in writing, such details concerning the incident in question as APS may reasonably request.

    For as long as Business Associate shall be in possession of any PHI, in any form, Business Associate shall periodically test, monitor, and audit Business Associate's Information security systems, measures and procedures (and those of the Business Associate Representatives) in order to insure that such systems, measures and procedures are consistent with industry best practices and standards. If any audit or review by Business Associate reveals any material security defects, problems, weaknesses or vulnerabilities, Business Associate shall notify APS thereof, and Business Associate shall cure the same within the time period specified by APS. For any such issues which result in a Disclosure not permitted by this Agreement, Business Associate shall abide by the terms in Section 9 of this Agreement. Failure of Business Associate to correct such problems, defects, weaknesses or vulnerabilities which affect APS within the reasonable time period specified by APS, which shall be no less than 30 days, shall be considered a material breach for purposes of this Agreement and any agreement between APS and Business Associate under which Business Associate is providing the Services.

    6.     Sub-Contractors and Agents. Business Associate will ensure that any and all Persons who have access to PHI by or through Business Associate agree to the same restrictions and conditions that apply to Business Associate hereunder.

    7.     APS Access to PHI. Upon receipt of a request from APS, and in accordance with the written policies of APS then in effect to which Business Associate has been informed through a written communication, Business Associate will, within the time period specified by APS, with no less than 10 business days being available to Business Associate, make available to APS for inspection and obtaining copies of any PHI about said individual that is in Business Associate's custody or control, so that APS may meet its access obligations under the Privacy Rules or to its clients. Upon receipt of such a request from an individual with respect to PHI, Business Associate will promptly forward such request to APS.

8.      Amendment of PHI. Business Associate will, upon receipt of notice from APS, and in accordance with the written policies of APS then in effect to which Business Associate has been informed through a written communication, amend, or permit APS access to amend any portion of PHI within the time period specified by APS, with no less than 10 business days being available to Business Associate so that APS may meet its amendment obligations under § 164.526 of the Privacy Rules or to its clients. Upon receipt of a request for amendment of PHI from an individual, Business Associate will promptly forward such request to APS.

9.      Disclosure Accounting. Except for disclosures for which accounting is not required under the 45 C.F.R. § 164.528, Business Associate will record the information a Covered Entity must report in an accounting for disclosures under 45 C.F.R. § 164.528 (the "Disclosure Information") for each disclosure of PHI that Business Associate makes to any Person (including APS) and promptly forward such Disclosure Information to APS so that APS may meet its disclosure accounting obligations under § 164.528 of the Privacy Rules or to its clients. Upon receipt of such a request from an individual, Business Associate will promptly forward such request to APS.

If Business Associate maintains an electronic record of health-related information on an individual that is created, gathered, managed and consulted by authorized health care clinicians and staff (electronic health record), Business Associate shall also account for any disclosure from said electronic health record, including disclosures for payment, treatment or healthcare operations from said electronic health record, as required by the HITECH Act.

10.     Inspection of Books and Records. Business Associate will make its internal practices, books, and records relating to its use and disclosure of PHI under this Agreement available to APS for the purposes of determining Business Associate's compliance with this Agreement and to the U.S. Department of Health and Human Services for the purposes of determining APS' compliance with the Privacy Rules.

11.     Reports to APS. Business Associate will report to APS promptly any use or disclosure of PHI that violates this Agreement of which Business Associate becomes aware. Business Associate will further provide to APS, in writing, such details concerning the incident in question as APS may reasonably request.

12.     Termination of Agreement for Cause. In the event of a material breach by Business Associate of any of its obligations hereunder, APS shall have, in addition to any other rights and remedies available at law or in equity, the right to terminate this Agreement at any time by providing to Business Associate written notice of termination setting forth the details of the incident that is the basis for such termination and the effective date of termination. APS and Business Associate hereby agree that any material breach of this Agreement by Business Associate shall constitute a material breach under any oral or written agreements between APS and Business Associate affected by such breach of this Agreement and shall entitle APS to terminate such agreements, without penalty, in addition to any other rights or remedies available to APS under such agreements.

13.     Obligations upon Termination.

A.      Return or Destruction. Upon termination or expiration of this Agreement, Business Associate will, if feasible, return to APS or destroy all PHI under Business Associate's custody or control, in whatever form or medium (including in any electronic medium under Business Associate's custody or control), including all copies of and any data or compilations derived from and allowing identification of any individual who is a subject of PHI. Business Associate will, in accordance with reasonable written policies of APS then in effect and previously provided to Business Associate in written form, complete such return or destruction and identify any PHI that is infeasible to return or destroy as promptly as possible after the effective date of the termination or expiration of this Agreement. Business Associate will limit its further use or disclosure of PHI to those purposes that make return or destruction infeasible. Upon termination or expiration of this Agreement, Business Associate will give to APS copies of all documents in Business Associate's possession or control that are required to be maintained by or on behalf of APS by the Privacy Rules or the Security Rules other than what Business Associate is permitted or required by law to retain.

B.    Continuing Privacy and Other Obligations.  Business Associate's obligation to protect the privacy of PHI hereunder will be continuous and survive termination or expiration of this Agreement.  The obligations of the parties hereto under Sections 7, 8, 9, 13, 14 and 15 of this Agreement shall survive the termination or expiration of this Agreement.

14.    Duty to Mitigate.    Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Agreement.

15.    Modification and Amendment.  This Agreement shall not be modified or amended in any respect except by a written instrument executed by the parties; provided, that in the event the provisions of this Agreement shall conflict with the requirements of applicable law concerning the use, handling, disclosure and/or treatment of PHI (including, without limitation, the Privacy Rules), as such laws may be modified, amended, or superseded from time to time, this Agreement shall be deemed amended as necessary to conform to such legal requirements at all times.  Notwithstanding the foregoing, Business Associate acknowledges and agrees that Business Associate is under an obligation to promptly review and respond to any amendment to this Agreement prepared by APS and sent to Business Associate.

16.    Notification of Breach. During the term of this Agreement, Business Associate shall notify APS within twenty-four (24) hours following the discovery of a Breach of unsecured PHI, or any use or disclosure of PHI in violation of this Agreement or applicable federal or state laws or regulations.  Business Associate shall take (i) prompt action to cure any deficiencies causing a Breach and (ii) any other action pertaining to such unauthorized disclosure required by applicable federal and state laws and regulations.  A Breach is considered to have been discovered as of the first day on which the Breach is known."

17.    To the extent possible, Business Associate's notification to APS shall at least:

- Identify the nature of the non-permitted use or disclosure or other breach;
- Identify the types of PHI used, accessed or disclosed;
- Identify the person(s) whose PHI has been or is reasonably believed to have been, accessed, acquired or disclosed;
- Identify who made the non-permitted use or received the non-permitted disclosure;
- Identify what corrective action Business Associate took or will take to prevent further non-permitted uses or disclosures;
- Identify what Business Associate did or will do to mitigate any deleterious effect of the non-permitted use or disclosure; and
- Provide such other information, including a written report, as APS may reasonably request.

18.    No Third Party Beneficiaries.    This Agreement shall not be construed to confer any rights or remedies upon any Person, other than APS and its officers, directors, employees, agents, successors, and assigns.

19.    Conflicts.    The terms and conditions of this Agreement will override and control any conflicting terms and conditions in any agreement between APS and Business Associate related to the privacy and security of PHI.  All other terms and conditions of any such agreement shall remain in full force and effect.

20.    Compliance with Laws.  Business Associate will comply with any and all federal, state and local laws, rules and regulations applicable to the use or disclosure by Business Associate of PHI hereunder.

21.    Remedies Cumulative.  The remedies afforded to APS in this Agreement are not intended to be exclusive, and each remedy shall be cumulative and shall be in addition to all other remedies available to APS at law or in equity.

22.    Waivers.  No delay or omission by APS in exercising any rights or remedies under this Agreement or applicable law shall impair such right or remedy or be construed as a waiver of any such right or remedy. Any single or partial exercise of a right or remedy shall not preclude further exercise of that right or remedy or the exercise of any other right or remedy.  No waiver shall be valid unless in writing signed by the party to be bound.

23.    Venue and Consent to Jurisdiction.  Any action at law, suit in equity, or other judicial proceeding for the enforcement of this Agreement or any provision hereof shall take place, at the option of APS (whether or not such proceeding is initiated by APS), in the State of West Virginia. Business Associate hereby consents to the personal jurisdiction of the state and federal courts in West Virginia, in any dispute arising from or relating to this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

WEST VIRGINIA MEDICAL INSTITUTE, INC.:

By: _____
Title: _____
Date: _____

APS HEALTHCARE BETHESDA, INC.

By: _____
Title: _____
Date: _____11-10-2010_____

Amendment To Letter of Agreement

BY AND BETWEEN Innovative Resource Group, LLC , dba APS Healthcare Midwest ("APS") and West Virginia Medical Institute, Inc. ("WVMI").

WHEREAS, APS and WVMI are parties to a Letter Agreement dated November 9, 2009 (the "Agreement"), and wish to amend the compensation terms of the Agreement;

NOW THEREFORE, in consideration of the foregoing and other valuable consideration, the receipt and accuracy of which is hereby acknowledged, APS and WVMI hereby mutually agree to amend the Agreement as follows.

1. Exhibit B to the Agreement is hereby deleted and replaced in its entirety with the attached Exhibit B.

2. The effective date of this Amendment Number Two shall be March1, 2014.

3. All other terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, APS and WVMI have executed this Amendment by their duly authorized representatives.

Innovative Resource Group, LLC

By: _____

Title: President

Date: April 23, 204

West Virginia Medical Institute, Inc.

By: _____

Title: CEO

Date: APRIL 21, 2014

**EXHIBIT B**

| Population | Base Year 12/09-02/10 | Base Year 03/10-06/10 | Base Year 07/10-9/10 | Base Year 10/10-11/10 | Base Year Adj Summary | Option Year One 12/10 - 11/11 | Option Year Two 12/11-11/12 | Option Year Three 12/12-11/13 | Option Year Four 12/13-2/14 | Option Year Four 3/14-11/14 |
|---|---|---|---|---|---|---|---|---|---|---|
| Aged & Disabled Waiver | $ 247,191 | $ 247,191 | $ 247,191 | $ 247,191 | | $ 252,135 | $ 257,178 | $ 262,321 | $ 267,567 | |
| 1 UM - Medical Services | $ 332,500 | $ 332,500 | $ 332,500 | $ 332,500 | | $339,150 | $ 345,933 | $ 352,852 | $ 359,909 | |
| 1 UM - Behavioral Health Services | $ 45,000 | $ 45,000 | - | - | | $ | | | | |
| Nursing Home | $ 18,547 | $ 18,547 | $ 18,547 | $ 18,547 | | $ 18,918 | $ 19,296 | $ 19,682 | $ 20,076 | |
| Total Monthly Before Adjustment | $ 643,238 | $ 643,238 | $ 598,238 | $ 598,238 | | $ 610,203 | $ 622,407 | $ 634,855 | $ 647,552 | $ 693,260 |
| Monthly Adjustment | $ - | $ 25,000 | $ 25,000 | $ 42,227 | | $ 43,072 | $ 43,933 | $ 44,812 | $ 45,708 | $ 27,778 |
| Revised Monthly Adjustment | | $ 668,238 | $ 623,238 | $ 640,465 | | $ 653,275 | $ 666,340 | $ 679,667 | $ 693,260 | $ 721,038 |
| Months Adjusted | | 4 | 3 | 2 | | | | | | |
| Total Adjustment Base Year | | $ 100,000 | $ 75,000 | $ 84,454 | $ 259,454 | | | | | |

## AMENDMENT NUMBER TWO
## TO LETTER AGREEMENT

**BY AND BETWEEN** Innovative Resource Group, LLC ("APS") and West Virginia Medical Institute, Inc., ("WVMI").

**WHEREAS,** APS and WVMI are parties to a Letter Agreement dated November 9, 2010 as amended (the "Agreement"), under which WVMI provides subcontracted services to APS under an Agreement for Utilization Management and Prior Authorization Services for the Bureau for Medical Services, Bureau of Children and Families and Bureau for Behavioral Health and Health Care Facilities that APS has entered into with the West Virginia Department of Health and Human Resources-Bureau for Medical Services (the "Prime Contract");

**WHEREAS** the term of the Prime Contract has been extended to May 31, 2015, and the parties desire to extend the Agreement and its current terms and conditions to be co-terminus with the Prime Contract.

NOW THEREFORE, in consideration of the foregoing and other valuable consideration, the receipt and accuracy of which is hereby acknowledged, APS and WVMI hereby mutually agree to amend the Agreement as follows.

1. Subsection (g) of the TERM AND TERMINATION Section of the Agreement is deleted, and replaced with the following provision:

   (g) May 31, 2015, unless extended by mutual agreement of the parties in writing

2. The period from December 1, 2014 to May 31, 2015 shall be referred to as the "Extension Period."

3. The monthly amount of $721,038.00 shall constitute payment in full to WVMI for all services provided and expenses incurred during the Extension Period, and shall be paid by APS in accordance with the Agreement.

4. The effective date of this Amendment Number Two shall be November 30, 2014.

5. All other terms and conditions of the Agreement shall remain in full force and effect.



**EXHIBIT**

H

IN WITNESS WHEREOF, APS and WVMI have executed this Amendment Number Two.

Innovative Resource Group, LLC

By: _____

Title: __President_____

Date: __12/16/14_____

West Virginia Medical Institute, Inc.

By: _____

Title: __Chief Financial OFFICE__

Date: __12-15-14_____

TEAMING AGREEMENT

This Teaming Agreement ("Teaming Agreement" or "Agreement") is made and entered into April 1, 2015/xx/xxxx ("Effective Date"), by and between, APS Healthcare Bethesda, Inc. including its subsidiaries and affiliates which shall include but not be limited to Innovative Resource Group, LLC dba APS Healthcare Midwest (collectively "APS"), and West Virginia Medical Institute, Inc. ("Vendor"), located at 3001 Chesterfield Place, Charleston, WV 25304. APS and Vendor are referred to herein individually as "Party" and collectively as the "Parties".

RECITALS

WHEREAS, the State of West Virginia ("State") is expected to publishwill publish a Request for Proposal through the Bureau of Childern and Families and Bureau for Behavioral Health and Health Care Facilities relating to the provision of utilization management and prior authorization services to Medicaid benefiiciaries("RFP"), and the State is authorized to enter into contracts with various entities for provision of those services set forth in the RFP (the "Program") and may issue a contract for the provisions of these services ("Contract");

WHEREAS, APS intends to submit a proposal in response to the RFP ("Proposal");

WHEREAS, APS desires Vendor to assist it in developing its Proposal and enter into an arrangement with Vendor in the event APS is awarded the Contract;

WHEREAS, the Parties currently provide substantially similar services to the State and belivebelieve that by combining their respective and complementary skills, capabilities and expertise, they can design, develop, and produce a Proposal that best meets the goals and objectives of the RFP so as to obtain and successfully perform the Contract;

NOW, THEREFORE, in consideration of the mutalmutual covenants herein contained and other valuable consideration, the receipt and adequacy of which are hereby acknowdeegedacknowledged, the Parties agree as follows:

ARTICLES

1.   **Relationship of the Parties**

   1.1   Except as otherwise provided herein, each Party shall exert its commercially reasonable efforts in support of APS' Proposal so that the State will award the Contract to APS and will accept Vendor as a subcontractor for Vendor's scope of work to be determined after release of RFP.

EXHIBIT

I

1.2    APS reserves the right, upon notification to Vendor, to add additional members to APS' team pursuant to proposed subcontracts for portions of the Proposal and/or Contract, provided that no additional team members shall be added to perform service similar to Vendor's currently in force Scope of Work as identified in the Letter of Agreement between the Parties dated November 9, 2010 as amended ( the "Current Agreement") Scope of Work or in competition thereof.  Upon termination of this Agreement in accordance with Section 9, neither Party shall have any further obligation to the other hereunder, other than under the Current Agreement, any(other than current Scope of Work and Letter of Agreement, the provisions of this Agreement; any previously executed Non-Disclosure of Confidentiality or _provisions of this Agreement or other agreements which survive termination)

1.3    The Parties shall remain as independent contractors at all times. Neither Party shall act as agent for or partner of the other or shall have authority to bind the other except to the extent authorized herein or as otherwise provided by mutual written agreement. This Teaming Agreement is not intended by the Parties to constitute or create a joint venture, pooling arrangement, partnership, or a formal business organization of any kind, other than a teaming arrangement in anticipation of a prime/subcontractor relationship, and the rights and obligations of the Parties shall be only those expressly set forth herein.

1.4    Nothing in this Teaming Agreement is intended to affect the rights of the State to negotiate directly with either Party hereto on any basis the State may desire; however, Vendor agrees that APS is the State contract for any issues involving the Proposal. Vendor further agrees that if contacted by the State, it shall not engage in negotiations of any kind with the State regarding the Proposal without notice to APS. Vendor agrees not to engage in any direct contact with the State, and to provide notice of and include APS in any communications with the State regarding the Proposal. In the Proposal and in all discussionsdiscussions with the State related to the Proposal, APS will identify Vendor as its subcontractor, state the relationship between the two parties, and disclose the proposed Scope of Work and responsbilitiesresponsibilities of each party under the Proposal.

1.5    APS shall have the rights of a prospective prime contractor in connection with the Proposal, the Contract and the subcontract arrangement (including, but not limited to, the right to make the final decision as to the form, content and submission of the Proposal and all realtedrelated information provided to the State in connection with the Proposal).

2.    Cooperation and Support of APS' Proposal Efforts

2.1    Both Parities shall cooperate fully to produce a competitive Proposal for the Contract in full satisfaction of the RFP's requirements and reflecting ~~commerically~~commercially reasonable terms. The Parties shall cooperate with each other in all respects under this Teaming Agreement. The ~~commericallly~~commercially reasonable efforts of Vendor in supporting APS' effort to obtain award of the Contract shall include, but are not limited to, the provision of advice and reasonable technical assistance, the preparation of information and materials relative to Vendor's services for incorporation into APS' Proposal to the State, as well as any subsequent or supplemental proposals or related submissions that the State may request that APS submit in support or explanation of its Proposal, and the provision of all necessary certifications with respect to Vendor's proposed subcontract of services.



2.2    Vendor will furnish access to qualified personnel with respect to Vendor's Scope of Work to ensure that APS' Proposal and related submissions to the State are accurate, competitive and responsive to the RFP, and to meet Vendor's other APS, Vendor shall assure the availability of management and technical personnel representing Vendor and authorized to act on its behalf to support and assist APS in any written or oral communications, discussions, and/or presentations with the State concerning APS' Proposal or the Program. APS shall promptly provide Vendor with notice of the opportunity for such ~~communciations~~communications, as well as the requested or proposed content thereof, subject to any limitations imposed on APS. APS agrees to keep Vendor advised of all changes in the State's requirements and APS' opinion on the probability of its receipt of the contract award. APS will consult with Vendor to obtain input and approval prior to making changes to the Proposal or prime contract that affect Vendor's Scope of Work. The Parties recognize the State may take action that results in changes to Vendor's Scope of Work (e.g., by amending the RFP, modifying the contract, or identifying issues during the evaluation and/or discussions process). Vendor shall take all reasonable steps necessary to implement such changes, while reserving all legal rights including but not limited to a reasonable equitable adjustment based on such changes.

2.3    Vendor represents and warrants that it has no agreement with any other entity that will prevent Vendor from fully performing all tasks to which Vendor contractually commits to perform in this Teaming Agreement and will, if possible, represent and warrant that it has no agreement with any other entity that will prevent it from fully performing all tasks to which it contractually commits to perform in the Subcontract.

2

2.4    Each Party shall bear all costs, risks and liabilities that it incurs that arise out of its performance of this Teaming Agreement, including all cost for staff, offices, equipment, supplies, audits and other cost of doing business. Neither Party shall have any right to any reimbursement, payment or compensation of any kind from any other Party with

respect to costs incurred during the period up to the award of the Contract unless otherwise specifically agreed in a separate writing between the Parties.

2.55 Each Party shall, within three(3) days of execution of this Agreement, designate in writing one or more individuals within its organization as its representative(s) responsbileresponsible for supervision and performance of the Parties obligations and functions under this Teaming Agreement. Each Party shall ensure that its representative(s) will be reasonably available to the other Party in order to resolve promptly any issues that arise under this Teaming Agreement.

3. <u>Subcontract Arrangement and Support for the Preparation of APS' Proposal</u>

3.1 Vendor will prepare and furnish information and material relevant to Vendor's Scope of Work, and related explanations and descriptions in support of the Proposal and APS' efforts to obtain award of the Contract and shall continue to provide such information and material as may be reasonably required until a Contract is awarded by the State pursuant to the RFP.

3.2 If cost data for cost realism analysis are requested by the State with respect to Vendor's Scope of Work, the Vendor shall submit to APS all pricing information and detailed supporting schedules requested by APS, consistent with directions and guidance by the State. The Parties agree that such pricing information and supporting schedules are highly confidential and proprietary to Vendor, and APS agrees to abide by all obligations herein regarding the confidentiality of such information.

3.3 Vendor shall provide to APS each of the other respresentationsrepresentations, certifications, disclosures and statements that are required by the RFP or otherwise requested by the State.

3.4 Subject to the provisions of this Agreement, APS shall have the sole right to determine the contents and form of the Proposal, as well as ultimate responsbilityresponsibility for the production and submission of the Proposal and all documents submitted to the State, its agencies, departments or other subdivisions thereto in connection with the Proposal. APS will prepare and direct the preparation of the Proposal and integrate the information provided by Vendor into such Proposal, provided that APS will consult with Vendor on all matters concerning its Scope of Work.

3.5 APS shall, in its Proposal and in discussions with the State in connection with its Proposal, identify Vendor as a prpposedproposed subcontractor for Vendor's Scope of Work. APS shall, it its sole discretion, determine which of its wholly owned subsidiaries or affiliates under common control will be utilized as the bidding entity, and the definitive subcontract between the parties following award of the Contract shall be with that entity.



Formatted: Check spelling and grammar

Formatted: Check spelling and grammar

Formatted: Check spelling and grammar

Formatted: Check spelling and grammar

Formatted: Check spelling and grammar

Formatted: Check spelling and grammar

3.6     If the Contract is awarded to APS, Vendor shall support APS' efforts to retain the Contract including the provision of reasonable assistance in defending against any protest filed by any person or entity other that APS relating to the Contract, at APS' expense.



4.     Compliance with Laws, RFP Requirements and Indemnification

4.1     The Parties expressly convenantcovenant and agree to comply with all current federal and state law and regulations applicable to the RFP, the Contract and/or the Program or otherwise governing the negotiation and/or performance of any Contract awarded under the RFP (the "**Procurement Laws**"), as well as any current State Instructions, directives and policies, and all representations, certifications, . disclosures or statemntsstatements that have been or shall have been provided in connection with the Proposal, the RFP or the Program.

**Formatted:** Check spelling and grammar



**Formatted:** Check spelling and grammar

4.2     Each Party shall be responsible for providing the necessary resources and expertise to develop systems and reports to protect the interityintegrity of the procurement process and to comply with all Procurement Laws and other requirements applicable to the RFP and the Contract, and shall preserve all books, records, data and evidence of procedures and policies relating to each Party's compliance therewith.

**Formatted:** Check spelling and grammar

4.3     Vendor will protect and maintain all confidential information including Protected Health Information (PHI) gained by reason of the RFP against unauthorized use, access, disclosure, modification or loss. This duly requires Vendor to employ reasonable security measures, which include restricting access to any confidential information by:



      a)Encrypting electronic confidential information during transport;

      b)     Physically securing and tracking media containing confidential information during transport;

      c)Limiting access to staff that have an authorized business requirement to view the confidential information;



      d)     Using access lists, Unique Used ID and hardened password authentication to protect confidential information on computer systems;

      e)Physically securing any computers, documents or other media containing confidential information;

      f) Encrypting all confidential information that is stored on portable devices, including but not limited to, laptop computers and flash memory devices.



The Parties will also protect and maintain all confidential information in accordance with the Business Associate Agreement ("BA") attached to this Agreement as ("**Exhibit B**")



5. **Subcontract Arrangement**

5.1 APS agrees to negotiate with Vendor in good faith the pricing and other terms as required for the Scope of Work. The parties shall negotiate in good faith, with the intent that the scope of services and pricing be substantially similar to those under the Current Agreement, except as necessary to meet material modifications required by the terms of the RFP or the negotiation with the State.

> Formatted: Check spelling and grammar

5.2 Vendor agrees to accept a flow down of the indemnification provisions in APS' prime contract with the State whereby liability may be assumed ~~to a maximum of the extent of six (6) months of annual fees received by Vendor under the subcontract~~, for failures or delays in performance to the extent such failure or delay arises solely from the action or inaction of Vendor.

5.3 The Parties understand and agree that the arrangement will be contingent upon award of the Contract to APS and State approval of the subcontract arrangement with Vendor, and subject to suspension or termination by the State of performance in the event of a bid protest or otherwise. It is further understood that the State, or other government authority, ~~-~~may disapprove of the subcontract arrangement and may direct APS to assign Vendor's Scope of Work to another party. In such cases, however, APS, in ~~consultation~~consultation and cooperation with Vendor, shall seek to determine the cause for the disapproval of Vendor and how best to convince the State, or other government authority, to accept Vendor as the subcontractor. If such efforts by APS are unsuccessfuly, the Vendor acknowledges and agrees that APS shall comply with the State, or other government authority, direction and that APS shall have no further obligations or limitation of rights under the Article, except that APS shall so advise Vendor in writing and provide to Vendor any written disapproval and directions that are provided to APS by the State, or other government authority. Under such circumstances, this Teaming Agreement shall terminate pursuant to Section 9.1.

> Formatted: Check spelling and grammar

> Formatted: Check spelling and grammar

5.4 The Parties further understand and agree that, subsequent to an award of the Contract to APS, if there are any delays in execution of the Contract or a definitive~~a~~ new subcontract agreement between the parties beyond the date of expiration of the Current Agreement~~arrangement brought about by such issues as, but not limited to, a bid protest, lack of sufficient time to negotiate Scope of Work or terms of a new subcontract arrangement, or interim extension of the current in force Contract, APS and~~ the Parties will extend the terms of Current Agreement until the earlier of~~Vendor will extend the all terms and provisions of Vendor's currently in force Scope of Work as identified in the Letter of Agreement dated November 9, 2010  for~~ninety (90) days or

the completion of a definitive subcontract~~to allow for resolution and execution of a new~~ ~~subcontract arrangement.~~

Formatted: Check spelling and grammar

6. **Communications and Publicity**

6.1 The Parties agree that APS, as the potential prime contractor, shall control all direct communications and interfacing with the State concerning APS' Proposal in response to the RFP.

6.2 Except as required by law or legal processes, Vendor shall not publicize (except to its own employees and within its organization) the terms of this Teaming Agreement, the Proposal, any resulting Contract, or any subcontracts to be carried out under this Teaming Agreement or any actions or activities relating thereto, without the specific consent of APS. Except as required by law or legal process, APS shall not publicize (except to its own employees and within its organization) Vendor's participation in the Proposal or any resulting Contract or the terms of the Teaming Agreement without Vendor's consent. Notwithstanding the foregoing provisions, this Teaming Agreement and the terms thereof may be made known to the State. Any such publicity shall give due credit to the contribution of each Party. In the event disclosure is required by law or legal process, the Party of whom disclosure is required shall, where possible, give the other Party prior notice before making the ~~disclosre~~disclosure and consult with the other Party concerning the content of the disclosure.

Formatted: Check spelling and grammar

7. **Confidentiality and Non-disclosure**

7.1 For the purposes of this Agreement, confidential and proprietary information entitled to protection hereunder means all such information originating from the furnishing Party, or from persons acting on behalf of the furnishing Party, or which the furnishing Party has received in confidence from a third party ("**Confidential Information**"). Confidential Information shall include all information, in any form, including, written, verbal or electronic, that concerns the business or affairs of a Party, its products, services, systems, software, finances (including prices, costs and revenues), marketing plans, programs, methods of operation, prospective and existing contracts and other business arrangements and/or business plans, procedures, strategies, systems and programs of third parties that have granted rights to the Party, as well as accompanying documents and related business plans. Confidential Information shall include all information and materials based on or derived by the Receiving Party from any of the foregoing.

7.2 That Party receiving Confidential Information (the "Receiving Party") shall not without the prior written consent of the Party providing the Confidential Information (the "Providing Party")

(a) use any portion of the Providing Party Confidential Information (including information of third parties furnished by the Providing Party) for any purpose

other than preparation and support of the Proposal or related responses to the RFP on behalf of APS, and/or performance of the Contract and/or subcontract arrangement; or

(b) disclose any portion of the Confidential Information to any persons other than the officers, employees and agents of the Receiving Party: (i) who reasonably need to have access to the Confidential Information for purposes of preparing proposals or related responses to the RFP on behalf of APS, and/or performance of the Contract and Subcontract or (ii) in the case of persons other than licensed professional who are bound by rules of professional conduct not to disclose any Confidential Information, who have previously agreed in writing to be bound by these requirements.

7.3 Without in any way limiting the foregoing, the Vendor and APS shall use commercially reasonable efforts to prevent any disclosure of each other's Confidential Information (including information of third parties furnished by a Providing Party) in breach of this Article 7. If either Party is in breach of this Article 7, such Party (the "Breaching Party") shall be responsible for all losses to either Party which arises as a result of any such breach by the Breaching Party. The Party receiving Confidential Information under this section agrees that the Providing Party furnishing such information shall have the right to obtain immediate injunctive relief to enforce obligations under this Section 7, in addition to any other rights and remedies the Providing Party may have in law or in equity. If any legal action is necessary to enforce this Section, the Providing Party shall be entitled to reasonable attorney's fees and expenses in addition to any other allowable relief. In addition, the Breaching Party shall defend, indemnify and hold harmless to the other Party from any and all claims, lawsuits, damages and financial losses arising as a result of the Breaching Party's noncompliance with the terms and conditions of this Article 7.

7.4 Neither Party shall have an obligation to hold Confidential Information in confidence to the extent that: (i) such Confidential Information becomes generally available to the public, other than as a result of unauthorized disclosure by Vendor, APS or by persons to whom Vendor or APS has made such Confidential Information available; (ii) such Confidential was received by Vendor or APS on a non-confidential basis from a third party lawfully possessing and lawfully entitled to disclose such Confidential Information; (iii) disclosure of such Confidential Information is specifically authorized in writing by the Providing Party; or (iv) disclosure of such Confidential Information is required by court order (subject to an appropriate protective order), but only after such advance notice to the Providing Party as may be possible under the circumstances and cooperation with Providing Party to permit an opportunity to object to the disclosure of such Confidential Information.

7.5     Confidential Information furnished by the Providing Party pursuant to this Article 7 shall remain the property of the Providing Party and shall, at the Providing Party's direction, forthwith be returned to the Providing Party or, at the direction of the Providing Party, be destroyed, together with all copies made by the other Party and by anyone to who such Confidential Information has been made available by the other Party.

8.     **Participation in Other Proposals**

8.1     In light of the Confidential Information to be exchanged between the Parties, as well as the need for both Parties to devote substantial effort and resources to the preparation of the Proposal and the pursuit of the Contract, Vendor represents and warrants that it has not and agrees it shall not, during the term of this agreement, act as a prime or subcontractor to another prime for participation in the Proposal or Contract. Similarly, APS represents and warrants it has not and agrees it shall not, during the term of this agreement, enter into any other teaming agreement, subcontract or other agreement with a person other than Vendor for Vendor's currently in force Scope of Work as identified in the Current Agreement~~Letter of Agreement dated November 9, 2010~~. The Parties understand and agree that it is APS' intention to submit a ~~bid p~~Proposal and to serve as prime contractor for the Proposal.

8.2     If the APS and Vendor proposal does not result is an award to APS, nothing contained herein shall prevent either party from pursuing work or entering into teaming agreements, subcontracts and other agreements or arrangements with other parties for any services described in the RFP. Nothing contained herein shall prevent either Party from subcontracting or pursuing any work which is the subject of this Agreement, individually or in association with the successfully contractor or a third party, following Contract award or in the event that this Agreement is terminated.

8.3     Nothing in this Agreement is intended to impair the ability of State to procure products and services through a full and open competition. If the State, including any State governmental agency, raises concerns about this Agreement, the Parties shall seek to respond fully to these concerns (including, if necessary, by modifying or terminating this Agreement).

9.     **Term and Termination**

9.1     Automatic Expiration or Mutual Termination: Unless extended by mutual written agreement of the Parties, the term of this Teaming Agreement shall commence on the Effective Date and shall continue until the first occurrence of any of the following events of termination:

        9.1.1     An official State announcement that the RFP or Program has been canceled or terminated or that an award will not be made based on the RFP; provided, however, that if the RFP is reinstated or reissued without

material change within 12 months of said announcement, then this Teaming Agreement shall continue in full force and effect.

9.1.2    The award of a contract under the RFP without an award of the Contract to APS; provided, however, that the obligations of this Teaming Agreement shall continue in full force in the event of a subsequent award of the Contract to APS following a bid protest concerning the award, subject to the other provisions of the Teaming Agreement.

9.1.3    APS is unable to obtain State, or other government authority, approval of Vendor as a subcontractor to APS, and the terms of the proposed Subcontractor between APS and Vendor cannot reasonably be altered or changed to effect approval thereof by the State.

9.1.4    By mutual consent of both Parties in writing.

9.1.5    One year after the Effective Date of this Teaming Agreement or the date upon which the last proposal or best and final offer is submitted by APS, whichever is earlier.

9.1.6    Dissolution of either Party, the filing by either Party of a petition for bankruptcy or reorganization, the making by either Party of a general assignment for the benefit of creditors, the assignment or subcontract by Vendor of substantially all of its obligations under this Teaming Agreement, unless permitted in accordance with Article 11 of this Teaming Agreement or either Party ceases conducting business as a going concern or becomes insolvent.

9.1.7    The debarment or suspension of either Party by the State or conviction by either party of a criminal offense material to the performance of this Agreement or to the award of the Contract to APS.

9.1.8    A determination by APS that it will not submit a Proposal or a determination by APS to withdraw its proposal.

9.2    Notwithstanding Article 9.1, the covenants, obligations and prohibitions in Article 4 and 12 herein shall survive termination of this Teaming Agreement and shall continue in full force and effect for a period of six (6) years after such termination or the completion or termination of any Contract (or successor contract under the Program) that is awarded to APS (or its successor), whichever is later; and the covenants obligations and prohibitions in Article 7 herein shall survive termination of this Teaming Agreement and shall continue in full force and effect for a period of three (3) years after such termination or the completion or termination of any Contract (or successor contract under the Program) that is awarded to APS (or its successor), whichever is later. These

covenants, obligations and prohibitions that survive termination shall be interpreted in accordance with the other provisions of this Teaming Agreement.

9.3    Termination for Cause. If APS or Vendor fails to perform a material obligation under this Teaming Agreement, the non-breaching Party shall give written notice by Certified Mail to the alleged breaching Party of such alleged breach. The alleged breaching Party shall have no more than thirty (30) days from receipt of the Certified Mail notice to correct the deficiency, or to present a good faith plan to correct the deficiency within a "reasonable period of time." What is a "reasonable period of time" shall depend on the nature of the deficiency and its impact on the critical path for accomplishing the objectives of this Teaming Agreement. If they alleged breaching Party does not correct the deficiency in a timely fashion or present a good faith plan to correct the deficiency "within a reasonable time." The non-breaching Party shall have the right to terminate this Teaming Agreement.

## 10.    Notices

All notices, certificates, acknowledgements and other reports required of the Parties under this Teaming Agreement shall be in writing and shall be deemed properly delivered when mailed or transmitted if dispatched by: a) certified mail, postage prepaid, return receipt requested; b) hand delivery; c) overnight courier prepaid; or d) via facsimile transmission with written confirmation of receipt. Such items should be addressed:

| To APS: | To Vendor: | |
|---|---|---|
| APS Healthcare, Inc. | West Virginia Medical Institute | |
| Stephan J. Schlager | John C. Wiesendanger | |
| ~~Title?~~ Senior Vice President, Operations | | Chief |
| Executive Officer | | |
| ~~Address~~ 100 Sterling Parkway, Suite 201 | | 3001 |
| Chesterfield Place | | |
| ~~City, State Zip~~ Mechanicsburg, PA 17050 | | Charleston, WV |
| 25304 | | |

| With copy to: | With copy to: |
|---|---|
| Innovative Resource Group, LLC | West Virginia Medical Institute |
| d/b/a APS Healthcare Midwest | Kathleen D. Merrill |
| Jennifer Britton | Chief Financial Officer |
| 100 Capitol Street | 3001 Chesterfield Place |
| Charleston, WV 25301 | Charleston, WV 25304 |

The method of delivery and addresses for notices listed above may be changed by written agreement of the Parties.

## 11.    Successors and Assignment

This Teaming Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their respective successors and assigns and delegates; provided, however, that

neither Party may assign or transfer its interest hereunder, or delegate its duties without the prior notice to the other Party, except that notice is not required in the event of a corporate name change of either party or assignment to an affiliated entity. The consent required under this Section 11 shall not be unreasonably withheld by either Party. In the event of an attempted assignment that is not in accordance with these requirements, the Party attempting the assignment shall continue to remain subject to all obligations to the other Party as set forth in this Teaming Agreement.

12.   **Lower-Tier Subcontracts**

Vendor recognizes and agrees that any lower-tier subcontract for any portion of Vendor's Scope of Work must incorporate certain terms and conditions in accordance with the RFP and the Contract, and that Vendor shall not enter into any such lower-tier subcontract without the prior written consent of APS. Such consent shall not unreasonably be withheld by APS, although APS may reasonably require assurances from Vendor prior to giving consent to any such lower-tier subcontract.

13.   **Exclusion of "Punitive, Special, Consequential or Indirect Damages"**

NOTWITHSTANDING ANY OTHER PROVISION OF THIS TEAMING AGREEMENT, IN NO EVENT SHALL EITHER PARTY HERETO BE LIABLE TO THE OTHER PARTY HERETO FOR PUNITIVE, SPECIAL, CONSEQUENCTIAL OR INDIRECT DAMAGES THAT ARE CLAIMED TO BE INCURRED BY THE OTHER PARTY WHETHER SUCH CLAIM ARISES UNDER CONTRACT, TORT (INCLUDING STRICT LIABILITY) OR OTHER THEORY OF LAW.

14.   **Modification**

This Teaming Agreement shall not be amended or modified, nor shall any waiver of any right hereunder be effective unless set forth in a document executed by duly authorized representatives of both APS and Vendor. The waiver of any breach of any term, covenant of condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same.

15.   **Severability**

If any part, term, or provision of this Teaming Agreement shall be held void, illegal, unenforceable, or in conflict with any law, rule, regulation, or requirement of a federal, state, or local State entity, the validity of the remaining portions of provisions shall not be affected thereby.

16.   **Taxes**

Each Party shall be responsible for their respective present and future taxes, duties, tariffs, fees, imposts, and other charges imposed by any federal, state, local or foreign governmental authority, including but not limited to such impositions on income, excise, import, purchase,

sales, use, turnover, added value, consular, gross receipts, gross wages, and similar assessments imposed upon the Party by any taxing authority as a result of the performance of the Party's duties and responsibilities hereunder.

17.    **Conflict of Law**

This Agreement, including all rights duties and obligations arising from or relating in any manner to the subject of this Agreement, shall be governed, construed and enforced under the laws of the State of New York (excepting any conflicts of law provisions, which would service to defeat the application of New York substantive law). Vendor agrees to submit to the exclusive personal jurisdiction of the state and federal courts of the State of New York for any actions, suits or proceeding arising out of or relating to the interpretation, construction, or enforcement of this Agreement or otherwise relating to the Information.

18.    **General Provisions**

18.1    Nothing contained in this Teaming Agreement shall, by express grant, implication, estoppel or otherwise, create in either Party any right, title, interest, or license in or to the inventions, patents, copyrights, technical data, computer software, software documentation or any other intellectual property ("Intellectual Property Rights")of the other Party ("Intellectual Property Rights"). Any joint developments will be subject to a separate written joint agreement, which Vendor and APS agree will be executed prior to any joint development activities.   Neither party will own any Confidential Information of the other party that may be included in any joint development.

18:2    This Agreement shall not be amended or modified, nor shall any waiver or any right hereunder be effective unless set forth in a document executed by duly authorized representative of both Parties. The waiver of any breach of any term, covenant or conditions herein contained shall not be deemed to be a waiver of such term, covenant or condition of any subsequent breach of the same of any other term, covenant or condition herein contained.

18.3    This Teaming Agreement shall be enforced and interpreted under the laws of the State of New York, exclusive of the choice of law rules thereof.

18.4    If any part, term or provision of this Agreement shall be held void, illegal, unenforceable, or in conflict with ay law of a federal, state of local government having jurisdiction over this Agreement, the validity of the remaining portions or provisions shall not be affected thereby.

18.5    Neither Party and its affiliates will (i) hire or attempt to induce an employees of the other, or its affiliates, to terminate his or her employee or (ii) offer employment to a former employee of the other during the twelve (12) month period immediately

following the former employee's termination, other than an exception is approved by mutual agreement of the parties.

18.6    This Teaming Agreement and its exhibit(s) contain all of the agreements, representations and understandings of the Parties hereto.

IN WITNESS WHEREOF, the Parties hereto have executed this Teaming Agreement effective as of this XX day of XXXX, 2015.

For APS Healthcare, Inc.                                    For West Virginia Medical Institute, Inc.

By: _____                           By: _____

Its: _____                          Its: _____

 

May 6, 2015

John Wiesendanger
West Virginia Medical Institute
3001 Chesterfield Avenue
Charleston, WV 25304

Dear Mr. Wiesendanger:

APS is appreciative of our ongoing relationship with WV ASO Programs, and we want to keep you abreast of important matters for our company.

I am writing today to share some very important news about changes in our ownership structure. I am pleased to report that APS Healthcare is entering into partnership with KEPRO. An agreement was entered into and closed on May 1, 2015.

KEPRO is a national care management and quality improvement organization primarily focused in the government marketplace. This strategic partnership with KEPRO will position us to better fulfill the APS mission of improving people's health while improving the financial performance of our customers' healthcare investment by allowing us to leverage the formidable foundation of both companies and build a stronger integrated company in the future.

APS now becomes a wholly-owned subsidiary within the KEPRO family of companies. The APS management team will remain in their current roles and will continue to lead the operational efforts on behalf of our clients. Contractually we remain the same entity of Innovative Resource Group dba APS Healthcare Midwest.

We look forward to continuing to work with you. Jennifer Britton will contact you to answer any questions you may have. As the integration process continues, we pledge to keep you well-informed about our progress. Now and in the future, we will continue serving you with our customary sense of dedication and commitment.

Sincerely,

Stephen J. Schlager, MBA
Senior Vice President, APS Operations



EXHIBIT

## SERVICES AGREEMENT

**THIS SERVICES AGREEMENT** (the "Agreement"), effective June 1, 2015, (the "Effective Date"), is entered into between Innovative Resource Group, LLC d/b/a APS Healthcare Midwest ("APS"), 44 South Broadway, Suite 1200, White Plains NY and the West Virginia Medical Institute, Inc. ("WVMI") for the provision of services to the West Virginia Department of Health and Human Resources-Bureau for Medical Services (the "Agency") under the Agreement for Utilization Management and Prior Authorization Services for the Bureau for Medical Services, Bureau for Children and Families and Bureau for Behavioral Health and Health Care Facilities (Purchase Order No. BMS90007) awarded to APS (the "Prime Contract").

## RECITALS

**WHEREAS**, APS was awarded the Prime Contract, commencing on the effective date of December 1, 2009; and

**WHEREAS**, APS and WVMI entered into a Letter of Agreement ("LOA"), commencing on the effective date of December 1, 2009; and

**WHEREAS**, WVMI provided services as a subcontractor to APS under the Prime Contract, consistent with the terms and conditions of the LOA; and

**WHEREAS**, the "Term and Termination" provision of the LOA validates that the LOA expires, effective May 31, 2015; and

**WHEREAS**, APS and WVMI mutually desires to enter into a three (3) month Agreement, commencing on June 1, 2015 and expiring on September 1, 2015, whereby WVMI shall perform certain services on behalf of APS, as specified below; and

**WHEREAS**, WVMI has represented to APS that it will perform the services in a timely and satisfactory manner.

**NOW, THEREFORE**, in consideration of the mutual promises and mutual covenants herein contained, and in furtherance of these objectives, and valuable consideration acknowledged as received, APS and WVMI mutually agree as follows:

## I. SUBCONTRACTOR SERVICES

WVMI shall provide Services described on **Exhibit A**, attached hereto and incorporated herein by reference. in providing these Services. WVMI shall at all times comply with the following:

(a) provisions of the Prime Contract as well as Instructions, directives, requirements and polices of the Agency and the State of West Virginia that are applicable and required to flow-down to WVMI;

1

EXHIBIT

K

(b) all provisions of the Request for Proposal, the Proposal and related documents describing the services that are applicable to WVMI, unless modified by the Prime Contract or the Agency; and

(c) all applicable provisions of State and -federal law and regulation.

The parties further understand and agree that, in the event the Agency changes the scope of services under the Prime Contract, and/or its payment to APS for the services provided by WVMI hereunder, the parties shall agree upon a comparable and equitable adjustment to the services and compensation hereunder.

## II. COMPENSATION

APS shall pay WVMI in the amount set forth on **Exhibit B**, attached hereto and incorporated herein, as payment in full for the subcontracted services. WVMI shall provide APS with detailed, monthly invoices.

Payment shall be made by APS within fifteen (15) calendar days of its receipt of payment from the Agency for the subcontracted services. The parties agree that this timeframe for payment shall not apply to payment for services rendered on or before May ___, 2015.

The parties understand and agree that APS shall have no obligation to pay WVMI unless and until such payment for work attributable to WVMI's Services is made by the Agency.

The parties further understand and agree that WVMI shall be solely liable for any and all performance penalties or liquidated damages imposed by the Agency or State of West Virginia that are attributable to WVMI acts, omissions or performance under this Agreement.

## III. NEGOTIATION OF DEFINITIVE SUBCONTRACT AGREEMENT

The parties shall exercise best efforts to negotiate in good faith, a definitive subcontract agreement ("Definitive Subcontract"). The Definitive subcontract shall contain terms and conditions consistent with this Agreement, the applicable requirements of the Prime Contract, the applicable implementation decisions made by the Agency, the applicable provisions of the RFP and Proposal, and the requirements of applicable law and regulation.

## IV. EFFECT ON PRIOR AGREEMENTS

The parties understand and agree that this Agreement shall supersede and replace in its entirety the Teaming Agreement between the parties, effective March, 11, 2009 (the "Teaming Agreement"), and the LOA between the parties, effective December 1, 2009, which have expired in their entirety and shall have no further force or effect.

## V. TERM AND TERMINATION

This Agreement shall commence on June 1, 2015 and shall expire on September 1, 2015, unless extended in writing by APS for up to three (3) one (1) month extensions.

Notification of extension shall be given in writing by APS to WVMI's CEO not later than fifteen (15) calendar days before the expiration of the one (1) month extension. If no written notice is given to WVMI within the specified time, the one (1) month extension will expire, terminating without cause the entire Agreement in its totality.

If WVMI breaches any material provision of this Agreement, APS may terminate this Agreement with five (5) calendar days written notice of termination to WVMI. If the breach is capable of being cured and WVMI begins to act diligently and continuously to cure such breach within a forty-eight (48) hour period of learning of the material breach, the termination shall not become effective. In the event WVMI attempts to terminate this Agreement pursuant to this paragraph due to APS failure to pay any undisputed amounts due, the five (5) day notice and cure period set forth above shall be reduced to two (2) business days.

If WVMI or an affiliate thereof shall, at any time, cease to manage or administer the services of this Agreement, then, as of the date of such cessation, this Agreement shall immediately terminate with one (1) calendar day notice.

## VI. COMMUNICATIONS

APS shall provide WVMI with prompt notification of all discussions and communications with the Agency which may have a material effect upon WVMI''s services or compensation hereunder. To the extent that an opportunity is provided by the Agency, APS shall provide WVMI with an opportunity to provide input on any proposed change that has a material impact on WVMI's services or compensation. APS shall consult with WVMI to obtain its input before agreeing to any change requested or directed by the Agency to the Prime Contract that has a material impact on WVMI's services or compensation there under.

## VII. CONFIDENTIALITY AND NONDISCLOSURE

Confidential and proprietary information entitled to protection hereunder means all information originating from the furnishing party, or from persons acting on behalf of the furnishing party, or which the furnishing party has received in confidence from a third-party ("Confidential Information"). Confidential Information shall include all information, in any form, including written, verbal or electronic, that concerns the business affairs of a party, its products, services, systems, software, finances (including prices, costs and revenues), marketing plans, programs, methods of operation, prospective and existing contracts and other business arrangements and/or business plans, procedures, strategies, systems and programs of third parties that have granted rights to the party, as well as accompanying documents and related business plans. Confidential

Information shall include all information and materials based on or derived by the Receiving Party from any of the foregoing.

The party receiving Confidential Information (the "Receiving Party") shall not, without the prior written consent of the party disclosing the Confidential Information (the "Disclosing Party"), use or disclose all or any portion of the Confidential Information except as necessary for performing services in connection with the Prime Contract and this Agreement.

Without limiting the foregoing, APS and WVMI shall use commercially reasonable efforts to prevent any use or disclosure of each other's Confidential Information in breach of this provision. If either party is in breach of this provision, such party (the "Breaching Party") shall be responsible for all losses to the other party which arise as a result of the breach. The parties shall each have the right to obtain immediate injunctive relief to enforce the obligations under this provision, in addition to any rights or remedies that they may have in law or equity. If any legal action is necessary to enforce this provision, the Disclosing Party shall be entitled to reasonable attorney's fees and expenses in addition to any other allowable relief. In addition, the Breaching Party shall defend, indemnify and hold harmless the other party from any and all claims, lawsuits, damages and financial losses arising as a result of the Breaching Party's breach of the terms and conditions of this provision.

Neither party shall have an obligation to hold Confidential Information in confidence to the extent that:

(a) such Confidential Information becomes generally available to the public, other than as a result of unauthorized disclosure by the Receiving Party or by persons to whom the Receiving Party has made such Confidential Information available; or

(b) such Confidential Information was received by the Receiving Party on a non-confidential basis from a third party lawfully possessing and lawfully entitled to disclose such Confidential Information; or

(c) disclosure of such Confidential Information is specifically authorized in writing by the Disclosing Party; or

(d) disclosure of such Confidential Information is required by court order (subject to an appropriate

protective order), but only after such advance notice to the Disclosing Party as may be possible under the circumstances and cooperation with the Disclosing Party to permit an opportunity to object to the disclosure of such Confidential Information.

Upon termination or expiration of this Agreement, all Confidential Information shall be returned to the Disclosing Party or, at the direction of the Disclosing Party, destroyed, together with all copies

made by the Receiving Party and by anyone to whom such Confidential Information has been made available by the Receiving Party.

## VIII. NON-SOLICITATION AND NON-COMPETE

Subject to Exhibit A "Transition Services," APS shall not solicit, nor attempt to solicit the services of any employee or subcontractor of WVMI without the prior consent of WVMI.

During the term of this Agreement and in perpetuity, WVMI will not compete or contend with APS, nor subcontract or delegate their services to obtain, attain or acquire any part, portion or segment of this APS Agreement.

## IX. MEDICAL CONFIDENTIALITY/PROTECTED HEALTH INFORMATION

The parties shall, at all times, comply with all applicable laws and regulations regarding patient information, medical records, and protected health Information, including but not limited to the Health Insurance Portability and Accountability Act ("HIPAA") and 45 C.F.R. Part 160 and Part 164 (the "HIPAA Privacy Rule"). The parties shall also execute a HIPAA Business Associate Agreement, attached hereto as **Exhibit C** and incorporated herein by reference.

## X. GOVERNANCE

This Agreement shall be governed and interpreted under the laws of the Commonwealth of Pennsylvania and any action brought based on this Agreement shall be brought in the Court of Common Pleas of Dauphin County, Pennsylvania or in the United States District Court for the Middle District of Pennsylvania.

**IN WITNESS WHEREOF**, the Parties have executed this Business Associate Subcontractor Agreement as of the day and year written above.

| APS HEALTHCARE BETHESDA, INC. | WEST VIRGINIA MEDICAL INSTITUTE, INC. |
|---|---|
| By: _____ | By: _____ |
| Print Name: _Joseph Dougher_ | Print Name: __John Wiesendanger_ |
| Print Title: _President & CEO_ | Print Title: ___CEO_ |
| Date: _____ | Date _____ |

5

 WVMI
Quality
Insights

May 28, 2015

Kimberly Tatum
Contracting Officer
Centers for Medicare & Medicaid Services
Mailstop B3-30-03
7500 Security Boulevard
Baltimore, MD 21244-1850

RE:    Conflict of Interest Notice under QIN-QIO IDIQ Contract No. HHSM-500-2014-
       QIN0031

Dear Ms. Tatum:

The West Virginia Medical Institute (WVMI) is writing to provide notice of a change in an
outside contract arrangement and to inquire whether a six-month wind down period would be
reasonable, in order to allow adequate time to terminate the arrangement.

WVMI is a subcontractor to APS on a utilization review contract APS has with the West
Virginia Bureau for Medical Services (BMS). BMS is the State Medicaid agency. Under the
contract, APS reviews behavioral health services for the State Medicaid program; WVMI, as a
subcontractor, reviews the medical necessity of medical services (e.g., inpatient hospital
services). WVMI has performed such reviews for the WV Medicaid program for 38 years.

Effective May 1, 2015, APS was acquired by KEPRO. APS is now a subsidiary of KEPRO.
KEPRO is the BFCC-QIO for West Virginia. WVMI (d/b/a Quality Insights) is the QIN-QIO
for West Virginia.

KEPRO recently informed WVMI that it desires to terminate the WVMI subcontract with APS
because of concerns that CMS might consider the subcontract as creating a potential conflict of
interest (COI).

WVMI is prepared to terminate the subcontract -- which would avoid the necessity of CMS
having to determine if a COI exists -- if a six-month unwinding period is acceptable to CMS.
Accordingly, WVMI respectfully requests that CMS advise whether a six-month transition
period would be acceptable and not pose COI problems. We understand that it is WVMI's and
KEPRO's responsibility to finalize the terms of the subcontract termination.



EXHIBIT

L

Kim Tatum
May 28, 2015
Page 2

The remainder of this letter provides additional information on why a six-month transition is needed and offers details, including milestones, on how the unwinding will occur if acceptable.

BMS plans to extend its current contract with APS for six more months, from June 1 through November 30, 2015. The extension will keep the current services in place while BMS conducts a competitive bid process for a new Medicaid utilization review contract, to begin December 1, 2015. In addition, the six-month extension will ensure no disruption of services while BMS transitions 150,000 Medicaid expansion members to managed care plans in July.

A six-month transition period will also enable WVMI to retain its 70 Medicaid review staff and continue its longstanding service to the State during the BMS procurement process.

Measurable milestones for the transition period would include the following:

- Date BMS issues an RFP for a new utilization review contract;
- Date WVMI submits a proposal for the new BMS contract;
- Date BMS awards the new contract:
- If WVMI is awarded the new contract, it will sever its subcontract with APS and start work under a new prime contract directly with BMS;
- If BMS awards the new contract to another vendor, WVMI will transition its medical review services to the new vendor and terminate its subcontract with APS.

Because the BMS contract extension will become effective on June 1, 2015, we would respectfully request your response on the earliest possible date. Thank you for your consideration of this request. Please let us know if we may provide additional information or answer any questions you may have.

Sincerely,

Kathleen N. Merrill

Kathleen D. Merrill
Chief Financial Officer

cc:     John Wiesendanger
        David Lambert

## Lambert, David

**From:** Tatum, Kimberly B. (CMS/OAGM) [mailto:Kimberly.Tatum@cms.hhs.gov]
**Sent:** Friday, May 29, 2015 11:27 AM
**To:** Lambert, David; Merrill, Kathi
**Cc:** Lewis, Phyllis (CMS/OAGM); Gesterling, Greg E. (CMS/OAGM); Kornreich, Douglas (OS/OGC/GLD); Wiesendanger, John
**Subject:** RE: Final Letter to Kim Tatum

I have reviewed your final letter and confirm that in order to terminate your subcontract arrangement, a six-month transition period is fair and reasonable and does not pose a conflict of interest with the current QIN contract.

*Kimberly Tatum*

*Contracting Officer*

*Acquisition Support Group (ASG)*
*Division of Quality Contracts (DQC)*
*Centers for Medicare & Medicaid Services (CMS)*
*7111 Security Boulevard*
*Baltimore, MD. 21244-1850*
*Office: 410-786-7440*
*Cell: 443-602-4701*
*E-mail: Kimberly.Tatum@cms.hhs.gov*

## *Current Work Schedule: ADS on Mondays and on Fridays*

IMPORTANT. This e-mail, including all attachments, constitute Federal Government records and property that is intended only for the use of the individual or entity to which it is addressed. It also may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this e-mail transmission is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is strictly prohibited. If you have received this e-mail in error, please notify the sender by responding to the e-mail and then delete the e-mail immediately

1



## Lambert, David

| | |
|---|---|
| **To:** | Lambert, David |
| **Subject:** | FW: Follow-up to Teaming Agreement Discussion |
| **Attachments:** | WVMI APS Services Agreement 6 1 15 redlined SSJD.docx |

**From:** Schlager, Stephen [mailto:sschlager@apshealthcare.com]
**Sent:** Monday, June 01, 2015 10:01 AM
**To:** Lambert, David; Wiesendanger, John
**Cc:** Dougher, Joe; Flax, Dwight; Britton, Jennifer; Merrill, Kathi; Marks, John; Berg, Sven; Spurlock, Aaron
**Subject:** RE: Follow-up to Teaming Agreement Discussion

Dave-

Thank you for forwarding the comments and revisions to the agreement. I believe Joe is okay with going to CMS and looking to extend the arrangement by six months. That said, there are some provisions that we would need to add back in to the agreement. While we understand your thought about competing in perpetuity and have removed that piece of the clause, **competing with us directly during the upcoming re-bid is not tenable to KEPRO.** We have kept this clause within the attachment.

There is probably not a need for a meeting this morning. If you would review the document and accept the changes, we will produce a clean copy and return it to you for signature.

Thank you for your time.
Steve

Stephen J. Schlager
Chief Operating Officer
Ext. 7012
Dir. (717) 265-7012
Mob. (717) 461-0499



**EXHIBIT**

tabbies®

$\mathcal{N}$

1

## AMENDMENT TO THE LETTER OF AGREEMENT

**THIS AMENDMENT TO THE LETTER OF AGREEMENT ("Amendment"),** commencing on the Effective Date of June 1, 2015, incorporates to the fullest extent the Letter of Agreement ("LOA"), with an Effective Date of December 1, 2009, between Innovative Resource Group, LLC d/b/a APS Healthcare Midwest ("APS"), 777 East Park Drive, Harrisburg, PA and the West Virginia Medical Institute, Inc. ("WVMI") for the provision of services to the West Virginia Department of Health and Human Resources-Bureau for Medical Services (the "Agency") under the Agreement for Utilization Management and Prior Authorization Services for the Bureau for Medical Services, Bureau for Children and Families and Bureau for Behavioral Health and Health Care Facilities (Purchase Order No. BMS90007) awarded to APS (the "Prime Contract"), and states as follows:

The LOA and all its provisions, requirements and deliverables are fully incorporated herein as though fully stated, affirmed and avowed, except that the following provision is rescinded and replaced by this restatement, as follows:

### TERM AND TERMINATION

This Amendment shall commence on June 1, 2015 and shall expire on September 30, 2015. No additional written prior notice is warranted.

**IN WITNESS WHEREOF,** the Parties have executed this Amendment as of the day and year written above.

**APS HEALTHCARE BETHESDA, INC.**

By: _____

Print Name: _Joseph Dougher_____

Print Title: _President & CEO_____

Date: ___6/12/15_____

**WEST VIRGINIA MEDICAL INSTITUTE, INC.**

By: _____

Print Name: ___John Wiesendanger_____

Print Title: ___CEO_____

Date: _June 10, 2015_____

**EXHIBIT**

_O_

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

WEST VIRGINIA MEDICAL INSTITUTE, INC.,

      Plaintiff,

v.                              Civil Action No.: _____

INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
a West Virginia Agency,

      Defendants.

## AFFIDAVIT OF STACY HOLSTINE

Stacy Holstine, first being duly sworn, states that the following is true to the best of her knowledge:

1. I, Stacy Holstine, am over the age of 18 years old, of sound mind, and have personal knowledge of the facts contained herein.

2. I am currently a project manager at West Virginia Medical Institute, Inc. where I manage services rendered for West Virginia's Medicaid program. I have worked for WVMI since September 1, 1998.

3. On June 17, 2015, I received a phone call from Helen Snyder, KEPRO/APS's West Virginia associate director at my office number.

1


EXHIBIT

P

4. Ms. Snyder asked me if I was working from home. When I advised her that I was, Ms. Snyder said "Good. We can talk freely."

5. Ms. Snyder then told me that she wished to discuss employment opportunities at KEPRO/APS and that KEPRO/APS would need WVMI staff in order to take the remainder of the Medicaid contract on October 1, 2015.

6. Ms. Snyder stated that KEPRO/APS would be hiring 21 nurses, a clerical staff supervisor, three other nurses, 10 clerical staff, a project manager for long-term care services, and a project manager for Medicaid services, the equivalent to my position.

7. Ms. Snyder stated that if I took the job with KEPRO/APS, I could keep my same salary, and she also discussed available benefits at KEPRO/APS.

8. Ms. Snyder stated that she knew that if I took the employment offer with KEPRO/APS, that my staff would follow me.

9. Ms. Snyder stated that I could choose which members of my WVMI staff that I would want as a way of "weeding out" staff, if I so desired.

10. Ms. Snyder stated that there would be a job posting in the following Sunday paper announcing the job openings at KEPRO/APS for the work currently being performed by WVMI staff.

11. Ms. Snyder stated that if any of my WVMI staff wanted to follow me to KEPRO/APS that they should contact her directly and that they would not have to go through the normal hiring process.

12. Ms. Snyder stated that if KEPRO/APS did not get enough WVMI recruits, they would have to hire from outside WVMI.

2

13. I asked Ms. Snyder what would happen if I or my staff did not take a position now and KEPRO/APS won the next state contract.

14. Ms. Snyder stated that she doubted that KEPRO/APS would have any open positions for the next state contract because they would need to fill them all in order to assume the work by October 1, 2015.

15. I have resigned from my position at WVMI effective September 3, 2015, and I have accepted employment at HealthSmart.

Further affiant sayeth naught.

Stacy Holstine
Stacy Holstine

STATE OF WEST VIRGINIA,

COUNTY OF Kanawha, TO WIT:

Taken, subscribed, and sworn before me, a Notary Public in and for the County and State aforesaid, this 21st day of August 2015.

My Commission expires: November 13, 2016

NOTARY PUBLIC OFFICIAL SEAL
STACEY D. KING
State of West Virginia
My Commission Expires Nov. 13, 2016
1406 Luray Lane, Charleston, WV 25313

Stacey D. King
Notary Public

3

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**WEST VIRGINIA MEDICAL INSTITUTE, INC.,**

        **Plaintiff,**

v.

                                      Civil Action No.: _____

**INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
a West Virginia Agency,**

        **Defendants.**

## AFFIDAVIT OF STACY LEADMAN

Stacy Leadman, first being duly sworn, states that the following is true to the best of her knowledge:

1. I, Stacy Leadman, am over the age of 18 years old, of sound mind, and have personal knowledge of the facts contained herein.

2. I am a project manager at West Virginia Medical Institute, Inc. where I managed long-term care services rendered to the state of West Virginia.

3. On or about June 18, 2015, I returned a phone call to Lori McGurty, the Director of Waiver Programs at KEPRO/APS. She had left a message for me previously on my office phone, but did not state what it was regarding, which is out of the ordinary for her.

1



**EXHIBIT**

tabbies®

Q

4. Ms. McGurty stated that she wanted to give me a "heads up" that KEPRO/APS would be placing an ad in the coming Sunday newspaper seeking individuals to fill positions at KEPRO/APS for work currently being performed by WVMI staff.

5. More specifically, Ms. McGurty stated that KEPRO/APS would be posting all positions relating to WVMI's long-term care work, including my position. She also listed other positions, including lead nurse supervisor, administrative support supervisor, field nurse positions, and 5 administrative support positions.

6. Ms. McGurty stated that KEPRO/APS was looking for experienced staff and that "absolutely we would entertain WVMI staff."

7. Ms. McGurty stated that job postings would also be listed on Career Builder, but that anyone from WVMI wishing to continue the same work would not have to go through the same hiring process.

8. Ms. McGurty stated that anyone at WVMI that wished to continue the same work should send their resume directly to her or Helen Snyder directly.

9. Ms. McGurty said that if I wished to speak to her "privately or off the record," that I was "more than welcome" to call her cell phone number, which she gave to me at that time.

10. While seemingly trying to recruit me, Ms. McGurty said that "now we can't solicit," and then chuckled.

11. Confiding that she was unsure of what WVMI had shared with its staff, Ms. McGurty stated that KEPRO/APS would be ending its contractual relationship with WVMI on September 30, 2015 due to a conflict of interest between KEPRO/APS and WVMI related to the United States Centers for Medicare and Medicaid Services, commonly referred to as CMS.

2

12. Ms. McGurty stated that the decision to sever the relationship between WVMI and KEPRO/APS was not optional adding "we didn't have a choice."

Further affiant sayeth naught.

Stacy Leadman

STATE OF WEST VIRGINIA,

COUNTY OF Kanawha, TO WIT:

Taken, subscribed, and sworn before me, a Notary Public in and for the County and State

aforesaid, this 21st day of August 2015.

My Commission expires: November 13, 2016

NOTARY PUBLIC OFFICIAL SEAL
STACEY D. KING
State of West Virginia
My Commission Expires Nov. 13, 2016
5406 Luray Lane, Charleston, WV 25312

Stacy D. King
Notary Public

3

From: "Snyder, Helen" <HCSnyder@apshealthcare.com<mailto:HCSnyder@apshealthcare.com>>

Date: August 11, 2015 at 8:00:13 PM EDT

To: "Stephens, Mark M.D." <Mark.Stephens@camc.org<mailto:Mark.Stephens@camc.org>>

Subject: WV Medicaid Review Panel


I have been trying to reach you by phone to discuss any interest you may have in continuing as the Medical Director for the WV Medicaid contract and/or continuing review for the WV program. We are trying to retain physicians who currently review for the WV Medicaid Program at WVMI and if you are interested KePRO also has the Medicare contract for this region. I would love to talk with you about this! I have attached information that outlines the transition as well as my contact information. I look forward to hearing from you!

Helen

Helen C. Snyder

Associate Director| IRG d/b/a APS Healthcare, Inc.

100 Capitol St., Suite 600, Charleston, WV 25301 p. 1.304.343.9663 | ext. 7506911/1.800.346.8272 hcsnyder@apshealthcare.com<mailto:hcsnyder@apshealthcare.com>

=====================================================================

CONFIDENTIALITY NOTICE: The information contained in this message may be privileged and confidential. If this e-mail contains protected health information, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited, except as permitted by law. If you have received this communication in error, please notify the sender immediately by replying to this message and deleting it from your computer. Thank you.



EXHIBIT

R

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

WEST VIRGINIA MEDICAL INSTITUTE, INC.,

     **Plaintiff,**

v.                            **Civil Action No.:** _____

**INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
a West Virginia Agency,**

     **Defendants.**

## AFFIDAVIT OF DAVID LAMBERT

     David Lambert, first being duly sworn, states that the following is true to the best of his knowledge:

     1. I, David Lambert, am over the age of 18 years old, of sound mind, and have personal knowledge of the facts contained herein.

     2. I am the Chief Administrative Officer of West Virginia Medical Institute, Inc.

     3. WVMI and APS have been contractual partners for the State of West Virginia's Medicaid contract for nearly six years. Since KEPRO acquired APS and since the State's second extension of the contract, KEPRO/APS has used its position as the nominal prime vendor to harm WVMI and to gain a competitive advantage in the upcoming rebid of the State's contract.

1



EXHIBIT

S

4. KEPRO/APS has been aggressively recruiting WVMI employees in order to take over WVMI's role in the contract with the State of West Virginia.

5. To date (as of August 25, 2015), 23 WVMI employees have resigned or tendered resignation notices. Of these, as many as 15 have accepted employment by KEPRO/APS to do effectively the same work there. The remaining employees have left due to fears of whether their jobs will continue to exist if KEPRO/APS takes over the contract on October 1, 2015.

6. These employees are essential and critical to WVMI's ability to perform its services to the State of West Virginia.

7. More than half of the employees who are leaving to go to KEPRO/APS are making their last day at WVMI around August 25, 2015.

8. WVMI already had all of its employees who perform Medicaid prior authorization services on mandatory overtime prior to the dispute with KEPRO/APS due to the recent Medicaid expansion.

9. Because these employees are already working mandatory overtime, it is extremely difficult for WVMI to deal with the sudden flight of employees.

10. It takes a minimum of three months of training in order to replace the reviewing employees, thereby jeopardizing WVMI's ability to hire and train more reviewers to replace the ones who have left for KEPRO/APS.

11. Because WVMI's reviewer resources were already stretched thin and because of the months of required training, KEPRO/APS's recruiting of WVMI employees is irreparably harming and will continue to irreparably harm WVMI's ability to perform the remainder of the contract with the State of West Virginia.

2

12. Due to the flight of employees that have been recruited by KEPRO/APS, WVMI is starting to experience significant backlogs. These backlogs will become more significant in the coming weeks as more employees are set to resign.

13. These backlogs threaten to cause disruption in services rendered to West Virginia's Medicaid program, delaying payment to health care providers, and delaying medical care that requires prior authorization.

14. If WVMI loses the final two months of the contract with the State of West Virginia, it will irreparably harm the finances of WVMI and will necessitate lay-offs of dozens of employees, both those who provide Medicaid services and employees in other departments who support them.

15. The flight of employees recruited by KEPRO/APS has substantially harmed and will continue to harm WVMI's ability to submit a bid in the upcoming RFP for the next contract with the State of West Virginia. WVMI has already lost management-level employees whose experience and knowledge of Medicaid policies and review processes is critical to preparation of a competitive bid.

16. If WVMI loses the last two months of the current contract, that will also substantially harm WVMI's ability to submit a bid in the upcoming RFP for the next contract with the State of West Virginia. The State's rebid for a new contract may take 3-6 months to complete. Due to KEPRO/APS's aggressive recruiting of WVMI employees and taking of WVMI's services, WVMI will suffer additional loss of financial and staff resources described in paragraphs 14 and 15, which will further harm its ability to submit a bid.

3

17. KEPRO/APS have already prematurely shifted some prior authorization reviews, in-home medical assessments and other services to its own staff, before even the end of the four-month extension WVMI was forced to accept on June 10, 2015.

Further affiant sayeth naught.

David Lambert

STATE OF WEST VIRGINIA,

COUNTY OF Kanawha, TO WIT:

Taken, subscribed, and sworn before me, a Notary Public in and for the County and State

aforesaid, this 25th day of august 2015.

My Commission expires: november 13, 2016

Stacey A. King
Notary Public



State of West Virginia
Office of the Attorney General
Health and Human Resources Division
812 Quarrier St., 2nd Floor
Charleston, WV 25301

Patrick Morrisey
Attorney General

(304) 558-2131
Fax (304) 558-0430

September 11, 2015

***Via Hand Delivery***
Honorable James C. Stucky
Kanawha County Circuit Court Judge
Kanawha Judicial Annex Building
111 Court Street
Charleston, WV 25301

> *Re:*    *West Virginia Medical Institute, Inc.,*
> *v. Innovative Resource Group, LLC, et al.*
> ***Kanawha County Circuit Court, Civil Action No. 15-C-1680***

Dear Judge Stucky:

Enclosed for your review, please find the **DEFENDANT DHHR'S MOTION TO DISMISS** which was filed in the Circuit Court of Kanawha County and served upon counsel of record on this date.

Thank you, in advance, for your consideration of this matter. Should you have questions or concerns, please do not hesitate to contact me.

Respectfully submitted,

*Christopher S. Dodrill*

Christopher S. Dodrill
Deputy Attorney General

CSD/ae
Enclosure(s) as stated.

cc:    Carte P. Goodwin, Esq./James A. Kirby, Esq./Lucas R. White, Esq.
       Webster J. Arceneaux, III
       Kelli D. Talbott, Esq./Greg S. Foster, Esq.



State of West Virginia
Office of the Attorney General
Health and Human Resources Division
812 Quarrier St., 2nd Floor
Charleston, WV 25301

Patrick Morrisey
Attorney General

(304) 558-2131
Fax (304) 558-0430

September 11, 2015

***Via Hand Delivery***
Ms. Cathy S. Gatson
Kanawha County Circuit Clerk
Kanawha Judicial Annex Building
111 Court Street
Charleston, WV 25301

> ***Re:*** ***West Virginia Medical Institute, Inc.,***
> ***v. Innovative Resource Group, LLC, et al.***
> ***Kanawha County Circuit Court, Civil Action No. 15-C-1680***

Dear Ms. Gatson:

Enclosed for filing, please find the **DEFENDANT DHHR'S MOTION TO DISMISS** and **CERTIFICATE OF SERVICE** evidencing service of the same upon counsel of record on this date.

Thank you for your attention to this matter. Should you have questions or concerns, please feel free to contact me.

Respectfully submitted,

*Christopher S. Dodrill*

Christopher S. Dodrill
Deputy Attorney General

CSD/ae
Enclosure(s) as stated.

cc:    Honorable James C. Stucky, Circuit Court Judge
       Carte P. Goodwin, Esq./James A. Kirby, Esq./Lucas R. White, Esq.
       Webster J. Arceneaux, III
       Kelli D. Talbott, Esq./Greg S. Foster, Esq.

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

### WEST VIRGINIA MEDICAL INSTITUTE, INC.,

    *Plaintiff*,

v.

    **Civil Action No.: 15-C-1680**
    **(Judge Stucky)**

**INNOVATIVE RESOURCE GROUP, LLC**
**d/b/a APS HEALTHCARE MIDWEST, a**
**Wisconsin Limited Liability Company,**
**KEPRO ACQUISITIONS, INC., a Pennsylvania**
**Corporation, WEST VIRGINIA**
**DEPARTMENT OF ADMINISTRATION,**
**PURCHASING DIVISION, a West Virginia**
**Agency, WEST VIRGINIA DEPARTMENT OF**
**HEALTH AND HUMAN RESOURCES,**
**a West Virginia Agency,**

    *Defendants*.

### DEFENDANT DHHR'S MOTION TO DISMISS

Defendant West Virginia Department of Health and Human Resources ("DHHR"), by counsel, moves to dismiss the Complaint under West Virginia Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(4), and 12(b)(6), and West Virginia Code §§ 55-17-3(a)(1) and 55-17-4(1). The Complaint must be dismissed against DHHR for four reasons. *First*, the Complaint must be dismissed because service of process was deficient. *Second*, Plaintiff West Virginia Medical Institute ("WVMI") failed to provide statutorily required pre-suit notification to DHHR, a state agency. *Third*, the Complaint fails to allege any wrongdoing by DHHR or assert any claims against DHHR for which relief can be granted. And *fourth*, WVMI has improperly named

DHHR as a direct defendant, rather than naming the responsible state official, thus violating the State's constitutional immunity. These arguments are explained more fully below.

**1.** *WVMI failed to properly serve DHHR in accordance with West Virginia Code § 55-17-4(1).* The Summons issued to DHHR in this case is defective, rendering service of process deficient. West Virginia Rule of Civil Procedure 4(a) requires that for service to be effective, a summons must "state the time within which the defendant must appear and defend[.]" An unlawful return date renders a summons void and requires that the summons be quashed. Syl. Pt. 1, *Fisher, Sons & Co. v. Crowley*, 57 W. Va. 312, 50 S.E. 422 (1905). WVMI's Summons upon DHHR fails to comply with this rule. The Summons instructs DHHR, "You are required to serve your answer within 20 days after service of this summons upon you, exclusive of the day of service." Summons to Karen L. Bowling. But DHHR is a government agency, and West Virginia Code § 55-17-4(1) provides that "[a] government agency shall be allowed sixty days to serve an answer to a complaint or petition for which a summons has been issued and served upon a government agency." Accordingly, WVMI's Summons upon DHHR is deficient, service of the Complaint was invalid, and this action must be dismissed against DHHR under West Virginia Rule of Civil Procedure 12(b)(4).

**2.** *WVMI failed to provide DHHR with pre-suit notification.* The Complaint against DHHR is statutorily barred because WVMI failed to provide proper pre-suit notification. West Virginia Code § 55-17-3(a)(1) requires that state entities be provided with 30 days' notice prior to the initiation of a civil action against them. Notice must be provided to the state agency itself, as well as the Attorney General. This requirement can be excused only upon a finding complying with the required notice would irreparably harm the plaintiff. Pre-suit notification is a jurisdictional pre-requisite to a civil action against a state agency. Syl. Pt. 3, *Motto v. CSX*

2

*Transp., Inc.*, 220 W. Va. 412, 647 S.E.2d 848 (2007). WVMI did not provide pre-suit notification to DHHR or the Attorney General thirty days before filing this action, as required by § 55-17-3, nor has WVMI shown that irreparable harm would have occurred had it followed the statutory mandate. Accordingly, this Court lacks jurisdiction to hear any claim against DHHR in this action, and DHHR must be dismissed as a defendant under West Virginia Rules of Civil Procedure 12(b)(1) and 12(b)(2).

**3.** ***The Complaint fails to state a claim for which relief can be granted against DHHR.*** West Virginia Rule of Civil Procedure 12(b)(6) requires that a Complaint be dismissed if it fails to allege sufficient facts to state a claim for which relief can be granted against a particular defendant. Dismissal is required here, as "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Ewing v. Board of Educ. of County of Summers*, 202 W. Va. 228, 235, 503 S.E.2d 541, 548 (1998) (internal quotations omitted). This is a dispute between two companies who maintain a prime contractor and subcontractor relationship with one another. Any grievance that WVMI has with Defendants APS Healthcare Midwest or KEPRO Acquisitions, or any former employee, is between WVMI and those Defendants. So long as West Virginia Medicaid services are not interrupted, DHHR has no interest at stake in this litigation.

Dismissal is required because the Complaint neither alleges wrongdoing by DHHR nor seeks any relief from the agency. The Complaint lodges ten claims. Counts One through Five— claims of antitrust violations, breach of contract, breach of good faith and fair dealing, and tortious interference of contract—are directed solely at Defendants APS and KEPRO, either individually or collectively. Compl. pp. 13-20. And in Counts Seven through Ten, WVMI alleges computer crimes, trade secret violations, conversion, and breach of contract against two

3

of its former employees. *Id.* at pp. 23-26. Of the Complaint's ten counts, only Count Six names DHHR as one of its targets for declaratory relief, but the allegations and relief sought in that claim are again aimed at APS and KEPRO only. *Id.* at pp. 20-22. In fact, the only indication that WVMI is seeking any relief from DHHR at all is in two footnotes. Footnote One states that WVMI is seeking "injunctive relief" from the state agency defendants (although WVMI asks for no injunctive relief against the agency), and Footnote Two acknowledges that DHHR is named only because it is a party to the contract at issue and would purportedly be affected by any declaratory judgment entered (it would not). These are hardly sufficient allegations to withstand dismissal. To be clear, DHHR has no interest in this case, as it will not be affected by the relief sought by WVMI. Indeed, even if complete relief were warranted in favor of WVMI on all ten counts, DHHR would not be compelled to take any action under the relief sought in the Complaint, nor would its interests be affected. Accordingly, the Complaint must be dismissed under Rule 12(b)(6).

**4.    *WVMI has improperly sued a state entity directly rather than naming the responsible state official.*** The Complaint against DHHR is also barred because the State has been sued in violation of the state constitution. The West Virginia Constitution provides, "The State of West Virginia shall never be made a defendant in any court of law or equity[.]" W. Va. Const. art. VI, § 35. A plaintiff seeking injunctive relief against a state entity—something WVMI is purporting to do—cannot sue the State directly, but rather must name the State officials charged with administering the program at issue. *See Univ. of W. Va. Bd. of Trustees ex rel. W. Va. Univ. v. Graf*, 205 W. Va. 118, 122-23, 516 S.E.2d 741, 745-46 (1998) (collecting cases that identify exceptions to sovereign immunity); *see also Ex Parte Young*, 209 U.S. 123 (1908) (holding that the Eleventh Amendment does not preclude suits against state officers for

injunctive relief). WVMI has sued DHHR directly, rather than suing the state official charged with administering the program involved. The action against DHHR thus violates the State's sovereign immunity, and DHHR must be dismissed as a defendant under West Virginia Rule of Civil Procedure 12(b)(2).

## CONCLUSION

The Complaint must be dismissed as to Defendant DHHR.

Respectfully submitted,

WEST VIRGINIA DEPARTMENT OF HEALTH
AND HUMAN RESOURCES,
*Defendant*,

By counsel,

PATRICK MORRISEY
ATTORNEY GENERAL

*Christopher S. Dodrill*

Christopher S. Dodrill (11040)
*Deputy Attorney General*
812 Quarrier St., 2nd Floor
Charleston, WV 25301
Phone: (304) 558-2131
Fax:    (304) 558-0430
Christopher.S.Dodrill@wvago.gov
*Counsel for West Virginia Department of*
*Health and Human Resources*

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

### WEST VIRGINIA MEDICAL INSTITUTE, INC.,

*Plaintiff*,

v.

Civil Action No.: 15-C-1680
(Judge Stucky)

INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
a West Virginia Agency,

*Defendants*.

## CERTIFICATE OF SERVICE

I, Christopher S. Dodrill, Deputy Attorney General and counsel for Respondents West

Virginia Department of Health and Human Resources do hereby certify that on September 11,

2015, I caused a true copy of the foregoing **DEFENDANT DHHR'S MOTION TO DISMISS**

to be served on counsel of record by Hand Delivery and/or U.S. Regular mail as follows:

Carte P. Goodwin, Esquire
James A. Kirby, III, Esquire
Lucas R. White, Esquire
Goodwin & Goodwin, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301

Webster J. Arceneaux, III, Esquire
Lewis Glasser Casey & Rollins PLLC
BB&T Square
300 Summers Street, Suite 700
Charleston, WV 25301

Kelli D. Talbott, Esquire
Senior Deputy Attorney General
Greg S. Foster, Esquire
Assistant Attorney General
State of West Virginia Office of the Attorney General
812 Quarrier St., 2nd Floor
Charleston, WV 25301

Christopher S. Dodrill



State of West Virginia
Office of the Attorney General
812 Quarrier Street, 2nd Floor
Charleston, WV 25301

Patrick Morrisey
Attorney General

(304) 558-8989
Fax (304) 558-4509

September 11, 2015

The Honorable Cathy Gatson
Kanawha County Circuit Clerk
111 Court Street, Judicial Annex
Charleston, WV 25301

      Re:    *West Virginia Medical Institute, Inc. v. Innovative Resource Group, LLL d/b/a*
            *APS Healthcare Midwest, et al.*, Civil Action No. 15-C-1680 (Stucky)

Dear Ms. Gatson:

      Enclosed please find a **Motion to Quash and Motion to Dismiss on Behalf of the West Virginia Department of Administration, Purchasing Division** to be filed in the above-referenced civil action.

      Thank you for your attention to this matter.

Very truly yours,

Kelli D. Talbott
Senior Deputy Attorney General

Enclosure
cc:    The Honorable James Stucky

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

WEST VIRGINIA MEDICAL INSTITUTE, INC.,

      Plaintiff,

v.                                        Civil Action No.: 15-C-1680
                                           (Judge Stucky)

INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company;
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation; WEST VIRGINIA DEPARTMENT
OF ADMINISTRATION, PURCHASING DIVISION
a West Virginia Agency; WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, a West Virginia Agency, ANGELA
HOBBS, an individual, and KRISTIN TAYLOR,
an individual,

      Defendants.

## MOTION TO QUASH AND MOTION TO DISMISS ON BEHALF OF THE
## WEST VIRGINIA DEPARTMENT OF ADMINISTRATION,
## PURCHASING DIVISION

Comes now the West Virginia Department of Administration, Purchasing Division

("Purchasing"), by counsel, Kelli D. Talbott, Senior Deputy Attorney General, and Greg S.

Foster, Assistant Attorney General, and pursuant to West Virginia Rule of Civil Procedure

12(b)(1), 12(b)(2), 12(b)(4) and 12(b)(6); West Virginia Code 55-17-3(a)(1); and, West Virginia

Code 55-17-4(1), moves to dismiss this action on the bases of lack of jurisdiction over the

subject matter; lack of personal jurisdiction over Defendant Purchasing; insufficiency of process;

failure to provide jurisdictional pre-suit notice thirty days prior to implementation; and failure to

assert a claim upon which relief can be granted.

**A.     DEFENDANT  PURCHASING'S  STATUTORY  TIME PERIOD  TO  ANSWER  OR  FILE  A  RESPONSIVE PLEADING  TO  PLAINTIFF'S  "COMPLAINT"  IS  SIXTY DAYS  PURSUANT  TO  WEST  VIRGINIA  CODE  § 55-17-4(1);  THEREFORE,  THE  SUMMONS  ISSUED  IN  THIS MATTER  REQUIRING  THE  DEFENDANT  TO  ANSWER WITHIN  TWENTY  DAYS  IS  CONTRARY  TO  LAW  AND MUST BE QUASHED.**

The Summons served upon Defendant Purchasing in this matter is defective.  The Summons with which Defendant Purchasing was served contained a twenty day return date for an answer to the Complaint.  Pursuant to West Virginia Code § 55-17-4(1), "[a] government agency shall be allowed sixty days to serve an answer to a complaint or petition for which a summons has been issued and served upon a government agency."

Accordingly, the twenty day answer period on the Summons in this matter is contrary to law.  Because the Summons is legally defective, process is insufficient under Rule 12(b)(4). Therefore, this Court must quash the Summons and dismiss this action from the docket of the Court.

**B.     THE   PLAINTIFF   FAILED   TO GIVE DEFENDANT PURCHASING  THIRTY  DAYS  PRE-SUIT  NOTICE REQUIRED  BY  WEST  VIRGINIA  CODE  §  55-17-3(a) WHICH  THE  SUPREME  COURT  HAS  HELD  IS  A JURISDICTIONAL  PRE-REQUISITE  FOR  FILING  AN ACTION AGAINST A STATE AGENCY.**

In *Motto v. CSX Transportation, Inc. and West Virginia Department of Environmental Protection, Office of Abandoned Mine Lands and Reclamation*, 220 W. Va. 412, 647 S.E.2d 848 (2007), the West Virginia Supreme Court held that compliance with the pre-suit notification provisions set forth in West Virginia Code § 55-17-3(a) is a jurisdictional pre-requisite for filing an action against a State agency.

West Virginia Code § 55-17-3(a)(1) provides that notwithstanding any provision of law to the contrary, at least thirty days *prior* to the institution of an action against a government agency, the complaining party must provide the chief officer of the government agency and the Attorney General written notice, by certified mail, return receipt requested, of the alleged claim and the relief desired.

Simply put, the Plaintiff did not provide Defendant Purchasing with the required thirty days notice prior to the institution of this action in the Circuit Court of Kanawha County. In *Motto*, the Supreme Court held that failure to comply with the statutory notice requirements mandates dismissal of a claim and "deprives the circuit court of jurisdiction . . . ." *Id.* at 855. Moreover, the Plaintiff has failed to show how it would be irreparably harmed by delaying institution of this action to provide pre-suit notice to Defendant Purchasing.

Therefore, Plaintiff's claim must be dismissed pursuant to Rule 12(b)(1) and 12(b)(2) because, absent compliance with the statute, this Court has no jurisdiction over Defendant Purchasing or over the claims brought by the Plaintiff.

## C. THE PLAINTIFF FAILS TO STATE A CLAIM AGAINST DEFENDANT PURCHASING.

Defendant Purchasing is not a proper or necessary defendant in this case and should be dismissed. Indeed, the Complaint does not assert any cognizable claim against Purchasing. Obviously, this is a dispute between private parties and Purchasing has no place in it.

Plaintiff has erroneously included Purchasing as a defendant based upon the mistaken belief that Purchasing is a party to the state contract at issue. Plaintiff's only claim against Purchasing is under Count V of the Complaint, wherein Plaintiff seeks Declaratory Relief. In footnote 2 of the Complaint, Plaintiff asserts, albeit mistakenly, that Purchasing is included because it is a "part[y] to the contracts at issue and thus would be affected by the declaration."

3

This is inaccurate. Plaintiff misunderstands Purchasing's role in the state procurement process and erroneously includes Purchasing as a defendant.

Purchasing is not a party to the contract at issue in this case. The parties to the contract are Innovative Resource Group, LLC, d/b/a APS Healthcare Midwest ("APS") and the West Virginia Department of Health and Human Resources ("DHHR"). Purchasing merely acts as the vehicle for state agencies, such as DHHR to solicit bids and procure contracts through the competitive bidding process. The state agency soliciting the bid enters into a contract with the successful bidder, known as the "vendor", via a purchase order. Purchasing is not a party to the purchase order between the contracting state agency and the vendor. Here, the contracting state agency was DHHR and the vendor was APS. Such is clearly and unequivocally set forth in the purchase order:

> **THE VENDOR, INNOVATIVE RESOURCE GROUP LLC, D/B/A APS HEATHCARE MIDWEST, AGREES TO ENTER WITH THE AGENCY, WV DEPARTMENT OF HEALTH AND HUMAN RESOURCES, INTO A CONTRACT** TO PROVIDE UTILIZATION MANAGEMENT/AUTHORIZATION SERVICES FOR BUREAU FOR MEDICAL SERVICES, BUREAU FOR CHILDREN AND FAMILIES, AND BUREAU FOR BEHAVIORAL AND HEALTH CARE FACILITIES FOR THE STATE OF WEST VIRGINIA PER THE SPECIFICATIONS, TERMS & CONDITIONS, BID REQUIREMENTS...

(See Purchase Order No. BMX90007, attached hereto as Exhibit A.)

Accordingly, Purchasing is not a contracting party and its inclusion in this case is unnecessary. Moreover, there is no allegation that Purchasing acted improperly and Counts I-IV are not asserted against Purchasing. Also, Purchasing is not a necessary defendant for purposes of granting declaratory relief under West Virginia Code § 55-13-11 because Purchasing is not an interested party and will not be affected by any declaratory relief granted by this Court. Purchasing's irrelevance is this case is further evidenced by its omission from Plaintiff's Motion

4

for Preliminary Injunction and Temporary Restraining Order. Indeed, the Plaintiff does not seek to preliminarily enjoin or temporarily restrain Purchasing from doing anything.

Ultimately, Plaintiff has no claim against Purchasing and Purchasing has no interest in the outcome of any declaratory ruling by this Court. Purchasing solicited the bid and procured the contract on behalf of DHHR, but its role is limited to that procurement process. Purchasing should not have to incur unnecessary legal costs and expenses as a defendant in this case.

## CONCLUSION

Accordingly, for the foregoing reasons, Defendant Purchasing respectfully requests that the Summons in this matter be quashed and that it be dismissed as a defendant.

Respectfully Submitted,

WEST VIRGINIA DEPARTMENT OF
ADMINISTRATION; PURCHASING DIVISION,

By Counsel

PATRICK MORRISEY
ATTORNEY GENERAL

KELLI D. TALBOTT (WVSB #4995)
SENIOR DEPUTY ATTORNEY GENERAL
GREG S. FOSTER (WVSB #10614)
ASSISTANT ATTORNEY GENERAL
812 Quarrier Street, 2nd Floor
Charleston, WV 25301
Telephone: (304) 558-8989
Facsimile: (304) 558-4509
Kelli.D.Talbott@wvago.gov
Greg.S.Foster@wvago.gov

5



**Purchase Order**

State of West Virginia
Department of Administration
Purchasing Division
2019 Washington Street East
Post Office Box 50130
Charleston, WV 25305-0130

| PURCHASE ORDER NO. | PAGE |
|---|---|
| BMS90007 | 1 |

| BLANKET RELEASE |
|---|

CORRECT PURCHASE ORDER NUMBER MUST APPEAR ON ALL PACKAGES, INVOICES AND SHIPPING PAPERS. QUESTIONS CONCERNING THIS PURCHASE ORDER SHOULD BE DIRECTED TO THE BUYER AS NOTED BELOW

INVOICE TO:
HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES

350 CAPITOL STREET, ROOM 251
CHARLESTON, WV
25301-3709

| CHANGE ORDER |
|---|

**10**

SEE REVERSE SIDE FOR TERMS AND CONDITIONS

VENDOR:
*323140235      800-305-3720
INNOVATIVE RESOURCE GROUP LLC
44 SOUTH BROADWAY STE 1200

WHITE PLAINS NY  10601

FILE LOCATION _15110_

SHIP TO:
HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES
ROOM 251
350 CAPITOL STREET
CHARLESTON, WV
25301-3709      304-558-1737

| DATE PRINTED | TERMS OF SALE | FEIN/SSN | FUND |
|---|---|---|---|
| 11/25/2009 | NET 30 | 392013972 | FIMS |
| SHIP VIA | F.O.B | FREIGHT TERMS | ACCOUNT NUMBER |
| BEST WAY | DESTINATION | PREPAID | P18664   - - |

| LINE | QUANTITY | UOP | VENDOR ITEM NO. | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | DELIVERY DATE | CAT NO. | ITEM NUMBER | | |

Purchasing Division's File **Copy**

DHHR

THE VENDOR, INNOVATIVE RESOURCE GROUP LLC, D/B/A
APS HEALTHCARE MIDWEST, AGREES TO ENTER WITH THE
AGENCY, WV DEPARTMENT OF HEALTH AND HUMAN RESOURCES,
INTO A CONTRACT TO PROVIDE UTILIZATION MANAGEMENT/
AUTHORIZATION SERVICES FOR BUREAU FOR MEDICAL SERVICES,
BUREAU FOR CHILDREN AND FAMILIES, AND BUREAU FOR
BEHAVIORAL HEALTH AND HEALTH CARE FACILITIES FOR THE
STATE OF WEST VIRGINIA PER THE SPECIFICATIONS, TERMS &
CONDITIONS, BID REQUIREMENTS, ADDENDUM NO. 1 DATED
2/5/2009, ADDENDUM NO. 2 DATED 2/13/2009, ADDENDUM
NO. 3 DATED 3/6/2009, ADDENDUM NO. 4 DATED 3/23/2009,
ADDENDUM NO. 5 DATED 4/7/2009, ADDENDUM NO. 6 DATED
5/5/2009, ADDENDUM NO. 7 DATED 5/10/2009, ADDENDUM NO.
8 DATED 5/15/2009, ADDENDUM NO. 9 DATED 5/29/2009 AND
THE VENDOR'S PROPOSAL DATED 6/10/2009 INCORPORATED
HEREIN BY REFERENCE AND MADE A PART OF HEREOF.

PURCHASING DIVISION
CERTIFIED ENCUMBERED

DEC 11 2009

ENTERED

**EXHIBIT**
A

APPROVED FOR
ONE FISCAL YEAR
APPROVAL AS TO FORM IS REQUIRED BY ATTORNEY GENERAL, CHECK HERE ☑

APPROVED AS TO FORM BY

16,897,006.00
TOTAL

BY   ROBERTA WAGNER   304-558-

PURCHASING DIVISION AUTHORIZED SIGNATURE

## GENERAL TERMS & CONDITIONS
## PURCHASE ORDER/CONTRACT

1. **ACCEPTANCE:** Seller shall be bound by this order and its terms and conditions upon receipt of this order

2. **APPLICABLE LAW:** The laws of the State of West Virginia and the *Legislative Rules* of the Purchasing Division shall govern all rights and duties under the Contract, including without limitation the validity of this Purchase Order/Contract.

3. **NON-FUNDING:** All services performed or goods delivered under State Purchase Orders/Contracts are to be continued to the terms of the Purchase Order/Contract, contingent upon funds being appropriated by the Legislature or otherwise being made available. In the event funds are not appropriated or otherwise available for these services or goods, this Purchase Order/Contract becomes void and of no effect after June 30.

4. **COMPLIANCE:** Seller shall comply with all Federal, State and local laws, regulations and ordinances including, but not limited to, the prevailing wage rates of the WV Division of Labor.

5. **MODIFICATIONS:** This writing is the parties final expression of intent. No modification of this order shall be binding unless agreed to in writing by the Buyer.

6. **ASSIGNMENT:** Neither this Order nor any monies due, or to become due hereunder may be assigned by the Seller without the Buyer's consent.

7. **WARRANTY:** The Seller expressly warrants that the goods and/or services covered by this order will: (a) conform to the specifications, drawings, samples or other description furnished or specified by the Buyer; (b) be merchantable and fit for the purpose intended; and/or (c) be free from defect in material and workmanship

8. **CANCELLATION:** The Director of Purchasing may cancel any Purchase Order/Contract upon 30 days written notice to the seller.

9. **SHIPPING, BILLING & PRICES:** Prices are those stated in this order. No price increase will be accepted without written authority from the Buyer. All goods or services shall be shipped on or before the date specified in this Order.

10. **LATE PAYMENTS:** Payments may only be made after the delivery of goods or services. Interest may be paid on late payments in accordance with the *West Virginia Code.*

11. **TAXES:** The State of West Virginia is exempt from Federal and State taxes and will not pay or reimburse such taxes.

12. **RENEWAL:** Any reference to automatic renewal is hereby deleted. The Contract may be renewed only upon mutual written agreement of the parties

13. **BANKRUPTCY:** In the event the vendor/contractor files for bankruptcy protection, the State may deem this contract null and void, and terminate such contract without further order.

14. **HIPAA BUSINESS ASSOCIATE ADDENDUM:** The West Virginia State Government HIPAA Business Associate Addendum (BAA), approved by the Attorney General, and available online at the Purchasing Division's web site (http://www.state.wv.us/admin/purchase/vrc/hipaa.htm) is hereby made part of the agreement. Provided that, the Agency meets the definition of a Cover Entity (45 CFR §160.103) and will be disclosing Protected Health Information (45 CFR §160.103) to the vendor.

15. **WEST VIRGINIA ALCOHOL & DRUG-FREE WORKPLACE ACT:** If this Contract constitutes a public improvement construction contract as set forth in Article 1D, Chapter 21 of the West Virginia Code ("The West Virginia Alcohol and Drug-Free Workplace Act"), then the following language shall hereby become part of this Contract: "The contractor and its subcontractors shall implement and maintain a written drug-free workplace policy in compliance with the West Virginia Alcohol and Drug-Free Workplace Act, as set forth in Article 1D, Chapter 21 of the West Virginia Code. The contractor and its subcontractors shall provide a sworn statement in writing, under the penalties of perjury, that they maintain a valid drug-free work place policy in compliance with the West Virginia and Drug-Free Workplace Act. It is understood and agreed that this Contract shall be cancelled by the awarding authority if the Contractor 1) Fails to implement its drug-free workplace policy; 2) Fails to provide information regarding implementation of the contractor's drug-free workplace policy at the request of the public authority; or 3) Provides to the public authority false information regarding the contractor's drug-free workplace policy."

# Purchase Order



State of West Virginia
Department of Administration
Purchasing Division
2019 Washington Street East
Post Office Box 50130
Charleston, WV 25305-0130

| PURCHASE ORDER NO. | PAGE |
|---|---|
| BMS90007 | 2 |

BLANKET RELEASE

CHANGE ORDER

CORRECT PURCHASE ORDER NUMBER MUST APPEAR ON ALL PACKAGES, INVOICES, AND SHIPPING PAPERS QUESTIONS CONCERNING THIS PURCHASE ORDER SHOULD BE DIRECTED TO THE BUYER AS NOTED BELOW.

**SEE REVERSE SIDE FOR TERMS AND CONDITIONS**

I
N
V
O
I
C
E
T
O

HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES

350 CAPITOL STREET, ROOM 251
CHARLESTON, WV
25301-3709

V
E
N
D
O
R

*323140235    800-305-3720
INNOVATIVE RESOURCE GROUP LLC
44 SOUTH BROADWAY STE 1200

WHITE PLAINS NY  10601

S
H
I
P
T
O

HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES
ROOM 251
350 CAPITOL STREET
CHARLESTON, WV
25301-3709    304-558-1737

| DATE PRINTED | | TERMS OF SALE | | FEIN/SSN | FUND |
|---|---|---|---|---|---|
| 11/25/2009 | | NET 30 | | 392013972 | FIMS |
| SHIP VIA | | F.O.B. | | FREIGHT TERMS | ACCOUNT NUMBER |
| BEST WAY | | DESTINATION | | PREPAID   P18664 | -- |

| LINE | QUANTITY DELIVERY DATE | UOP CAT NO. | VENDOR ITEM NO. ITEM NUMBER | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | 1 12/01/2009 | YR | 961-20 | 16897006.00000 | 16,897,006.00 |

MEDICAL NECESSITY AND UTILIZATION MANAGEMENT SERVICE


EXHIBIT 3

LIFE OF CONTRACT:   THIS CONTRACT BECOMES EFFECTIVE ON
12/1/2009    AND EXTENDS FOR A PERIOD OF ONE (1)
YEAR OR UNTIL SUCH "REASONABLE TIME" THEREAFTER AS IS
NECESSARY TO OBTAIN A NEW CONTRACT OR RENEW THE
ORIGINAL CONTRACT.  THE "REASONABLE TIME" PERIOD SHALL
NOT EXCEED TWELVE (12) MONTHS.  DURING THIS "REASONABLE
TIME" THE VENDOR MAY TERMINATE THIS CONTRACT FOR ANY
REASON UPON GIVING THE DIRECTOR OF PURCHASING 30 DAYS
WRITTEN NOTICE.

UNLESS SPECIFIC PROVISIONS ARE STIPULATED ELSEWHERE
IN THIS CONTRACT DOCUMENT, THE TERMS, CONDITIONS AND
PRICING SET HEREIN ARE FIRM FOR THE LIFE OF THE
CONTRACT.

RENEWAL: THIS CONTRACT MAY BE RENEWED UPON THE MUTUAL
WRITTEN CONSENT OF THE SPENDING UNIT AND VENDOR,
SUBMITTED TO THE DIRECTOR OF PURCHASING THIRTY (30)

APPROVAL AS TO FORM IS REQUIRED BY ATTORNEY GENERAL, CHECK HERE ☐

| | TOTAL | |
|---|---|---|

APPROVED AS TO FORM BY

BY_____
PURCHASING DIVISION AUTHORIZED SIGNATURE

# Purchase Order



State of West Virginia
Department of Administration
Purchasing Division
2019 Washington Street East
Post Office Box 50130
Charleston, WV 25305-0130

| PURCHASE ORDER NO. | PAGE |
|---|---|
| BMS90007 | 3 |

BLANKET RELEASE

CORRECT PURCHASE ORDER NUMBER MUST APPEAR ON ALL PACKAGES, INVOICES, AND SHIPPING PAPERS. QUESTIONS CONCERNING THIS PURCHASE ORDER SHOULD BE DIRECTED TO THE BUYER AS NOTED BELOW

INVOICE TO:
HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES

350 CAPITOL STREET, ROOM 251
CHARLESTON, WV
25301-3709

CHANGE ORDER

SEE REVERSE SIDE FOR
TERMS AND CONDITIONS

VENDOR:
*323140235    800-305-3720
INNOVATIVE RESOURCE GROUP LLC
44 SOUTH BROADWAY STE 1200

WHITE PLAINS NY  10601

SHIP TO:
HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES
ROOM 251
350 CAPITOL STREET
CHARLESTON, WV
25301-3709    304-558-1737

| DATE PRINTED | TERMS OF SALE | FEIN/SSN | FUND |
|---|---|---|---|
| 11/25/2009 | NET 30 | 392013972 | FIMS |
| SHIP VIA | F.O.B. | FREIGHT TERMS | ACCOUNT NUMBER |
| BEST WAY | DESTINATION | PREPAID | P18664 -- |

| LINE | QUANTITY UOP / DELIVERY DATE CAT NO. | VENDOR ITEM NO. / ITEM NUMBER | UNIT PRICE | AMOUNT |
|---|---|---|---|---|

DAYS PRIOR TO THE EXPIRATION DATE. SUCH RENEWAL SHALL
BE IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE
ORIGINAL CONTRACT AND SHALL BE LIMITED TO FOUR(4) ONE
(1) YEAR PERIODS.

CANCELLATION: THE DIRECTOR OF PURCHASING RESERVES THE
RIGHT TO CANCEL THIS CONTRACT IMMEDIATELY UPON WRITTEN
NOTICE TO THE VENDOR IF THE COMMODITIES AND/OR SERVICES
SUPPLIED ARE OF AN INFERIOR QUALITY OR DO NOT CONFORM
TO THE SPECIFICATIONS OF THE BID AND CONTRACT HEREIN.

OPEN MARKET CLAUSE: THE DIRECTOR OF PURCHASING MAY
AUTHORIZE A SPENDING UNIT TO PURCHASE ON THE OPEN
MARKET, WITHOUT THE FILING OF A REQUISITION OR COST
ESTIMATE, ITEMS SPECIFIED ON THIS CONTRACT FOR
IMMEDIATE DELIVERY IN EMERGENCIES DUE TO UNFORESEEN
CAUSES (INCLUDING BUT NOT LIMITED TO DELAYS IN TRANS-
PORTATION OR AN UNANTICIPATED INCREASE IN THE VOLUME
OF WORK.)

BANKRUPTCY: IN THE EVENT THE VENDOR/CONTRACTOR FILES
FOR BANKRUPTCY PROTECTION, THIS CONTRACT IS AUTOMATI-
CALLY NULL AND VOID, AND IS TERMINATED WITHOUT FURTHER
ORDER.

THE TERMS AND CONDITIONS CONTAINED IN THIS CONTRACT
SHALL SUPERSEDE ANY AND ALL SUBSEQUENT TERMS AND

APPROVAL AS TO FORM IS REQUIRED BY ATTORNEY GENERAL, CHECK HERE ☐

TOTAL

APPROVED AS TO FORM BY

BY_____
PURCHASING DIVISION AUTHORIZED SIGNATURE

# Purchase Order



State of West Virginia
Department of Administration
Purchasing Division
2019 Washington Street East
Post Office Box 50130
Charleston, WV 25305-0130

| PURCHASE ORDER NO. | PAGE |
|---|---|
| BMS90007 | 4 |

BLANKET RELEASE

CHANGE ORDER

CORRECT PURCHASE ORDER NUMBER
MUST APPEAR ON ALL PACKAGES,
INVOICES, AND SHIPPING PAPERS.
QUESTIONS CONCERNING THIS PUR-
CHASE ORDER SHOULD BE DIRECTED
TO THE BUYER AS NOTED BELOW

SEE REVERSE SIDE FOR
TERMS AND CONDITIONS

**INVOICE TO:**
HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES

350 CAPITOL STREET, ROOM 251
CHARLESTON, WV
                    25301-3709

**VENDOR:**
*323140235        800-305-3720
INNOVATIVE RESOURCE GROUP LLC
44 SOUTH BROADWAY STE 1200

WHITE PLAINS NY  10601

**SHIP TO:**
HEALTH AND HUMAN RESOURCES
BUREAU FOR MEDICAL SERVICES
ROOM 251
350 CAPITOL STREET
CHARLESTON, WV
          25301-3709    304-558-1737

| DATE PRINTED | TERMS OF SALE | | FEIN/SSN | | FUND |
|---|---|---|---|---|---|
| 11/25/2009 | NET 30 | | 392013972 | | FIMS |
| SHIP VIA | | F.O.B | | FREIGHT TERMS | ACCOUNT NUMBER |
| BEST WAY | DESTINATION | | PREPAID | P18664 | -- |

| LINE | QUANTITY | UOP | VENDOR ITEM NO | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | DELIVERY DATE | CAT.NO | ITEM NUMBER | | |

CONDITIONS WHICH MAY APPEAR ON ANY ATTACHED PRINTED
DOCUMENTS SUCH AS PRICE LISTS, ORDER FORMS, SALES
AGREEMENTS OR MAINTENANCE AGREEMENTS, INCLUDING ANY
ELECTRONIC MEDIUM SUCH AS CD-ROM.

REV. 05/26/2009

APPROVAL AS TO FORM IS REQUIRED BY ATTORNEY GENERAL, CHECK HERE ☐

| | TOTAL |
|---|---|

APPROVED AS TO FORM BY

BY_____
PURCHASING DIVISION AUTHORIZED SIGNATURE

BMS90007 Utilization/Prior Authorization

**4.5 Cost Proposal Format/Bid Sheets**

————— 0 **5** ———

## TOTAL ALL INCLUSIVE ANNUAL FEE FOR ALL BUREAUS

|  |  |  |
|---|---|---|
| Year 1 | | 9,874,150 |
| Year 2 | | 9,972,892 |
| Year 3 | | 10,072,621 |
| Year 4 | | 10,173,347 |
| Year 5 | | 10,275,080 |
| **Grand Total** | **$** | **50,368,089** |
| **Grand Total With Optional Services** | **$** | **87,093,219** |

## TOTAL ALL INCLUSIVE ANNUAL FEE FOR OPTIONAL SERVICES

| AGED AND DISABLED WAIVER.............. | Year 1 | 3,160,509 |
|---|---|---|
| (BMS Option) | Year 2 | 3,192,114 |
| | Year 3 | 3,224,035 |
| | Year 4 | 3,256,275 |
| | Year 5 | 3,288,838 |
| | | |
| MR/DD WAIVER..................................... | Year 1 | 3,085,544 |
| (BMS Option) | Year 2 | 3,243,542 |
| | Year 3 | 3,403,120 |
| | Year 4 | 3,437,152 |
| | Year 5 | 3,471,523 |
| | | |
| VISION.................................................. | Year 1 | 65,274 |
| (BMS Option) | Year 2 | 65,927 |
| | Year 3 | 66,586 |
| | Year 4 | 67,252 |
| | Year 5 | 67,924 |

BMS90007 Utilization/Prior Authorization                    ≡≡ 0 6

## 4.5 Cost Proposal Format/Bid Sheets

| LABORATORY........................................... | Year 1 | 20,662 |
|---|---|---|
| (BMS Option) | Year 2 | 20,869 |
| | Year 3 | 21,078 |
| | Year 4 | 21,288 |
| | Year 5 | 21,501 |

| NURSING FACILITY...................................... | Year 1 | 357,460 |
|---|---|---|
| (BMS Option) | Year 2 | 361,034 |
| | Year 3 | 364,645 |
| | Year 4 | 368,291 |
| | Year 5 | 371,974 |

| Other Public Payers PEIA and SCHIP..... | Year 1 | n/a - per Q&A question 16 |
|---|---|---|
| (BMS Option) | Year 2 | n/a - per Q&A question 16 |
| | Year 3 | n/a - per Q&A question 16 |
| | Year 4 | n/a - per Q&A question 16 |
| | Year 5 | n/a - per Q&A question 16 |

| Other Socially Necessary Services........ | Year 1 | 333,407 |
|---|---|---|
| (BCF Options) | Year 2 | 336,741 |
| | Year 3 | 340,109 |
| | Year 4 | 343,510 |
| | Year 5 | 346,945 |

Innovative Resource Group LLC d/b/a APS Healthcare Midwest (APS)

Bidder

_J.K. Milonoy_

Signature

_6/4/09_

Date

Note:

Given the economic pressures that the state is currently experiencing, APS has chosen to limit
the annual price escalation rate to one percent (as reflected in the numbers above).

## APS HEALTHCARE COST PROPOSAL/BID SHEETS
### Bureau for Medical Services
### Behavioral Health Services

| A&D Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Existing Scope of Work MANDATORY** | | | | | | |
| BH OP UM Services Review - TCM, Clinic, Rehab, Psychologist, Psychiatrist, LBHC Specialty BH OP Retro Review TCM, Clinic, Rehab, Psychologist, Psychiatrist, LBHC Specialty, SNS | | | | | | |
| Peer Review/Physician Consulting | | | | | | |
| Training/Technical Assistance | | | | | | |
| Medical Claims Analysis | | | | | | |
| Data Analysis and Reporting | | | | | | |
| QI | | | | | | |
| Consumer & Community Affairs | | | | | | |
| BH Inpatient UM Services Review - Adult, Psych <21, PRTF, Partial Psych * | | | | | | |
| BH PRTF Retro Review * | | | | | | |
| Total Existing Scope | $ 3,622,604 | $ 3,658,830 | $ 3,695,418 | $ 3,732,372 | $ 3,769,696 | $ 18,478,920 |
| **New Scope of Work MANDATORY** | | | | | | |
| Eligibility Verification | | | | | | |
| Total New Scope | $ 343,828 | $ 347,264 | $ 350,737 | $ 354,244 | $ 357,786 | $ 1,753,857 |

| Cost Breakout for New Scope of Work | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| Development/Start Up ** | $ 9,540 | $ 9,635 | $ 9,732 | $ 9,829 | $ 9,927 | $ 48,664 |
| Staff and Related Expenses | $ 334,286 | $ 337,629 | $ 341,005 | $ 344,415 | $ 347,858 | $ 1,705,193 |
| Operations | $ - | $ - | $ - | $ - | $ - | $ - |
| New Scope Cost | $ 343,826 | $ 347,264 | $ 350,737 | $ 354,244 | $ 357,786 | $ 1,753,857 |
| Existing Scope of Work Cost | $ 3,622,604 | $ 3,658,830 | $ 3,695,418 | $ 3,732,372 | $ 3,769,696 | $ 18,478,920 |

| Grand Total - Existing Scope + New Scope | $ 3,966,438 | $ 4,006,094 | $ 4,046,155 | $ 4,086,616 | $ 4,127,483 | $ 20,232,777 |

Notes:
* Represents scope of work transitioning from WVMI to APS
** Represents costs associated with implementation of new scope and/or expansion of existing scope
These costs are spread over the five year term with the intention of addressing state economic pressures

BMS90007 Utilization/Prior Authorization

4.5 Cost Proposal Format/Bid Sheets

≈ 08

### APS HEALTHCARE COST PROPOSAL/BID SHEETS
### Bureau for Medical Services
### Utilization Management Medical Services

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Existing Scope of Work MANDATORY** | | | | | | |
| ASO Activity for general and acute inpatients, other specialty, rehab, dental and long term care. | | | | | | |
| Total Existing Scope | $ 4,192,724 | $ 4,234,652 | $ 4,276,998 | $ 4,319,768 | $ 4,362,966 | $ 21,387,108 |
| **New Scope of Work MANDATORY** | | | | | | |
| Dental (increase to existing) | | | | | | |
| Podiatry | | | | | | |
| Cardiac Rehabilitation | | | | | | |
| Pulmonary Rehabilitation | | | | | | |
| Home Health | | | | | | |
| Hospice | | | | | | |
| Personal Care | | | | | | |
| Total New Scope | $ 613,792 | $ 619,930 | $ 626,129 | $ 632,391 | $ 638,715 | $ 3,130,957 |

| Cost Breakout for New Scope of Work | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| Development/Start Up * | $ - | $ - | $ - | $ - | $ - | $ - |
| Staff and Related Expenses | $ - | $ - | $ - | $ - | $ - | $ - |
| Operations | $ 613,792 | $ 619,930 | $ 626,129 | $ 632,391 | $ 638,715 | $ 3,130,957 |
| New Scope Cost | $ 613,792 | $ 619,930 | $ 626,129 | $ 632,391 | $ 638,715 | $ 3,130,957 |
| Total Existing Scope Cost | $ 4,192,724 | $ 4,234,652 | $ 4,276,998 | $ 4,319,768 | $ 4,362,966 | $ 21,387,108 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Grand Total - Existing Scope + New Scope** | $ 4,806,517 | $ 4,854,582 | $ 4,903,128 | $ 4,952,159 | $ 5,001,681 | $ 24,518,068 |

Notes:
* Represents costs associated with implementation of new scope and/or expansion of existing scope.
These costs are spread over the five year term with the intention of addressing state economic pressures

BMS90007 Utilization/Prior Authorization

**4.5 Cost Proposal Format/Bid Sheets**

09

### APS HEALTHCARE COST PROPOSAL/BID SHEETS
### Bureau For Medical Services
### OPTIONAL SERVICES

**MR/DD WAIVER OPTION**

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Existing Scope of Work Option** | | | | | | |
| Annual education, assessment and budget | | | | | | |
| On-site retrospective review of provider | | | | | | |
| Prior authorization of services | | | | | | |
| Quality Improvement: Provider & Consumer/Family Councils, and QI functions | | | | | | |
| Statistical budget model, claims analysis and data reporting | | | | | | |
| Total Existing Scope w/volume increase | $ 2,451,297 | $ 2,475,810 | $ 2,500,569 | $ 2,525,574 | $ 2,550,830 | $ 12,504,081 |

| New Scope of Work Option | | | | | | |
|---|---|---|---|---|---|---|
| On-site retrospective reviews of provider quality | | | | | | |
| Member Eligibility including management of wait list and appeals | | | | | | |
| CMS QI/QS plan | | | | | | |
| Total New Scope w/volume increases yrs 2 & 3 forward * | $ 634,246 | $ 787,732 | $ 902,552 | $ 911,577 | $ 920,693 | $ 4,136,801 |

| Cost Breakout for New Scope of Work | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| Development/Start Up ** | $ 54,903 | $ 55,452 | $ 56,008 | $ 56,586 | $ 57,132 | $ 280,058 |
| Staff and Related Expenses | $ 397,090 | $ 493,918 | $ 591,714 | $ 597,631 | $ 603,607 | $ 2,683,960 |
| Operations | $ 182,254 | $ 218,363 | $ 254,832 | $ 257,380 | $ 259,954 | $ 1,172,783 |
| New Scope Cost | $ 634,246 | $ 767,732 | $ 902,552 | $ 911,577 | $ 920,693 | $ 4,136,801 |
| Existing Scope Cost | $ 2,451,297 | $ 2,475,810 | $ 2,500,569 | $ 2,525,574 | $ 2,550,830 | $ 12,504,081 |

| Grand Total - Existing + New Scope | $ 3,085,544 | $ 3,243,542 | $ 3,403,120 | $ 3,437,152 | $ 3,471,523 | $ 16,848,881 |

Notes:
* According to Q&A 2, additional SSFs will be added to meet demand of add'l caseloads (1 in yr 2 and 1 in yr 3)
** Represents costs associated with implementation of new scope and/or expansion of existing scope
These costs are spread over the five year term with the intention of addressing state economic pressures.

BMS90007 Utilization/Prior Authorization

4.5 Cost Proposal Format/Bid Sheets

10

## APS HEALTHCARE COST PROPOSAL/BID SHEETS
### Bureau For Medical Services
### OPTIONAL SERVICES CONTINUED

**A&D WAIVER OPTION**

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Existing Scope of Work MANDATORY** | | | | | | |
| Assessments | | | | | | |
| Eligibility determination/referral | | | | | | |
| Coordination with other stakeholders | | | | | | |
| Prior authorizations | | | | | | |
| Total Existing Scope | $ 2,995,953 | $ 3,025,913 | $ 3,056,172 | $ 3,086,734 | $ 3,117,601 | $ 15,282,373 |

| New Scope of Work MANDATORY | | | | | | |
|---|---|---|---|---|---|---|
| Eligibility: Management of wait list and appeal statuses | | | | | | |
| Prior authorization of services | | | | | | |
| Total New Scope | $ 164,555 | $ 166,201 | $ 167,863 | $ 169,541 | $ 171,237 | $ 839,397 |

| Cost Breakout for New Scope of Work | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| Development/Start Up.* | $ 42,493 | $ 42,917 | $ 43,347 | $ 43,780 | $ 44,218 | $ 216,754 |
| Staff and Related Expenses | $ 108,364 | $ 109,468 | $ 110,582 | $ 111,668 | $ 112,785 | $ 552,867 |
| Operations | $ 13,679 | $ 13,816 | $ 13,954 | $ 14,093 | $ 14,234 | $ 69,775 |
| New Scope Cost | $ 164,555 | $ 166,201 | $ 167,863 | $ 169,541 | $ 171,237 | $ 839,397 |
| Existing Scope Cost | $ 2,995,953 | $ 3,025,913 | $ 3,056,172 | $ 3,086,734 | $ 3,117,601 | $ 15,282,373 |

| Grand Total - Existing Scope + New Scope | $ 3,160,509 | $ 3,192,114 | $ 3,224,035 | $ 3,256,275 | $ 3,288,838 | $ 16,121,770 |
|---|---|---|---|---|---|---|

Notes.

* Represents costs associated with implementation of new scope and/or expansion of existing scope.
These costs are spread over the five year term with the intention of addressing state economic pressures.



## APS HEALTHCARE COST PROPOSAL/BID SHEETS
### Bureau For Medical Services
### OPTIONAL SERVICES CONTINUED

**VISION OPTION**

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
| Total Vision | $ 65,274 | $ 65,927 | $ 66,589 | $ 67,252 | $ 67,924 | $ 332,964 |

**LABORATORY OPTION**

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
| Total Lab | $ 20,662 | $ 20,869 | $ 21,078 | $ 21,288 | $ 21,501 | $ 105,399 |

**NURSING FACILITY OPTION**

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| Current Scope | $ 224,785 | $ 227,033 | $ 229,304 | $ 231,597 | $ 233,913 | 1,146,632 |
| New Scope | $ 132,674 | $ 134,001 | $ 135,341 | $ 136,694 | $ 138,061 | 676,772 |
| Total Nursing Facility | $ 357,460 | $ 361,034 | $ 364,645 | $ 368,291 | $ 371,974 | 1,823,403 |

**OTHER PUBLIC PAYERS PEIA AND
SCHIP OPTION**

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| Per Q&A Question #16 - Cost cannot be projected at this time |  |  |  |  |  |  |
| Total Other Public Payers PEIA & SCHIP |  |  |  |  |  |  |

Innovative Resource Group LLC d/b/a APS Healthcare Midwest (APS)
Bidder

Signature

Date  6/4/09

BMS90007 Utilization/Prior Authorization

4.5 Cost Proposal Format/Bid Sheets

≡≡ 12

## APS HEALTHCARE COST PROPOSAL/BID SHEETS
### Bureau for Children and Families

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Existing Scope of Work MANDATORY** | | | | | | |
| SNS UM Consulting and training | | | | | | |
| SNS Prior Authorization | | | | | | |
| SNS Retrospective Quality Reviews w/ financial and credentialing | | | | | | |
| OOS UM consulting and training | | | | | | |
| OOS Prior authorization | | | | | | |
| OOS Retrospective Quality Reviews | | | | | | |
| Quality Improvement Functions | | | | | | |
| Consumer Education | | | | | | |
| Data Analysis | | | | | | |
| **Total Existing Scope** | $ 495.399 | $ 500,353 | $ 505,357 | $ 510,410 | $ 515,514 | $ 2,527,033 |
| **New Scope of Work Option** | | | | | | |
| 20 services added resulting in 5 codes for 8-9 payer groups | | | | | | |
| **Total New Scope** | $ 333 407 | $ 336,741 | $ 340,109 | $ 343,510 | $ 346,945 | $ 1,700,712 |

| Cost Breakout for New Scope of Work | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Totals |
|---|---|---|---|---|---|---|
| Development/Start Up* | $ 80,116 | $ 80,919 | $ 81,728 | $ 82,545 | $ 83,371 | $ 408,680 |
| Staff and Related Expenses | $ 168,813 | $ 170,501 | $ 172,206 | $ 173,928 | $ 175,686 | $ 861,116 |
| Operations | $ 84 477 | $ 85,322 | $ 86,175 | $ 87,036 | $ 87,907 | $ 430,916 |
| New Scope Cost | $ 333 407 | $ 336,741 | $ 340,109 | $ 343,510 | $ 346,945 | $ 1,700,712 |
| Existing Scope Cost | $ 495,399 | $ 500,353 | $ 505,357 | $ 510,410 | $ 515,514 | $ 2,527,033 |

| Grand Total - Existing Scope + New Scope | $ 828,806 | $ 837,094 | $ 845,465 | $ 853,920 | $ 862,458 | $ 4,227,743 |
|---|---|---|---|---|---|---|

Notes:
* Represents costs associated with implementation of new scope and/or expansion of existing scope
These costs are spread over the five year term with the intent of or addressing state economic pressures.

Innovative Resource Group LLC d/b/a APS Healthcare Midwest (APS)
Bidder

Signature

6/4/09
Date

BMS90007 Utilization/Prior Authorization

4.5 Cost Proposal Format/Bid Sheets

13

### APS HEALTHCARE COST PROPOSAL/BID SHEETS
### Bureau for Behavioral Health and Health Facilities

| ASO Program | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Existing Scope of Work MANDATORY** | | | | | | |
| BHHF Specific Data Set Collection | | | | | | |
| Block Grant Reporting | | | | | | |
| Weekly & Monthly Data Submission Reports | | | | | | |
| YSS & YSS-F Survey & Report | | | | | | |
| OBHS Consumer Eligibility Determination | | | | | | |
| APS CareConnection Records Transfer | | | | | | |
| Total Existing Scope of Work plus volume increase | $ 217,247 | $ 219,419 | $ 221,613 | $ 223,829 | $ 226,068 | $ 1,108,176 |
| **New Scope of Work MANDATORY** | | | | | | |
| Eligibility Gatekeeping | | | | | | |
| Service Level Prior Authorizations | | | | | | |
| Training & Technical Assistance | | | | | | |
| Retrospective Reviews | | | | | | |
| Reporting Standard and Ad Hoc | | | | | | |
| BHHF Specific Additional Data Set | | | | | | |
| Total New Scope | $ 388,558 | $ 392,444 | $ 396,368 | $ 400,332 | $ 404,335 | $ 1,982,038 |

| Cost Breakout for New Scope of Work | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Totals |
|---|---|---|---|---|---|---|
| Development/Start Up * | $ 38,558 | $ 38,943 | $ 39,333 | $ 39,726 | $ 40,123 | 196,682 |
| Staff and Related Expenses | $ 264,565 | $ 267,211 | $ 269,883 | $ 272,581 | $ 275,307 | 1,349,547 |
| Operations | $ 85,436 | $ 86,290 | $ 87,153 | $ 88,025 | $ 88,905 | 435,809 |
| New Scope Cost | $ 388,558 | $ 392,444 | $ 396,368 | $ 400,332 | $ 404,335 | 1,982,038 |
| Existing Scope Cost | $ 217,247 | $ 219,419 | $ 221,613 | $ 223,829 | $ 226,068 | 1,108,176 |

| Grand Total - Existing Scope + New Scope | $ 605,806 | $ 611,863 | $ 617,981 | $ 624,161 | $ 630,403 | 3,090,213 |

Notes
* Represents costs associated with implementation of new scope and/or expansion of existing scope.
These costs are spread over the five year term with the intention of addressing state economic pressures.

Innovative Resource Group LLC d/b/a APS Healthcare Midwest (APS)
Bidder

Signature

Date  6/4/09

## CERTIFICATE OF SERVICE

I, Kelli D. Talbott, Senior Deputy Attorney General for the State of West Virginia, do hereby

certify that a true and exact copy of the foregoing *Motion to Quash and Motion to Dismiss on*

*Behalf of the West Virginia Department of Administration, Purchasing Division* was served by

first class mail, postage prepaid, this **11ᵗʰ day of September, 2015**, addressed as follows:

Carte P. Goodwin, Esquire
James A. Kirby, III, Esquire
Lucas R. White, Esquire
Goodwin & Goodwin, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301

Webster J. Arceneaux, III, Esquire
Lewis Glasser Casey & Rollins PLLC
BB&T Square Suite 700
300 Summers Street
Charleston, WV 25301

The same was hand delivered to the following:

Christopher Dodrill, Esquire
812 Quarrier Street, 2nd Floor
Charleston, WV 25301

_____
Kelli D. Talbott



Goodwin & Goodwin, LLP
300 Summers Street
Suite 1500                    T (304) 346-7000
Charleston, WV 25301-1678     F (304) 344-9692          www.goodwingoodwin.com

September 11, 2015

Cathy S. Gatson, Clerk
Kanawha County Judicial Annex
111 Court Street
Charleston WV 25305

> **Re:    West Virginia Medical Institute v. Innovative Resource Group LLC,
> et al.
> Civil Action No.: 15-C-1680**

Dear Ms. Gatson:

Please find enclosed for filing the **Notice of Hearing** in the above-referenced case. Please file this in accordance with normal procedures.

Thank you for your assistance in this matter. Please contact me immediately if you have any questions or require any further information.

Sincerely,

Carte P. Goodwin

Cc:    The Honorable James C. Stucky
Counsel of Record

CPG/bdr
Enclosure

**IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA**

**WEST VIRGINIA MEDICAL INSTITUTE, INC.,**

     **Plaintiff,**

v.                           **Civil Action No.: 15-C-1680**

**INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
a West Virginia Agency, ANGELA HOBBS, an
individual, and KRISTYN TAYLOR, an
individual,**

     **Defendants.**

**NOTICE OF HEARING**

Please take notice that Plaintiff West Virginia Medical Institute, Inc., by the undersigned

counsel, will bring on for hearing its Motion for Preliminary Injunction and Temporary Restraining

Order before the Honorable James C. Stucky, in his judicial chambers located at the Kanawha

County Judicial Annex, 111 Court Street, Charleston, West Virginia on September 25, 2015, at

1:30 p.m., at which time you may appear to protect your interests.

Respectfully submitted,

West Virginia Medical Institute, Inc.,

*By counsel,*

Carte P. Goodwin (W. Va. Bar 8039)

1

James A. Kirby, III (W. Va. Bar 8564)
Lucas R. White (W. Va. Bar 12501)
GOODWIN & GOODWIN, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
(304) 346-7000

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**WEST VIRGINIA MEDICAL INSTITUTE, INC.,**

    **Plaintiff,**

**v.**                        **Civil Action No.: 15-C-1680**

**INNOVATIVE RESOURCE GROUP, LLC**
**d/b/a APS HEALTHCARE MIDWEST, a**
**Wisconsin Limited Liability Company,**
**KEPRO ACQUISITIONS, INC., a Pennsylvania**
**Corporation, WEST VIRGINIA**
**DEPARTMENT OF ADMINISTRATION,**
**PURCHASING DIVISION, a West Virginia**
**Agency, WEST VIRGINIA DEPARTMENT OF**
**HEALTH AND HUMAN RESOURCES,**
**a West Virginia Agency, ANGELA HOBBS, an**
**individual, and KRISTYN TAYLOR, an**
**individual,**

    **Defendants.**

## CERTIFICATE OF SERVICE

I, Carte P. Goodwin, certify that, on September 11, 2015, a true and exact copy of the foregoing **Notice of Hearing** was served via U.S. Mail upon the following:

Webster J. Arceneaux III, Esq.
Lewis Glasser Casey & Rollins PLLC
BB&T Square, Suite 700
300 Summers Street
Charleston, WV 25301
*Counsel for Innovative Resource Group, LLC & KEPRO Acquisitions, Inc.*

Kelli D. Talbott, Esq.
Greg S. Foster, Esq.
Office of the Attorney General
812 Quarrier Street, 2nd Floor
Charleston, WV 25301
*Counsel for West Virginia Department of Administration, Purchasing Division*

Chris Dodrill
Deputy Attorney General
Office of the Attorney General of West Virginia
812 Quarrier Street, 2nd Floor
Charleston, WV 25301
*Counsel for West Virginia Department of Health and Human Resources*

Michael J. Del Giudice
Timothy J. LaFon
Ciccarello, Del Giudice & LaFon
1219 Virginia Street, East - Suite 100
Charleston, WV 25301
*Counsel for Angela Hobbs and Kristen Taylor*

Carte P. Goodwin (W. Va. Bar 8039)

4

2015 SEP 11  PM 12: 28

CATHY
KANAWHA COUNTY CIRCUIT COURT

---

SENDER

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

David Tincher, Purchasing Director
WJ Dept Of Administration
Purchasing Division
2019 Washington St. F
Charleston, WJ 25305

9590 9403 0620 5183 0071 79

7015 1520 0003 1445 9133

A. Signature
X _Crnald H Kushner_      ☐ Agent
                          ☐ Addressee
B. Received by (Printed Name)    C. Date of Delivery
                                 SEP - 9 20

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

RESTRICTED DELIVERY

3. Service Type
☐ Adult Signature                    ☐ Priority Mail Express®
☐ Adult Signature Restricted Delivery ☐ Registered Mail™
☐ Certified Mail®                    ☐ Registered Mail Restricted
☑ Certified Mail Restricted Delivery    Delivery
☐ Collect on Delivery                ☑ Return Receipt for
☐ Collect on Delivery Restricted Delivery   Merchandise
☐ Insured Mail                       ☐ Signature Confirmation™
☐ Insured Mail Restricted Delivery   ☐ Signature Confirmation
  (over $500)                           Restricted Delivery

PS Form 3811, April 2015 PSN 7530-02-000-9053   15-C-1680     Domestic Return Receipt



F I L E D

2015 SEP 17  PM 12: 29

CATHY S.
KANAWHA COUNTY CIRCUIT COURT

---

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Patrick Morrisey, Attorney General
West Virginia Attorney General
State Capitol Complex
Bldg 1, Room E-26
Charleston WV 25305

9590 9403 0620 5183 0071 55

7015 1520 0003 1445 9126

A. Signature
X _____ Kushner  □ Agent
                        □ Addressee

B. Received by (Printed Name)          C. Date of Delivery
                                        SEP – 9 2

D. Is delivery address different from item 1?  □ Yes
If YES, enter delivery address below:          □ No

RESTRICTED DELIVERY

3. Service Type
□ Adult Signature
□ Adult Signature Restricted Delivery
□ Certified Mail®
□ Certified Mail Restricted Delivery
□ Collect on Delivery
□ Collect on Delivery Restricted Delivery
□ Insured Mail
□ Insured Mail Restricted Delivery (over $500)

□ Priority Mail Express®
□ Registered Mail™
□ Registered Mail Restricted Delivery
□ Return Receipt for Merchandise
□ Signature Confirmation™
□ Signature Confirmation Restricted Delivery

PS Form 3811, April 2015 PSN 7530-02-000-9053    ISC - 1680 ms    Domestic Return Receipt





2015 SEP 11 PM 12:29

CATHY S.
KANAWHA COUNTY CIRCUIT COURT

SENDER:

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

A. Signature

☐ Agent
☐ Addressee

B. Received by (Printed Name)          C. Date of Delivery

1. Article Addressed to:

Karen Bowling, Secretary
West Virginia DHHR
One Davis Square
Ste 100, East
Charleston, WV 25301

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

RESTRICTED DELIVERY

9590 9403 0620 5183 0071 62

2. Article Number (Transfer from service label)

7015 1520 0003 1445 9119

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, April 2015 PSN 7530-02-000-9053    15-C-1680 ms    Domestic Return Receipt



Civil Action Number         15-C-1680

Package Identification Code    92148901125134100000791895

Signature Downloaded       9/14/2015 2:01:20 PM

Defendant Name             INNOVATIVE RESOURCE GROUP, LLC

2015 SEP 15 AM 8: 21

KANAWHA COUNTY CIRCUIT COURT



**UNITED STATES POSTAL SERVICE.**

Date Produced: 09/14/2015

WEST VIRGINIA SECRETARY OF STATE:

The following is the delivery information for Certified Mail™/RRE item number 9214 8901 1251 3410 0000 7918 95. Our records indicate that this item was delivered on 09/10/2015 at 10:44 a.m. in CHARLESTON, WV 25302. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

209 W WASHINGTON ST

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number: 79189

Civil Action Number

Package Identification Code

Signature Downloaded

Defendant Name

15-C-1680

92148901125134100000791901

9/21/2015 6:04:25 AM

KEPRO ACQUISITIONS, INC.

2015 SEP 22  AM 11: 26

CAHITY
KANAWHA COUNTY CIRCUIT COURT


**UNITED STATES
POSTAL SERVICE.**

Date Produced: 09/21/2015

WEST VIRGINIA SECRETARY OF STATE:

The following is the delivery information for Certified Mail™/RRE item number 9214 8901
1251 3410 0000 7919 01. Our records indicate that this item was delivered on
09/14/2015 at 12:20 p.m. in HARRISBURG, PA 17111. The scanned image of the
recipient information is provided below.

Signature of Recipient :

Address of Recipient :

777 E. PARK DR

Thank you for selecting the Postal Service for your mailing needs. If you require
additional assistance, please contact your local post office or Postal Service
representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United
States Postal Service. It is solely for customer use.

Customer Reference Number: 79190