IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**WEST VIRGINIA MEDICAL INSTITUTE, INC.,**

             **Plaintiff,**

v.                                                  CIVIL ACTION NO. 2:15-cv-12836 _____

**INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
A West Virginia Agency,**

      **Defendants.**

CERTIFICATE OF SERVICE

   I, Ramonda C. Lyons, counsel for Defendant Innovative Resource Group, LLC d/b/a APS

Healthcare Midwest APS and KEPRO Acquisitions, Inc., do hereby certify that on August 31,

2015, I electronically filed the *Notice of Removal* with the Clerk of the Court using the CM/ECF

system which will send notification of such filing to the CM/ECF participants shown below.  I

further certify that the *Notice of Removal* was sent via e-mail to the following:

          Carte P. Goodwin, Esq.
          Goodwin & Goodwin, LLP
          300 Summers Street, Suite 1500
          Charleston, WV  25301

          Christopher S. Dodrill, Esq.
          Office of the WV Attorney General
          812 Quarrier Street, Floor 6
          Charleston, WV  25301

Kelli D. Talbott, Esq.
Office of the WV Attorney General
812 Quarrier Street, Floor 2
Charleston, WV  25301

Innovative Resource Group, LLC d/b/a APS
Healthcare Midwest APS and KEPRO Acquisitions,
Inc.,

*By Counsel*

LEWIS GLASSER CASEY & ROLLINS, PLLC


/s/ Ramonda C. Lyons
Webster J. Arceneaux, III (WVSB #155)
Ramonda C. Lyons (WVSB #6927)
300 Summers Street, Suite 700
P.O. Box 1746
Charleston, WV  25326
Phone:   304-345-2000
Fax:      304-343-7999



Goodwin & Goodwin, LLP
300 Summers Street
Suite 1500          T (304) 346-7000
Charleston, WV 25301-1678   F (304) 344-9692          www.goodwingoodwin.com

September 2, 2015

Mr. Webster J. Arceneux III
Lewis, Glasser, Casey & Rollins PLLC
300 Summers Street
Suite 700
Charleston, WV 25301

> **Re:   West Virginia Medical Institute v. Innovative Resource Group LLC, et al.**
> **Civil Action No.: 15-C-1615**
> **USDC Civil Action No.: 2:15-cv-12836**

Dear Jay:

It came to my client's attention Monday afternoon that two APS/KEPRO employees, Angela Hobbs and Kristyn Taylor, may has misappropriated a significant amount of WVMI's proprietary and confidential information and data. It appears that this property was taken by these employees prior to their recent resignations from WVMI and subsequent employment by APS/KEPRO. At a minimum, the information/data in question appears to consist of hundreds of documents and upwards to one thousand (1,000) emails related to WVMI's internal procedures, processes, training materials, and other legally protected documents. Such information/data would be invaluable to any competitor seeking insight into the services provided by WVMI, or – more pointedly – seeking to gain a competitive advantage in preparing a bid proposal.

If true, such conduct could run afoul of the West Virginia Computer Crimes and Abuse Act, W. Va. Code § 61-3C-1, *et seq.*, the Uniform Trade Secrets Act, W. Va. Code § 47-22-1, *et seq.*, as well as a host of other common law, statutory, and contractual protections. Moreover, if APS/KEPRO induced or contributed to these actions, or is merely in possession of the information/data, such liability would extend to the company itself. *See* W.Va. Code §§ 61-3C-6, 9, & 16. Suffice it to say that my client is exploring every legal option available to address this potential breach, the most obvious of which would be to amend the Complaint to add legal claims against these individuals (and most likely your clients) for the misappropriation and possession of this computer data and proprietary information. In addition to bolstering the



EXHIBIT

C



pending claims surrounding APS/KEPRO's anti-competitive conduct, the individual defendants would provide an additional basis for remanding the case back to state court. I will be filing the appropriate motion soon.

In the meantime, any computer data, proprietary information, or other property of WVMI that may be in the possession of APS/KEPRO or any APS/KEPRO employees should be returned immediately. Thank you for your prompt attention to this issue.

Sincerely,

Carte P. Goodwin

CPG/bdr

## Jay Arceneaux

| | |
|---|---|
| **From:** | Jay Arceneaux |
| **Sent:** | Wednesday, September 02, 2015 5:40 PM |
| **To:** | 'Carte Goodwin'; Ramonda C. Lyons |
| **Cc:** | James A. Kirby III |
| **Subject:** | RE: WVMI v APS |

And what is your good faith basis to suggest that APS or KEPRO possessed this information when I have represented to you that APS had no knowledge of it. What proof do you have?

Webster J. Arceneaux, III
**Lewis Glasser Casey & Rollins PLLC**
Charleston-Morgantown-Columbus OH
Phone: 304.345.2000 |
Toll Free: 800.695.6958|
Fax: 304.343.7999|
Website: www.lgcr.com |
BB&T Square Suite 700|
300 Summers Street|
Charleston West Virginia 25301|
P. O. Box 1746|
Charleston, West Virginia  25326|

MISTAKEN TRANSMISSION: The information contained in this message and attachments, if any, are attorney privileged or confidential information intended for the use only of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this message is prohibited. If you have received this email in error, please immediately notify me by replying to this email or telephoning (304) 345-2000 and delete all electronic copies of this email and attachments, if any. Thank you.

**From:** Carte Goodwin [mailto:CPG@goodwingoodwin.com]
**Sent:** Wednesday, September 02, 2015 5:25 PM
**To:** Jay Arceneaux; Ramonda C. Lyons
**Cc:** James A. Kirby III
**Subject:** RE: WVMI v APS

Got your 5:03 pm e-mail.

I suppose we will have to disagree as to whether there's a credible basis to amend the complaint.   In addition to potential claims against the individual employees that may have taken the property, a fair reading of the statutory provisions I referred to in my letter suggests that if such property/data was at any point "possessed" by APS or KEPRO , then liability could attach on that basis alone.

**Carte Goodwin**



1



Goodwin & Goodwin, LLP
300 Summers Street, Suite 1500
P. O. Box 2107
Charleston, WV 25328-2107

CPG@goodwingoodwin.com
(304) 346-7000

CONFIDENTIALITY NOTICE: This electronic communication (including attachments) is from a law firm and may contain confidential information intended only for the use of the named recipient and protected by the attorney-client privilege. If you are not the intended recipient of this message, you are hereby notified that dissemination, distribution, or copying of this message is strictly prohibited. If you received this communication in error, please notify us immediately by return message or by telephone at (304) 346-7000 and delete this communication from your system. Thank you

**From:** Jay Arceneaux [mailto:wjarceneaux@lgcr.com]
**Sent:** Wednesday, September 02, 2015 5:03 PM
**To:** Carte Goodwin; James A. Kirby III
**Cc:** Ramonda C. Lyons
**Subject:** WVMI v APS

This will acknowledge receipt of your hand delivered letter today. I can affirmatively represent as follows: 1) APS knows nothing about these allegations and APS knows nothing about any WVMI trade secrets; and, 2) now that APS has received notice of these allegations from you, APS will instruct the former WVMI employees not to rely upon any emails or documents from WVMI and that they should return any documents or emails if they have them.

You should also be advised that APS is changing the processes for handling claims and therefore, it does not intend to rely on any past practices of WVMI. APS intends to process its claims in its own manner in accordance with its own practices. Under these circumstances, we do not agree that WVMI has any basis to amend its complaint in this matter and WVMI can expect that we will oppose any motion to amend in that regard. Please acknowledge receipt of this email.

Webster J. Arceneaux, III
**Lewis Glasser Casey & Rollins PLLC**
Charleston-Morgantown-Columbus OH
Phone: 304.345.2000 |
Toll Free: 800.695.6958|
Fax: 304.343.7999|
Website: www.lgcr.com |
BB&T Square Suite 700|
300 Summers Street|
Charleston West Virginia 25301|
P. O. Box 1746|
Charleston, West Virginia 25326|

MISTAKEN TRANSMISSION: The information contained in this message and attachments, if any, are attorney privileged or confidential information intended for the use only of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this message is prohibited. If you have received this email in error, please immediately notify me by replying to this email or telephoning (304) 345-2000 and delete all electronic copies of this email and attachments, if any. Thank you.

**From:** Ramonda C. Lyons
**Sent:** Monday, August 31, 2015 7:24 PM
**To:** Carte Goodwin (CPG@goodwingoodwin.com); Kelli D. Talbott; Christopher S. Dodrill

**Cc:** Jay Arceneaux
**Subject:** APS/WVMI - Notice of Removal and Confirmation of Filing

All,

Attached please find a courtesy copy of the Notice of Removal filed earlier this evening (excluding Exhibit A).  A hard copy will be mailed to you as well.

Below please find the district court's confirmation of filing:

**Notice of Electronic Filing**

The following transaction was entered by Lyons, Ramonda on 8/31/2015 at 7:02 PM EDT and filed on 8/31/2015

| | |
|---|---|
| **Case Name:** | Plaintiff v. Defendant |
| **Case Number:** | 5:15-cv-11111 |
| **Filer:** | Defendant |

**Document Number:** 245

**Docket Text:**
**NOTICE OF REMOVAL WITH FEE PAID. West Virginia Medical Institute, Inc. v Innovative Resource Group, LLC, et al from Kanawha County Circuit Court, (case number 15-C-1615)Filing Fee $400. Receipt #0424-1956139., filed by Defendant. (Attachments: # (1) Exhibit A, Part 1, # (2) Exhibit A, Part 2, # (3) Exhibit A, Part 3, # (4) Exhibit A, Part 4, # (5) Exhibit A, Part 5, # (6) Exhibit A, Part 6, # (7) Exhibit A, Part 7, # (8) Exhibit A, Part 8, # (9) Exhibit A, Part 9, # (10) Exhibit B, # (11) Civil Cover Sheet)(Lyons, Ramonda)**

**5:15-cv-11111 Notice has been electronically mailed to:**

Ramonda C. Lyons    rlyons@lgcr.com, madodrill@lgcr.com

**5:15-cv-11111 Notice must be delivered by other means to:**

Plaintiff
The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079362125 [Date=8/31/2015] [FileNumber=1727062-0
] [9b8a8324c3ed7e4721d74c14442cf7574f11ed34270346674acc5143b1521ed8653
3c1cab56582e7f3c5eeb54dc052bc55973a127eed273453b0720a91808fc8]]
**Document description:**Exhibit A, Part 1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079362125 [Date=8/31/2015] [FileNumber=1727062-1
] [98fd0159ae880243ccc59f5a050cc8158bb2df859d5be25111563af5e4b3e462cfe
b14bb41504129ca7654b452c6102fa2a3a351ab20598195b92b8b56e88fa5]]
**Document description:**Exhibit A, Part 2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079362125 [Date=8/31/2015] [FileNumber=1727062-2
] [002562864bbb51569777e3da76b02cedec4d0362ea19bdf63e0096b8bcb1f32f3ad
5c9acbc5737c9977c9873b208e42d2edf1e6ebec331036fef469bab01c592]]
**Document description:**Exhibit A, Part 3
**Original filename:**n/a

**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079362125 [Date=8/31/2015] [FileNumber=1727062-3
] [868385bfa66f8d0bac0085cfc55b568c4590abd2521f411455367d9c2a89321817b
94b5e1331063d37006686f3ee3cdc94f1e3378b3f38f4adbf522954233781]]
**Document description:**Exhibit A, Part 4
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079362125 [Date=8/31/2015] [FileNumber=1727062-4
] [44966246272824d87b92400d8509e60bb80b9ef6e64ad394a153d19056ea1df1bd4
8b7df83062a89733055c2d7de4007218d704d4f86fc55341e8c2d8b207dfd]]
**Document description:**Exhibit A, Part 5
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079362125 [Date=8/31/2015] [FileNumber=1727062-5
] [95f4157ce12b2598ba575e8820f194e54eb9e6659e60d37f07bdf87185625e86efc
9d729b57291823e0424b9050c6357e44d0bc489b9f07586fde3cb2848ead7]]
**Document description:**Exhibit A, Part 6
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079362125 [Date=8/31/2015] [FileNumber=1727062-6
] [8457034cb568e66e7ad3225293a6d428984f937f519bcd8a843b405771ba6914a12
eec184b29918d9b465c7a086cf8d306baf505618e3487e9084202b2854514]]
**Document description:**Exhibit A, Part 7
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079362125 [Date=8/31/2015] [FileNumber=1727062-7
] [a867f129ca8cbe4bd603afe991b846a1a9d0cacd1734186ac5bbbd24f87fe33d7fc
b0e907f7ded27da1db85bd387cf800ee2bcadb63312c5c958afbfc5608b46]]
**Document description:**Exhibit A, Part 8
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079362125 [Date=8/31/2015] [FileNumber=1727062-8
] [56fe16c375dc6ccf0504fab341865a3fd3519dcba8989b9231fe866872fb2e69368
a8eca2764ebd637ef5c5a1ff85d8d6d4fbe322ac064f63c5ef3f3204cb331]]
**Document description:**Exhibit A, Part 9
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079362125 [Date=8/31/2015] [FileNumber=1727062-9
] [60d25677bf51869c029ee1eb1b88e9daa70c179ecea96a1168ba8feb1e1d79d8f4f
ca4022b256fc5188c1e55bd97ee572deaa383655bf00b869550541f70131d]]
**Document description:**Exhibit B
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079362125 [Date=8/31/2015] [FileNumber=1727062-1
0] [0357b206dfe2a599016a1e409c29db258892d10ba17dc37e94309ddf2906804d77
dcf4ae8b51dd73ee146ce8f3d926eeb304e86040edea0dc8dbe3cffb3e4361]]
**Document description:**Civil Cover Sheet
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079362125 [Date=8/31/2015] [FileNumber=1727062-1
1] [5ca4325e3e5728e30ce80104970b6e8c85b4ec83af88c435e8d3c678f68d24bce7
fb8964a58e2d43d1831519efc4da28e3da5546f3ec14427cf54f5e6f060fb0]]

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA


WEST VIRGINIA MEDICAL INSTITUTE, INC.,

   **Plaintiff,**

v.             **Civil Action No.: 2:15-CV-12836**


**INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
a West Virginia Agency,**

   **Defendants.**

## NOTICE OF DISMISSAL

   Pursuant to Rule 41 of the Federal Rules of Civil Procedure, Plaintiff West Virginia

Medical Institute, Inc., voluntarily dismisses this civil action without prejudice.

        Respectfully submitted,


        West Virginia Medical Institute, Inc.,


        *By counsel,*


        /s/ Carte P. Goodwin
        Carte P. Goodwin (W. Va. Bar 8039)
        James A. Kirby, III (W. Va. Bar 8564)
        Lucas R. White (W. Va. Bar 12501)
        GOODWIN & GOODWIN, LLP
        300 Summers Street, Suite 1500
        Charleston, WV 25301
        (304) 346-7000



EXHIBIT

E

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

WEST VIRGINIA MEDICAL INSTITUTE, INC.,

      Plaintiff,

v.                                Civil Action No.: 15-C-1615

INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
a West Virginia Agency,

      Defendants.

## CERTIFICATE OF SERVICE

      I, Carte P. Goodwin, do hereby certify that on the 3rd day of September, 2015, I filed via

the Court's electronic filing system the foregoing **Notice of Dismissal** and notice on counsel below

has occurred electronically.

Webster J. Arceneaux III, Esq.
Lewis Glasser Casey & Rollins PLLC
BB&T Square, Suite 700
300 Summers Street
Charleston, WV 25301
*Counsel for Innovative Resource Group, LLC & KEPRO Acquisitions, Inc.*

Kelli D. Talbott, Esq.
Greg S. Foster, Esq.
Office of the Attorney General
812 Quarrier Street, 2nd Floor
Charleston, WV 25301
*Counsel for West Virginia Department of Administration, Purchasing Division*

Chris Dodrill
Deputy Attorney General
Office of the Attorney General of West Virginia
812 Quarrier Street, 2nd Floor
Charleston, WV 25301
csd@wvago.gov
*Counsel for West Virginia Department of Health and Human Resources*

/s/ Carte P. Goodwin

Carte P. Goodwin

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

2015 SEP -4 PM 3: 29

WEST VIRGINIA MEDICAL INSTITUTE, INC.,

       Plaintiff,

v.

Civil Action No.: 15-C-1680
Judge Stuck

INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
a West Virginia Agency, ANGELA HOBBS, an
individual, and KRISTYN TAYLOR, an
individual,

       Defendants.

## COMPLAINT

### *Parties*

1. Plaintiff West Virginia Medical Institute, Inc. ("WVMI") is a private, not-for-profit corporation incorporated pursuant to W. Va. Code § 31E-1-1, *et seq*, that does business in Kanawha County, West Virginia.

2. Defendant Innovative Resource Group, LLC d/b/a APS Healthcare Midwest ("APS") is a private, for-profit foreign limited liability company organized under the laws of Wisconsin that does business in Kanawha County, West Virginia.

1



3. Defendant KEPRO Acquisitions, Inc. ("KEPRO") is a private, for-profit foreign corporation organized under the laws of Pennsylvania that does business in Kanawha County, West Virginia. However, KEPRO is not authorized to do business in West Virginia.

4. Defendant West Virginia Department of Administration, Purchasing Division ("DOA") is the state government body charged by law to provide procurement and purchasing services to various state agencies. *See* W. Va. Code § 5A-3-1, *et seq.*

5. Defendant West Virginia Department of Health and Human Resources ("DHHR") is a state government body charged by law to provide various medical services.[1]

6. Defendant Angela Hobbs ("Hobbs") is a resident of Kanawha County, West Virginia.

7. Defendant Kristyn Taylor ("Taylor") is a resident of Kanawha County, West Virginia.

8. This case involves tortious and anti-competitive actions in the bidding of public contracts. Currently, WVMI and APS are parties to a contract whereby both parties have provided services to West Virginia's Medicaid program for almost six years. The parties' contract with the State has been extended twice and is scheduled to once again expire and be rebid later this year.

9. The amicable and cooperative relationship between APS and WVMI abruptly ended when a competitor, KEPRO, purchased APS. Six years ago, KEPRO competed unsuccessfully against the WVMI and APS team when WVMI and APS won the Medicaid contract. Rather than compete against them once again, KEPRO simply *bought* APS, and it is now using its subsidiary to cripple WVMI, KEPRO's strongest competitor in West Virginia. Immediately after the acquisition, KEPRO and APS began efforts to squeeze WVMI out of the final months of the six-year contract; to poach WVMI's crucial employees; and to engage in aggressive, tortious, and bad-faith actions

---

[1]    Pursuant to W. Va. Code § 55-17-3(a)(1), pre-suit notice is not required for DOA and DHHR because WVMI seeks only injunctive relief from those agencies and irreparable harm would occur to WVMI if the institution of this action were delayed any further, as explained further in this Complaint and WVMI's contemporaneously filed Motion for Preliminary Injunction and Temporary Restraining Order.

to undercut WVMI's ability both to perform in the contract's remaining months and to compete in the upcoming rebid process. If left unchecked, APS's and KEPRO's unlawful actions will cause irreparable harm to WVMI, stifle competition in the upcoming bidding process, and disrupt the provision of necessary medical care to West Virginia Medicaid recipients.

10. Hobbs and Taylor were formerly employees of WVMI that left to work for KEPRO and APS. Prior to leaving WVMI for APS, however, Hobbs and Taylor, both now employees of KEPRO and/or APS, took with them significant amounts of confidential, proprietary, and trade secret information and data.

### *The RFP*

11. On or about January 25, 2009, DHHR and DOA released Request for Proposals BMS90007 ("RFP") seeking bids for the provision of utilization management and prior authorization services to three DHHR bureaus: the Bureau for Medical Services, the Bureau for Children and Families, and the Bureau for Health and Health Care Facilities.

12. Prior to and at the time the RFP was released, WVMI had been an incumbent provider of utilization review and prior authorization services to West Virginia's Medicaid program for over 32 years.

13. The 2009 RFP was intended to combine the utilization review and prior authorization services provided by WVMI pursuant to its previous contracts with other behavioral health and child welfare services provided pursuant to separate contracts, effectively combining all utilization review and prior authorization services under a single agreement. APS was the incumbent provider of these other behavioral health and child welfare services.

3

### *The Teaming Agreement: WVMI and APS join forces for the RFP*

14. On or about March 11, 2009, APS and WVMI agreed to combine their respective talents and jointly respond to the RFP with a bid ("Bid").

15. Pursuant to this agreement ("Teaming Agreement"), WVMI agreed to offer its utilization review and prior authorization services to DHHR. APS acted nominally as the prime bidder, with WVMI listed as the "proposed subcontractor" for utilization review and prior authorization services. WVMI was the *only* subcontractor named in the Bid.

16. The Bid touted the significant advantages of this arrangement, stating:

> We [APS] propose to subcontract with West Virginia Medical Institute (WVMI) for review resources, an approach that benefits [DHHR] with decades of utilization management review experience in all aspects of review required by the scope of work, enabling us to streamline authorization and other services, and assuring a smooth and timely provider and member transition to the integrated service model within timeframes required by the RFP and minimizing disruption to [DHHR], the provider community, and West Virginia consumers.

17. In several other portions throughout the Bid, APS described and detailed the extensive services that WVMI would provide to DHHR as the "proposed subcontractor."

18. Pursuant to the Bid, WVMI was proposed to perform — and has in fact performed — services equal to roughly 50% of the value of the total Contract.

### *The winning bid and the contract*

19. Following a review of the bid submissions, DOA awarded contract BMS90007 ("Contract") to APS and WVMI. KEPRO was the only other bidder.

20. A substantial and critical factor in the award of the Contract was the inclusion of WVMI as the critical "proposed subcontractor" for utilization review services that were touted in the Bid and described in paragraphs 13 and 14, *supra*.

4

21. As expressed in the Contract, it was the intent of APS, WVMI, DHHR, and DOA that WVMI would serve as the critical subcontractor and provide utilization review and prior authorization services for the entirety of the Contract's five-year term.

22. Effective December 1, 2009, APS and WVMI formally became the providers of utilization management and prior authorization services to DHHR, pursuant to the five-year Contract, set to expire on November 30, 2014.

### *The Letter of Agreement cements APS's and WVMI's relationship*

23. Following the Contract award, WVMI and APS entered into a Letter of Agreement ("LOA") to outline the obligations and rights of the parties regarding the Contract.

24. The LOA states that "[t]he parties intend that WVMI shall provide services as a subcontractor to APS under the Prime Contract."

25. Absent certain occurrences such as breach or sufficient notice, the LOA's term was for the full five-years of the Contract, expiring on November 30, 2014, "unless extended by mutual agreement of the parties in writing."

26. As expressed in the LOA, it was the intent of APS and WVMI that WVMI would serve as the critical subcontractor and provide utilization review and prior authorization services for the entirety of the Contract.

27. WVMI has performed its duties consistent with the LOA and the Contract and has provided a substantial portion of the value of the Contract.

### *The First Extension*

5

28. With the Contract's original expiration date of November 30, 2014 looming, DHHR extended the Contract for six months until May 31, 2015. Upon information and belief, this six-month extension ("First Extension") was due to delays in preparing the request for proposals for a new contract covering the same services ("Upcoming RFP").

29. Because APS, WVMI, DHHR, and DOA intended that WVMI serve as the critical subcontractor for the entirety of the contract and because the parties intended that WVMI's service be co-terminous with the Contract, WVMI and APS sought to amend the LOA to reflect DHHR's First Extension.

30. Thereafter, on or about December 16, 2014, APS and WVMI amended their LOA ("Extension Amendment") to extend its provisions until May 31, 2015, commensurate with the First Extension of the Contract.

31. The Extension Amendment states that **"the term of the Prime Contract has been extended to May 31, 2015, and the parties desire to extend the [Letter of] Agreement and its current terms and conditions to be co-terminous with the Prime Contract"** (emphasis added).

32. As expressed in the Extension Amendment, it was the intent of APS, WVMI, DHHR, and DOA that WVMI would serve as the critical subcontractor and provide utilization review and prior authorization services (comprising a substantial portion of the total value) for the entirety of the Contract including extensions.

### *The Second Extension and APS/KEPRO's bad-faith tactics*

33. As the extended May 31, 2015, expiration date approached, the State had yet to issue the Upcoming RFP. Thus, on or about May 4, 2015, DHHR once again extended the Contract for another six months until November 30, 2015 ("Second Extension").

6

34. Upon information and belief, it is DOA's and/or DHHR's intent to release the Upcoming RFP and award the new contract by December 1, 2015.

35. APS and WVMI once again were intending to submit a joint bid in response to the Upcoming RFP, and had begun negotiating an updated teaming agreement.

36. On or about May 6, 2015, KEPRO notified WVMI that it acquired APS effective May 1, 2015. APS became a wholly owned subsidiary of KEPRO.

37. Shortly after purchasing APS, KEPRO contended that federal conflict-of-interest rules precluded KEPRO and APS from continuing the contractual relationship with WVMI. These rules stem from unrelated contracts that KEPRO and WVMI had with the United States Centers for Medicare and Medicaid Services.

38. On account of this purported conflict of interest, KEPRO informed WVMI that it would not extend the LOA commensurate with the Second Extension. KEPRO asserted that, because of the conflict of interest, it could only allow three additional months, in exchange for WVMI agreeing to not compete "in perpetuity" and to transition all of its Medicaid employees to KEPRO.

39. Contrary to KEPRO's specious claims, on or about May 29, 2015, the Centers for Medicare and Medicaid Services informed WVMI that a six-month extension of the LOA would be "fair and reasonable" and would "not pose a conflict of interest" under the applicable federal regulations. In turn, WVMI provided this information to KEPRO and APS.

40. Faced with this guidance from the governing federal authority, KEPRO abandoned its "conflict" argument that it could continue the relationship for no more than three months and indicated a willingness to extend for six additional months, but only if WVMI agreed to anti-competitive provisions and to transition its employees.

7

41. As this abrupt about-face suggests, APS's and KEPRO's allegation of a conflict of interest was a manufactured justification concocted in bad faith after KEPRO had decided it wanted to force out WVMI and impermissively take its business in West Virginia.

42. Upon information and belief, KEPRO directed APS to squeeze WVMI out of its critical subcontractor role and to impermissively take WVMI's business. The concocted conflict of interest issue was a ruse to accomplish these true intentions.

43. Yet, after being forced to abandon the pretextual conflict of interest objection, KEPRO and APS concocted new bad-faith maneuvers to harm WVMI's business and ability to compete in the Upcoming RFP.

44. In June 2015, in furtherance of their tortious, unlawful, unconscionable, and bad-faith intentions, KEPRO and APS provided to WVMI the following trilemma of unlawful and unacceptable options:

        a.   that KEPRO and APS agree to a six-month extension to the LOA in exchange for WVMI agreeing to forgo submitting a bid for the Upcoming RFP, in violation of applicable antitrust and purchasing laws; or

        b.   that KEPRO and APS agree to a three-month extension to the LOA and WVMI forfeits half of the remaining value of the Contract (approximately $2.2 million) under the Second Extension; or

        c.   that the parties simply let the LOA and Extension Amendment expire, causing WVMI to lose all of its remaining business under the Contract entirely (approximately $4.3 million).

45. The first option was untenable because, in addition to depriving WVMI of its lawful right to compete in the Upcoming RFP, it also would run afoul of the following statutory provisions:

a. <u>W. Va. Code § 5A-3-31</u> (emphasis added)

    (a) It shall be unlawful for any person to corruptly **act alone** or combine, collude or conspire with one or more other persons with respect to the purchasing or supplying of services, commodities or printing to the state under the provisions of this article if the purpose or effect of such action, combination, collusion or conspiracy is either to:

        (1) **Lessen competition among prospective vendors**; or

        (2) **Cause the state to pay a higher price for such services**, commodities or printing than would be or would have been paid in the absence of such action, combination, collusion or conspiracy; or

        **(3) Cause one prospective vendor or vendors to be preferred over one or more other prospective vendor or vendors.**

    (b) Any person who violates any provision of this section is guilty of a felony and, upon conviction thereof, shall be imprisoned in a state correctional facility not less than one nor more than five years, and be fined not exceeding $10,000.

b. <u>W. Va. Code § 47-18-3</u>

    (a) **Every contract**, combination in the form of trust or otherwise, or conspiracy **in restraint of trade or commerce in this State shall be unlawful.**

    (b) Without limiting the effect of subsection (a) of this section, the following shall be deemed to restrain trade or commerce unreasonably and are unlawful:

                  * * *

        (2) A contract, combination or conspiracy between two or more persons whereby, in the letting of any public or private contract:

           (A) The price quotation of any bid is fixed or controlled; or

           **(B) One or more persons . . . refrains from the submission of a bid.**

46. The second option was unattractive insofar as it would conflict with the parties' original intent and nearly six-year understanding of the Bid, Contract, LOA, and Extension Amendment ("[T]he parties desire to extend the Agreement and its current terms and conditions *to be co-terminous with the Prime Contract*."). Additionally, accepting this option would result in irreparable harm to WVMI, leaving its roughly seventy (70) West Virginia employees out of work and, more importantly, causing substantial service disruptions to West Virginia's Medicaid program and recipients.

9

47. The third option, of course, was untenable as it would not only run counter to the parties' contractual agreements, but would also irreparably harm WVMI, leaving its roughly seventy (70) West Virginia employees out of work and, more importantly, causing substantial service disruptions to West Virginia's Medicaid program and recipients.

48. These unlawful and heavy-handed negotiation tactics were intended to unlawfully eliminate any competition in the Upcoming RFP and thereby deprive the State of its ability to maximize the purchasing value of public funds.

49. KEPRO was clear and brazen regarding the anti-competitive intent of these tactics, even conceding that allowing WVMI to compete "with us directly during the upcoming rebid is untenable to KEPRO."

50. After WVMI refused KEPRO's and APS's unlawful and anti-competitive offers, the parties engaged in contentious negotiations and *finally* agreed to a four-month extension of the LOA, until October 1, 2015 ("Four-Month Extension").

51. The Four-Month Extension was agreed to and executed on June 10, 2015, ten days *after* the First Extension had expired. For the intervening time, WVMI continued to perform its obligations to the State under the Contract, without any guarantee that it would be compensated for its services. If WVMI had not continued to perform these utilization review and prior authorization obligations, West Virginia's Medicaid program and patients would have experienced significant service delays.

52. APS and KEPRO unlawfully, tortiously, and in bad faith exploited this precarious position that they themselves created by making unlawful demands for contractual provisions that would violate purchasing law.

53. Rather than jeopardize future business *and* payment for services that it had *already rendered*, WVMI had no other commercially reasonable alternative but to accept the Four-Month Extension in an effort to maintain the status quo, continue working towards an amicable resolution regarding the final two months of the Contract, and preserve its ability to compete in the Upcoming RFP.

54. Within days of executing the Four-Month Extension, KEPRO's and APS's true intentions were laid bare as they began aggressively poaching WVMI's utilization review and prior authorization employees, including directors, managers, and reviewers, all done in an effort to undercut WVMI's ability to perform its current obligations and impair WVMI's ability to compete in the Upcoming RFP.

55. To date, 23 employees have resigned or provided resignation notice, as many as 15 of which have gone or will go to KEPRO and APS.

56. KEPRO and APS are deliberately misleading WVMI employees by reviving the concocted conflict-of-interest ruse, suggesting that the termination of the subcontractual arrangement has been mutually agreed upon due to a conflict of interest per CMS Guidelines.

57. The targeted employees are critical to WVMI's ability to currently perform under the Contract, to perform in the final two months of the Contract, and to prepare and submit a competitive bid in the Upcoming RFP.

58. Upon information and belief, APS and KEPRO established the poached employees' start date as August 25, 2015 — before the end of even the Four-Month Extension — in an effort to undermine WVMI's ability to perform its current obligations, cripple WVMI's ability to perform in the final two months of the Contract, and, most importantly, to eliminate WVMI's ability to compete with APS and KEPRO in the Upcoming RFP.

11

59. Such actions have severely and irreparably harmed WVMI's business, lessened competition for the Upcoming RFP, and threatened delays in the treatment of Medicaid patients and reimbursements to Medicaid providers.

60. Such actions breach the Contract, LOA, Extension Amendment, and Four-Month Extension; violate the duty of good faith and fair dealing; and violate state purchasing laws.

61. WVMI is continuing to perform its obligations under the Contract to the best of its ability notwithstanding the fact that the LOA, Extension Amendment, and Four-Month Extension have not been extended for the full six months, commensurate with the Second Extension, as originally intended by all the parties. KEPRO and APS have unlawfully, tortiously, and in bad faith used this precarious position to their advantage in negotiating with WVMI.

62. KEPRO's and APS's poaching of WVMI employees is hindering WVMI's ability to perform its obligations to APS and DHHR for the Four-Month Extension, let alone the entirety of the Contract to which it is entitled.

63. WVMI has suffered compensable damages and irreparable harm due to the actions alleged above.

64. WVMI will continue to suffer compensable damages and irreparable harm if not granted the relief prayed for below.

### *Hobbs's and Taylor's conduct*

65. Hobbs and Taylor were employed at WVMI.

66. As a condition of their employment with WVMI, Hobbs and Taylor were prohibited from disclosing WVMI's confidential, proprietary, and trade secret information. Hobbs and Taylor were also required, as a condition of their employment contracts, to return all of WVMI's confidential,

12

proprietary, and trade secret information and data in their possession upon termination of their employment with WVMI.

67. Hobbs and Taylor were recruited by KEPRO and APS as part of their unlawful and tortious effort to cripple WVMI's business and ability to compete in the Upcoming RFP.

68. Hobbs and Taylor resigned from their employment effective on or about August 21, 2015.

69. Prior to Hobbs's and Taylor's departure from WVMI, Hobbs and Taylor forwarded over one thousand (1,000) WVMI emails to their personal email accounts and downloaded over one hundred (100) WVMI documents to personal thumb drives. This conduct was unauthorized.

70. These emails and documents contain WVMI's confidential, proprietary, and trade secret information and data. Specifically, this included procedures, processes, criteria, and training materials.

71. This information and data derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

72. Upon information and belief, these emails and documents were or are still in Hobbs's and Taylor's possession and/or the possession of KEPRO and APS.

73. Upon information and belief, Hobbs and Taylor possessed and/or continue to possess these emails and documents while employed by KEPRO and/or APS.

## COUNT I: Corrupt Actions to Lessen Competition in Violation of W. Va. Code § 5A-3-31

*Defendants APS and KEPRO*

74. WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

13

75. APS and KEPRO have corruptly acted with respect to the purchasing of services to the State with the purpose and effect of lessening competition among prospective vendors, causing the State to pay a higher price for such services than would be paid in the absence of such actions, and causing one prospective vendor to be preferred over another prospective vendor, all in violation of W. Va. Code § 5A-3-31.

76. APS and KEPRO have violated W. Va. Code § 5A-3-31 by, among other things:

    a. APS's bad faith attempts to squeeze WVMI out of its critical subcontractor role;

    b. APS's concocted conflict of interest ruse;

    c. APS's insistence on WVMI agreeing to forgo competing for the Upcoming RFP in exchange for obtaining the full six-month extension to which it is entitled;

    d. APS's aggressive recruiting of WVMI's key employees to undercut WVMI's ability to perform under the Contract and to undercut WVMI's ability to submit a bid in the Upcoming RFP.

77. WVMI has suffered compensable damages and irreparable harm caused by APS's and KEPRO's unlawful actions, and WVMI will continue to suffer compensable damages and irreparable harm caused by APS's and KEPRO's unlawful actions if WVMI is not granted the relief prayed for below.

78. WHEREFORE, WVMI respectfully requests that this Court grant as follows:

    a. Declare that APS and KEPRO have violated W. Va. Code § 5A-3-31 as described above;

    b. Issue a temporary restraining order, preliminary injunction, and permanent injunction enjoining APS and KEPRO from engaging in the unlawful actions

14

described above (*see* WVMI's Motion for Preliminary Injunction and Temporary Restraining Order filed contemporaneously with this Complaint);

c.  Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

d.  Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## COUNT II: Breach of Contract

### *Defendant APS*

79. WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

80. APS, WVMI, DHHR, and DOA intended that WVMI role as the critical subcontractor for utilization review and prior authorization services would be co-terminous with the Contract.

81. APS and WVMI expressly agreed that WVMI's role as the subcontractor for utilization review and prior authorization services would be "co-terminous" with the Contract.

82. APS breached the Contract, LOA, and Extension Amendment by APS's refusal to allow WVMI to perform utilization review and prior authorization services and by APS's refusal to grant WVMI an extension on the LOA and Extension Amendment through the Second Extension.

83. WVMI is legally entitled to this extension pursuant to the Contract, LOA, Extension Amendment, and all other relevant contracts.

84. Additionally, as a result of the foregoing, APS breached the Contract by APS's refusal to allow WVMI to perform utilization review and prior authorization services as required by the Contract; by APS's refusal to grant WVMI an extension on the LOA and Extension Amendment

15

though the Second Extension, and by changing the Contract by eliminating WVMI without a formal change order as required by the Contract.

85. APS breached the implied duty to refrain from preventing or hindering another party's performance, which was implied in the Contract, LOA, Extension Amendment, and Four-Month Extension, by its aggressive recruiting of WVMI's key employees.

86. These breaches of the respective contracts have caused WVMI to suffer compensable damages and irreparableharm and will continue to cause WVMI to suffer compensable damages and irreparable harm if WVMI is not granted the relief prayed for below.

87. WHEREFORE, WVMI respectfully requests that this Court grant as follows:

     e.  Declare that APS is in breach of the LOA, Extension Amendment, and Contract as described above;

     f.  Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

     g.  Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## COUNT III: Breach of Duty of Good Faith and Fair Dealing

*Defendant APS*

88. WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

89. Pursuant to the Contract, LOA, Extending Amendment, Four-Month Extension, and by operation of law, APS owed WVMI a duty of good faith and fair dealing.

90. As a result of the foregoing, APS breached the duty of good faith and fair dealing that it owed to WVMI, including but not limited to the following:

16

      a.  APS's bad faith attempts to squeeze WVMI out of its critical subcontractor role;

      b.  APS's concocted conflict of interest ruse;

      c.  APS's insistence on inclusion of an unlawful anti-competitive clause in order for WVMI to obtain the six-month extension to which it is entitled; and

      d.  APS's aggressive recruiting of WVMI's employees to undercut WVMI's ability to perform under the Contract and to undercut WVMI's ability to submit a bid in the Upcoming RFP.

91. This breach has caused WVMI to suffer compensable damages and irreparable harm and will continue to cause WVMI to suffer compensable damages and irreparable harm if WVMI is not granted the relief prayed for below.

92. WHEREFORE, WVMI respectfully requests that this Court grant as follows:

      a.  Declare that APS has breached its duty of good faith and fair dealing, as described above;

      b.  Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

      c.  Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## COUNT IV: Tortious Interference with Contractual Relations

### *Defendant KEPRO*

93. WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

94. Upon information and belief, KEPRO directed APS to breach the LOA, Extension Amendment, Four-Month Extension, Contract, and other relevant agreements upon its purchase of APS.

95. WVMI had a contractual and business relationship and interests with APS and with DHHR and DOA through its provision of utilization review and prior authorization services pursuant to the Contract, LOA, Extension Amendment, Four-Month Extension, and other relevant agreements between APS, WVMI, DHHR, and DOA.

96. KEPRO is not a party to the Contract, LOA, Extension Amendment, Four-Month Extension, or any other relevant agreements between APS, WVMI, DHHR, and DOA.

97. Upon information and belief, KEPRO intentionally interfered with the contractual and business relationship and interests that WVMI had with APS and with DHHR and DOA by directing APS to breach the Contract, LOA, Extension Amendment, Four-Month Extension, and other relevant agreements as described above and by attempting to unlawfully prevent WVMI from competing in the Upcoming RFP in violation of antitrust and state purchasing law.

98. Upon information and belief, KEPRO did so with gross fraud, malice, oppression, with wanton, willful, reckless conduct, and with criminal indifference to civil obligations.

99. This interference has caused WVMI to suffer compensable damages and irreparable harm and will continue to cause WVMI to suffer compensable damages and irreparable harm if WVMI is not granted the relief prayed for below.

100.    The actions of KEPRO as described above and otherwise described herein constitute tortious interference with contractual relations.

101.    WHEREFORE, WVMI respectfully requests that this Court grant as follows:

18

    a. Declare that KEPRO tortuously interfered with WVMI's contractual and business relations and interests, as described above;

    b. Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

    c. Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## Count V: Tortious Interference with Contractual Relations

### *Defendants KEPRO and APS*

102.     WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

103.     WVMI had contractual and business relations with its employees.

104.     KEPRO and APS, who are not parties to those contracts, tortiously interfered with WVMI's contractual and business relations with its employees, as described herein, by aggressively recruiting them.

105.     KEPRO and APS engaged in this conduct with the intent to cripple WVMI's business and its ability to compete in the Upcoming RFP.

106.     WVMI has suffered damages as a result of this tortious conduct.

107.     WHEREFORE, WVMI respectfully requests that this Court grant as follows:

    a. Declare that KEPRO and APS tortiously interfered with WVMI's contractual and business relations and interests with its employees, as described above;

    b. Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

c.  Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## Count VI: Declaratory Relief

*Defendants KEPRO, APS, DOA, and DHHR*[2]

108.    WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

109.    APS's Bid constitutes an offer to DHHR and DOA, and the inclusion of WVMI as a "proposed subcontractor" in the Bid constitutes an offer by APS that it would employ WVMI as the critical subcontractor to perform utilization review and prior authorization services under the Contract.

110.    The inclusion of WVMI as the critical subcontractor was a material term to the offer.

111.    By awarding the Contract to APS, DOA and/or DHHR accepted accepted the offer, including the material term in which WVMI is identified as a "proposed subcontractor."

112.    By operation of law and by the express terms of the RFP, the terms of the Bid became part of the Contract itself, including the material term in which WVMI is identified as a "proposed subcontractor." Specifically, the RFP states that "the RFP and the Vendor's response will be included as part of the contract by reference."

113.    Neither the First nor the Second Extensions to the Contract changed the material term regarding WVMI's role as the critical subcontractor.

114.    Indeed, the RFP requires that the successful bidder seek and obtain DHHR approval to use a subcontractor, which it did by accepting the offer to use WVMI as a subcontractor.

---

[2]    Defendants DOA and DHHR were included here because they are parties to the contracts at issue and thus would be affected by the declaration. "When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration . . . ." W. Va. Code § 55-13-11.

115.    In the Bid, APS specifically requested formal approval to use WVMI as a subcontract for the critical functions of utilization review and prior authorization services.

116.    This request was formally granted by DHHR.

117.    The RFP and the Contract state that if changes to the Contract become necessary,

> a formal contract change order will be negotiated by the State [DOA], the Agency [DHHR] and the Vendor [APS], to address changes to the terms and conditions, costs of work included under the contract. Approved contract change order is defined as one approved by the Purchasing Division and approved as to form by the West Virginia Attorney General's Office . . . .

118.    Additionally, the RFP and the Contract emphatically state that **"NO CHANGE SHALL BE IMPLEMENTED BY THE VENDOR UNTIL SUCH TIME AS THE VENDOR RECEIVES AN APPROVED WRITTEN CHANGE ORDER"** (emphasis in original).

119.    Thus, any attempted change to the Contract — including an elimination of WVMI's critical subcontractor role providing utilization review and prior authorization services comprising nearly 50% of the total contract — is ineffective and unlawful without a formal change order.

120.    Upon information and belief, APS has not sought, nor has DOA granted, any change orders to the Contract that would eliminate or modify WVMI's critical subcontractor role.

121.    Despite this, KEPRO and APS seek to prematurely eliminate WVMI's critical subcontractor role in breach of the Contract.

122.    WVMI is an intended third-party beneficiary of the Contract, including all extensions.

123.    WVMI has a substantial and direct interest in the Contract.

124.    As a result of the foregoing, an actual, justiciable controversy exists regarding the interpretation of the Contract, the LOA, the Extension Amendment, and other agreements between the parties.

21

125.     Pursuant to Rule 57 of the West Virginia Rules of Civil Procedure, as well as the Uniform Declaratory Judgment Act, W. Va. Code § 55-12-1, *et seq.*, WVMI requests that this Court enter a Declaratory Judgment that WVMI is entitled to perform under the Contract as the critical subcontractor for utilization review and prior authorization services for the entirety of the Contract, including all extensions.

126.     WHEREFORE, WVMI respectfully requests that this Court declare as follows:

a. Declare that WVMI's role as a critical subcontractor providing utilization review and prior authorization services is a material term to the Contract;

b. Declare that DOA and/or DHHR must approve a formal change order before WVMI's role as a critical subcontractor under the Contract can be changed, modified, or eliminated in any way, as required by the Contract;

c. Declare that WVMI is legally entitled to continue performing through the entirety of the Contract, including the Second Extension and all future extensions, as a result of the Contract, LOA, Extension Amendment, and all other relevant contracts;

d. Declare that APS's and KEPRO's heavy-handed negotiation tactics, including but not limited to the trilemma, were unlawful, tortious, in breach of all relevant contracts, and in bad faith;

e. Award costs and attorneys' fees associated with this declaratory judgment action, pursuant to W. Va. Code § 55-13-10; and

f. Award any and all other further relief, including but not limited to further declaratory relief, that the Court and jury deem just and proper.

22

### Count VII: Violations of the West Virginia Computer Crimes and Abuse Act

127.     WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

128.     Hobbs and Taylor, following their resignation of employment from WVMI, knowingly, willfully, and without authorization, directly or indirectly, possessed WVMI's computer data.

129.     Hobbs and Taylor possessed this computer data while employees and/or agents of KEPRO and/or APS.

130.     WVMI has suffered damages resulting from this conduct.

131.     The conduct alleged herein violates the West Virginia Computer Crime and Abuse Act, W. Va. Code § 61-3C-1, *et seq.*

132.     WHEREFORE, WVMI respectfully requests that this Court grant as follows:

   a. Declare that Defendants violated the West Virginia Computer Crimes and Abuse Act, as described above;

   b. Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

   c. Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

### Count VIII: Violations of the Uniform Trade Secrets Act

133.     WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

134.     By engaging in the conduct alleged herein, Hobbs and Taylor, individually and as employees and/or agents of KEPRO and/or APS, have misappropriated WVMI's trade secret information and data from which WVMI derives independent economic value, actual or potential,

23

from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and is the subject of efforts by WVMI reasonable under the circumstances to maintain their secrecy.

135.   Hobbs and/or Taylor have used improper means, including theft, breach or inducement of a breach of a duty to maintain secrecy, breach or inducement of a breach of Hobbs's and Taylor's employment contract, and/or espionage through electronic or other means to obtain WVMI's confidential, proprietary, and trade secret information and data.

136.   Upon information and belief, Hobbs and Taylor possessed WVMI's confidential, proprietary, and trade secret information while employees and/or agents of KEPRO and/or APS, all without WVMI's express or implied consent.

137.   Hobbs's and Taylor's misappropriation of WVMI's trade secret information was willful and malicious.

138.   The conduct alleged herein violates the Uniform Trade Secrets Act, W. Va. Code § 47-22-1, *et seq.*

139.   WHEREFORE, WVMI respectfully requests that this Court grant as follows:

   a.   Declare that Defendants violated the Uniform Trade Secrets Act, as described above;

   b.   Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

   c.   Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

24

## Count IX: Conversion

140.    WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

141.    The conduct alleged herein constitutes wrongful exertion of dominion over WVMI's business property in denial of WVMI's rights.

142.    The conduct alleged herein constitutes an unlawful conversion for which WVMI is entitled to recover all available damages and/or the converted property.

143.    WHEREFORE, WVMI respectfully requests that this Court grant as follows:

    a.  Declare that Defendants converted WVMI's property, as described above;

    b.  Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

    c.  Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

## Count X: Breach of contract

### *Defendants Hobbs and Taylor*

144.    WVMI realleges all preceding paragraphs as if fully set out and alleged herein.

145.    As a condition of Hobbs's and Taylor's employment with WVMI, they were under a duty to return all WVMI information and data and to not disclose WVMI's confidential, proprietary, and trade secret information.

146.    The conduct alleged herein violates these duties.

147.    WHEREFORE, WVMI respectfully requests that this Court grant as follows:

a.  Declare that Hobbs and Taylor breached their employment contracts, as described above;

b.  Award WVMI all applicable damages available, including but not limited to compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief; and

c.  Award any and all other further relief, including but not limited to further declaratory and injunctive relief, that the Court and jury deem just and proper.

Respectfully submitted,

West Virginia Medical Institute, Inc.,

*By counsel,*

Carte P. Goodwin (W. Va. Bar 8039)
James A. Kirby, III (W. Va. Bar 8564)
Lucas R. White (W. Va. Bar 12501)
GOODWIN & GOODWIN, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
(304) 346-7000

26

## VERIFICATION

West Virginia Medical Institute, Inc., by David Lambert, its Chief Administrative Officer, being duly sworn, states that he has been authorized by West Virginia Medical Institute, Inc. to bring the above-styled Complaint; that he has read the foregoing Complaint; that he has personal knowledge of the facts and allegations contained therein; and that the facts and allegations contained herein are true to the best of his knowledge.


David Lambert
Chief Administrative Officer
West Virginia Medical Institute, Inc.


STATE OF WEST VIRGINIA,

COUNTY OF Kanawha, TO WIT:

Taken, subscribed, and sworn before me, a Notary Public in and for the County and State aforesaid, this 3rd day of September 2015.

My Commission expires: August 1, 2022

Shella R. Rauen
Notary Public

OFFICIAL SEAL
STATE OF WEST VIRGINIA
NOTARY PUBLIC
SHELLA R. RAUEN
331 BELVUE DRIVE
HURRICANE, WV 25526
MY COMM. EXP. AUGUST 1, 2022

1

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

FILED

2015 SEP -4 PM 3:30

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

WEST VIRGINIA MEDICAL INSTITUTE, INC.,

        Plaintiff,

v.                           Civil Action No.: 15-C-1680

INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
a West Virginia Agency, ANGELA HOBBS, an
individual, and KRISTYN TAYLOR, an
individual,

        Defendants.

## PLAINTIFF WEST VIRGINIA MEDICAL INSTITUTE, INC.'S MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

COMES NOW Plaintiff West Virginia Medical Institute, Inc. ("WVMI"), by counsel, and

files this Motion for Preliminary Injunction and Temporary Restraining Order against Defendants

Innovative Resource Group, LLC d/b/a APS Healthcare Midwest ("APS") and KEPRO

Acquisitions, Inc. ("KEPRO"). WVMI and APS provide services to West Virginia's Medicaid

program pursuant to a six-year contract that will soon be rebid. A mutual competitor, KEPRO, has

since purchased APS and now both entities seek to deprive WVMI of its contract in its final days,

in an unlawful, tortious, and bad-faith effort to eliminate competition with WVMI in the upcoming

rebid. Additionally, KEPRO and APS are aggressively poaching WVMI's employees in an effort

1-4

1

to undermine WVMI's ability to perform its services and to compete in the rebid, while simultaneously threatening to disrupt services to West Virginia's Medicaid program and its patients and providers. Two of these poached employees, Angela Hobbs ("Hobbs") and Kristyn Taylor ("Taylor") took significant amounts of WVMI's confidential, proprietary, and trade secret information prior to their resignations from WVMI. Upon information and belief, Hobbs and Taylor possessed and may still possess this information individually and as employees and/or agents of KEPRO and/or APS.

These actions are tortious, in bad faith, in breach of contract, and violate West Virginia's purchasing laws. WVMI has been irreparably harmed by these actions and will continue to be harmed in more drastic ways if KEPRO and APS are not stopped and its misappropriated computer data is not returned. For these reasons, WVMI respectfully requests that this Court issue a preliminary injunction enjoining APS's and KEPRO's tortious actions and breaches for the pendency of this litigation and requiring immediate return of WVMI's property. Additionally, because time is of the essence and significant irreparable harm *is already occurring*, WVMI also respectfully requests that this Court issue a temporary restraining order, as well, in order to maintain the status quo. In further support of this Motion, WVMI states as follows:

I.      **Facts**

For nearly 40 years, WVMI has provided utilization review, prior authorization, and other services to West Virginia's Medicaid program. Essentially, "utilization review" or "utilization management" refers to the review of health care services provided to a health insurer's members — in this case, Medicaid beneficiaries — to confirm that the treatments are medically necessary and cost-effective. This review is performed by physicians, nurses, and other health care professionals. "Prior authorization" is a type of review where approval is required before services

2

are rendered; if prior authorization is not given, the insurer (Medicaid) in most cases will not pay the provider. High-cost services typically requiring prior authorization include hospital stays, certain surgeries, in-home care, and medical equipment. WVMI has provided these services to the State for years and pursuant to multiple contracts awarded through competitive bidding. In addition to these utilization review services, WVMI also assesses the medical needs of Medicaid beneficiaries in their homes to determine if they are medically eligible for in-home care under the Medicaid Aged and Disabled Waiver program. These assessments and annual reassessments are performed by trained nurses geographically located across West Virginia.

On January 30, 2009, the Department of Health and Human Resources ("DHHR"), in conjunction with the Department of Administration ("DOA"), released a Request for Proposals ("RFP") for these utilization management and prior authorization services across three different DHHR bureaus, effectively combining several piecemeal contracts into one, overall utilization management and prior authorization review contract for the entire State ("Contract"). *See* RFP, attached hereto as Exhibit A.

APS and WVMI sought to combine their respective talents and submit a bid in response to the RFP ("Bid"). Specifically, APS and WVMI entered into an agreement ("Teaming Agreement") whereby APS would submit the formal Bid as the prime vendor, and the Bid would specifically list WVMI as the critical "proposed subcontractor" for the provision of utilization review and prior authorization services for West Virginia's Medicaid program. *See* Teaming Agreement, attached hereto as Exhibit B. The Bid's structure relied heavily on WVMI's long history and vast experience as the provider of Medicaid utilization review and prior authorization services to the State. *See, e.g.*, Bid, relevant portions of which attached hereto as Exhibit C. Additionally, structuring the Bid in this way insured that there was continuity of service, as WVMI had been the incumbent provider

3

for over 30 years. This teaming strategy was successful, and APS and WVMI won the contract, beating out the only other bidder, which happened to be KEPRO. *See* Purchase Order BMS90007 and Bid Tabulation, attached hereto as Exhibits D and E, respectively. Effective December 1, 2009, APS and WVMI became the providers of utilization management and prior authorization services to DHHR, and WVMI's portion accounted for nearly 50% of the total value of the Contract. *See* contract value table, attached hereto as Exhibit F. In order to formalize the relationship between WVMI and APS, they entered into a Letter of Agreement ("LOA") outlining each other's rights and obligations with respect to the Contract. *See* LOA, attached hereto as Exhibit G.

The Contract provided for a five-year term and was set to expire on November 30, 2014. However, because of internal delays in preparing the request for proposals for the new contract ("Upcoming RFP"), DHHR extended the original contract for an additional six months to May 31, 2015 ("First Extension"). WVMI and APS quickly and amicably amended the LOA to reflect this extension, expressly stating their "**desire to extend the Agreement and its current terms and conditions to be co-terminous with the Prime Contract.**" Extension Amendment at pg. 1, attached hereto as Exhibit H. (emphasis added). Thus, WVMI and APS intended and agreed at this time — as they had always intended since the Teaming Agreement — that WVMI would provide utilization review and prior authorization services for the entire Contract.[1] Throughout the six-month period of the First Extension, WVMI and APS were performing their respective duties under the Contract. Simultaneously, WVMI and APS were negotiating another teaming agreement to once again join forces for the Upcoming RFP. *See* draft teaming agreement, attached hereto as Exhibit I.

---

[1]     Consistent with the parties' stated intent, the Extension Amendment admittedly included a term provision providing that the LOA, as extended, would expire on May 31, 2015, the same date as the underlying Contract. *See* Exhibit H at pg. 1.

4

On May 4, 2015, in response to further delays in preparing the Upcoming RFP, DHHR once again extended the Contract for another six months, until November 30, 2015 ("Second Extension"). On May 6, 2015, two days after the Second Extension, KEPRO (which was the only other bidder during the 2009 RFP) informed WVMI that it had acquired APS as a wholly owned subsidiary. *See* letter from S. Schlager, attached hereto as Exhibit J. Shortly thereafter, KEPRO informed WVMI it believed that federal conflict-of-interest rules regarding separate contracts that both KEPRO and WVMI had with the United States Centers for Medicare and Medicaid ("CMS") precluded WVMI's continuing performance.[2] Because of this purported conflict of interest, KEPRO contended that it had to sever APS's contractual relationship with WVMI at the end of the First Extension (even though the LOA, as amended, provides that WVMI's role is "co-terminous"). KEPRO cited no express opinion from CMS regarding this issue; its supposed interpretation of the law was its own. KEPRO presented WVMI with a draft agreement that terminated WVMI's services after three months, transferred all of WVMI's Medicaid reviewing employees to APS, and contained an absurd clause that prevented WVMI from ever competing against KEPRO "in *perpetuity*."[3] *See* initial proposed agreement (emphasis added), attached hereto as Exhibit K.

This purported conflict of interest struck WVMI as particularly suspicious. In response, WVMI sough guidance directly from CMS, which informed WVMI that "a six-month transition period is fair and reasonable and does not pose a conflict of interest." *See* letter to K. Tatum and email from K. Tatum, attached hereto as Exhibits L and M, respectively. After its conflict-of-interest strategy proved unsuccessful, KEPRO became brazen in its anti-competitive intent,

---

[2]      WVMI and KEPRO both have Quality Improvement Organization contracts with CMS, the provisions of which generally prohibit them from contracting together to provide Medicare-related services.

[3]      As explained below, such anti-competitive clauses violate West Virginia purchasing laws. *See* W. Va. Code § 5A-3-31.

5

informing WVMI that any extension would be contingent upon WVMI's agreement to forgo competing in the Upcoming RFP: "competing with us directly during the upcoming re-bid is not tenable to KEPRO." *See* email from S. Schlager, attached hereto as Exhibit N.

With their true motivation laid bare, APS and KEPRO engaged in bad-faith and heavy-handed negotiation tactics, providing WVMI with the following trilemma of unacceptable options:

1. that KEPRO and APS agree to a six-month extension of the LOA in exchange for WVMI agreeing to forgo submitting a bid for the Upcoming RFP, in brazen violation of applicable antitrust and purchasing laws;

2. that KEPRO and APS agree to a three-month extension of the LOA in which WVMI would forfeit half of the remaining value of the Contract (approximately $2.1 million) under the Second Extension; or

3. that the parties simply let the LOA and Extension Amendment expire, causing WVMI to lose all of its remaining business under the Contract entirely.

The first option was unacceptable because it required giving up the chance to compete in the Upcoming RFP. In fact, the first option is patently illegal. By pressuring WVMI to enter into such an anti-competitive agreement, KEPRO and APS acted to "[l]essen competition among prospective vendors" in violation of West Virginia Code § 5A-3-31. Additionally, agreeing to this clause would also constitute a restraint of trade in violation of West Virginia's antitrust laws. *See, e.g.*, W. Va. Code § 47-18-3 (prohibiting contracts whereby "[o]ne or more persons . . . refrains from the submission of a bid" in competitive contracts).

The second option was unacceptable because it conflicted with the parties' original intent and nearly six-year understanding that WVMI's service would be "co-terminous" with the

Contract with DHHR. This option would cause WVMI to lose three months of business and over two million dollars, forcing it to lay off much of its staff, who would no doubt go to work for KEPRO and APS. With this severe loss of income and flight of talent, WVMI would then be in a severely weakened position to compete for the Upcoming RFP. Thus, while this second option did not include an explicit anti-competitive clause, it would still have the same effect. Finally, the third option was as unacceptable as the first, but doubly so: instead of losing three months of business, WVMI would lose six.

After WVMI rejected these unacceptable options, the parties continued contentious negotiations through late May and early June of this year. As of May 31, the First Extension ended and the Second Extension began, and WVMI and KEPRO/APS had not agreed to an extension. Yet there was still utilization review and prior authorization work that needed to be done. WVMI was effectively forced to continue to perform its obligations under the Contract without a formal extension agreement. And WVMI did so: it performed these services without *any* guarantee that it would be compensated. Finally, on June 10, ten days *after* the First Extension ended, the parties agreed to a four-month extension of the LOA, until October 1, 2015 ("Four-Month Extension").[4] *See* Four-Month Extension, attached hereto as Exhibit O. While WVMI is entitled to the full six months in order to be "co-terminous" with the Contract, WVMI had no commercially reasonably alternative than to accept this insufficient Four-Month Extension due to APS's and KEPRO's heavy-handed negotiation tactics and their unfair exploitation of their position as the nominal prime vendor. Otherwise, WVMI would jeopardize not only its future business in the Upcoming RFP, *but also* payment for services *already rendered*. The Four-Month Extension was therefore

---

[4]     The Four-Month Extension was silent as to the final two months of the Contract and did not waive WVMI's right to perform those services.

accepted to maintain the status quo, to continue working towards an amicable resolution regarding the final two months, and to preserve WVMI's ability to compete in the Upcoming RFP.

Within days of executing the Four-Month Extension, KEPRO went for the mortal blow. KEPRO and APS began aggressively targeting, recruiting, and poaching WVMI's highly trained, essential employees. *See* affidavits of S. Holstine and S. Leadman, attached hereto as Exhibits P and Q, respectively. KEPRO and APS have deliberately lied in these efforts, reviving the concocted conflict-of-interest ruse, and stating that "the termination of our subcontractual arrangement has been mutually agreed upon due to a conflict of interest per CMS Guidelines related to current Medicare business performed by both parties." *See* letter from H. Snyder, attached hereto as Exhibit R. To date, 23 WVMI employees have resigned or have turned in resignation notices, with as many as 15 going to KEPRO and APS. *See* affidavit of D. Lambert, attached hereto as Exhibit S. These include employees at all levels of WVMI's Medicaid operation, including reviewers, clerical staff, a manager, and a director. WVMI's reviewing resources were already stretched thin due to the recent Medicaid expansion. All of its prior authorization employees were working on mandatory overtime *before* the issues with KEPRO and APS, so WVMI cannot make up for these resignations with its remaining employees. Because of the compressed timeframe, WVMI does not have time to hire and train new reviewers, either. Minimum training is at least three months. *See id.* The loss of these employees — especially at this time — will undermine WVMI's ability to perform its services and cripple WVMI's ability to submit a bid in the Upcoming RFP. In fact, KEPRO and APS have apparently set the poached employees' start date as August 25 — *even before the end of the Four-Month Extension. See id.* Not content to hobble WVMI for the final two months and the Upcoming RFP, KEPRO also wants to sabotage the Four-Month Extension itself.

8

Two of these poached employees, Hobbs and Taylor, were recently discovered to have taken over one hundred (100) WVMI documents and forwarded over one thousand (1,000) WVMI emails to their personal accounts. These documents and emails contain WVMI's confidential, proprietary, and trade secret information, including internal processes, reviewing criteria, and training materials — everything competitors like KEPRO and APS would need to entirely replicate WVMI's business. Upon information and belief, Hobbs and Taylor possessed and may in fact still possess this information, in their individual capacity and as employees and/or agents of KEPRO and/or APS.

APS, at KEPRO's direction, has exploited its position as the nominal prime vendor to force WVMI out of the Contract, in breach of the Letter of Agreement and in violation of the duty of good faith and fair dealing. Moreover, KEPRO and APS have sought to destroy their competition in the Upcoming RFP by poaching WVMI's employees and attempting to extract illegal anti-competitive agreements. Because of the irreparable harm that WVMI has suffered and will continue to suffer if KEPRO and APS continue their unlawful actions, WVMI now respectfully requests that this Court issue a preliminary injunction enjoining these actions and maintaining the status quo for the pendency of the litigation until such time as a permanent injunction can be issued. Also, WVMI requests that this Court order the immediate return of all of WVMI's confidential, proprietary, and trade secret information and data in the possession of KEPRO, APS, Hobbs, or Taylor. Because time is of the essence, WVMI also requests that this Court issue a temporary restraining order, as well, until a hearing can be held on the preliminary injunction.

## II.    Standard of Review

Rule 65 of the West Virginia Rules of Civil Procedure provides for preliminary injunctive relief through the pendency of an action. However, because preliminary injunctions can only be

9

issued with notice to the adverse party, Rule 65 also provides for a temporary restraining order

("TRO") which can control until such time as a hearing can be held on a preliminary injunction.

As the Supreme Court of Appeals has described,

> When circumstances are not urgent, an aggrieved party will ask a court for a
> preliminary injunction, which requires notice to the adverse party. However, when
> circumstances show that 'immediate and irreparable injury, loss, or damage will
> result to the applicant before the adverse party' can be heard, a party may ask a
> court to issue, in lieu of a preliminary injunction, an *ex parte* temporary restraining
> order.

*Camden-Clark Mem. Hosp. Corp. v. Turner*, 575 S.E. 2d 362, 367 (W. Va. 2002) (footnote

omitted) (quoting W. Va. R. Civ. P. 65(b)).

The Supreme Court of Appeals has instructed that

> The customary standard applied in West Virginia for issuing a preliminary
> injunction is that a party seeking the temporary relief must demonstrate by a clear
> showing of a reasonable likelihood of the presence of irreparable harm; the absence
> of any other appropriate remedy at law; and the necessity of a balancing of hardship
> test including: '(1) the likelihood of irreparable harm to the plaintiff without the
> injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the
> plaintiff's likelihood of success on the merits; and (4) the public interest.'

*State By and Through McGraw v. Imperial Mrktg.*, 472 S.E. 2d 792, 798 n.8 (W. Va. 1996)

(quoting *Jefferson Cnty. Bd. Educ. v. Jefferson Cnty. Educ. Ass'n*, 393 S.E. 2d 653, 662 (W. Va.

1990)). Furthermore, the Court has stated that the balancing of hardship factors are seen in

"flexible interplay," meaning that a weak finding of one factor can be outweighed by a strong

finding of another. *Jefferson Cnty*, 393 S.E. 2d at 663 (quoting *Merrill Lynch, Pierce, Fenner &*

*Smith, Inc. v. Bradley*, 756 F. 2d 1048, 1054 (4th Cir. 1985).

The standard for a TRO is essentially the same, except that the party seeking one must

demonstrate by affidavit or verified complaint that "immediate and irreparable injury, loss, or

damage will result" before a hearing can be held. W. Va. R. Civ. P. 65(b).

### III.    Argument

Absent injunctive relief, WVMI will suffer immediate and irreparable harm. It will lose the benefits of the final two months of the Contract to which it is entitled, and it will be severely hobbled in bidding for the Upcoming RFP. KEPRO's harm, by comparison, is minimal. WVMI has a high likelihood of success given the Defendants' brazen flouting of their own anti-competitive intent. Moreover, the Letter of Agreement evinces the parties' intent that it be "co-terminous" with the Contract. Finally, the public interest weighs heavily in favor of fostering competition in the Upcoming RFP and avoiding service disruptions to West Virginia's Medicaid program. KEPRO and APS are engaging in unlawful activity *right now*, and that conduct is causing substantial and irreparable harm to WVMI *right now*. Immediate action is necessary to prevent further and deeper harm that cannot be undone. As such, not only a preliminary injunction is necessary, but also a TRO as well.

> ### a.    *WVMI will suffer further irreparable harm if the injunctive relief is not granted because it will lose its crucial employees and the ability to submit a bid in the Upcoming RFP.*

Without the final two months of the Contract, WVMI will be in a dire economic situation. Its Medicaid work constitutes a substantial portion of its business, and going without it for the final two months would cause deep lay-offs in staff — the staff left behind by KEPRO, at least — and would seriously threaten WVMI's finances. Of course, the other threat to WVMI is KEPRO's and APS's aggressive poaching of critical WVMI employees at all levels, from the nurses and administrative staff who do most of the review work, to their managers and directors who oversee operations. These critical employees are necessary to perform WVMI's services for both the Four-Month Extension and the final two months of the Contract. Moreover, these employees,

11

particularly the higher-level managers and directors, are necessary to prepare and submit a bid in the Upcoming RFP. The most egregious fact, though, is that KEPRO and APS are setting many of the poached employees' start date as August 25, before the end of the Four-Month Extension and in the midst of WVMI's pre-bid preparation. If such flight of employees is left unabated, WVMI's ability to submit a competitive bid in the Upcoming RFP will be crippled, as will its ability to perform even for the remainder of the Four-Month Extension, let alone the final two months to which it is entitled. Finally, and worst of all, if WVMI's ability to perform its utilization review and prior authorization services is further undermined, West Virginia's Medicaid program risks serious service disruptions, including delays in medical care that requires prior authorization and delays in reimbursement to providers. As for the misappropriated proprietary information, the harm WVMI suffers is substantial and irreparable. It essentially provides a roadmap for competitors — namely KEPRO and APS — to entirely replicate WVMI's business and train employees to perform WVMI's utilization review and prior authorization services.

WVMI simply seeks injunctive relief to prevent the active recruitment of WVMI employees and to maintain the status quo of the Letter of Agreement for the remainder of the Contract. Failure to grant this injunctive relief now will cause WVMI to lose the final two months of the Contract, undermine its ability to perform even through the Four-Month Extension, cripple its ability to submit a competitive bid, and risk service disruption to West Virginia's Medicaid beneficiaries and providers. These are all bells that cannot be unrung.

### b. KEPRO and APS will not suffer irreparable harm if the injunctive relief is granted because the relief would only preserve the status quo.

In contrast, the harm to KEPRO and APS if the injunctive relief is granted is minimal. All that would happen is that the status quo would be maintained, just as it has been for over five and a half years. The parties would continue in the same relationship that they have been all this time

(and to which they have contractually agreed, no less). If WVMI is ultimately unsuccessful in this litigation, KEPRO and APS would of course then be free to proceed to take the remaining two months of the Contract and WVMI employees, as if nothing ever happened.

### c. WVMI will likely succeed on the merits because KEPRO and APS are undoubtedly seeking to stifle competition in the Upcoming RFP and because the parties clearly intended WVMI's role to be "co-terminous" with the Contract.

WVMI has brought several claims against KEPRO and APS: (1) violation of state purchasing law prohibiting anti-competitive conduct, (2) breach of contract, (3) breach of the duty of good faith and fair dealing, (4) tortious interference with contractual relations, (5) tortious interference with WVMI's employees, and (6) declaratory judgment. Essentially, WVMI's success on all six of these counts turns on two basic legal questions:

- Whether KEPRO and APS have acted to "[l]essen competition among prospective vendors" (Count I and V); and

- Whether the LOA, as amended, is "co-terminous" with the overall Contract (Counts II–IV and VI).

The answer to both of these questions is yes, thus providing WVMI with a high likelihood of success on the merits.

The first question goes to Count I, which alleges a violation of West Virginia Code § 5A-3-31. This statute prohibits actions detrimental to competition among bidders on public contracts and provides:

> (a) It shall be unlawful for any person to corruptly **act alone** or combine, collude or conspire with one or more other persons with respect to the purchasing or supplying of services, commodities or printing to the state under the provisions of this article if the purpose or effect of such action, combination, collusion or conspiracy is either to:
>   (1)   **Lessen competition among prospective vendors**; or

13

> (2) **Cause the state to pay a higher price** for such services, commodities or printing than would be or would have been paid in the absence of such action, combination, collusion or conspiracy; or
>
> (3) **Cause one prospective vendor or vendors to be preferred over one or more other prospective vendor or vendors.**
>
> (b) Any person who violates any provision of this section is guilty of a felony and, upon conviction thereof, shall be imprisoned in a state correctional facility not less than one nor more than five years, and be fined not exceeding $10,000.

W. Va. Code § 5A-3-31 (emphasis added). The rationale of this statute is obvious: to foster a strong market and a lower price for services paid for by the public. That KEPRO and APS have been attempting to keep WVMI out of the running for the Upcoming RFP cannot seriously be denied, not even by KEPRO and APS themselves. *They have already admitted as much.* APS's own Chief Operating Officer baldly stated to WVMI that "competing with us directly during the upcoming re-bid is not tenable to KEPRO." *See* Exhibit N. When considering whether KEPRO and APS intended to lessen competition among vendors, this Court should take them at their word. KEPRO's statements, when combined with their calculated conduct and employee poaching, provide a high likelihood of success on the merits of WVMI's first claim.

All of the remaining counts turn on the interpretation of the LOA, namely, whether it is intended to be "co-terminous" with the Contract. Obviously WVMI's breach of contract claim (Count II) turns on this, but so does its claims for breach of the duty of good faith and fair dealing (Count III), tortious interference with contractual relations (Count IV), and declaratory relief (Count V). As described above, APS and WVMI entered into the LOA, which provided that they would work together for the five-year term of the Contract. *See* Exhibit G at pg. 2 (providing a five-year term for the LOA from December 1, 2009 to November 30, 2014, absent termination and notice provisions). Given the finite term of the overall Contract, it only made sense that the LOA

14

also have a corresponding finite term, as well.[5] When the five-year Contract suddenly became a five-and-a-half-year Contract with the First Extension, WVMI and APS quickly executed the Extension Amendment, stretching out the terms of the LOA accordingly, expressly stating that "**the parties desire to extend the Agreement and its current terms and conditions to be co-terminous with the Prime Contract.**" Exhibit H at pg. 1 (emphasis added). Add this express text to the course of dealing between the parties, and the intent of the parties becomes clear. WVMI and APS had joined forces pursuant to the Teaming Agreement to submit a joint bid to DHHR for the Contract. APS, acting as the nominal prime vendor, relied on WVMI's history and experience performing utilization review and prior authorization services for West Virginia's Medicaid program and its then-incumbent position. When the Contract was extended, the LOA was extended. Obviously, the parties intended this relationship to last as long as the Contract.

This all changed when APS was acquired by KEPRO. It was only then, when it was controlled by the only other bidder in the 2009 RFP, that APS reneged on the nearly six-year understanding between the parties. KEPRO and APS have since stated in absolute and unequivocal terms that WVMI will not be performing the final two months of the Contract, despite the LOA. Moreover, KEPRO and APS have taken definitive steps detrimental to WVMI in furtherance of this intent to breach. In so doing, APS, at KEPRO's direction, has repudiated the LOA, thereby breaching it. As the Supreme Court of Appeals has instructed,

> It is well established . . . that the renunciation or repudiation of a contract before the time for performance, which amounts to a refusal to perform at any time, gives the adverse party the option to treat the entire contract as broken and to sue immediately for damages as for a total breach.

*Annon v. Lucas*, 185 S.E. 2d 343, 350 (W. Va. 1971) (citations and quotations omitted).

---

[5]     The LOA provides for termination without cause, but only with 120 days' notice. *See* Exhibit G at pg. 2. APS never complied with this notice provision.

Moreover, KEPRO's and APS's aggressive poaching of employees is hindering WVMI's ability to perform not only the final two months of the Contract, but even the Four-Month Extension. With fewer employees doing more work, WVMI is suffering backlogs and is in danger of service disruptions. *See* Exhibit S. In recruiting these essential employees away from WVMI, APS (at KEPRO's direction) has breached the duty implied in every contract to refrain from hindering the other's performance. *See, e.g., Millan v. Bartlett*, 71 S.E. 13 (W. Va. 1911) ("An express covenant to perform certain acts implies a covenant to refrain from performance of other acts which operate to defeat performance of the express covenant."); *Whitt v. Godwin*, 193 S.E. 2d 841, 844 (Va. 1965) ("There is an implied condition of every contract that one party will not prevent performance by the other party."); 23 Williston on Contracts § 63:26 (4th ed.) ("[W]here a party stipulates that another shall do a certain thing, that party consequently impliedly promises that he or she will personally do nothing that will hinder or obstruct the other in doing that thing.").

Given the express "co-terminous" text, the course of dealing between WVMI and APS, and the breach of the implied term to not prevent the other party's performance, WVMI has a high likelihood of success on the contractual claims, as well. As for the misappropriated proprietary information and data, WVMI also has a high likelihood of success on the merits. This information is undoubtedly WVMI's, not Hobbs's or Taylor's, and should be returned immediately.

### d. The public interest demands that this injunctive relief be granted in order to prevent disruption of services to West Virginia's Medicaid patients and providers and to ensure competition in the Upcoming RFP.

The public interest is the most important reason why injunctive relief should be granted in this case. The public has a strong interest in fostering vigorous competition among bidders on public contracts to ensure the most efficient use of taxpayers' funds. Given the fast-approaching rebid and KEPRO's and APS's present actions to scuttle any hope of a competitive WVMI bid,

16

the public interest weighs heavily in favor of injunctive relief enjoining such anti-competitive conduct. The actions that KEPRO and APS are engaging in *right now* are having — and will continue to have — irreparable harm on WVMI's ability to compete. *See* Exhibit S. The less competition in the Upcoming RFP, the more public funds will be needlessly expended. Additionally, KEPRO's and APS's poaching of employees is not only harming WVMI's ability to submit a competitive bid, but also threatening disruptions in the provision of its services to West Virginia's Medicaid program. With employees leaving to go to KEPRO and APS *even before the end of the Four-Month Extension*, WVMI is dangerously close to delays, which will cause longer wait times for Medicaid beneficiaries who need prior authorizations and denial or delays in payment to providers who render services without prior authorization. *See id.*

### e. *Because time is of the essence, this Court should issue a temporary restraining order until the preliminary injunction can be ruled upon.*

WVMI faces immediate and irreparable harm if injunctive relief is not granted now. KEPRO's and APS's actions are undermining WVMI's ability to submit a bid, which it is preparing for now. This new contract will be put out to bid only once, and if WVMI misses this chance now due to KEPRO's and APS's misconduct, WVMI will not have another chance for several years, if ever. Moreover, the poaching of employees is threatening WVMI's ability to perform its utilization review and prior authorization services *now*, particularly given the August 25 start date that KEPRO and APS have instituted. If services are delayed, WVMI will not be able to turn back the clock and complete reviews on time. There simply is not enough time to provide both a full hearing on the preliminary injunction and to forestall the irreparable harm to WVMI — and the public — if KEPRO's and APS's actions are not stopped now.

In compliance with Rule 65 of the West Virginia Rules of Civil Procedure, the undersigned counsel for WVMI certifies that immediate and irreparable harm will occur before the adverse

17

parties can be heard in opposition. All parties of record will be served through the formal Rule 4 process with the Summons, Complaint, and this Motion. Additionally, in order to provide notice as soon as practicably possible, the undersigned will also endeavor to email these documents to all parties (or their attorneys, as appropriate). Finally, because such injunctive relief would simply hold the status quo, no bond should be required.

## IV. Conclusion

For the forgoing reasons, WVMI respectfully requests that this Court:

a. Issue a temporary restraining order prohibiting KEPRO and APS from engaging in any acts in violation of West Virginia Code 5A-3-31, including the recruiting of WVMI's current employees;

b. Issue a temporary restraining order prohibiting KEPRO and APS from breaching the LOA, including the implied duty to refrain from hindering WVMI's performance, by recruiting any current WVMI employees and taking away work assigned to WVMI under the LOA;

c. Issue a temporary restraining order maintaining the status quo with WVMI performing its obligations pursuant to the LOA throughout the duration of the Contract, including any extensions, and prohibiting KEPRO and APS from moving any utilization review or prior authorization services away from WVMI or preventing WVMI from providing its utilization review and prior authorization services;

d. Issue an order requiring KEPRO, APS, Hobbs, and Taylor to immediately return all of WVMI's information, documents, and data and to destroy all copies from their computers and other data systems; and

18

e.   Set a hearing for consideration of WVMI's Motion for Preliminary Injunction as

soon as practicable, but within ten (10) days, pursuant to Rule 65(b) of the West

Virginia Rules of Civil Procedure.


Respectfully submitted,

West Virginia Medical Institute, Inc.,

*By counsel,*

Carte P. Goodwin (W. Va. Bar 8039)
James A. Kirby, III (W. Va. Bar 8564)
Lucas R. White (W. Va. Bar 12501)
GOODWIN & GOODWIN, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
(304) 346-7000

19



IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

WEST VIRGINIA MEDICAL INSTITUTE, INC.,

    Plaintiff,

v.                                   Civil Action No.: _____

INNOVATIVE RESOURCE GROUP, LLC
d/b/a APS HEALTHCARE MIDWEST, a
Wisconsin Limited Liability Company,
KEPRO ACQUISITIONS, INC., a Pennsylvania
Corporation, WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,
PURCHASING DIVISION, a West Virginia
Agency, WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
a West Virginia Agency,

    Defendants.

## CERTIFICATE OF SERVICE

    I, Carte P. Goodwin, certify that, on September 4, 2015, a true and exact copy of the foregoing **Plaintiff West Virginia Medical Institute, Inc.'s Motion for Preliminary Injunction and Temporary Restraining Order** was directed to be served with the Complaint and Summons upon the following:

Innovative Resource Group, LLC
c/o Corporation Service Company
209 West Washington Street
Charleston, WV 25301
*via Secretary of State*

KEPRO
777 East Park Drive
Harrisburg, PA 17111
*via Secretary of State*

David Tincher, Director
West Virginia Department of Administration, Purchasing Division
2019 Washington Street, East
Charleston, WV 25305
*via certified mail, return receipt requested*

Karen Bowling
West Virginia Department of Health and Human Resources
One Davis Square
Suite 100 East
Charleston, WV 25301
*via certified mail, return receipt requested*

Angela Hobbs
713 Coal Fork Drive
Charleston, WV 25306
*via personal service*

Kristyn Taylor
868 S. Washington Street
St. Albans, WV 25177
*via personal service*

Patrick Morrisey
West Virginia Attorney General
State Capitol Complex
Bldg. 1, Room E-26
Charleston, WV 25305
*via certified mail, return receipt requested*

Carte P. Goodwin

21